IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| K.N., a minor, and JENNIFER NGATUVAI, individually and on behalf of K.N., <br><br> Plaintiffs, <br> v. <br><br> LIFE TIME FITNESS, INC., a foreign corporation, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER** <br><br> Case No. 2:16-cv-39 <br><br> District Judge Jill N. Parrish |

Before the court is Life Time Fitness, Inc.'s Motion for Partial Summary Judgment Re: Claims of Jennifer Ngatuvai (ECF No. 67). For the reasons below, the court grants the motion as to Ms. Ngatuvai's claim for intentional infliction of emotional distress and stays the remainder of the motion. The court will issue a separate order certifying questions to the Utah Supreme Court.

### I. BACKGROUND

Jennifer Ngatuvai is K.N.'s mother, and they both reside in Utah. In July 2016, Ms. Ngatuvai became a member of Life Time Fitness, a fitness center in South Jordan, Utah. When she joined the fitness center, Ms. Ngatuvai signed a Member Usage Agreement, which included an Assumption of Risk and Waiver of Liability provision.

On August 18, 2014, Ms. Ngatuvai left her three-and-a-half-year-old daughter, K.N., in Life Time's child center while Ms. Ngatuvai participated in a water aerobics class in Life Time's pool. After about ninety minutes, Ms. Ngatuvai returned to the child center to fetch her daughter. But K.N. was not easy to find. After some searching, Ms. Ngatuvai eventually found her daughter in the boys' bathroom, naked from the waist down.

Understandably, Ms. Ngatuvai was angry. Life Time's policy is that boys use the boys' bathroom and girls use the girls' bathroom. Ms. Ngatuvai spoke with Life Time child center employees at the front desk and then ventured to the child center manager's office, where she spoke with Sarah Johnson Carroll. After Ms. Ngatuvai informed Ms. Carroll that she had found her daughter partially undressed in the boys' bathroom, Ms. Carroll left her office and went to the child center to investigate. At that point, K.N. told her mother that "the boys licked her."

Ms. Ngatuvai then left the child center to report the incident to Life Time's general manager, Steve Cutler, in his office. After speaking with Mr. Cutler, Ms. Ngatuvai and her daughter left Life Time to shop at Sam's Club before returning home. Over the next half hour after leaving Life Time, Ms. Ngatuvai questioned her daughter to obtain more information, including clarification regarding whether there had been one or two boys in the bathroom with her.

Following the incident at Life Time, Ms. Ngatuvai attended seven appointments for counseling with Tammy Ishimatsu, who is a licensed clinical social worker. Ms. Ishimatsu noted that Ms. Ngatuvai had suffered a secondary trauma and met some of the criteria for PTSD, but she was unsure whether Ms. Ngatuvai met the full criteria. Still, Ms. Ishimatsu did diagnose Ms. Ngatuvai with moderate depression and recommended a course of treatment. However, Ms. Ngatuvai did not complete that course of treatment because she "didn't love" the counselor.

On December 24, 2015, Ms. Ngatuvai filed suit against Life Time in state court. The case was removed to this court on the basis of diversity jurisdiction in January 2016. Ms. Ngatuvai alleges that her daughter was sexually assaulted at Life Time, and she brings claims on behalf of her daughter and on her own behalf, including claims for negligent infliction of emotional distress and intentional infliction of emotional distress.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is genuine only if "a reasonable jury could find in favor of the nonmoving party on the issue." *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712 (10th Cir. 2014). "In making this determination, 'we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.'" *Id.* at 712–13 (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000)).

A movant is not required to provide evidence negating an opponent's claim. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1521 (10th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Rather, the nonmoving party has the burden of "present[ing] affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)). "[A] party opposing a motion for summary judgment may not rest on mere allegations or denials to demonstrate there is a genuine issue of material fact for trial." *Sammons v. Allenbrand*, 817 F. Supp. 94, 95 (D. Kan. 1993) (quoting *Liberty Lobby*, 477 U.S. at 256). Rather, "[a] party asserting that a fact is . . . genuinely disputed must support the assertion by citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). *See also* DUCivR 56-1.

