# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| K.N., a minor, and JENNIFER NGATUVAI, individually and on behalf of K.N., <br><br> Plaintiffs, <br> v. <br><br> LIFE TIME FITNESS, INC., a foreign corporation, <br><br> Defendant. | **MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND REQUEST FOR CERTIFICATION** <br><br> Case No. 2:16-cv-39 <br><br> District Judge Jill N. Parrish |

On March 23, 2018, the court issued a Memorandum Decision and Order (ECF No. 104) granting in part defendant Life Time Fitness's Motion for Partial Summary Judgment (ECF No. 67). The court granted summary judgment in favor of Life Time on plaintiff Jennifer Ngatuvai's claim for intentional infliction of emotional distress. However, it stayed the remainder of the motion pending certification of certain questions to the Utah Supreme Court.

Before this court issued the order certifying those questions, the Utah Supreme Court issued an opinion in *Mower v. Baird*, 422 P.3d 837 (Utah 2018). The court's opinion in *Mower* directly addresses the primary question this court had identified for certification. Consequently, this court invited the parties to submit supplemental briefing applying the standard enunciated in *Mower* to Ms. Ngatuvai's claim for negligent infliction of emotional distress, and to further address the propriety of certifying the other previously identified issue. Now, after carefully reviewing *Mower* and the parties' supplemental briefing, the court concludes that certification is no longer necessary, and denies Life Time's Motion for Partial Summary Judgment as it relates to Ms. Ngatuvai's negligent infliction of emotional distress claim.

# I.    UNDISPUTED FACTS

Jennifer Ngatuvai is K.N.'s mother. In July 2016, Ms. Ngatuvai became a member of Life Time Fitness, a fitness center in South Jordan, Utah. When she joined the fitness center, Ms. Ngatuvai signed a Member Usage Agreement, which included an Assumption of Risk and Waiver of Liability provision.

On August 18, 2014, Ms. Ngatuvai left K.N. (then three-and-a-half years old) in Life Time's child center while Ms. Ngatuvai participated in a water aerobics class in Life Time's pool. After about ninety minutes, Ms. Ngatuvai returned to the child center to retrieve her daughter. But K.N. was not easy to find. After some searching, Ms. Ngatuvai eventually found her daughter in the boys' bathroom, naked from the waist down.

Understandably, Ms. Ngatuvai was angry. Life Time's policy is that boys use the boys' bathroom and girls use the girls' bathroom. Ms. Ngatuvai spoke with Life Time child center employees at the front desk and then ventured to the child center manager's office, where she spoke with Sarah Johnson Carroll. After Ms. Ngatuvai informed Ms. Carroll that she had found her daughter partially undressed in the boys' bathroom, Ms. Carroll left her office and went to the child center to investigate. At that point, K.N. told her mother that "the boys licked her."

Ms. Ngatuvai then left the child center to report the incident to Life Time's general manager, Steve Cutler. After speaking with Mr. Cutler, Ms. Ngatuvai and K.N. left Life Time to do some shopping before returning home. Over the next half hour, Ms. Ngatuvai questioned her daughter to obtain more information, including clarification regarding whether there had been one or two boys in the bathroom with her.

Following the incident at Life Time, Ms. Ngatuvai attended seven appointments for counseling with Tammy Ishimatsu, a licensed clinical social worker. Ms. Ishimatsu noted that Ms. Ngatuvai had suffered a secondary trauma and met some of the criteria for PTSD, but she

was unsure whether Ms. Ngatuvai met the full criteria. Still, Ms. Ishimatsu diagnosed Ms. Ngatuvai with moderate depression and recommended a course of treatment. However, Ms. Ngatuvai did not complete that course of treatment because she "didn't love" the counselor.

On December 24, 2015, Ms. Ngatuvai filed suit against Life Time in state court. The case was removed to this court on the basis of diversity jurisdiction in January 2016. Ms. Ngatuvai alleges that her daughter was sexually assaulted at Life Time, and she brings claims on behalf of her daughter and on her own behalf, including a claim for negligent infliction of emotional distress.

## II.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is genuine only if "a reasonable jury could find in favor of the nonmoving party on the issue." *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712 (10th Cir. 2014). "In making this determination, 'we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party.'" *Id.* at 712–13 (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000)).

A movant is not required to provide evidence negating an opponent's claim. *Comm. for First Amendment v. Campbell*, 962 F.2d 1517, 1521 (10th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). It is the nonmoving party that has the burden of "present[ing] affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)). "[A] party opposing a motion for summary judgment may not rest on mere allegations or denials to demonstrate there is a genuine issue of material fact for trial." *Sammons v. Allenbrand*, 817 F. Supp. 94, 95 (D. Kan. 1993) (quoting *Liberty Lobby*, 477 U.S. at 256). Rather, "[a] party asserting that a fact

is . . . genuinely disputed must support the assertion by citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1). *See also* DUCivR 56-1.