## III. DISCUSSION

Life Time urges the court to grant summary judgment in its favor on Ms. Ngatuvai's claims for negligent infliction of emotional distress and intentional infliction of emotional distress. The court first addresses her claim for intentional infliction of emotional distress. Then it turns to her claim for negligent infliction of emotional distress. Finally, the court examines the preinjury release Ms. Ngatuvai signed upon joining Life Time.

A. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Utah recognizes claims for the tort of intentional infliction of emotional distress. To properly state a claim for the tort,

> [a] plaintiff must plead facts that demonstrate that the defendant intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would have known that such would result; *and* his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.

*Oman v. Davis School Dist.*, 194 P.3d 956, 969 (Utah 2008). Life Time argues that it cannot be liable for intentional infliction of emotional distress because "Jennifer Ngatuvai has failed to set forth any evidence to demonstrate that Life Time intentionally caused her harm." ECF No. 67 at 15.

Ms. Ngatuvai does not respond to Life Time's argument. Consequently, she fails to meet her burden to "present affirmative evidence in order to defeat" Life Time's properly supported motion for summary judgment on intentional infliction of emotional distress. *See Campbell*, 962 F.2d at 1521. At oral argument, counsel for Ms. Ngatuvai suggested that Life Time's actions taken after Ms. Ngatuvai discovered her daughter in the boys' bathroom constituted an intentional tort. But Ms. Ngatuvai's complaint makes no reference to any Life Time actions taken after Ms. Ngatuvai found her daughter. Therefore, summary judgment in favor of Life Time on Ms. Ngatuvai's claim for intentional infliction of emotional distress is appropriate.

B. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

In 1988, the Utah Supreme Court recognized a cause of action for negligent infliction of emotional distress and established guidelines limiting the availability of recovery. *See Johnson v. Rogers*, 763 P.2d 771 (Utah 1998). In *Johnson*, a majority of the court agreed that the test for determining liability would be as set forth in § 313 of the Second Restatement of Torts and as

explained in the accompanying comments. *See id.* at 785 (Zimmerman, J., joined by three other justices, concurring in part).

The Restatement reads:

(1) If the actor unintentionally causes emotional distress to another, he is subject to liability to the other for resulting illness or bodily harm if the actor
    (a) should have realized that his conduct involved an unreasonable risk of causing the distress, otherwise than by knowledge of the harm or peril of a third person, and
    (b) from facts known to him should have realized that the distress, if it were caused, might result in illness or bodily harm.
(2) The rule stated in Subsection (1) has no application to illness or bodily harm of another which is caused by emotional distress arising solely from harm or peril to a third person, *unless the negligence of the actor has otherwise created an unreasonable risk of bodily harm to the other.*

Restatement (Second) of Torts § 313 (1965) (emphasis added). Under § 313(2), Ms. Ngatuvai cannot recover for injury caused by emotional distress arising solely from harm to her daughter unless Life Time's negligence created an unreasonable risk of bodily harm to Ms. Ngatuvai. Courts frequently call this requirement the "zone of danger" test.

**1. Zone of Danger**

Clearly, Ms. Ngatuvai was not in the zone of danger during the alleged assault on her daughter. She was participating in an aerobics class in the pool while her daughter was in the child care center. *Cf. Hansen v. Sea Ray Boats*, 830 P.2d 236, 237 (Utah 1991) ("a plaintiff may only recover for trauma caused by witnessing injury to a relative if the plaintiff is also within the zone of danger"); Restatement (Second) of Torts § 313, cmt. d ("[W]here the actor negligently runs down and kills a child in the street, and its mother, in the immediate vicinity, witnesses the event and suffers severe emotional distress resulting in a heart attack or other bodily harm to her, she cannot recover for such bodily harm unless she was herself in the path of the vehicle, or was in some other manner threatened with bodily harm to herself otherwise than through the emotional distress at the peril to her child."). Because Ms. Ngatuvai was not in the zone of

5

danger during the alleged assault, she cannot recover under the principles enunciated in the Second Restatement.