## III.    DISCUSSION

Life Time urges the court to grant summary judgment in its favor on Ms. Ngatuvai's claim for negligent infliction of emotional distress. It makes three arguments. *First*, Ms. Ngatuvai cannot recover because Life Time did not owe her a traditional duty under *B.R. ex rel. Jeffs v. West*, 275 P.3d 228 (Utah 2012). *Second*, Ms. Ngatuvai cannot recover because Life Time did not owe her a special duty under *Mower*. And *third*, Ms. Ngatuvai cannot recover because she has not provided evidence of severe emotional distress.[1] The court first summarizes the Utah Supreme Court's holding in *Mower*. Then it addresses each of Life Time's arguments.

### A.    THE *MOWER* STANDARD

Utah first recognized a cause of action for negligent infliction of emotional distress in 1988. *See Johnson v. Rogers*, 763 P.2d 771 (Utah 1988). In *Johnson*, a majority of the Utah Supreme Court agreed that the test for determining liability would be as set forth in § 313 of the Second Restatement of Torts and the accompanying comments. *See id.* At 785 (Zimmerman, J., joined by three other justices, concurring in part).

---

[1] Alternatively, Life Time recommends certification of three questions to the Utah Supreme Court: (1) "Whether the limited emotional distress duty articulated in *Mower* . . . exists for omissions, and if so, what is the test in the context of an omission? (2) If Utah recognizes such a duty, whether the evidence presented here is sufficient to support a finding that the plaintiff has suffered severe emotional distress? (3) Whether under Utah law the preinjury release here is valid and enforceable as a preinjury release for recreational activities, and if not, whether the preinjury release is valid and enforceable under the *Tunkl* factors." The question that *Mower* resolved was the primary issue the court identified for certification. In light of its resolution, the impetus for certification, a time-consuming and costly procedure, has largely been removed. Additionally, Life Time's first proposed question is irrelevant because, as explained below, this case features affirmative conduct, not omissions, and its second and third questions essentially ask the Utah Supreme Court to apply existing law to the facts of this case. As a result, the court declines to certify these issues to the Utah Supreme Court.

Section 313 of the Second Restatement requires that an individual seeking recovery for emotional harm caused solely by the harm or peril of a third person must themselves have been subjected to an unreasonable risk of bodily harm. Restatement (Second) of Torts § 313 (Am. Law Inst. 1965). Courts in Utah and elsewhere frequently refer to this requirement as the "zone-of-danger" test. Because Ms. Ngatuvai faced no bodily harm, she cannot satisfy the zone-of-danger requirement under the Second Restatement.

However, in July of this year, the Utah Supreme Court announced in *Mower* that it was "time to expand [Utah's] recovery for negligent infliction of emotional distress in very limited circumstances." *Mower*, 2018 422 P.3d at 856. Specifically, the court held that "there are certain types of relationships, activities, and undertakings that go to the core of another person's emotional well-being and security" and that those engaged in such relationships, activities, or undertakings "have a duty to refrain from causing the other person severe emotional distress." *Id.*

In so holding, the court largely adopted § 47(b) of the Third Restatement of Torts. *See* Restatement (Third) of Torts § 47(b) (Am. Law Inst. 2012). But the court deviated from section 47(b) in two ways: (1) under *Mower*, Utah retains the requirement that plaintiffs show "severe" emotional distress—not "serious" emotional distress, as contemplated by the Third Restatement; and (2) under *Mower*, Utah does not recognize a duty to refrain from causing severe emotional distress "when there wouldn't otherwise be a traditional duty of reasonable care." *Id.*

Under the *Mower* standard, the expanded emotional distress duty analysis entails a two-step consideration: "(1) Does the defendant owe a traditional duty of reasonable care to the plaintiff?; and (2) if so, is the relationship, activity, or undertaking of the type that warrants a special, limited duty to refrain from causing severe emotional distress?" *Id.* Both questions must answered in the affirmative before Utah law imposes a duty. In analyzing the first question, the

court "follows the five-factor test . . . established in *B.R. ex rel. Jeffs v. West*, 2012 UT 11, ¶ 5, 275 P.3d 228." *Id.* The second question requires its own three-prong analysis: "(1) Does the relationship, activity, or undertaking necessarily implicate the plaintiff's emotional well-being?; (2) Is there an especially likely risk that the defendant's negligence in the course of performing obligations pursuant to such relationship, activity, or undertaking will result in severe emotional distress?; and (3) Do general public policy considerations warrant rejecting a limited emotional distress duty where prongs one and two would otherwise find one to exist?" *Id.* at 856–57 (internal citations, quotation marks, and alterations omitted). To satisfy *Mower*'s second question, all three prongs must be satisfied. *Id.* at 857.

## B. APPROPRIATE LEVEL OF CATEGORICAL ANALYSIS

Because both *Mower* questions "must be determined as a matter of law and on a categorical basis for a given class of tort claims[,]" the court must first decide what categorical level of analysis is appropriate. *See id.* at 856 ("This new, limited emotional distress duty analysis should still be completed in the same manner as a traditional duty analysis—on a categorical level."). Life Time suggests that the *Mower* steps should be applied to Life Time as a fitness center, whereas Ms. Ngatuvai urges they should be applied to Life Time as a childcare center.