However, the Utah Supreme Court most recently visited the "zone of danger" analysis in 1999 when it decided *Straub v. Fisher & Paykel Health Care*, 990 P.2d 384 (Utah 1999). In that case, the court considered an approach taken by the Supreme Court of California in *Dillon v. Legg*, 441 P.2d 912, 914 (1968). In *Dillon*, the California Supreme Court expanded the "zone of danger" analysis and began permitting recovery for emotional distress when three conditions are present: (1) the plaintiff is located near the scene of the accident; (2) the emotional shock results from "the sensory and contemporaneous observance of the accident"; and (3) the plaintiff and victim are closely related. *Id.* at 920–21. But the Utah Supreme Court rejected the *Dillon* approach, as it had done seven years before in *Hansen v. Sea Ray Boats, Inc.*, 830 P.2d 236 (Utah 1992). The court reiterated that "vicarious recovery by a *Dillon* bystander is 'too attenuated from the principle of duty to allow for reasonable limitations on recovery.'" *Straub*, 990 P.2d at 388 (quoting *Hansen*, 830 P.2d at 242).

Nearly twenty years have passed since the court's decision in *Straub*. And in the intervening time, the Third Restatement of Torts has adopted a modified version of the *Dillon* approach:

> An actor who negligently causes sudden serious bodily injury to a third person is subject to liability for serious emotional harm caused thereby to a person who:
> (a) perceives the event contemporaneously, and
> (b) is a close family member of the person suffering the bodily injury.

Restatement (Third) of Torts § 48 (2012). The authors of the Restatement note that, "[i]ncluding California, 29 American jurisdictions now follow *Dillon* or a modified version of the *Dillon* approach." *Id.*, cmt. a; *see also Mattingly v. Sheldon Jackson Coll.*, 743 P.2d 356 (Alaska 1987); *Dillon v. Legg*, 441 P.2d 912 (Cal. 1968); *Clohessy v. Bachelor*, 675 A.2d 852 (Conn. 1996); *Zell*

6

*v. Meek*, 665 So. 2d 1048 (Fla. 1995); *Leong v. Takasaki*, 520 P.2d 758 (Haw. 1974); *Groves v. Taylor*, 729 N.E.2d 569 (Ind. 2000); *Barnhill v. Davis*, 300 N.W.2d 104 (Iowa 1981); *Lejeune v. Rayne Branch Hosp.*, 556 So. 2d 559 (La. 1990); *Culbert v. Sampson's Supermarkets, Inc.*, 444 A.2d 433 (Me. 1982); *Dziokonski v. Babineau*, 380 N.E.2d 1295 (Mass. 1978); *Toms v. McConnell*, 207 N.W.2d 140 (Mich. Ct. App. 1973); *Entex, Inc. v. McGuire*, 414 So. 2d 437 (Miss. 1982); *Versland v. Caron Transp.*, 671 P.2d 583 (Mont. 1983); *James v. Lieb*, 375 N.W.2d 109 (Neb. 1985); *Grotts v. Zahner*, 989 P.2d 415 (Nev. 1999); *Corso v. Merrill*, 406 A.2d 300 (N.H. 1979); *Portee v. Jaffee*, 417 A.2d 521 (N.J. 1980); *Folz v. State*, 797 P.2d 246 (N.M. 1990); *Johnson v. Ruark Obstetrics & Gynecology Assocs., P.A.*, 395 S.E.2d 85 (N.C. 1990); *Paugh v. Hanks*, 451 N.E.2d 759 (Ohio 1983); *Sinn v. Burd*, 404 A.2d 672 (Pa. 1979); *D'Ambra v. United States*, 338 A.2d 524 (R.I. 1975); *Kinard v. Augusta Sash & Door Co.*, 336 S.E.2d 465 (S.C. 1985); *Ramsey v. Beavers*, 931 S.W.2d 527 (Tenn. 1996); *Freeman v. City of Pasadena*, 744 S.W.2d 923 (Tex. 1988); *Gain v. Carroll Mill Co.*, 787 P.2d 553 (Wash. 1990); *Heldreth v. Marrs*, 425 S.E.2d 157 (W. Va. 1992); *Bowen v. Lumbermens Mut. Cas. Co.*, 517 N.W.2d 432 (Wis. 1994); *Gates v. Richardson*, 719 P.2d 193 (Wyo. 1986).