The court finds Ms. Ngatuvai's position more compelling. A categorical analysis does not, as Life Time seems to suggest, require the court to operationalize the class of defendants at the highest level of abstraction. Indeed, in *Mower*, the categorical level articulated by the Utah Supreme Court was therapists "treating a child for potential sexual abuse" rather than therapists treating a child generally. Life Time provides no reason why its provision of fitness services must trump its provision of child care services, and the court cannot see the logic in treating Life Time's child care operation—the use of which requires an additional fee—any differently than a

6

child care operation not owned by a fitness center. As a result, Life Time's request that the court simply ignore its provision of child care services and instead focus on its status as a fitness center is unconvincing.

Accordingly, the court conducts each of the multi-pronged duty analyses prescribed by *Mower* at the categorical level of a child care provider vis-à-vis the parents of a child under the care of that provider.

## C.  WHETHER LIFE TIME OWED MS. NGATUVAI A TRADITIONAL DUTY

*Mower* step one requires the court to consider whether Life Time owed a traditional duty of reasonable care to Ms. Ngatuvai. As explained above, the *Jeffs* analysis here must be conducted at the categorical level of whether a childcare center owes a duty to the parents of a minor in its care.

*Jeffs* established a five-factor test for determining whether a defendant owes a traditional duty of care to a plaintiff. Those factors are:

> (1) whether the defendant's allegedly tortious conduct consists of an affirmative act or merely an omission; (2) the legal relationship of the parties; (3) the foreseeability or likelihood of injury; (4) public policy as to which party can best bear the loss occasioned by the injury; and (5) other general policy considerations.

275 P.3d at 230 (internal citations and quotation marks omitted). The first two factors are "plus" factors that determine whether a duty would normally exist. *See id*. The last three factors are "minus" factors that may eliminate a duty that would otherwise exist. *See id*.

### 1.  The *Jeffs* "Plus" Factors Establish a Cognizable Duty

#### a. Whether Life Time's allegedly tortious conduct consisted of an affirmative act or an omission

The law of torts has long recognized the distinction between acts and omissions. Indeed, the difference between misfeasance and nonfeasance is critical "and is perhaps the most fundamental factor courts consider when evaluating duty." *Id.* at 231. On one hand, active

misconduct typically carries a duty of care. *See id.* But passive inaction does not, absent some special legal relationship.

Life Time argues that its alleged failure to supervise K.N. is not an act but an omission. The court disagrees. In *Mower*, the Utah Supreme Court explained that nonfeasance is "passive inaction, a failure to take positive steps to benefit others, or to protect them from harm *not created by any wrongful act of the defendant*." 2018 WL 3322749, at *4 (emphasis added). The italicized language is intended to forestall the exact argument Life Time makes here. The animating principle is that a tortfeasor may not affirmatively undertake to perform some service, and then, by *failing* to do so with proper precautions, transform such a failure into an omission that does not implicate a duty. The Utah Supreme Court has made clear that "[a]ctive misfeasance . . . is not confined to situations where an affirmative act directly causes the harm to the plaintiff." *Cope v. Utah Valley State College*, 342 P.3d 243 (Utah 2014) (pointing to the misfeasance of "a surgeon who fails to sterilize instruments, causing an infection").

Here, the harm that befell K.N. is alleged to arise from the wrongful acts of the defendant: inadequate staffing and supervision in the performance of a service that Life Time affirmatively undertook. As such, the alleged conduct is properly framed as misfeasance.

### b. The legal relationship of the parties

The first two duty factors are interrelated. "A special legal relationship between the parties . . . acts as a duty-enhancing, 'plus' factor[,]" which will sometimes even give rise to an otherwise non-existent duty in the omission context. *Jeffs*, 275 P.3d at 231. But "[a] special relationship is not typically required to sustain a duty of care to those who could foreseeably be injured by the defendant's affirmative acts." Here, Life Time's affirmative acts (i.e., the first *Jeffs* factor) are sufficient to create a duty, whether or not there also exists a special legal relationship between a child care provider and the parents of minors in its care.

## 2. The *Jeffs* "Minus" Factors Do Not Militate in Favor of Rejecting a Duty

### a. The foreseeability or likelihood of injury

"In duty analysis, foreseeability does not question 'the specifics of the alleged tortious conduct' such as 'the specific mechanism of the harm.'" *Id.* at 235 (quoting *Normandeau v. Hanson Equip., Inc.*, 215 P.3d 152, 158 (Utah 2009)). "It instead relates to 'the general relationship between the alleged tortfeasor and the victim' and 'the general foreseeability' of harm." *Id.* (quoting *Normandeau*, 215 P.3d at 158).