The Third Restatement also provides for recovery for emotional harm even absent bodily injury or the risk thereof:

> An actor whose negligent conduct causes serious emotional harm to another is subject to liability to the other if the conduct:
> (a) places the other in danger of immediate bodily harm and the emotional harm results from the danger; or
> (b) occurs in the course of specified categories of activities, undertakings, or relationships in which negligent conduct is especially likely to cause serious emotional harm.

Restatement (Third) of Torts § 47 (2012). Under § 47(b), recovery is appropriate for harm caused by conduct occurring in the course of certain relationships and activities, even absent the

7

danger of bodily harm or contemporaneous perception. For example, "courts have imposed liability on hospitals and funeral homes for negligently mishandling a corpse and on telegraph companies for negligently mistranscribing or misdirecting a telegram that informs the recipient, erroneously, about the death of a loved one." *Id.* cmt. b. And "[r]ecovery may be available under Subsection (b) regardless of whether the claim would also satisfy § 48." *Id.* cmt. a.

Ms. Ngatuvai urges the court to apply the principles of §47 of the Third Restatement. She argues compellingly that child care is one of those categories of undertakings in which negligent conduct is especially likely to cause serious emotional harm. But a federal court sitting in diversity must apply the law of the forum state. *Wood v. Eli Lilly & Co.*, 38 F.3d 510, 512 (10th Cir. 1994). Therefore, this court must ascertain and apply Utah law "with the objective that the result obtained in the federal court should be the result that would be reached in a [Utah] court." *Id.* Utah law is clear: § 313 of the Second Restatement applies, and Ms. Ngatuvai cannot recover for negligent infliction of emotional distress because she was not within the zone of danger.

In the alternative, Ms. Ngatuvai requests certification to the Utah Supreme Court of this question: Would the Utah Supreme Court adopt the Restatement (Third) of Torts § 47?[1] This argument is more compelling. Section 47(b) may entitle Ms. Ngatuvai to recovery because negligence in child care is especially likely to cause serious and foreseeable emotional harm to parents.

---

[1] Notably, Ms. Ngatuvai does not argue that she could recover under § 48 of the Third Restatement. The court agrees with that assessment. Although Ms. Ngatuvai argues that she perceived the alleged injury to her daughter contemporaneously, as required by that section, her argument does not comport with the principles of the Third Restatement. The illustrations to § 48 cmt. e make clear that seeing the injury or hearing the injury as it occurred would entitle her to recovery for emotional injury. However, arriving on the scene afterward and then viewing the injuries to her daughter, even if she were to later view the alleged assault on video, would not entitle her to recovery. Here, Ms. Ngatuvai did not perceive injury to her daughter contemporaneously.

It has been eighteen years since the Utah Supreme Court last considered the bounds of claims for negligent infliction of emotional distress. And Utah common law currently rests on an application of the 1965 Restatement inconsistent with the approach taken by the 2012 Restatement. Furthermore, certification from this court is Ms. Ngatuvai's only opportunity to make her argument before a Utah appellate court. If her claim had proceeded in state court, where it was originally filed, she would have had the right to appeal a final order or judgment denying recovery for her claims and argue for a change in the law. *See* Utah R. App. P. 3(a). For these reasons, and because the question is a controlling issue of law that no Utah Supreme Court opinion has addressed with the benefit of the Third Restatement, certification is appropriate.

2. **Severe Emotional Distress**

In Utah, claims for negligent infliction of emotional distress also require that the plaintiff suffer emotional distress. That distress must be "so severe as to constitute mental illness" or as to cause the plaintiff to "suffer[ ] physical symptoms as a result of their distress." *Harnicher v. Univ. of Utah Medical Ctr.*, 962 P.2d 67, 70 (Utah 1998).