Life Time does not offer arguments for any of the *Jeffs* "minus" factors, instead resting on its contention that the "plus" factors do not give rise to a duty in the first instance. Ms. Ngatuvai, on the other hand, offers an argument[2] about the foreseeability of "the specifics of the alleged tortious conduct" rather than "the general relationship between the alleged tortfeasor and the victim[,]" the latter being the appropriate analysis under Utah law. *Id.* Despite this, the court has no problem concluding that "there are circumstances within this category in which [child care providers] could foresee injury" to the parents of minors under their care. *See Mower*, 422 P.3d at 845. Thus, this factor does not weigh against the imposition of a duty.

### b. Which party best bears the loss

"[T]his factor considers whether the defendant is best situated to take reasonable precautions to avoid injury." *Jeffs*, 275 P.3d at 236. Only when the "victim or some other third party is in a superior position of knowledge or control to avoid the loss in question" would this factor favor rejecting a duty. *Id.* Due to the nature of child care services—a context in which one's young children are placed entirely under the control of another—only the child care center

---

[2] Specifically, she argues that "it is also clearly foreseeable that a parent who entrusts a child to a childcare facility would suffer severe emotional distress from a sexual assault on their child."

is in a position to take reasonable precautions to avoid harms flowing therefrom. Thus, this factor also does not weigh against finding a traditional duty.

### c. Other policy considerations

This prong empowers courts to identify collateral policy considerations that warrant a wholesale rejection of an otherwise existent duty. Under this prong, a court may conclude that, "for certain categories of cases, defendants may not be held accountable for damages they carelessly cause, no matter how unreasonable their conduct." *Mower*, 422 P.3d at 846 (citation omitted). As with the other "minus" factors, Life Time does not weigh in on this prong, and Ms. Ngatuvai, of course, does not believe any such public policy concerns exist.

The court imagines that child care providers and others might protest that the imposition of a duty vis-à-vis parents of the children under their care would expand liability, in turn leading to greater costs and a concomitant decrease in access to child care. That concern seems especially salient when, as here, the child care services are provided at minimal cost as an adjunct to the primary product. If liability were substantially increased for these types of providers, they might well decide not to offer such a service at all.

But the separate requirements of breach and proximate cause would seem to mitigate any concerns about exponentially increasing liability. Indeed, recognizing that a child care provider owes a duty to parents does not at all change the standard of care under which such providers presently operate. Stated differently, a child care provider "shouldn't fear a duty to [parents of children under its care] because [a child care provider] who doesn't breach that duty won't be held liable." *Id.* at 847.

### D. WHETHER LIFE TIME OWED MS. NGATUVAI A SPECIAL *MOWER* DUTY

Having concluded that childcare providers owe a traditional duty to parents of the children under their care, the court turns to *Mower*'s second step, a three-prong consideration of

whether that traditional duty also encompasses a "special, limited duty to refrain from causing severe emotional distress[.]" *Mower*, 422 P.3d at 856.

### 1. Whether Life Time's relationship, activity, or undertaking necessarily implicated Ms. Ngatuvai's well-being

This first prong "ensures that the relationship, activity, or undertaking is one that's 'fraught with the risk of emotional harm' to the plaintiff." *Id.* at 857 (citation omitted). The prong can be satisfied "only in those very limited 'situations where the emotional well-being of others is at the core of, or is necessarily implicated by, the relationship, activity, or undertaking.'" *Id.* (citation and alteration omitted).

Neither party argues that emotional well-being is at the core of child care, but Ms. Ngatuvai contends that child care necessarily implicates her emotional well-being. Life Time argues for the opposite conclusion, relying principally on its contention that the appropriate categorical level is a fitness, rather than child care, center, which would plainly fail to qualify for an activity that necessarily implicates Ms. Ngatuvai's emotional well-being.

Having already rejected that categorical argument, the court agrees with Ms. Ngatuvai that child care is an activity or undertaking that "can meet this high threshold." *Id.* It is, of course, true that a therapist treating a minor child for sexual abuse presents the paradigmatic example of this type of undertaking. But *Mower* clearly contemplates that there are other activities that will satisfy this prong. The care of one's children is undeniably "fraught with the risk of emotional harm" to their parents. Accordingly, the court finds that this prong weighs in favor of imposing on child care providers a limited duty to refrain from causing severe emotional distress to parents of children under their care.

### 2. Whether there was an especially likely risk that Life Time's negligence would result in severe emotional distress

The second prong of this test consists of a proximity element: "Remoteness between acts of negligence and the plaintiff will militate against a duty of care by making the emotional harm less likely to result from the relationship." *Id.* (alterations and citation omitted). The likelihood of severe emotional distress is to be analyzed against an objective standard, rather than examining whether a particular plaintiff is likely to experience severe emotional distress. *Id.*

Here, as in *Mower*, it is "not only foreseeable, but especially likely, that [a childcare provider's] negligence will cause [severe] emotional distress to the plaintiff." *Id.* (second alteration in original). Even more than the first, this prong weighs in favor of imposing on a child care center a limited duty to refrain from causing emotional distress.