The Utah Supreme Court has "emphasized that the emotional distress suffered must . . . be such that a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Id.* (citations and alterations omitted). Applying the principles of § 313 of the Second Restatement, the Utah Supreme Court noted that "the rule stated in this Section does not give protection to mental and emotional tranquility in itself." *Id.* (quoting Restatement (Second) of Torts § 313 cmt. a (1965)). Furthermore, "in contrast to the section 312 rule for intentional creation of emotional distress, 'one who unintentionally but negligently subjects another to such emotional distress does not take the risk of any exceptional physical sensitiveness to emotion which the other may have unless the circumstances known to the actor should apprise him of it.'" *Id.* (quoting Restatement

9

(Second) of Torts § 313 cmt. c (1965)). Furthermore, the Utah Supreme Court has indicated that "headaches, depression, and insomnia are only transitory physical phenomena and are not the type of physical injury that would sustain the [negligent infliction of emotional distress] action." *Hansen v. Mtn. Fuel Supply Co.*, 858 P.2d 970, 975 (Utah 1993) (citing *Burns v. Jaquays Mining Corp.*, 752 P.2d 28, 32 (Ariz. Ct. App. 1988)).

Here, Ms. Ngatuvai was diagnosed with moderate depression, and she testified that she experienced, at various times, feelings of helplessness, anxiety, worry, grief, suicidal thoughts, uncontrollable crying, and nightmares. Life Time argues that Ms. Ngatuvai's physical and mental symptoms are insufficient to demonstrate that she suffered severe emotional distress because of her daughter's alleged assault. But the court does not find this argument persuasive. Emotional distress is "an intangible damage and an issue of fact within the province of the factfinder." *F.D.I.C. v. Hulsey*, 22 F.3d 1472, 1489 (10th Cir. 1994). Here, a reasonable juror could find, based on the evidence, that Ms. Ngatuvai suffered severe emotional distress that resulted in illness or bodily harm. Therefore, summary judgment in Life Time's favor is inappropriate on the sufficiency of Ms. Ngatuvai's emotional distress.

Additionally, § 47(b) of the Third Restatement, if adopted by the Utah Supreme Court, would provide recovery even "when the actor's negligent conduct creates a risk of causing only emotional harm to the person seeking recovery." Restatement (Third) of Torts § 47(b) cmt. a (2012). Therefore, if the Utah Supreme Court adopts § 47 of the Third Restatement or some formulation of the rule articulated therein, it may also permit recovery for solely emotional harm in this and similar cases.

## C. WAIVER

Utah has "joined the majority of jurisdictions in permitting people to surrender their rights to recover in tort for the negligence of others." *Rothstein v. Snowbird Corp.*, 175 P.3d 560,

562 (Utah 2007). However, "preinjury releases are not unlimited in power and can be invalidated in certain circumstances." *Pearce v. Utah Athletic Found.*, 179 P.3d 760, 765 (Utah 2008) (Parrish, J.), *abrogated in part by Penunuri v. Sundance Partners, Ltd.*, 2017 WL 3697701 (Utah 2017). The Utah Supreme Court has noted that at least three circumstances would render a preinjury release unenforceable: (1) the release offends public policy; (2) the release is for activities that fit within the public interest exception; and (3) the release is unclear or ambiguous. *Id.*[2]

The release Ms. Ngatuvai signed reads in full:

> I understand that there is an inherent risk of injury, whether caused by me or someone else, in the use of or presence at a Life Time Fitness center, the use of equipment and services at a Life Time Fitness center, and participation in Life Time Fitness' programs. This risk includes, but is not limited to:
> 1) Injuries arising from the use of any of Life Time Fitness' centers or equipment, including any accidental or "slip and fall" injuries;
> 2) Injuries arising from participation in supervised or unsupervised activities and programs within a Life Time Fitness center or outside a Life Time Fitness center, to the extent sponsored or endorsed by Life Time Fitness;
> 3) Injuries or medical disorders resulting from exercise at a Life Time Fitness center, including, but not limited to heart attacks, strokes, heart stress, sprains, broken bones and torn muscles or ligaments; and
> 4) Injuries resulting from the actions taken or decisions made regarding medical or survival procedures.
> 
> I understand and voluntarily accept this risk. I agree to specifically assume all risk of injury, whether physical or mental, as well as all risk of loss, theft or damage of personal property to me, any person that is a part of this membership and any guest under this membership while such persons are using or present at any Life Time Fitness center, using any lockers, equipment, or services at any Life Time Fitness center. I waive any and all claims or actions that may arise against Life Time Fitness, Inc., its affiliates, subsidiaries, successors or assigns (collectively, "Life Time Fitness") as well as each party's owners, directors, employees or volunteers as a result of any such injury, loss, theft or damage to any such person, including and without limitation, personal, bodily or mental injury, economic loss or any damage to me, my spouse, my children, or guests resulting from the negligence of Life Time Fitness or anyone else using a Life Time Fitness center. If there is any claim by anyone based on any injury, loss,

---

[2] Ms. Ngatuvai also argues that Utah law prohibits waivers from applying to injury caused by gross or wanton negligence. But she does not bring a claim for gross negligence.