### 3. Whether general public policy considerations warrant rejecting an emotional distress duty

The third prong of the second step is, in the parlance of Utah's Supreme Court, a "minus" factor—it is used to reject a duty where one would otherwise exist. This prong "should closely mirror" the fifth *Jeffs* factor, "with special consideration to any public policy concerns specifically implicated by a limited emotional distress duty, in conjunction with the three overarching policy concerns that frame our negligent infliction of emotional distress case law." *Id.* at 861. Those "overarching policy concerns" are (1) ensuring the genuineness of claims;[3] (2) imposing reasonable limitations on recovery; and (3) avoiding vicarious recovery for breach of a

---

[3] It is unclear what work this factor is capable of doing that is not already being accomplished by Utah's requirement that a negligent infliction of emotional distress plaintiff experience "severe" emotional distress. The parties seem similarly confounded because they merely repeat their arguments on the "severe" requirement in attempting to advance arguments related to public policy "in conjunction with the three overarching policy concerns that frame our negligent infliction of emotional distress case law."

duty owed another. The parties have not adduced,[4] and the court cannot identify, any public policy concerns "in conjunction with the three overarching policy concerns" of Utah's negligent infliction of emotional distress case law that would warrant rejecting the imposition of a special *Mower* duty in these circumstances.

### E. Whether Ms. Ngatuvai Suffered Severe Emotional Distress

Life Time separately submits that *Mower*'s express retention of the "severe" emotional distress requirement—having rejected § 47(b)'s more liberal "serious" emotional distress standard—is independently fatal to Ms. Ngatuvai's claim. Although this court—in its March 23, 2018 order—speculated that the Utah Supreme Court might permit a lesser showing of emotional distress if it adopted § 47(b), summary judgment was expressly denied on the issue of whether Ms. Ngatuvai suffered "severe" emotional distress. The court ruled that "a reasonable juror could find, based on the evidence, that Ms. Ngatuvai suffered severe emotional distress that resulted in illness or bodily harm." (ECF No. 104 at 10). *Mower* did not add to this requirement, it merely made clear that the Utah Supreme Court was not dispensing with it. The law has not changed between the court's March 23, 2018 order and now. The court therefore reaffirms its prior ruling on the "severe" emotional distress requirement.

### F. Whether Ms. Ngatuvai's Recovery is Precluded by the Liability Waiver

Utah has "joined the majority of jurisdictions in permitting people to surrender their rights to recover in tort for the negligence of others." *Rothstein v. Snowbird Corp.*, 175 P.3d 560, 562 (Utah 2007).

---

[4] Life Time feebly argues, without any elaboration, that "the public policy concerns specially implicated by an emotional distress duty weigh against the imposition of a duty." Ms. Ngatuvai similarly merely asserts that recognizing a duty here would not do violence to the three overarching policy concerns. The court does not begrudge the parties' lean briefing; the language of this prong invites everything and nothing.

However, "preinjury releases are not unlimited in power and can be invalidated in certain circumstances." *Pearce v. Utah Athletic Found.*, 179 P.3d 760, 765 (Utah 2008), *abrogated in part by Penunuri v. Sundance Partners, Ltd.*, 2017 WL 3697701 (Utah 2017). The Utah Supreme Court has noted that at least three circumstances would render a preinjury release unenforceable: (1) the release offends public policy; (2) the release is for activities that fit within the public interest exception;[5] and (3) the release is unclear or ambiguous. *Id.*[6]

The release Ms. Ngatuvai signed reads in full:

I understand that there is an inherent risk of injury, whether caused by me or someone else, in the use of or presence at a Life Time Fitness center, the use of equipment and services at a Life Time Fitness center, and participation in Life Time Fitness' programs. This risk includes, but is not limited to:
1) Injuries arising from the use of any of Life Time Fitness' centers or equipment, including any accidental or "slip and fall" injuries;
2) Injuries arising from participation in supervised or unsupervised activities and programs within a Life Time Fitness center or outside a Life Time Fitness center, to the extent sponsored or endorsed by Life Time Fitness;
3) Injuries or medical disorders resulting from exercise at a Life Time Fitness center, including, but not limited to heart attacks, strokes, heart stress, sprains, broken bones and torn muscles or ligaments; and
4) Injuries resulting from the actions taken or decisions made regarding medical or survival procedures.

---

[5] As the Utah Supreme Court has explained:
Though similar in name, an analysis of the public policy exception and an analysis of the public interest exception begin at different points and require different considerations. Specifically, to determine whether an exculpatory provision is contrary to public policy, we first determine whether a public policy has been established in the common law or in constitutional or statutory provisions. On the other hand, to determine whether an exculpatory provision is invalid under the public interest exception, we consider a variety of aspects of the contract, including whether "[t]he party seeking exculpation is engaged in performing a service of great importance to the public," and whether, "[a]s a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services."
*Penunuri v. Sundance Partners, Ltd.*, 301 P.3d 984, 992 n.53 (Utah 2013) (internal citations omitted).
[6] Ms. Ngatuvai also argues that waivers of liability for injury caused by gross or wanton negligence. But she does not bring a claim for gross negligence.