> theft or damages that involves me, any person that is a part of my membership, or any guest under this membership, I agree to defend Life Time Fitness against such claims and pay Life Time Fitness for all expenses relating to the claim, and indemnify Life Time Fitness for all obligations resulting from such claims.

Member Usage Agreement, ECF No. 67-2 at 1. The court's review of the preinjury release reveals that the release does not offend public policy, and it is not ambiguous. However, the particular nature of the services provided by Life Time renders the question of whether the release is invalid under the public interest exception appropriate for certification.

### 1. The Preinjury Release is Not Contrary to Public Policy

Preinjury releases must be compatible with public policy. *Pearce*, 179 P.3d at 765. In 2001, the court "relied on public policy gleaned from Utah law in holding that a preinjury release signed by a parent is not enforceable against a minor child." *Id.* And in 2007, the court "relied on the legislature's statement of public policy in Utah's Inherent Risks of Skiing Act to conclude that a ski resort cannot enforce a preinjury release against a skier whose injuries may have resulted from the negligence of the ski resort." *Id.* But in *Pearce*, the plaintiff did not present, and the court did not find, "a public policy that would render unenforceable a preinjury release between a public bobsled ride operator and an adult bobsled rider." *Id.*

As in *Pearce*, Ms. Ngatuvai has not presented, and this court has not found, a public policy that would render her preinjury release unenforceable.[3] Ms. Ngatuvai argues that "[i]t is clearly the public policy of Utah to do everything it can to prevent child abuse." ECF No. 100 at 29. Life Time agrees that "the prevention of child sexual abuse is an important public policy in the State of Utah." ECF No. 93 at 21. But the preinjury release Ms. Ngatuvai signed does not relieve Life Time of its obligation to exercise due care in the operation of its child center; it does

---

[3] Indeed, she admits that "[t]here is no statute or case law in Utah that expressly states that the Waiver at issue violates public policy." ECF No. 100 at 29.

12

not prevent Ms. Ngatuvai from pursuing a cause of action for negligence on behalf of her daughter. Instead, it precludes Ms. Ngatuvai from asserting her own claims. Consequently, the preinjury release is not contrary to public policy.

### 2. The Preinjury Release is Not Ambiguous

Preinjury releases must also be "communicated in a clear and unequivocal manner." *Pearce*, 179 P.3d at 767 (citation omitted). However,

> [t]o be effective, a release need not achieve perfection; only on Draftsman's Olympus is it feasible to combine the elegance of a trust indenture with the brevity of a stop sign. . . . It suffices that a release be clear, unambiguous, and explicit, and that it express an agreement not to hold the released party liable for negligence.

*Id.* (quoting *Nat'l & Int'l Bhd. of St. Racers, Inc. v. Superior Court*, 264 Cal. Rptr. 44, 47 (Ct. App. 1989)).

In *Pearce*, the court held that a 111-word sentence containing "some 'legalese'" was not unclear or equivocal because it "release[d] [the defendant] from any claim 'whether caused by the negligence of [the defendant] or otherwise." *Id.* Likewise here, Ms. Ngatuvai waived "any and all claims or actions that may arise against Life Time Fitness . . . as a result of any such injury, loss, theft or damage to any such person, including and without limitation, personal, bodily or mental injury . . . to me, my spouse, my children, or guests resulting from the negligence of Life Time Fitness." Member Usage Agreement, ECF No. 67-2 at 1. The language of Ms. Ngatuvai's waiver is broad, to be sure. But it is not unclear or equivocal. In no uncertain terms, Ms. Ngatuvai waived her right to all claims arising from Life Time's negligence, even those that result in bodily or mental injury to her children.[4]