I understand and voluntarily accept this risk. I agree to specifically assume all risk of injury, whether physical or mental, as well as all risk of loss, theft or damage of personal property to me, any person that is a part of this membership and any guest under this membership while such persons are using or present at any Life Time Fitness center, using any lockers, equipment, or services at any Life Time Fitness center. I waive any and all claims or actions that may arise against Life Time Fitness, Inc., its affiliates, subsidiaries, successors or assigns (collectively, "Life Time Fitness") as well as each party's owners, directors, employees or volunteers as a result of any such injury, loss, theft or damage to any such person, including and without limitation, personal, bodily or mental injury, economic loss or any damage to me, my spouse, my children, or guests resulting from the negligence of Life Time Fitness or anyone else using a Life Time Fitness center. If there is any claim by anyone based on any injury, loss, theft or damages that involves me, any person that is a part of my membership, or any guest under this membership, I agree to defend Life Time Fitness against such claims and pay Life Time Fitness for all expenses relating to the claim, and indemnify Life Time Fitness for all obligations resulting from such claims.

Member Usage Agreement, ECF No. 67-2 at 1. The court's review of the preinjury release reveals that the release does not offend public policy, and it is not ambiguous. However, as explained below, the court finds that the preinjury release is void under the public interest exception, but only to the degree that its effect is to release Life Time from liability flowing from its child care center.

### 1. The Preinjury Release is Not Contrary to Public Policy

Preinjury releases must be compatible with public policy. *Pearce*, 179 P.3d at 765. In 2001, the court "relied on public policy gleaned from Utah law in holding that a preinjury release signed by a parent is not enforceable against a minor child." *Id.* And in 2007, the court "relied on the legislature's statement of public policy in Utah's Inherent Risks of Skiing Act to conclude that a ski resort cannot enforce a preinjury release against a skier whose injuries may have resulted from the negligence of the ski resort." *Id.* But in *Pearce*, the plaintiff did not present, and the court did not find, "a public policy that would render unenforceable a preinjury release between a public bobsled ride operator and an adult bobsled rider." *Id.*

As in *Pearce*, Ms. Ngatuvai has not presented, and this court has not found, a public policy that would render her preinjury release unenforceable.[7] Ms. Ngatuvai argues that "[i]t is clearly the public policy of Utah to do everything it can to prevent child abuse." ECF No. 100 at 29. Life Time agrees that "the prevention of child sexual abuse is an important public policy in the State of Utah." ECF No. 93 at 21. But the preinjury release Ms. Ngatuvai signed does not relieve Life Time of its obligation to exercise due care in the operation of its child center; it does not prevent Ms. Ngatuvai from pursuing a cause of action for negligence on behalf of her daughter. Instead, it precludes Ms. Ngatuvai from asserting her own claims. Consequently, the preinjury release is not contrary to public policy.

### 2. The Preinjury Release is Not Ambiguous

Preinjury releases must also be "communicated in a clear and unequivocal manner." *Pearce*, 179 P.3d at 767 (citation omitted). However,

> [t]o be effective, a release need not achieve perfection; only on Draftsman's Olympus is it feasible to combine the elegance of a trust indenture with the brevity of a stop sign. . . . It suffices that a release be clear, unambiguous, and explicit, and that it express an agreement not to hold the released party liable for negligence.

*Id.* (quoting *Nat'l & Int'l Bhd. of St. Racers, Inc. v. Superior Court*, 264 Cal. Rptr. 44, 47 (Ct. App. 1989)).

In *Pearce*, the court held that a 111-word sentence containing "some 'legalese'" was not unclear or equivocal because it "release[d] [the defendant] from any claim 'whether caused by the negligence of [the defendant] or otherwise." *Id.* Likewise here, Ms. Ngatuvai waived "any and all claims or actions that may arise against Life Time Fitness . . . as a result of any such injury, loss, theft or damage to any such person, including and without limitation, personal,

---

[7] Indeed, she admits that "[t]here is no statute or case law in Utah that expressly states that the Waiver at issue violates public policy." ECF No. 100 at 29.

bodily or mental injury . . . to me, my spouse, my children, or guests resulting from the negligence of Life Time Fitness." Member Usage Agreement, ECF No. 67-2 at 1. The language of Ms. Ngatuvai's waiver is broad, to be sure. But it is not unclear or equivocal. In no uncertain terms, Ms. Ngatuvai waived her right to all claims arising from Life Time's negligence, even those that result in bodily or mental injury to her children.[8]

### 3. The Preinjury Release is Partially Invalid Under the Public Interest Exception

"[A] preinjury release may be invalidated if it attempts to limit liability for activities in which there is a strong public interest." *Pearce*, 179 P.3d at 765. In determining whether a strong public interest in an activity would render an exculpatory provision invalid under the public interest exception, the Utah Supreme Court adopted the standard set out in *Tunkl v. Regents of the University of California*, 383 P.2d 441, 445–46 (Cal. 1963). *See Berry v. Greater Park City Co.*, 171 P.3d 442 (Utah 2007), *abrogated on other grounds by Penunuri v. Sundance Partners,*