---

[4] The same page of the Member Usage Agreement lists rules and regulations by which members must abide. One of those regulations concerns child centers. The Member Usage Agreement requires that "[n]o person between the ages of 3 months and 11 years is allowed into any area other than a Life Time Fitness child center except during designated family hours." Member

13

### 3. The Court will Certify the Question of Whether the Preinjury Release is Invalid Under the Public Interest Exception

"[A] preinjury release may be invalidated if it attempts to limit liability for activities in which there is a strong public interest." *Pearce*, 179 P.3d at 765. In determining whether a strong public interest in an activity would render an exculpatory provision invalid under the public interest exception, the Utah Supreme Court adopted the standard set out in *Tunkl v. Regents of the University of California*, 383 P.2d 441, 445–46 (Cal. 1963). *See Berry v. Greater Park City Co.*, 171 P.3d 442 (Utah 2007), *abrogated on other grounds by Penunuri v. Sundance Partners, Ltd.*, 2017 WL 3697701 (Utah 2017). *Tunkl* established six guidelines for evaluating whether a release should be invalidated under the public interest exception:

> [1] [The transaction] concerns a business of a type generally thought suitable for public regulation. [2]The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In

---

Usage Agreement, ECF No. 67-2 at 1. And during family hours, those children must be "accompanied by a parent or legal guardian at all times." *Id.* From reading the Member Usage Agreement, Ms. Ngatuvai would have known that she was waiving all her claims arising out of injuries to her children, and that her children were only permitted in Life Time's child care center or under her personal supervision during family hours. Tragically, sexual abuse is all too common—even at licensed daycare centers. A reasonable person would understand that waiving "all claims" arising out of injury to her children at a child care center would necessarily include waiving claims arising out of sexual abuse.

The court is sympathetic to Ms. Ngatuvai's argument on this point. If the language of the Member Usage Agreement had read, "your child is at risk of sexual abuse at our child care center, and you agree to waive all claims arising out of such sexual abuse," perhaps Ms. Ngatuvai would not have signed the agreement. But the agreement contemplated "all claims" arising out of "personal, bodily, or mental injury" to her children. Limiting the clear language of that agreement based on whether Ms. Ngatuvai was able to imagine that it might impact her claims arising out of sexual abuse would set an unworkable precedent that would ultimately require contracting parties to list, over hundreds of pages, each conceivable claim that a party might wave.

14

exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Tunkl*, 383 P.3d at 445–46.

Although Utah adopted the *Tunkl* guidelines in 2007, the Utah Supreme Court has only actually applied the guidelines once, in *Berry*, the decision adopting them.[5] 171 P.3d at 447–48. That case concerned whether the public interest would permit a skier to release an organizer from injuries suffered during a race as a result of the organizer's negligence. But the court's analysis in *Berry*, which involved an injury Mr. Berry sustained while competing in a ski race at Park City Mountain Resort, provides little guidance in the instant case, as we shall see.

   a. Tunkl *Factor 1: Whether the transaction concerns a business of a type generally thought suitable for public regulation*

In Utah, gyms and childcare centers are both subject to public regulation—gyms under the Health Spa Services Protection Act, Utah Code Ann. § 13-23-1 *et seq.*, and childcare centers under the Utah Child Care Licensing Act, Utah Code Ann. § 26-39-1 *et seq.*[6] Consequently, the first factor weighs in favor of applying the public interest exception.

---

[5] The court cited the *Tunkl* guidelines in *Pearce* and in *Broderick v. Apartment Management Consultants, L.L.C.*, 279 P.3d 391, 392 (Utah 2012). But in *Pearce*, the court reached its holding without applying the guidelines, and in Broderick, the court reached its holding without consideration of the merits because the defendant had failed to brief the *Tunkl* guidelines adequately.

[6] Life Time argues that "Utah law specifically exempts [its childcare facility] from state regulation." ECF No. 93 at 21. Indeed, the Utah Child Care Licensing Act appears to exclude Life Time's childcare facilities from licensing and certification requirements. *See* Utah Code Ann.§ 26-39-403(2)(f). But the act does not exclude Life Time's childcare facilities from other requirements. *Cf.* Utah Code Ann. § 26-39-403(1) (listing care programs to which none of the provisions or requirements of the act apply).