---

[8] The same page of the Member Usage Agreement lists rules and regulations by which members must abide. One of those regulations concerns child centers. The Member Usage Agreement requires that "[n]o person between the ages of 3 months and 11 years is allowed into any area other than a Life Time Fitness child center except during designated family hours." Member Usage Agreement, ECF No. 67-2 at 1. And during family hours, those children must be "accompanied by a parent or legal guardian at all times." *Id.* From reading the Member Usage Agreement, Ms. Ngatuvai would have known that she was waiving all her claims arising out of injuries to her children, and that her children were only permitted in Life Time's child care center or under her personal supervision during family hours. Tragically, sexual abuse is all too common—even at licensed daycare centers. A reasonable person would understand that waiving "all claims" arising out of injury to her children at a child care center would necessarily include waiving claims arising out of sexual abuse.

If the language of the Member Usage Agreement had read, "your child is at risk of sexual abuse at our child care center, and you agree to waive all claims arising out of such sexual abuse," perhaps Ms. Ngatuvai would not have signed the agreement. But the agreement contemplated "all claims" arising out of "personal, bodily, or mental injury" to her children. Limiting the clear language of that agreement based on whether Ms. Ngatuvai was able to imagine that it might impact her claims arising out of sexual abuse would set an unworkable precedent that would ultimately require contracting parties to list, over hundreds of pages, each conceivable claim that a party might wave.

*Ltd.*, 2017 WL 3697701 (Utah 2017). *Tunkl* established six guidelines for evaluating whether a release should be invalidated under the public interest exception:

> [1] [The transaction] concerns a business of a type generally thought suitable for public regulation. [2]The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.

*Tunkl*, 383 P.3d at 445–46.

Although Utah adopted the *Tunkl* guidelines in 2007, the Utah Supreme Court has only actually applied the guidelines once, in *Berry*, the decision adopting them.[9] 171 P.3d at 447–48. That case concerned whether the public interest would permit a skier to release an organizer from injuries suffered during a race as a result of the organizer's negligence. But the court's analysis in *Berry*, which involved an injury Mr. Berry sustained while competing in a ski race at Park City Mountain Resort, provides little guidance in the instant case. The court "must therefore attempt to predict how [Utah's] highest court would" apply these factors to this release. *Squires v. Breckenridge Outdoor Educ. Ctr.*, 715 F.3d 867, 875 (10th Cir. 2013).

---

[9] The court cited the *Tunkl* guidelines in *Pearce* and in *Broderick v. Apartment Management Consultants, L.L.C.*, 279 P.3d 391, 392 (Utah 2012). But in *Pearce*, the court reached its holding without applying the guidelines, and in *Broderick*, the court reached its holding without consideration of the merits because the defendant had failed to adequately brief the *Tunkl* guidelines.

In *Pearce*, the Utah Supreme Court supplemented its dearth of precedent applying the *Tunkl* factors by reference to the more highly-developed *Tunkl* case law in California—the state from which Utah adopted these criteria. In the face of that same scarcity of Utah law, the court will adopt the Utah Supreme Court's methodology and consult California's *Tunkl* decisional law in its analysis below.

Before turning to the *Tunkl* factors, however, the court must decide which service should be the subject of that analysis. Mirroring the parties' dispute in the categorical duty analysis, Ms. Ngatuvai argues that the relevant service should be the provision of child care services whereas Life Time contends that it should be its provision of fitness center services.

When an entity provides multiple services of a vastly different character, there is no logic in analyzing the validity of a liability waiver under the lens of only one of those services. Rather, the waiver should be severable insofar as it purports to waive liability emanating from distinct activities. Whether a waiver will be given effect must be considered by reference to the particular activity involved. Given that the liability waiver here is alleged to cover claims arising from Life Time's provision of *both* fitness services and child care services, the analysis must center on the particular service to which Life Time seeks to apply the release.[10]

Life Time is correct in arguing that the waiver must be given effect if the relevant activity is fitness services. The Utah Supreme Court has imposed a categorical constraint—separate from the *Tunkl* factors—on the application of the public interest exception to recreational activities. In

---

[10] This approach accords with the activity-specific analysis employed by California courts. For example, in *Gavin W. v. YMCA of Metropolitan Los Angeles*, 131 Cal. Rptr. 2d 168, 177 (Cal. Ct. App. 2003), defendant YMCA argued that because its release had been upheld in cases asserting negligence arising from recreational activities, the identical release should be given effect to bar negligence claims arising from its provision of child care services. The California appellate court rejected that argument, applying the *Tunkl* factors to conclude that "[c]hild care . . . is an essential activity for working families, not a recreational activity."

*Pearce*, after surveying the weight of authority from around the country—with special attention to California—the Utah Supreme Court "join[ed] the majority of courts by adopting the rule that preinjury releases for recreation activities are not invalid under the public interest exception." *Pearce*, 179 P.3d at 767. The Utah Supreme Court has not had occasion to consider whether health clubs fall within this category, but in adopting this categorical constraint, the court relied on multiple cases that found health clubs, or specific activities within health clubs, to fall within this categorical exemption.[11]

The claim at issue here does not relate to Life Time's fitness center. Rather, it stems from Life Time's alleged negligence in operating a child care center. As a result, the activity to which the *Tunkl* factors must be applied is child care services.