15

b. Tunkl *Factor 2: Whether the party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public*

Whether Life Time performs a service of great importance to the public is unclear because of the dual nature of Life Time's services. On one hand, while sufficient physical exercise is essential to a healthy, happy population, a gym membership is not necessary to exercise. On the other hand, childcare services are of great importance to the public, and necessary for at least some people. In considering the second *Tunkl* factor, should the court consider these services independently or as an aggregate whole? *Berry* provides no guidance, so it is unclear whether the second factor weighs in favor of applying the public interest exception.

c. Tunkl *Factor 3: Whether the party holds itself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards*

The record suggests that Life Time accepts applications for membership from adults from all walks of life, so long as they agree to pay and abide by certain terms and conditions. Thus, the third *Tunkl* factor weighs in favor of applying the public interest exception.

d. Tunkl *Factor 4: Whether, as a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks its services.*

Anyone who has applied for (or attempted to extricate themselves from) a gym membership knows that gyms possess a decisive advantage of bargaining strength over their potential members. But the fourth *Tunkl* factor depends upon the essential nature of the service. As the court noted above, an exercise gym does not perform an essential service. But a childcare center does. For the same reason articulated in the second factor, it is unclear whether the fourth factor weighs in favor of applying the public interest exception.

e. Tunkl *Factor 5: Whether, in exercising a superior bargaining power, the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision*

*whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.*

The record suggests that Life Time presented its potential members with a standardized adhesion contract of exculpation and that there was no means by which a member could pay an additional fee to obtain protection against negligence. Consequently, the fifth factor weighs in favor of applying the public interest exception.

f. Tunkl *Factor 6: Whether, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.*

Applying the final factor to the facts of this case proves particularly difficult. A gym membership does not place the member or his or her property under the control of the gym. And Ms. Ngatuvai's contract did not require her to use Life Time's childcare center. But because of the transaction, Ms. Ngatuvai had the right to (and did) take advantage of Life Time's childcare facilities, placing her daughter—the most precious of her belongings—under Life Time's control.

*Berry* provides limited guidance. There, the court held that Mr. Berry was not necessarily under the resort's control. In fact, the resort was capable of exercising only "a negligible degree of control over the manner in which Mr. Berry traversed the racecourse or whether he elected to complete the course at all after inspecting its features." 171 P.3d at 448. Here, Life Time had significant control over the manner in which Ms. Ngatuvai used the childcare center. But she could have elected not to use the childcare center at all, after inspecting it.

Ms. Ngatuvai placed her daughter in Life Time's control, subject to the risk of carelessness by the gym or its agents. But was K.N. placed in Life Time's control as a result of the transaction, or as a result of Ms. Ngatuvai's decision to use the childcare center? With only

17

*Berry* for guidance, the answer is unclear. Thus, whether the sixth factor weighs in favor of applying the public interest exception is unclear.

In sum, three of the *Tunkl* factors weigh in favor of applying the public interest exception. But the three remaining factors are unclear. The enforceability of Ms. Ngatuvai's preinjury release is a controlling issue of law in this action, but this court cannot predict how the Utah Supreme Court would rule on the issue. Furthermore, deciding the enforceability of such a waiver will doubtless have a tremendous impact on numerous Utah businesses with child care centers and their patrons. Consequently, this issue is also appropriate for certification to the Utah Supreme Court.

## IV.   ORDER

For the reasons stated above, the court orders as follows:

1. Life Time's motion for summary judgment is **GRANTED** as to Ms. Ngatuvai's claim for intentional infliction of emotional distress.
2. In all other respects, Life Time's motion for summary judgment is **STAYED** pending certification of controlling questions of law to the Utah Supreme Court.
3. The court will issue a separate order certifying questions to the Utah Supreme Court.
4. The parties are **ORDERED** to meet, confer, and file with the court a set of stipulated facts and questions of law to assist the court in drafting its certification order. The stipulated facts and questions shall be filed with the court on or before Friday, April 6, 2018.

Signed March 23, 2018

                          BY THE COURT

                          _____

                          Jill N. Parrish
                          United States District Court Judge