### a. *Tunkl* Factor 1: Whether the transaction concerns a business of a type generally thought suitable for public regulation

In Utah, child care centers are subject to public regulation under the Utah Child Care Licensing Act, Utah Code Ann. § 26-39-1 *et seq*. Though Life Time points out that the more limited scope of their child care center subjects them to a less stringent panoply of regulations than are applicable to a traditional child care center,[12] this *Tunkl* factor does not require that the business be subject to a certain quantum of public regulation. It is beyond dispute that child care

---

[11] For example, the *Pearce* court relied on *Randas v. YMCA of Metropolitan Los Angeles*, 21 Cal. Rptr. 2d 245, 247 (Cal. Ct. App. 1993), which found that "[s]wimming, like other athletic or recreational activities, however enjoyable or beneficial, is not 'essential' as a hospital is to a patient or a repair garage is to a California motorist." (internal citation omitted).

[12] Life Time argues that "Utah law specifically exempts [its childcare facility] from state regulation." ECF No. 93 at 21. Indeed, the Utah Child Care Licensing Act appears to exclude Life Time's childcare facilities from licensing and certification requirements. *See* Utah Code Ann.§ 26-39-403(2)(f). But the act does not exclude Life Time's childcare facilities from other requirements. *Cf.* Utah Code Ann. § 26-39-403(1) (listing care programs to which none of the provisions or requirements of the act apply). Utah's legislature apparently saw fit to subject child care facilities such as Life Time's to at least some regulation, while exempting other types of providers entirely.

services are generally thought suitable for—and in Utah are subject to—public regulation. Consequently, the first factor weighs in favor of applying the public interest exception.

### b. *Tunkl* Factor 2: Whether the party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public

California courts applying this *Tunkl* factor consider whether the "service [is] merely an optional item consumers can do without if they don't want to waive their rights to recover for negligence or . . . something that they need enough so they have little choice if the provider attaches a liability disclaimer[.]" *Gardner v. Downtwon Porsche Audi*, 225 Cal. Rptr. 757 (Cal. Ct. App. 1986).

Child care is undoubtedly a service of great importance to the public, and is a matter of practical necessity for most parents, but especially working parents. For many members of the public, child care—whatever its precise form—is "something that they need enough so that they have little choice if the provider attaches a liability disclaimer[.]" *Id.* Thus, the second factor militates strongly in favor of applying the public interest exception.

### c. *Tunkl* Factor 3: Whether the party holds itself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards

The record suggests that Life Time accepts applications for membership from adults from all walks of life, so long as they agree to pay and abide by certain terms and conditions. The child care center is similarly available to any member of the public who becomes a member of the fitness center. Thus, the third *Tunkl* factor weighs in favor of applying the public interest exception.

d. ***Tunkl* Factor 4: Whether, as a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks its services.**

The record is insufficient to conclude that this factor weighs in favor of or against applying the public interest exception. In *Gavin W.*, the California appellate court reviewed facts establishing that California was experiencing an urgent shortage of child care availability, which had in turn led to such providers possessing a decisive advantage of bargaining strength. *See* 131 Cal. Rptr. 2d at 175–76. There are no such facts before this court, and Ms. Ngatuvai does not argue that this factor favors invalidating the waiver. But neither is there sufficient information from which to conclude that Utah's child care market is such that parents possess anything approaching equal bargaining strength. Thus, the fourth *Tunkl* factor is neutral.

e. ***Tunkl* Factor 5: Whether, in exercising a superior bargaining power, the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence.**

The record suggests that Life Time presented its potential members with a standardized adhesion contract of exculpation and that there was no means by which a member could pay an additional fee to obtain protection against negligence. Consequently, the fifth factor weighs in favor of applying the public interest exception.

f. ***Tunkl* Factor 6: Whether, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents.**

Ms. Ngatuvai had the right to (and did) take advantage of Life Time's childcare facilities, placing her daughter—the most precious of her belongings—in Life Time's control, subject to the risk of carelessness by LifeTime and its agents. This factor weighs strongly in favor of applying the public interest exception.

In sum, the *Tunkl* factors weigh in favor of invalidating waivers insofar as they purport to encompass claims arising from child care services. The net result here is that, had the claim arisen from Life Time's provision of fitness services—a recreational activity—the liability waiver would be given effect. But because the claim flows from its provision of child care services—an activity that the Utah Supreme Court would very likely place within the ambit of the public interest exception—the waiver will be invalidated as to this claim.

## IV.    ORDER

For the reasons stated above, the court orders as follows:

1. Defendant's Motion for Summary Judgment on Ms. Ngatuvai's claim for Negligent Infliction of Emotional Distress is **DENIED.**

2. Defendant's Request for Certification of Questions to the Utah Supreme Court is **DENIED.**

Signed December 11, 2018

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge