# EXHIBIT "A"



**Tristyn Teel Wilkerson, Psy.D.**
Licensed Psychologist
Psychology - Neuropsychology

Sent via email to **Jake@andersonhinkins.com**

March 25, 2019

Jake Hinkins, Esq.
Anderson and Hinkins
881 Baxter Drive
South Jordan, Utah 84095

Re:    K.N., a minor and Jennifer Ngatuvai, individually and on behalf of K.N. vs.
       Lifetime Fitness, Inc.
       Case #150909040

Dear Mr. Hinkins:

As you requested, I have interviewed both Jennifer and ▓▓▓▓▓▓ regarding the incident that occurred at Lifetime Fitness Child Center on August 14, 2014. I have reviewed relevant records and documents pertaining to this case. I will provide my opinion as to whether ▓ Ngatuvai is currently or will in the future require treatment for any mental or emotional conditions as a result of the incident reported above.

I initially met ▓▓▓▓▓ and her parents, Jennifer and Corona Ngatuvai as I observed the independent medical examination on February 8, 2018 at the law offices of Strong and Hanni in Sandy, Utah. I informally spoke with ▓▓, Jennifer and Corona at that time. However, my role was primarily to observe the evaluation that was completed by Dr. Eileen Ryan on that date. I subsequently met with Jennifer Ngatuvai on February 22, 2019 for interview and then with ▓▓ and Jennifer on Thursday, March 7, 2019. ▓▓ participated in a psychological examination, including comprehensive interview, the results of which are described in the following report.

## Review of Records

The following records were reviewed and used in forming the examiner's opinions:

Jake Hinkins, Esq.
March 25, 2019

Re: K.N., a minor and Jennifer Ngatuvai
Page 2

- Therapy records, Pam Mitchell, LCSW, dated September 11, 2014 - March 18, 2015

- Deposition of Corona Ngatuvai, dated January 6, 2017

- Deposition of Jennifer Ngatuvai, dated January 6, 2017

- Deposition of ████████, dated March 6, 2018

- Independent Medical Examination completed by Eileen Ryan, DO, dated April 6, 2018

- Transcript of police interview of ████████, dated August 21, 2014

- Therapy records for Jennifer Ngatuvai, Tammy Ishimatsu, dated March 9, 2015 to May 19, 2015

- Michael Johnson, M.D., Families First Pediatrics, dated February 6, 2017

- Michael Johnson, M.D., Families First Pediatrics, dated February 3, 2017

- Parkway Pediatrics records, dated February 7, 2011 to August, 2016

- Riverton Family Health Center records, dated May 27, 2011

- Allison Triplitt, M.D., U of U Department of Dermatology pediatrics note, dated April 2, 2013

## Relevant Background Information

| | |
|---|---|
| NAME: | ████████ |
| PARENTS: | Jennifer and Corona Ngatuvai |
| DOB: | February 2, 2011 |
| CA: | 8 years 1 month |
| CURRENT GRADE: | Second |

████ is the youngest of five siblings. ████ (16), ████ (14), ████ (12, and ████ (10) are not currently experiencing any medical, social, emotional or academic problems at present. ████ mother, Jennifer, completed one year of college. She is not currently employed outside the home. She reports no personal or extended family history of learning, attention, behavior or psychiatric problems. Corona Ngatuvai completed a Bachelor's Degree and is currently employed as an IT manger. No personal or extended family history of learning, attention, behavior or psychiatric problems are noted for Corona as well. Ms. Ngatuvai's pregnancy with ████ was without complication. ████ was born via Caesarean Section at forty weeks gestation and weighed eight pounds, four ounces at birth. No post-delivery complications were noted. As an infant, ████ was described as difficult. She enjoyed cuddling and was easily

Jake Hinkins, Esq.                                    Re: K.N., a minor and Jennifer Ngatuvai
March 25, 2019                                                                           Page 3

calmed. She was not excessively restless or irritable. She was regular in terms of sleep and feeding patterns.

As a toddler, ███ was described as very active. She was regular in patterns of sleep and appetite and demonstrated appropriate persistence and attention. She adapted well to transition and change and was not abnormally distractible. She was not reportedly intense in terms of emotional expression.

███ medical history is unremarkable overall with the exception of hospitalization for fever at three months of age. ███ currently settles down to sleep and sleeps through the night without disruption five out of seven days. She experiences some nightmares and is described as a restless sleeper. ███ is not currently prescribed any medication.

███ met most developmental milestones within normal limits with the exception of speech milestones, including word phrase and sentence speech which occurred early. Socially, ███ is noted to use words or phrases repetitively. She exhibits a strong negative reaction to change in routine and lacks organizational skills. ███ coordination is rated as average overall. Parents report that she is able to understand directions and situations as well as other children her age.

███ parents were not initially concerned about her ability to succeed in kindergarten. She is currently performing above grade level in all subjects. She has been placed into an accelerated learning program. ███ has received speech therapy. However, parents report that she has always been ahead in school. No behavioral problems are noted in the classroom. However, ███ mother reported that "her teacher spoke to me last month about her being a little more withdrawn than she has been." ███ does not often seek friendship with peers but is sought by peers for friendship. No peer social problems are noted with the exception of some hesitance in establishing new social relationships.

At home, ███ is noted to be somewhat impulsive. She is easily frustrated and has a history of temper outbursts. ███ is overly anxious and worried. She sometimes does not seem to learn from experience. ███ has destroyed property during outbursts at home. ███ works well for short term rewards but struggles to work towards more long term rewards. She is noted to throw more temper tantrums than do her siblings and has difficulty benefitting from her experience. Discipline used in the home includes talking through behavior and consequences. This works the short term. Parents agree on disciplinary practices. ███ main hobbies and interests include participating in sports or activities with other children. Her areas of greatest accomplishment include school. She enjoys electronics. She dislikes doing chores. When asked what she likes about ███, her mother stated "almost everything. She is delightful."

Jake Hinkins, Esq.                                    Re: K.N., a minor and Jennifer Ngatuvai
March 25, 2019                                                                            Page 4

## Interview of Jennifer Ngatuvai (February 22, 2019)

Jennifer was seen to review ▮▮▮ history and to discuss current functioning. Jennifer presented to my office casually dressed and appropriately groomed. She appeared to be friendly and forthcoming. Jennifer appeared to be emotionally stable. She was typically calm and relaxed. However, when discussing the incident at Life Time Fitness and also subsequent emotional symptoms, Jennifer became tearful.

Jennifer discussed ▮▮▮ behavior prior to the incident at Life Time Fitness. She reported that ▮▮▮ historically was "super easy and happy." ▮▮▮ was flexible. She dealt well with transition and change and did not have meltdowns. Jennifer reported that ▮▮▮ demonstrated appropriate behavior for her age and even had fewer meltdowns than was expected given the fact that she was three years old.

Jennifer stated that after the incident ▮▮▮ received counseling by Pam Mitchell, LCSW for approximately six months. They engaged in play therapy and ▮▮▮ was seen weekly in general. Jennifer reported that ▮▮▮ had made progress in therapy and therapy was discontinued. However, some symptoms persisted such as separation anxiety and emotional lability. Jennifer stated that following the incident at Life Time, ▮▮▮ began to have bathroom accidents. She would not go to the bathroom outside of the house unaccompanied. In first grade, she had to be assigned a time to go to the bathroom with a friend who accompanied her. At present, ▮▮▮ is comfortable using the restroom at school. However, in other places outside of the home she will try to hold it as long as she can. She also has been noted to run home from a neighbor's house to use the restroom at home. Ms. Ngatuvai reported that right after the incident at Life Time, ▮▮▮ was angrier. She also experienced frequent meltdowns. Jennifer stated that ▮▮▮ worked on feeling identification with Ms. Mitchell. I inquired as to the progress that ▮▮▮ has made in the last five years since the incident. Jennifer described the progress as "cyclical" and that symptoms worsen whenever ▮▮▮ is expected to review events surrounding Life Time Fitness as she has been expected to do periodically throughout this case. For example, during the Independent Medical Examination, there was a gap overnight between interviews. The first day ▮▮▮ was questioned as to the events that occurred at Life Time Fitness. Ms. Ngatuvai reported that night ▮▮▮ was highly anxious, had emotional meltdowns, and described a considerable amount of self-blame for not having been able to read the sign on the bathroom and if she had been smarter she would not have entered the bathroom with the boys. Ms. Ngatuvai reported that ▮▮▮ cried late into the night and was difficult to soothe. However, once the Independent Medical Examination was completed, ▮▮▮ slowly appeared to slowly improve and there was no work on the case completed by the Ngatuvai family since last February or March. However, ▮▮▮ saw Mr. Hinkins on New Years and Ms. Ngatuvai reported "once it is back in her life, she gets clingy and won't leave my side." Since the beginning of the year, Ms. Ngatuvai reported that ▮▮▮ has been extremely clingy with mom. She "breaks down about everything if something does not go her way." This

Jake Hinkins, Esq.                                    Re: K.N., a minor and Jennifer Ngatuvai
March 25, 2019                                                                        Page 5

includes meltdowns involving screaming and crying which lasts two to five minutes. ███ reportedly avoids the shower and has meltdowns when she has to get in the shower. She also assumes that her mom is yelling when she is not. ███ has demonstrated an increase in problems with emotional regulation since New Years. ███ mother reported that ███ second grade teacher has said that she has been withdrawn and quiet since the beginning of the year. ███ mother reported that at times the subject of Life Time Fitness comes up in conversation. For example, ███ sister will ask why they cannot go swim at Life Time anymore and ███ will reply, "because I went there and boys did things to me and mom says I never have to go back." ███ at that time will touch her mom for reassurance that she does not in fact have to go back to Life Time. ███ mother reported, "you know that was something she doesn't want to return to." ███ mother avoids driving by Life Time Fitness so that the subject does not come up.

In regards to current symptoms, ███ mother reported symptoms consistent with a current diagnosis of Post Traumatic Stress Disorder. ███ reportedly experiences symptoms of intrusion, including distress at exposure to events that remind her of the trauma. ███ will demonstrate "off" behavior and become withdrawn even when driving by the building where the Independent Medical Examination took place. ███ exhibits physiological anxiety symptoms such as tension when expected to go into unfamiliar bathrooms. ███ demonstrates avoidance of stimuli associated with the trauma. She avoids distressing memories, thoughts and feelings. An example of this is refusal to go in unfamiliar bathrooms. She also demonstrates negative alterations in cognition and mood associated with the event. ███ has an inability to remember important aspects of the event, particularly therapy that she underwent with Pam Mitchell following the incident. Although Ms. Ngatuvai reports that ███ memory is typically quite good, especially regarding the incident and the fact that she was three years old at the time that it occurred. However, despite her recollection of the incident ███ could not remember having been in therapy with Pam Mitchell. ███ also demonstrates persistent or exaggerated negative beliefs about herself. ███ reports to her mother that she is stupid, anything she does is wrong, and that she is angry at herself. ███ has disordered cognitions about the cause of the event. Between the IME interviews and also at other times ███ reported to her mother that if she had been able to read and if she was smarter she would not have gone into the boys' bathroom. ███ mother also reports that ███ has a persistent negative emotional state. "If something happens in the morning to set her off, all day will be bad" per parent report. ███ has also demonstrated an increase in irritable or angry behavior since the beginning of the year which seems to occur whenever ███ has recently been asked to recall her trauma. She has angry outbursts. She is also hypervigilant. ███ mother reported that ███ is "aware of everything all the time, where everyone is, and what they are doing." ███ also has sleep disturbance which has resurfaced since the beginning of the year. Approximately two times per week she gets up and seeks reassurance from her parents and needs snuggling in the middle of the night.

Jake Hinkins, Esq.                                    Re: K.N., a minor and Jennifer Ngatuvai
March 25, 2019                                                                          Page 6


In discussing ▆▆▆ symptoms with Jennifer, she made some parallels between ▆▆▆
symptoms and similar things that she was experiencing. It is common for parents of children
that have undergone trauma to also experience the abuse of their children as traumatic. Post
traumatic stress includes the exposure to actual or threatened death, serious injury, and sexual
violence, including witnessing, directly experiencing, or learning about the event. Ms. Ngatuvai
reported that she experiences intrusion symptoms, including distressing recollections of the
event. This also gets worse whenever Ms. Ngatuvai has to "do stuff related to the case." Ms.
Ngatuvai stated that when she has to discuss the event and do things related to the case, she
experiences significant distress, including difficulty controlling her emotions. She experiences
this distress as suffocating and described herself as "in tears 24/7." Ms. Ngatuvai reported that
she underwent therapy for the condition and that EMDR helped her to stabilize and gain a little
bit of control. Ms. Ngatuvai also avoids stimuli associated with the trauma. She avoids driving
by Life Time Fitness and states that it is "easier when you don't have to think about it every
day." Ms. Ngatuvai reports an inability to remember important aspects of the event. She
stated that she has difficulty remembering "all the little details" and is reminded of things that
she has forgotten if she goes over her journals. Ms. Ngatuvai also blames herself frequently for
what her daughter has experienced and stated that she feels selfish for bringing ▆▆▆ to the
daycare while she worked out. "I'm a stay at home mom. If I hadn't taken her to daycare I
didn't have to." Ms. Ngatuvai reports frequent tearfulness and also a persistent inability to
experience positive emotions. "I could lay in bed all day until it is time to pick up the kids. I
am only interested in their activities." Ms. Ngatuvai reported that before the incident at Life
Time she participated in water aerobics regularly and crafted a lot. She has no interest in
those activities. Ms. Ngatuvai reported that since the event she has been more irritable and
angry. "My husband can tell you for sure." She also is hypervigilant of threat, particularly
towards ▆▆▆ and will keep ▆▆▆ close to protect her. She reports difficulty with
concentration and sleep disturbance. "I don't sleep at night. I could lay in bed all day." Ms.
Ngatuvai reports that she does not have a history of mental illness. Her doctor either
prescribed or suggested an antidepressant in college after her third baby but Ms. Ngatuvai
never took the medication. She stated that she was likely prescribed the antidepressant due
to feelings of being overwhelmed as she had three children and had just had a baby, but
symptoms resolved without treatment.

Ms. Ngatuvai completed two inventories, the Beck Anxiety Inventory - II and the Beck
Depression Inventory - II. Her responses to the Beck Anxiety Inventory - II yielded a score of
10, which indicates mild anxiety. Her responses to the Beck Depression Inventory - II yielded
a score of 31, suggesting severe depressive symptoms.

Jake Hinkins, Esq.
March 25, 2019

Re: K.N., a minor and Jennifer Ngatuvai
Page 7

## DSM-5 Diagnostic Overview of Jennifer Ngatuvai

Based on reported symptoms, Jennifer meets criteria for DSM-5 diagnoses of:

Major Depressive Disorder, severe with current episode
Post Traumatic Stress Disorder

## Evaluation of ▇▇▇▇▇▇ (3/7/19)

### Tests Administered

Conners Comprehensive Behavior Rating Scales (parent form)
Rating Scale of Impairment (parent form)
Reynolds Child Depression Scale
Plenk Storytelling Test
Kinetic Family Drawing
Human Figure Drawing
Multidimensional Anxiety Scale for Children, Second Edition
Clinical Interview

Parent responses to the Conners Comprehensive Behavior Rating Scale place ▇▇▇ at the following age-adjusted T-scores. For comparative purposes, the Content and DSM-5 Scales appear below (mean = 50; s.d. = 10; high scores indicate problems):

### Conners CBRS–P Content Scales: Detailed Scores

The following table summarizes the results of the parent's assessment of ▇▇▇ Ngatuvai and provides general information about how she compares to the normative group. Please refer to the *Conners CBRS Manual* for more information on the interpretation of these results.

| Scale | Raw Score | T-score | Guideline | Common Characteristics of High Scorers |
|---|---|---|---|---|
| Emotional Distress (ED): Total | 36 | 89 | Very Elevated Score (Many more concerns than are typically reported) | Worries a lot (including possible social anxieties), may show signs of depression; may have physical symptoms (aches, pains, difficulty sleeping); may seem socially isolated; may have rumination. |
| Upsetting Thoughts (ED subscale) | 2 | 82 | Very Elevated Score (Many more concerns than are typically reported) | Has upsetting thoughts. May get stuck on ideas or rituals. May show signs of depression, including suicidal ideation. |
| Worrying (ED subscale) | 22 | 90 | Very Elevated Score (Many more concerns than are typically reported) | Worries a lot, including anticipatory and social worries. May experience inappropriate guilt. |
| Social Problems (ED subscale) | 4 | 73 | Very Elevated Score (Many more concerns than are typically reported) | Socially awkward, may be shy. Seems socially isolated. May have limited conversational skills. |
| Defiant/ Aggressive Behaviors | 13 | 77 | Very Elevated Score (Many more concerns than are typically reported) | May have poor control of anger and/or aggression; may be physically and/or verbally aggressive; may show violence, bullying, destructive tendencies; may have legal problems. |
| Academic Difficulties (AD): Total | 3 | 46 | Average Score (Typical levels of concern) | Problems with learning, understanding, or remembering academic material. Poor academic performance. May struggle with communication skills. |
| Language (AD subscale) | 3 | 49 | Average Score (Typical levels of concern) | Problems with reading, writing, spelling, and/or communication skills. |
| Math (AD subscale) | 0 | 43 | Average Score (Typical levels of concern) | Problems with math. |

Jake Hinkins, Esq.
March 25, 2019

Re: K.N., a minor and Jennifer Ngatuvai
Page 8

| | | | | |
|---|---|---|---|---|
| Hyperactivity/ Impulsivity | 8 | 58 | Average Score (Typical levels of concern) | High activity levels, may be restless, may have difficulty being quiet. May have problems with impulse control; may interrupt others or have trouble waiting for his/her turn. |
| Separation Fears | 10 | 79 | Very Elevated Score (Many more concerns than are typically reported) | Fears being separated from parents/caregivers. |
| Perfectionistic and Compulsive Behaviors | 11 | 82 | Very Elevated Score (Many more concerns than are typically reported) | Rigid, inflexible, perfectionistic. May become "stuck" on a behavior or idea. May be overly concerned with cleanliness. May set unrealistic goals. |
| Violence Potential Indicator | 17 | 67 | Elevated Score (More concerns than are typically reported) | May display, or may be at risk for, aggressive behavior. |
| Physical Symptoms | 7 | 60 | High Average Score (Slightly more concerns than are typically reported) | May complain about aches, pains, or feeling sick. May have sleep, appetite, or weight issues. |

## DSM-5 Symptom Scales: Detailed Scores

The following table summarizes the results of the parent's assessment of ▓▓▓▓▓ with respect to the DSM-5 Symptom scales, and provides general information about how she compares to the normative group. Please refer to the *Conners CBRS Manual* for more information on the interpretation of these results.

| Scale | Raw Score | T-score | Guideline |
|---|---|---|---|
| ADHD Predominantly Inattentive Presentation | 10 | 65 | Elevated Score (More concerns than are typically reported) |
| ADHD Predominantly Hyperactive-Impulsive Presentation | 8 | 58 | Average Score (Typical levels of concern) |
| Conduct Disorder | 6 | 85 | Very Elevated Score (Many more concerns than are typically reported) |
| Oppositional Defiant Disorder | 14 | 90 | Very Elevated Score (Many more concerns than are typically reported) |
| Major Depressive Episode | 8 | 71 | Very Elevated Score (Many more concerns than are typically reported) |
| Manic Episode | 3 | 60 | High Average Score (Slightly more concerns than are typically reported) |
| Generalized Anxiety Disorder | 15 | 79 | Very Elevated Score (Many more concerns than are typically reported) |
| Separation Anxiety Disorder | 14* | 90 | Very Elevated Score (Many more concerns than are typically reported) |
| Social Anxiety Disorder (Social Phobia) | 13 | 90 | Very Elevated Score (Many more concerns than are typically reported) |
| Obsessive-Compulsive Disorder | 2 | 67 | Elevated Score (More concerns than are typically reported) |
| Autism Spectrum Disorder | 9 | 68 | Elevated Score (More concerns than are typically reported) |

*Raw score(s) are based on extrapolated data due to omitted item(s).

Jake Hinkins, Esq.                                    Re: K.N., a minor and Jennifer Ngatuvai
March 25, 2019                                                                        Page 9

Jennifer completed the Conners Comprehensive Behavior Rating Scales. Jennifer's report indicates consistency in her response style. Jennifer's responses do not indicate an overly negative or positive response style. This may be a considered a valid measure.

Jennifer reports that ▇▇▇ experiences marked emotional distress, upsetting thoughts, worrying, social problems, defiant and aggressive behaviors, separation fears, perfectionistic and compulsive behaviors, aggressive behavior, and physical symptoms. Jennifer's responses reflect marked emotional symptoms in many areas with specific elevations in the areas of oppositional behavior, depression, and anxiety.

Parent responses to the Rating Scale of Impairment yielded the following age-adjusted T-scores (mean = 50; s.d. = 10; high scores indicates problems):

### RSI Scales

The RSI Scales should be used to identify the child's level of impairment in different life areas compared to the general population. When using the results from the RSI for treatment planning, it is important to examine the individual RSI Scale scores to identify specific life areas where the child is impaired. It is also possible to use elevated item scores to identify specific areas of concern.

| Scale | T-score (90% CI) | Percentile Rank | Classification | Interpretive Guideline |
|-------|------------------|-----------------|----------------|------------------------|
| School | 42 (38-48) | 21 | No Impairment | No impairment indicated. |
| Social | 65 (58-69) | 93 | Moderate impairment | Moderate level of impairment for activities such as interacting, socializing, and communicating with others. |
| Mobility | 62 (53-66) | 88 | Mild Impairment | Mild level of impairment when physically moving, such as running, kneeling, etc. |
| Domestic | 72 (63-75) | 99 | Considerable Impairment | Considerable level of impairment in the ability to do household tasks. |
| Family | 51 (44-58) | 54 | No Impairment | No impairment indicated. |

### Total Score

The Total Score should be used as a general indication of overall impairment.

| Scale | T-score (90% CI) | Percentile Rank | Classification | Interpretive Guideline |
|-------|------------------|-----------------|----------------|------------------------|
| Total Score | 61 (57-64) | 86 | Mild Impairment | Mild level of overall impairment. |

Jennifer's responses to this measure reflect an overall mild level of impairment for ▇▇▇. However, there is considerable level of impairment in the ability to do household tasks and a moderate level of impairment for activities such as interacting, socializing and communicating with others. Specifically, areas of impairment noted by Ms. Ngatuvai include ▇▇▇ ability to participate in group events, talk to friends, communicate her needs, have friends at school and work well with others. She also struggles to clean up after herself, put clean clothes away, complete chores, clean her room and put things away in the house. ▇▇▇ also does not often share feelings with her family.

Jake Hinkins, Esq.
March 25, 2019

Re: K.N., a minor and Jennifer Ngatuvai
Page 10

## Behavioral Observations

███ was seen in this office for one testing session. She was noted to be appropriately dressed and groomed. ███ was accompanied to the evaluation by her mother. Eye contact was good. Receptive and expressive articulation appeared normal. ███ frequently initiated conversation and easily maintained. Her expression was typically calm. She was emotionally stable and not tearful at any time during the assessment. ███ was alert, attentive and focused. Joint attention, body and object use and visual and listening response appeared normal. The quality of her social overture and response was good. She was cooperative and attempted all items set before her. No muscular tension nor habitual mannerisms were noted. ███ was not fidgety or distracted. Overall, she maintained a positive and friendly relationship with this examiner. She was emotionally responsive and smiled appropriately. It was not difficult to establish a working relationship with ███. This may be considered a valid estimation of ███ symptoms at present.

## Assessment Results and Interpretation

### Reynolds Child Depression Scale

███ responses to the Reynolds Child Depression Scale reflected depressive symptoms at the 1st percentile when compared to same-age peers. ███ reports minimal depressive symptoms.

### Multidimensional Anxiety Scale for Children - 2

| | T-Scores (mean = 50; s.d. = 10) |
|---|---|
| TOTAL SCORE | 52 |
| ANXIETY PROBABILITY | Borderline |
| Separation Anxiety/Phobia | 62 |
| GAD Index | 51 |
| Social Anxiety Total | 39 |
| Humiliation/Rejection | 36 |
| Performance Fears | 46 |
| Obsessions and Compulsions | 53 |
| Physical Symptoms Total | 60 |
| Panic | 54 |
| Tense/Restless | 65 |
| Harm Avoidance | 49 |

███ responses to this measure reflect elevated levels of separation anxiety and also physical tension and restlessness. Specifically, ███ reports she is scared or fearful

Jake Hinkins, Esq.
March 25, 2019

Re: K.N., a minor and Jennifer Ngatuvai
Page 11

about not being near her mom or dad, being away from parents or family, not having a light on at night, sleeping alone, bad weather, the dark, animals or bugs. ▓▓ also tends to feel restless and be shaky or jittery.

## Human Figure Drawing

▓▓ completed a Human Figure Drawing. ▓▓ discussed her drawing. She stated that she is "thinking about being happy", "that I just did something right or gave something up for someone" or "I did something important or I won something." ▓▓ Human Figure appears below in reduced size:



## Kinetic Family Drawing

▓▓ discussed her Kinetic Family Drawing. She stated that her dad is first and he is sleeping in the bed with mom. Next comes ▓▓ who is jumping on the trampoline. "He was doing a back flip and broke it." Next is ▓▓ who is washing the laundry. "She loves to draw and read." Next is ▓▓ who is "long boarding." ▓▓ is "making a card for dad because he had surgery." Finally comes ▓▓. "I'm making a picture." ▓▓ stated that everyone in her drawing is feeling happy. ▓▓ drawings appear below in reduced size.

#1



Jake Hinkins, Esq.
March 25, 2019

Re: K.N., a minor and Jennifer Ngatuvai
Page 12

#2 



#3



## Plenk Storytelling Test

The Plenk Storytelling Test is a children's assessment tool designed to assess children's feelings and internal working models. The Plenk Storytelling Test consists of nine picture cards. Eight of the cards show photograph pictures of children. The other picture is that of an abstract landscape with what looks like a storm approaching a large field. The pictures are ambiguous to prevent responding in a set manner. ▇ was asked to tell this examiner what was happening in each story, what the people on each card were feeling and what would happen in her imagination following the events on each card. Relevant themes were then identified in ▇ responses. In the first card, ▇ identified themes of getting lost and feelings of being alone. This theme of feeling alone and also a fear of abandonment or being separated from a caregiver was present in several of ▇ responses, particularly the third card (the dad was going to leave and go into the Army to fight in a war). The sixth card (the girl was all alone with no one to play with and has no friends), and card nine (the boy is feeling alone and nobody cares about him. He can't find a friend). She also reported frequent themes of regret, including the second card (regret at having hurt a friend), and card five (feeling

Jake Hinkins, Esq.                                    Re: K.N., a minor and Jennifer Ngatuvai
March 25, 2019                                                                    Page 13

bad for making bad decisions). Although most of the stories end up on a positive note (the lonely girl finds a friend, the lost child finds his mom, etc.), the themes continue to emerge in subsequent cards. ▮▮▮ responses are consistent. She was a coherent storyteller and easily engaged with the task.

**Clinical Interview**

▮▮▮ participated in a brief clinical interview with this examiner. It should be noted that this examiner did not ask ▮▮▮ to describe the events that occurred at Life Time Fitness. During the clinical interview my rationale for not bringing up this topic was that ▮▮▮ has already gone over at length the events that occurred in both deposition and in the Independent Medical Examination completed by Dr. Eileen Ryan which this examiner observed. Also given that recalling the incident is reported to exacerbate ▮▮▮ emotional symptoms, this examiner deemed it unnecessary for the purposes of this evaluation. Instead, I inquired as to current symptoms and functioning from ▮▮▮.

If given three wishes, ▮▮▮ indicated that she would wish for: (1) "to get more brothers and sisters"; (2) "mom had the best life she could have"; and (3) "be protected and bad things won't happen." If ▮▮▮ could be any animal she stated she would be a dog because she wants to "feel the life of a dog." She thinks it would be strange and she wants to know what it is like. ▮▮▮ discussed her feelings. She stated that she is most happy when she spends time with family, plays with friends and meets new people. She is sad whenever she "makes poor choices", she does not tell the truth or she steals. She stated that she feels sad when she or other people do these things. ▮▮▮ discussed worry. She stated that she worries that her parents are going to die when they are away from ▮▮▮. ▮▮▮ reported that her dad goes away often for work and she worries about him when he leaves. ▮▮▮ reported frequent feelings of nervousness. She gets nervous if she has to take a big test or if it is something she has not studied. She stated that she worries whenever someone leaves. She gave the example of when her principal left and there was as a substitute principal. She also becomes very nervous when there is a substitute teacher because "I don't know what to expect." ▮▮▮ stated that she is often afraid of bugs. She also is afraid of going upside down. She is afraid of worms, heights and going fast scare her. ▮▮▮ stated that she becomes angry if "someone has to ruin my day." She stated that she gets angry at Keilani, threatens or fights her if she does not get her way. "▮▮▮ reported, "I'm pretty chill at school." ▮▮▮ discussed school. She stated that she likes reading and math. She is sometimes challenged but sometimes it is easy. ▮▮▮ again repeated that she likes to know what to expect, particularly at school. She also loves free time, teachers, principal and students. ▮▮▮ stated that she does not look forward to lock down drills. "It's exciting then boring. We have to hide in a closet and I don't like to whisper." ▮▮▮ reported a good relationship with her siblings. She stated that they work out any

problems that they have. She gets along best with ▮▮ but sometimes gets along with her the worst. ▮▮ stated that ▮▮ "thinks she can insult me in front of everyone. She brags and thinks she is better than everyone." ▮▮ discussed sleep. She stated that she sometimes sleeps well but it depends on whether or not she keeps the light on. ▮▮ also experiences nightmares. Her nightmares typically are about someone getting hurt, family dying or ▮▮ dying. ▮▮ reported that she has them very often. When ▮▮ has a nightmare, she stated "I try to think about other stuff but it is hard to stop thinking about." "I ask mom if I can cuddle with her for the rest of the night." ▮▮ reports that she has friends that she met at preschool, church or school. She has school friends but they do not go on play dates. Her friend Drew likes to play Roblox but her best friend moved to Idaho. ▮▮ stated that when she grows up she would like to be a technology manager. She stated, "my dad is an informational technology manager. I want to be more than informational. I want to do stuff." ▮▮ reports that her parents sometimes fight and it "gives me big anxiety." ▮▮ reported that she also has anxiety at school sometimes.

## DSM-5 Diagnostic Overview of ▮▮▮▮▮

Based on evaluation and reported symptoms, ▮▮ meets DSM-5 criteria for:

Post Traumatic Stress Disorder

## Conclusion and Recommendations

▮▮ currently meets DSM 5 criteria for a diagnosis of Post-Traumatic Stress Disorder. ▮▮ experienced sexual abuse as a three year old child. As a three year old ▮▮ had limited understanding that what the boys in the bathroom did to her was abuse. However, many child victims of sexual abuse show significant symptoms of post-traumatic stress regardless of their interpretation of the event at the time. Even children who experience sexual abuse as infants frequently show signs of significant post-traumatic stress. ▮▮ limited understanding of the sexual nature of the event in no way prevents her from developing symptoms of post-traumatic stress. ▮▮ exhibited symptoms of post-traumatic stress following the incident as was documented and diagnosed. She currently exhibits symptoms of post-traumatic stress including hypervigilance, avoidance, and negative mood. It is common for trauma victims to have periods of improvement in symptom severity followed by an increase in symptom severity when they are exposed to reminders of the event. ▮▮ has demonstrated a pattern of increase in symptom severity whenever she is expected to meet with her attorney or be interviewed regarding the sexual abuse she endured. This is expected with symptoms of post-traumatic stress. ▮▮ mother reports that ▮▮ experiences symptoms of post-traumatic stress currently, including hypervigilance and avoidance, as well as problems with emotion regulation, oppositional behaviors, emotional distress, and worrying. ▮▮ did not discuss her past experiences during this examination. However, ▮▮ discussed themes of anxiety,

Jake Hinkins, Esq.
March 25, 2019

Re: K.N., a minor and Jennifer Ngatuvai
Page 15

hypervigilance, separation anxiety, loneliness, and regret during assessment. Self-report measures completed show a high degree of separation anxiety and physiological anxiety which is common in survivors of trauma. ▉ also discussed numerous seemingly unrelated fears, however these suggest an overall hypervigilance to threat characteristic of trauma survivors. ▉ has previously been diagnosed with Post Traumatic Stress Disorder. This diagnosis remains appropriate. Continued symptoms of post-traumatic stress continue to impair ▉ functioning across multiple domains including sleep (nightmares, restlessness), recreational activities (▉ fears being separated from her parents or attending activities separately from them), socialization (shyness, difficulty communicating her needs, and social withdrawal), and household tasks (▉ struggles to complete household tasks independently).

In addition, ▉ mother Jennifer reported her own symptoms of post-traumatic stress. It is not uncommon for parents of children who have experienced trauma to also experience their own associated trauma symptoms. Jennifer reports hypervigilance, particularly where the safety of ▉ is concerned, clear avoidance of reminders of the incident including avoidance of Life Time Fitness in her car, and feelings of guilt and inappropriate self-blame regarding the cause of the incident. Jennifer reports feeling as if it was her selfishness that led her to leave ▉ at the daycare, as she was a stay at home mom and did not need to have others care for her child. Jennifer reports significant guilt that she was unable to keep ▉ from harm, and these feelings persist. Jennifer also experiences severe depressed mood, which was historically not a problem before ▉ was abused. Jennifer has been seen in therapy for these conditions but has continued impairment from symptoms of post-traumatic stress and depressed mood. Jennifer is impaired across domains including relationships with her husband and family members (reduced interest in physical intimacy, less energy for activities) recreational activities and hobbies (Lack of interest), physical health and self-care (Hypersomnolence, weight gain), social activities (lack of energy for social relationships) and household responsibilities (Prefers to stay in bed until the children get home).

## Recommendations

▉

▉ symptoms of post-traumatic stress and associated impairment require ongoing treatment. ▉ has shown a pattern of periods of improvement followed by periods of worsening symptoms and subsequent impairment. This is likely to continue throughout her life without treatment. In addition, in the absence of treatment, ▉ symptoms of post-traumatic stress may impact future relationships s ▉ enters adulthood, which is common for many survivors of trauma and sexual abuse. Although ▉ participated in therapy as a very young child, she continues to have periodic surges of symptoms. A course of individual trauma focused behavioral therapy (TF-CBT) is recommended for ▉ in order to help her address unhelpful cognitions that contribute to her anxiety and emotional distress, to teach appropriate coping skills, and to reduce overall symptoms of post-traumatic stress. TF-CBT is

Jake Hinkins, Esq.                                          Re: K.N., a minor and Jennifer Ngatuvai
March 25, 2019                                                                              Page 16

an evidence-based treatment for children and adolescents impacted by trauma. It is a
components-based treatment model that incorporates trauma-sensitive interventions with
cognitive behavioral, family, and humanistic principles and techniques. TF-CBT has proved
successful with children and adolescents (ages 3 to 18) who have significant emotional
problems (e.g., symptoms of posttraumatic stress disorder, fear, anxiety, or depression) related
to traumatic life events. TF-CBT is a short-term therapy course which usually takes no more
than 25 sessions to complete.

In addition, Eye Movement Desensitization and Reprocessing (EMDR) is a psychotherapy
treatment that was designed to alleviate the distress associated with traumatic memories.
███ would also benefit from a course of EMDR treatment. EMDR is also a time-limited
treatment which usually takes 3 to 12 sessions.

Following trauma specific treatment, ███ would benefit from ongoing weekly mental health
therapy and support to address any residual anxiety symptoms, to encourage positive social
interaction and prevent isolation, and to reduce and cope with physiological anxiety.

Pharmacological intervention may be advisable to help alleviate symptoms of anxiety and
hypervigilance. Consultation with a pediatric psychiatrist is recommended. Ongoing treatment
and follow up visits are likely to be needed in this area.

With these treatments in place, ███ prognosis is good, although she is likely to experience
resurfacing of some symptoms of post-traumatic stress at unpredictable times throughout her
life, which is common in sexual abuse survivors. The therapies described above will reduce the
likelihood of chronic impairment and will assist ███ development of coping skills to address
symptoms as they arise.

### Jennifer

Jennifer would also benefit from Eye Movement Desensitization and Reprocessing (EMDR)
treatment to address symptoms of post-traumatic stress. Course of treatment for adults is
similar in length to that of the course described above in ███ recommendations.

Jennifer is likely to require ongoing therapy for the foreseeable future. Jennifer would benefit
from a course of Cognitive behavioral therapy (CBT) to gain appropriate coping skills to reduce
depressive and post-traumatic stress symptoms. CBT is a form of psychological treatment that
has been demonstrated to be effective for a range of problems including depression and post-
traumatic stress disorder.  Jennifer may also benefit from strategies designed to improve her
self-concept and confidence, and additional mental health therapy may help Jennifer expand
her social network and gain support.

Jake Hinkins, Esq.                                    Re: K.N., a minor and Jennifer Ngatuvai
March 25, 2019                                                                        Page 17


In addition, Jennifer may benefit from consultation with a Psychiatrist. Pharmacologic
intervention through medication may be useful in reduction of symptoms of depression.
Common antidepressant medications include Selective Seratonin Reuptake Inhibitors such as
Prozac or Zoloft. Ongoing treatment and follow up visits are likely to be needed in this area.


Tristyn Teel Wilkerson, Psy.D.
Licensed Psychologist


TTW/kg

**VITAE**

**Tristyn Teel Wilkerson, Psy.D.**

**Psychology/Neuropsychology**
**230 S 500 E Ste 100, Salt Lake City, UT 84102**
**Tristyn@wilkersonpsych.com**
**(206) 909-3085**

## EDUCATION

| | |
|---|---|
| 2005 to 2012 | Washington School of Professional Psychology |
| | Argosy University |
| | Seattle, WA |
| | Doctor of Psychology in Clinical Psychology (Psy.D.). |
| | G.P.A.: 3.95/4.0 |

| | |
|---|---|
| September 2012 | Doctoral Dissertation |
| | Argosy University |
| | Seattle, WA |
| | *Patterns of disaffiliation from the Mormon Church: Psychological and social perspectives.* Robert Grubbs Ph.D. (Chair) |

| | |
|---|---|
| 2005 to 2008 | Argosy University |
| | Seattle, WA |
| | Masters of Arts in Clinical Psychology (MA) |
| | G.P.A.: 3.98/4.0 |

| | |
|---|---|
| 2002 to 2004 | Portland State University |
| | Portland, OR |
| | Bachelor of Science in Psychology, Graduated with honors |
| | G.P.A.: 3.67/4.0 |

| | |
|---|---|
| 1998 to 2002 | Associate of Arts, Oregon Transfer Degree. |

## PROFESSIONAL EXPERIENCE

Licensed in the state of UT. License number 8610846-2501

| | |
|---|---|
| December 2018 to present | **Neurology Learning and Behavior Center**<br>Salt Lake City, UT<br>**Clinical Supervisor**<br>Supervision of post-doctoral residents in regards to mental health therapy cases. |
| March 2015 to present | **Neurology Learning and Behavior Center**<br>Salt Lake City, UT<br>**Licensed Clinical Psychologist/Neuropsychologist**<br>Comprehensive neuropsychological and/or psychological assessment with individuals ages 2 to 90. Comprehensive neuropsychological and psychological evaluations include: intake, test administration, scoring, interpretation, recommendations, and follow up. Assessment for services through Vocational Rehabilitation. Mental health therapy serving children, adolescents and adults. Areas of therapy specialty include: adolescents and adults with severe parent/family conflict, disruptive behaviors, anxiety, post-traumatic stress, and/or sexual abuse and assault. Young children with history of trauma and disruptive behaviors/anxiety. Additional services include consultation on forensic cases. Summary and dictation of forensic medical records. |
| September 2012 to March 2015 | **Neurology Learning and Behavior Center**<br>Salt Lake City, UT<br>**Postdoctoral Resident**<br>Comprehensive neuropsychological assessment with a primarily pediatric population. Neuropsychological assessment of geriatric populations and adults with TBI. Comprehensive evaluations include: intake, test administration, scoring, interpretation, and recommendations. Mental health therapy serving children and adolescents. |
| September 2011 to September 2012 | **The Children's Center**<br>Salt Lake City, UT<br>**Psychology Intern**<br>Full time intern therapist and psychology intern. Duties included: Therapy with preschool aged children and families. Infant mental health and attachment based therapy. Work with evidence based practice in treating children who are survivors of trauma (TFCBT). |

Overnight counselor at an inpatient chemical dependency treatment center for adolescent girls. I provided crisis management and counseling as needed, complete clerical and organizational tasks, write nightly chart notes, and respond in writing to the clients' daily processing journals.

August 2004 to **The Christie School, Babson Cottage**
August 2005 Lake Oswego, OR
<u>**Teacher Counselor**</u>
Full time Teacher Counselor for children ages 7-18 in an inpatient assessment and stabilization cottage. Duties included: crisis intervention, milieu management, and working with a team of professionals to provide recommendations for medication management and treatment for children and adolescents. In addition to my job requirements I also developed and ran a late night support group for 5 to 10 girls between the ages of 15 and 18.

## PUBLICATIONS

Wilkerson, T. T. (2018). Understanding the comprehensive assessment of autism spectrum disorder through case studies. In S. Goldstein & S. Ozonoff (Eds.), *Assessment of Autism Spectrum Disorder* (2nd ed.). (pp. 383- 414.). New York: The Guilford Press.

October 2012 to September 2014
Assistant to the Editor in Chief for the Journal of Attention Disorders. Sage Publications

## PROFESSIONAL/COMMUNITY ACTIVITES

2016 to present                     Volunteer for the American Foundation of Suicide Prevention

October 2017                      Completed SafeTalk training for the American Foundation of Suicide Prevention

August 2004                    Completed domestic violence advocacy training at Bradley-Angle
                               House in Portland, OR


## ADDITIONAL QUALIFICATIONS
Adult and Child CPR certified        Blood-borne Pathogens and HIV Trained
First Aid certified

## RESEARCH INTERESTS
Validity of instruments used in neuropsychological assessment. Use of assessment tools in
forensic cases. Traumatic brain injury. Medical trauma. Assessment of children with cognitive
deficits. Diversity and assessment. Religion and psychotherapy. Bias and diversity in
psychotherapy. Effects of the death of a parent on children and adolescents.

## CLINICAL INTERESTS
Neuropsychological assessment with children and adults. Interventions within the educational
setting. Young adults, adolescents, children, and underserved populations. Attachment, grief and
end of life issues, issues regarding chronic and/or terminal illness. Diversity in therapy and
assessment.


## SKILLS
Familiarity with the Statistical Package for the Social Sciences (SPSS), Microsoft Word,
Microsoft Power Point, basic computer skills.

## PROFESSIONAL AFFILIATIONS
National Academy of Neuropsychology Member


## REFERENCES

Dr. Sam Goldstein, Ph.D. Director and postdoctoral supervisor at Neurology, Learning, and
Behavior Center. Also, Editor in Chief for Journal of Attention Disorders. Salt Lake City, UT.
801-532-1484

Jennifer Mitchell, Ph.D.
Clinical Director at The Children's Center. Salt Lake City, UT 801-582-5534

Dr. Douglas Kerr, Ph.D.
Clinical Supervisor at Navos Child and Family Services. Also, Core Faculty Member at Argosy
University, Seattle. 206-523-8824

EXHIBIT "B"

Case 2:16-cv-00039-JNP   Document 138-1   Filed 09/13/19   PageID.1450   Page 24 of 122

K.N. vs LIFETIME FITNESS, INC.
June 24, 2019                                    Tristyn Wilkerson, Psy.D.

1

```
                IN THE UNITED STATES DISTRICT COURT
              FOR DISTRICT OF UTAH, CENTRAL DIVISION

                           * * *
K.N., a minor, and          )
JENNIFER NGATUVAI,          )
individually and on         )   Case No. 2:16-cv-00039
behalf of K.N.,             )
                            )   Deposition of:
Plaintiffs,                 )   TRISTYN WILKERSON, Psy.D.
                            )
       vs.                  )
                            )
LIFETIME FITNESS, INC., a   )
foreign corporation,        )
                            )
Defendant.                  )

                           * * *

                    June 24, 2019
                      9:42 a.m.

                           * * *

                 230 South 500 East
                     Suite 100
              Salt Lake City, Utah 84102

                           * * *

                     Amber Park
            - Certified Shorthand Reporter -
            - Registered Professional Reporter -
```

```
                                                         2
 1              A P P E A R A N C E S
 2   For the Plaintiffs:
             T. JAKE HINKINS
 3           ANDERSON HINKINS
             881 Baxter Drive
 4           South Jordan, Utah 84095
 5
     For the Defendant:
 6           STEPHEN J. TRAYNER
             STRONG & HANNI
 7           102 South 200 East
             Suite 800
 8           Salt Lake City, Utah 84111
 9
10                      * * *
11              I N D E X
12   EXAMINATION                              PAGE
13   Examination by Mr. Trayner                  3
14
15              E X H I B I T S
16   NO.  DESCRIPTION                         PAGE
     1    Report, Curriculum Vitae, and Trial    3
17        Testimony
     2    Legal Policy and Contract and Billings 3
18   3    Documents From Flash Drive            11
19
20
21
22
23
24
25
```

```
                                                         3
 1
          Monday, June 24, 2019:  9:42 a.m.
 2
          (Whereupon, Deposition Exhibits No. 1 and
 3    2 were marked for identification.)
 4          P R O C E E D I N G S
 5      TRISTYN WILKERSON, Psy.D.,
 6    called as a witness, having been duly sworn,
        was examined and testified as follows:
 7
               EXAMINATION
 8
 9  BY MR. TRAYNER:
10      Q    Doctor, would you please state your full
11  name?
12      A    Tristyn Teel Wilkerson.
13      Q    And my understanding is, Dr. Wilkerson,
14  that you have been previously deposed in another legal
15  matter so you've been through this process at least
16  once before?
17      A    I have.
18      Q    All right.  Do you see any need for me to
19  review for you the basic instructions that are
20  typically given at the beginning of a deposition about
21  answering audibly, not nodding your head, trying to
22  avoid nonverbal gestures, and keeping your answers out
23  loud?  Do you see any need for me to repeat those type
24  of instructions for you?
25      A    No.
```

```
                                                         4
 1      Q    Very good.  As we've started today we have
 2  marked as Exhibit Number 1, a document.  Could you
 3  identify what that document is?
 4      A    It is a copy of my report, my CV, and
 5  trial testimony.
 6      Q    And the date of the report is March 25th
 7  of 2019?
 8      A    Yes.
 9      Q    And we've also marked as Exhibit Number 2
10  a couple of additional documents.  Could you identify
11  those, please?
12      A    This is my legal policy and contract,
13  including billing.
14      Q    All right.  And are the billings current
15  as of what date?
16      A    I believe as of today but let me verify.
17  It's dated June 24, 2019.
18      Q    All right.  Very good.  Doctor, we have
19  allotted two hours and I intend to stick to that two
20  hours so as not to interfere with whatever
21  appointments or matters you have today.  So we're
22  going to kind of fly fast and furious to try to get
23  through this in two hours, but I want to make certain
24  that you have adequate time to explain yourself with
25  regards to any of the questions that I ask, so you
```

```
                                                         5
 1  feel free to answer fully and completely to your best
 2  ability and I'll kind of skim through the things we
 3  need to talk about if that's all right.
 4          My name is Steve Trayner, I represent the
 5  defendant Lifetime.  We previously met I think we
 6  decided it was about two years ago I guess --
 7      A    Yes.
 8      Q    -- at the time of Dr. Ryan's evaluation of
 9  ███████ Ngatuvai.
10          What I'd like to do is first of all have
11  you give us a little bit of background information as
12  to when you were first retained in connection with
13  this matter.  Could you tell us that?
14      A    I was first retained just prior to the IME
15  by Dr. Eileen Ryan to observe that IME.
16      Q    All right.  Could you give us an estimate
17  as to how far in advance of that that you were
18  retained?
19      A    I believe that I have somewhere in here
20  the correspondence.  Or it would have been in that --
21  that you have right here.
22      Q    Sorry about that.  I didn't mean to take
23  it from you.
24      A    No, that's fine.  In going over this
25  recently I just saw the email that was originally sent
```

6

1  to Dr. Goldstein requesting assistance. I don't know
2  where it is in here. Katie moved everything when she
3  scanned it.
4      Q    Maybe as you're going through that if you
5  can give us just a rough estimate. Do you think it
6  was within a month of the evaluation? More than a
7  month?
8      A    It would have been a month tops.
9      Q    Okay. And do you recall who contacted
10  this office? I understand that originally they wanted
11  Dr. Goldstein but you're the one that eventually
12  participated in that evaluation process?
13     A    Yes. I believe it was Mr. Hinkins that
14  emailed Sam.
15     Q    Were you given any materials or background
16  information before you showed up that day at our
17  office when Dr. Ryan was going to do her evaluation?
18     A    No.
19     Q    So everything caught you kind of fresh
20  having not had anything previous to review?
21     A    Well, I did have a conversation with Jake.
22     Q    Okay. What do you remember about that
23  conversation?
24     A    It was an outline of the various
25  complaints and the sequence of events leading up to

7

1  the lawsuit and what my role would be as an observer.
2      Q    Okay. And by complaints, was that the
3  complaints that the little girl was having or are you
4  talking about the legal complaint?
5      A    The legal complaints.
6      Q    Okay. And you attended the first day, as
7  I recall, of the evaluation, and that was -- I found
8  the date of the evaluation I think it was the 8th and
9  the 9th of February of 2018.
10     A    Yes.
11     Q    When did you next have any involvement
12  after the first day that you attended the evaluation?
13     A    It would have been when I was contacted to
14  formally evaluate ███.
15     Q    And when was that?
16     A    I wish I had all of my email
17  correspondence in front of me. That would have
18  been -- I'm estimating -- it would have been in
19  January of this year.
20     Q    All right. And as part of Exhibit
21  Number 2 you've provided us with a copy of your
22  billing and that billing picks up on January 28th of
23  2019 --
24     A    Uh-huh.
25     Q    -- a half-hour consultation --

8

1      A    Uh-huh.
2      Q    -- with -- it says attorney.
3      A    Yes.
4      Q    And then just previous to that it looks
5  like you received a retainer on January 21st, a
6  retainer of $2,000. Is that correct?
7      A    That's correct.
8      Q    What do you recall about the meeting on
9  January 28th? Was it a meeting or was it a telephone
10  call?
11     A    It was a telephone call.
12     Q    Okay. And was that with Mr. Hinkins?
13     A    Yes.
14     Q    And did he at that time ask you to
15  formally evaluate ███?
16     A    Yes.
17     Q    And then the evaluation that you performed
18  on ███, what day did that take place?
19     A    That took place on --
20     Q    I'm looking at your invoice, it appears to
21  be March 7th of 2009. Is that right?
22     A    Yes.
23     Q    Okay.
24     A    I was looking at the date on the report
25  but that was the day it was sent.

9

1      Q    Did I say 2009? 2019.
2      A    2019. I did not go back in time.
3      Q    All right. And it was a two-hour
4  evaluation, is that correct?
5      A    Correct.
6      Q    And it appears that previous to meeting
7  with ███ on March the 7th I see an entry for an
8  evaluation of one hour on February the 22nd, 2019.
9  What was that?
10     A    I met with Jennifer Ngatuvai to discuss
11  and update history on that day.
12     Q    All right. So you met with Jennifer and
13  then it looks like the next activity after the 22nd of
14  February you received some records and reviewed those
15  records on the 27th.
16     A    Yes.
17     Q    And then did your evaluation on March
18  the 7th, and subsequent to that spent some time
19  reviewing additional records, is that right?
20     A    Yes.
21     Q    Okay. Are you able in looking at your
22  file to tell us which records you received at what
23  time?
24     A    I am not. However, I can get those later
25  via email because they were sent to me via email.

10

1    Q    Okay.  Now were they all received in one
2    bunch and you just reviewed them in kind of a piece
3    meal fashion, if you will, or did the records come in
4    at various times if you recall?
5    A    At various times.
6    Q    Okay.  What I would just ask, Doctor,
7    you're going to be given the opportunity to review
8    your transcript if you choose to do that.  I would
9    like to receive not the emails, because we've greed
10   that the emails with Counsel are not going to be
11   produced, but at least the sequencing.  If you could
12   just identify for us the sequence and on what dates
13   you received what documents if you would, please.
14   A    Sure.
15   Q    And I understand that you are producing
16   for us today, other than the communications with
17   Counsel, a complete copy of your file, is that right?
18   A    Yes.
19   Q    And that is what we have just been handed
20   by your wonderful assistant, is that correct?
21   A    I would assume so.
22   Q    You assume that what's on this flash drive
23   is a copy of the records you requested that she
24   produce for us?
25   A    Yes.

11

1    Q    All right.  We're going to go ahead -- and
2    we may take a peek at it a little later, but let's go
3    ahead and mark that as Exhibit Number 3.
4         (Whereupon, Deposition Exhibit No. 3 was
5    marked for identification.)
6    (BY MR. TRAYNER)
7    Q    I know that you've not had a chance to
8    double-check the flash drive --
9    A    I have not.
10   Q    -- but what do you expect that we're going
11   to see on that flash drive?
12   A    You're going to see all of the records
13   that I received regarding ████, including her
14   deposition, the interview completed by Officer Coons,
15   a few medical records, and therapy records from Pam
16   Mitchell, and...
17   Q    Maybe I can help, Doctor.  I'm looking at
18   page 2 of your report, which is Exhibit Number 1, and
19   there is a list of records that fall under a heading
20   of review of records.
21   A    Yes.
22   Q    Would that be a comprehensive list of all
23   of the records that you received and reviewed with
24   regards to either ████ or Jennifer Ngatuvai that were
25   generated by third parties?

12

1    A    Yes.
2    Q    And then I take it that in conjunction
3    with some of the testing that you did of ████ you
4    would have generated some internal work product as
5    well?
6    A    Yes.
7    Q    And has that internal work product been
8    made part of what we've marked as Exhibit Number 3?
9    A    I believe so.
10   Q    All right.  Have you reviewed at any time
11   any records generated by individuals or persons
12   outside of your office other than those found on
13   page 2 of your report?
14   A    No.
15   Q    Who determined what records you would be
16   provided to review?
17   A    It was a group effort.
18   Q    Okay.  Tell me about that group effort.
19   A    I was sent some records by Mr. Hinkins and
20   also requested some records based on the conversation
21   that I had with Jennifer Ngatuvai.
22   Q    All right.  Did you receive all of the
23   records that you requested?
24   A    Yes.
25   Q    Were you apprised of any records that

13

1    existed but you did not request to review those
2    records?
3    A    There were some records listed in the IME
4    report.
5    Q    And this would be Dr. Eileen Ryan's
6    report?
7    A    Yes.
8    Q    So if she identified a record of some type
9    generated by a third party that you did not review,
10   you were at least aware of the existence of those
11   records, correct?
12   A    Yes.
13   Q    Is there a reason why you did not request
14   the opportunity to review any additional records that
15   were identified in Dr. Ryan's report?
16   A    Some of them I did not feel was relevant
17   such as kindergarten records, receipts, surveillance
18   videos.
19   Q    All right.  But you at least reviewed her
20   report, saw what she looked at --
21   A    Yes.
22   Q    -- and then you and Counsel discussed it
23   and you requested what documents you felt like you
24   should review?
25   A    Yes.

14

1    Q    Were you apprised of the existence of any
2  other records generated by third parties other than
3  those contained in Dr. Ryan's IME report?
4    A    No.
5    Q    And did you -- as far as the records that
6  you identified on page 2 of your report, did you
7  personally review those records?
8    A    I did.
9    Q    Maybe we could take a look at the billing
10  record, Exhibit Number 2, and just total up the number
11  of hours you spent in reviewing the records that were
12  provided to you.  Could you look at that and -- I've
13  got it here handy to make it easier.
14    A    That would be four hours.
15    Q    Four hours?
16    A    Uh-huh.  Wait, there's another one.  Five.
17  Five total.
18    Q    Did you generate notes of your record
19  review?
20    A    No, I did not.
21    Q    And by record review, you also reviewed
22  some depositions.  Did you generate any notes with
23  regards to your review of the depositions?
24    A    No, I did not.
25    Q    And then the report was generated, looks

15

1  like, March 20th and on March 22nd, is that correct?
2    A    That is correct.
3    Q    Now other than speaking with Mr. Hinkins
4  and Jennifer and ▉▉▉ Ngatuvai, did you speak with
5  anyone else with regards to your work on this case?
6    A    I briefly spoke to Corona during the
7  original observation of the IME, but I was not going
8  to be evaluating ▉▉▉ at that time so there was no
9  information gathered.  It was more of a casual "Hi,
10  how you doing" conversation.
11    Q    Okay.  And other than that incident- -- if
12  I might characterize it as kind of an incidental
13  conversation with Mr. Ngatuvai -- did you talk to
14  anyone else other than the Ngatuvais, meaning
15  Jennifer, ▉▉▉, Corona's conversation, and
16  Mr. Hinkins with regards to your work or evaluation in
17  this case?
18    A    No.
19    Q    In connection with your work I know that
20  you performed a number of tests and those are
21  identified in your report, correct?
22    A    Yes.
23    Q    Did you conduct any testing of either
24  Jennifer or ▉▉▉ that is not included in your report
25  that is marked as Exhibit Number 1?

16

1    A    No.
2    Q    Did you at any time make reference to or
3  do any literature search in connection with this case?
4    A    I originally did a literature search on
5  best case practices for forensic interviewing to aid
6  me in my observation of Dr. Ryan.
7    Q    Okay.  So that would have been done
8  previous to going to the evaluation by Dr. Ryan?
9    A    Yes.
10    Q    And do you recall -- I don't have any of
11  those billing records.  Do you know why we don't have
12  those billing records?
13    A    I don't know.  I've -- I have no idea.
14  I'm assuming that we could get them though.
15    Q    Okay.  I would just make a request for
16  those records, and perhaps before we leave today if
17  somebody could just take a second look?
18    A    They probably just forgot that we've done
19  this twice.
20    Q    Okay.  Or at least did it in two stages.
21    A    Exactly.
22    Q    We don't want to do this twice.
23    A    Well, they close out the billing after a
24  period and so I can get that quite easily.
25    Q    Okay.  Other than doing a literature

17

1  search about how a forensic evaluation should take
2  place, did you do any other type of literature search
3  in conjunction with your work and your opinions in
4  this case?
5    A    Not specifically.
6    Q    Did you print out any of the literature
7  research that you did or did you just peruse it on the
8  internet?
9    A    I did print some.
10    Q    Had you observed a forensic evaluation
11  previous to Dr. Ryan's evaluation of ▉▉▉?
12    A    Different types of forensic evaluations.
13  I have observed Child Protective Services
14  interviewing, and also interviews completed at the
15  Children's Justice Center, but not an IME.
16    Q    Okay.  So the Children's Justice Center
17  interview, that would be similar to what was done by
18  Officer Coons in this case?
19    A    Yes.
20    Q    And the Child Protective Service
21  interview, would that be similar to what they did the
22  day that Jennifer took ▉▉▉ in to be evaluated or is
23  that a different type of evaluation?
24    A    I think it would be different.
25    Q    Okay.

Case 2:16-cv-00039-JNP    Document 138-1    Filed 09/13/19    PageID.1455    Page 29
of 122

K.N. vs LIFETIME FITNESS, INC.
June 24, 2019                                              Tristyn Wilkerson, Psy.D.

18

1    A    In those I just was a trusted adult for
2  therapy clients who were being interviewed by Child
3  Protective Services.
4    Q    All right.  Rather than, say, a physical
5  examination that was done by Linda Lewis in this case?
6    A    Yes.
7    Q    Gotcha.  Let me just ask you if you're
8  familiar with the Journal of Pediatrics?
9    A    I am.
10    Q    And do you consider it to be an
11  authoritative source?
12    A    I would say so.
13    Q    Are you familiar with the Journal of Child
14  Abuse and Neglect that's published by the
15  International Society for the Prevention of Child
16  Abuse and Neglect?
17    A    I am.
18    Q    And do you consider it to be an
19  authoritative source?
20    A    Yes.
21    Q    Are you familiar with the Clinical
22  Psychology Review that is edited by Dr. Gordon
23  Asmundson, A-s-m-u-n-d-s-o-n?
24    A    I'm not familiar with that one.
25    Q    Okay.  How about the Journal of the

19

1  American Academy of Psychiatry and the Law, are you
2  familiar with that publication?
3    A    I have heard of it but I've never read it.
4    Q    Okay.  So you wouldn't know whether you
5  would accept it as being authoritative or not?
6    A    No.
7    Q    Okay.  Let's talk about your involvement
8  in this case.  Would you characterize yourself as a
9  clinical psychologist or as a forensic psychologist
10  with regards to the work that you've done on this
11  case?
12    A    I would classify myself as a clinical
13  psychologist, technically clinical neuropsychologist,
14  which is my full title.
15    Q    Okay.  And I know that you did work with
16  regards to the one case that is referenced that you
17  did a deposition.  I believe that was -- what is the
18  name of the case here that you were involved with?
19    A    The previous one?
20    Q    Yes.
21    A    Romrell.
22    Q    All right.  And the Romrell,
23  R-o-m-r-e-l-l, versus Jordan Valley Medical Center,
24  that was a medical malpractice case?
25    A    It was.

20

1    Q    It involved your evaluation of two little
2  girls, correct?
3    A    Yes.
4    Q    Did not involve a claim of posttraumatic
5  stress disorder?
6    A    No.
7    Q    Have you been retained in connection with
8  cases other than Romrell and the present case?
9    A    I have.
10    Q    Are you currently consulting on any cases
11  involving claims of posttraumatic stress disorder?
12    A    I am.
13    Q    Have you issued any Rule 26 reports other
14  than this case with regards to posttraumatic stress
15  disorder in a child?
16    A    No.  And what is Rule 26 just to clarify?
17    Q    And that's great.  I'm happy to tell you
18  what Rule 26 is.  I'll tell you what all the other
19  rules are but we don't have enough time.  Rule 26,
20  Dr. Wilkerson, is the rule that pertains to expert
21  reports.
22    A    Okay.
23    Q    It requires certain information, the type
24  of disclosures that you've made in this case with
25  regards to Exhibit Number 1.  So Rule 26 has a lot of

21

1  other things in it, but as it relates to you it says
2  that an expert needs to prepare a report and the
3  report needs to contain certain information.
4    A    Okay.
5    Q    So when I ask you about with regards to
6  the preparation of a Rule 26 report, this would be the
7  type of report that you prepared in this case,
8  intending that it be used in connection with the
9  litigation.  Rather than, say, maybe consultation with
10  the attorney.
11    A    Okay.
12    Q    Have you prepared any other Rule 26 type
13  reports involving children with claims of
14  posttraumatic stress disorder?
15    A    No.
16    Q    Okay.  Could you estimate for us the
17  number of cases that you've been involved with that
18  are in litigation?
19    A    Currently in litigation?
20    Q    Just let's start with total.
21    A    Okay.  And is that as an expert witness or
22  as a treating provider?
23    Q    As an expert witness.  Thank you.
24    A    Okay.  That would probably -- total, four.
25    Q    Okay.  And have you been retained on

Case 2:16-cv-00039-JNP    Document 138-1    Filed 09/13/19    PageID.1456    Page 30
of 122

K.N. vs LIFETIME FITNESS, INC.
June 24, 2019                                    Tristyn Wilkerson, Psy.D.

22

1    behalf of the defense or on behalf of the plaintiff in
2    those four cases?
3         A    On behalf of the defense for one and the
4    plaintiff for the others.
5         Q    All right.  And do any of those four cases
6    involve claims of posttraumatic stress disorder?
7         A    Yes.
8         Q    Which cases relate to -- these are,
9    again -- well, let me strike that.
10              Have you prepared a Rule -- you've not
11   prepared a Rule 26 report in any of those other four
12   cases?
13        A    I have.
14        Q    You have?
15        A    Yes.
16        Q    Which cases have you prepared Rule 26
17   reports?
18        A    The one where I'm working for the defense.
19        Q    Okay.  Who retained you on that case?
20        A    Nickie Tolman, Powers and Tolman.
21        Q    Is that a Salt Lake City firm?  I'm not
22   familiar with them.
23        A    No.  It's Idaho Falls.  Well, I think
24   she's in Twin Falls but the case is in Idaho Falls.
25        Q    So that would be the only -- of the other

23

1    litigation cases where you're a retained expert, that
2    would be the only one where you prepared a report
3    dealing with posttraumatic stress disorder?
4         A    Yes.
5         Q    But in that case it involves an adult?
6         A    Yes.
7         Q    Have you been made subject to any
8    challenges as an expert?  They sometimes refer to
9    those in the state of Utah as a Rinmasch challenge or
10   a Daubert challenge.  To your knowledge have you been
11   made subject to any challenge of that nature?
12        A    I don't know what that is.
13        Q    Okay.  Now I want to just verify that you
14   have an understanding of your obligations under Rule
15   26.  The rule states that "the report is to contain a
16   complete statement of all opinions the witness will
17   express and the basis and reasons for them."  That's a
18   verbatim quote from Rule 26B sub (i).  The report
19   that you've prepared, Exhibit Number 1, does it contain a
20   complete statement of all the opinions that you will
21   express and the basis and the reasons therefore?
22        A    Yes.
23        Q    Okay.  And the other requirement under
24   Rule 26 is that the report is to contain, quote, "the
25   facts or data considered by the witness in forming

24

1    their opinions."  Have you done that in regards to
2    Exhibit Number 1?
3         A    Yes.
4         Q    Great.  Since the preparation and
5    finalization of your report on March 25, 2019, other
6    than preparing for your deposition today have you done
7    any other work on this case?
8         A    No.
9         Q    Now could you just describe for us what
10   you've done to prepare for your deposition today?
11        A    I reread all of the records that I had
12   received and reread my report and prepared documents
13   for scanning.
14        Q    Okay.  And so all of the documents you
15   listed on page 2 of your report you went back and
16   reviewed them?
17        A    Yes.
18        Q    And could you estimate how long you spent
19   in preparing for your deposition?
20        A    Approximately three hours.
21        Q    Okay.  And based upon your review --
22   re-review of the records, if you will, is there
23   anything in your report that you believe you need to
24   change based upon your re-review of those records?
25        A    No.

25

1         Q    Okay.  Now do you have any specific
2    training as a forensic neuropsychologist?
3         A    Other than the work and supervision that I
4    did under Sam Goldstein for my two-year post doctoral
5    residency, no.
6         Q    All right.  So what specific did
7    Dr. Goldstein do during that two-year postgraduate
8    work with him to train you as a forensic evaluator or
9    neuropsychologist?
10        A    I did a majority of his legal testing for
11   two years and consulted with him on each case after
12   the testing had been completed.
13        Q    Now in regards to the performance of the
14   testing, in your mind is there any difference between
15   the manner in which the tests are administered in a
16   forensic setting versus a clinical setting?
17        A    There's very little difference because the
18   standardization has to take place the same regardless.
19   Sometimes there are videotapes made for certain
20   forensic evaluations and sometimes we would do
21   additional measures such as malingering measures where
22   we wouldn't do that in a typical psychological
23   evaluation.
24        Q    All right.  And the type of testing that
25   you did in this case with regards to either Jennifer

26

1  or ██████, did you do that in a clinical
2  setting or in a forensic setting?
3      A   It would have been considered a forensic
4  setting, although in this case there was very little
5  difference between the two.
6      Q   Okay.  What additional work did you do in
7  this case that would take it into the forensic realm
8  rather than just the clinical neuropsychological
9  realm?
10     A   For this I was answering a specific
11 question rather than trying to ascertain a diagnosis
12 based on many different factors throughout the
13 client's life.
14     Q   Okay.  Did you do anything other than --
15 different other than answering the specific questions
16 that were posed to you?
17     A   No.
18     Q   Okay.  Had you ever been involved or
19 retained by Mr. Hinkins before?
20     A   No.
21     Q   Or his law firm?
22     A   No.
23     Q   How about Mr. Humpherys, Rich Humpherys,
24 have you worked for Mr. Humpherys before?
25     A   No.  I can't remember which -- in the

27

1  Romrell which attorney that was -- no, that was
2  Williams, so no.
3      Q   All right.  In this case other than
4  relying in part upon statements made to you by
5  Jennifer and ██████, have you relied upon any
6  other verbal statements made by anyone to you?
7      A   To me, no.
8      Q   But obviously if some other provider has
9  the recitation of a verbal comment, you would have
10 relied upon that?
11     A   Yes.
12     Q   All right.  Let's go to the initial
13 meeting February 8th of 2018.  That's the day of the
14 initial evaluation.  As I recall you stayed throughout
15 the balance of the evaluation that day?
16     A   Yes.
17     Q   Were you aware there was going to be a
18 second day of evaluation when you arrived that day?
19     A   I did.
20     Q   And had you made plans to be present for
21 the second day?
22     A   I had, though it was determined at the
23 time that it wouldn't be necessary.
24     Q   And how was that determination made?
25     A   I understood my role to make sure that the

28

1  questioning and the methods used by Dr. Ryan were not
2  going to be particularly triggering or abusive or
3  coercive in any significant way that would harm ██,
4  and after the first day of observation it appeared
5  that unless she completely changed tactics -- and who
6  knows -- that that was unlikely.
7      Q   Okay.
8      A   There was nothing in the first day that I
9  needed to stop the evaluation for.
10     Q   It was pretty much vanilla?
11     A   You could say that.
12     Q   Okay.  And I don't know that it got much
13 more exciting the second day but we went through the
14 process.
15         Did you speak at all to ██ that first
16 day?
17     A   I did.  I, in fact, watched her for a
18 period of time while I believe it was Corona was being
19 interviewed as well.
20     Q   Oh, so you were with ██ during the time
21 that her father was being interviewed?
22     A   Yes.
23     Q   All right.  And so could you estimate
24 approximately how long that was?
25     A   I would say that part was about an hour,

29

1  and then I had spoken to her briefly throughout the
2  day.
3      Q   Okay.  Did you make any notes of your
4  observations or what was said between the two of you?
5      A   No.  We did not discuss the case at all.
6      Q   Okay.  What type of conversations took
7  place between the two of you say during that hour or
8  so that you had with her while Corona was being
9  interviewed?
10     A   My Little Pony.
11     Q   My Little Pony.  You're going to have to
12 help me with that.  I've heard of My Little Pony but
13 what do you mean by that?
14     A   We discussed My Little Pony and the TV
15 show My Little Pony that she likes to watch and her
16 favorite characters and...
17     Q   Did you talk to ██ at all after the
18 first day was completed?
19     A   No.
20     Q   Did you -- other than saying good-bye, did
21 you talk to Jennifer or Corona before leaving that
22 day?
23     A   No.
24     Q   Did you speak with Jennifer before the
25 evaluation by Dr. Ryan that day?

30

1    A   I spoke with her briefly and introduced
2   myself.
3    **Q   Just pleasantries?**
4    A   Yes.
5    **Q   And after Dr. Ryan finished her evaluation**
6   **that first day did you speak further with Jennifer at**
7   **all?**
8    A   No.
9    **Q   Did you ask Jennifer to inquire as to how**
10  **████ felt about the interview or anything like that?**
11   A   No.
12   **Q   Okay.  Would it have been your**
13  **recommendation that she should engage in that kind of**
14  **conversation with her daughter after that evaluation?**
15   A   I would have suggested, had I spoken to
16  her, that she discuss that or have -- not her discuss
17  that, but have her daughter discuss that in a therapy
18  setting because that can be very distressing and
19  increase any symptoms that she may be having in the
20  recollection.
21   **Q   Okay.  And did you speak with Corona after**
22  **the evaluation the first day?**
23   A   No.
24   **Q   Okay.  Have you reviewed any of the**
25  **videotape that was made of the evaluation by Dr. Ryan?**

31

1    A   No.
2    **Q   Were you aware that such videotape exists?**
3    A   I did -- or I was.
4    **Q   All right.  And then the next involvement**
5   **I take it after that would have been when Counsel**
6   **called you in late January and said, "We're going to**
7   **need to have a formal evaluation done"?**
8    A   Yes.
9    **Q   Okay.  And then you met with Jennifer on**
10  **February 22nd and then you met with ████ on**
11  **March 7th, is that right?**
12   A   Correct.
13   **Q   Were any of your meetings with either**
14  **Jennifer or ████ recorded in any way?**
15   A   No.
16   **Q   But you did generate notes in both of**
17  **those meetings?**
18   A   I did.
19   **Q   Okay.  And those notes are part of what**
20  **should be on the flash drive?**
21   A   Yes.
22   **Q   Okay.  And you spent -- let's see, what**
23  **was it again? -- two hours with Jennifer -- excuse me,**
24  **one hour with Jennifer on the 22nd and then when you**
25  **met with ████ you spent two hours with ████?**

32

1    A   Yes.  Jennifer attended that session with
2   ████.
3    **Q   Okay.  Did you interview Jennifer in any**
4   **way on March the 7th?**
5    A   I spoke with her but it was not an
6   interview.
7    **Q   Okay.  Was Jennifer present during any of**
8   **the interviewing or testing that you conducted on**
9   **████?**
10   A   Yes.  All of it.
11   **Q   All of it.  Let's talk about the one hour**
12  **you spent with Jennifer.  What was done in that one**
13  **hour?  Could you give us a brief summary?**
14   A   In that one hour we went over the history
15  form, which is in here, and she filled me in about
16  relevant background history.  She talked about current
17  symptoms that ████ was experiencing, both current and
18  then historically.  So after the incident at Lifetime
19  and up until this point.  And she also discussed and
20  we talked about her experience after the incident and
21  leading up to the present day.  She filled out two
22  self-report questionnaires on that day of her own and
23  that was it.
24   **Q   Okay.  And all of those documents that you**
25  **referred to should be on the flash drive, correct?**

33

1    A   They should be, yes.
2    **Q   Very good.  Now with respect to the two**
3   **hours that you spent with ████, what was done during**
4   **that two-hour time period?**
5    A   During that we completed several
6   self-report measures, including the Reynolds
7   Children's Depression Scale and the Multidimensional
8   Anxiety Scale for Children, second edition.  We did a
9   few tests, the Plenk Storytelling Test, Kinetic Family
10  Drawing, and Human Figure Drawing, and I interviewed
11  ████ directly.
12   **Q   Okay.  How much time was spent in the**
13  **clinical aspect of that meeting, meaning the**
14  **interview?**
15   A   The clinical interview took approximately,
16  I would say, 45 minutes.
17   **Q   Okay.  And the testing that was**
18  **administered, how long would that have taken**
19  **approximately?**
20   A   An hour.
21   **Q   And the balance of the time, what would**
22  **that have been?**
23   A   Self-report measures.
24   **Q   And were you present during all of the**
25  **testing as well as the filling out of the self-report**

34

1  measures?
2      A   I was.
3      Q   And did Jennifer participate in any way in
4  any of the testing or the self-report measure reports?
5      A   She did not.
6      Q   The room where the testing -- was all of
7  the testing and the self-reporting and interviewing
8  all done in a single room or multiple rooms here?
9      A   Single room.
10     Q   Okay.  We're in a conference room here
11 today.  Was it about the same size as this conference
12 room?
13     A   It was exactly the same size.
14     Q   Exactly the same size.  So what --
15     A   On that wall.
16     Q   So we're talking about, what, 15 feet by
17 maybe 10?
18     A   Approximately.
19     Q   Give or take --
20     A   Yeah.
21     Q   -- a foot or two.  Okay.
22         And is there a table such as the table
23 we're seated at today?
24     A   Yes, but about half the size.
25     Q   Okay.

35

1      A   More comfortable chairs.
2      Q   Okay.  Now after you met with ████ on
3  March 7th it appears that you spent two hours in
4  record review on the same day, the 7th.  Would that
5  have been done after you met with her or prior to
6  meeting with her?
7      A   Prior to.
8      Q   Okay.  And then you spent another two
9  hours in reviewing records on the 20th.  I take it
10 that was to prepare the report?
11     A   Yes.
12     Q   Okay.  Now let me ask you with respect to
13 the -- there was a history form I think you said was
14 filled out and I haven't had the opportunity to look
15 at that.  Could I just briefly take a look at that,
16 please?
17     A   Yes.
18     Q   And this is a document entitled Childhood
19 History Form, is that correct?
20     A   Correct.
21     Q   And it's a ten page form?
22     A   (Witness nods head.)
23     Q   How is that ten page form filled out?
24     A   It is usually filled out by the parents,
25 and in this case was emailed to Jennifer which she

36

1  filled out electronically and sent back to us.
2      Q   Okay.  So when I see the word processing
3  or typed responses, that's because she filled it out
4  and sent it back to you online?
5      A   Yes.
6      Q   And are all of the responses that are
7  found on this ten-page form, were they prepared by
8  Jennifer to your knowledge?
9      A   To my knowledge, yes.
10     Q   Okay.  Did you inquire whether she had any
11 input or help from anyone else?
12     A   I did not.
13     Q   Did you go over this history during the
14 time that you met with either Jennifer or Jennifer and
15 ████?
16     A   I did.
17     Q   Which of the two meetings or both?
18     A   That would have been the meeting with --
19 now I'm second guessing myself because I can't
20 remember if she gave it to me after the first meeting
21 or if she gave it to me prior to the first meeting.
22     Q   Okay.  But in any event, Dr. Wilkerson,
23 you would have reviewed this history with her to make
24 certain it was accurate?
25     A   Yes.

37

1      Q   Okay.  Now just help me understand from a
2  clinical neuropsychologist or forensic
3  neuropsychologist standpoint why is it that you ask
4  about history?
5      A   Because I need to know if there are any
6  developmental concerns, early emotional concerns,
7  brain injuries, any number of things that could
8  contribute to current presentation.
9      Q   Now the history form that was filled out,
10 was that filled out with respect to ████ or was it
11 filled out with respect to Jennifer?
12     A   ████.
13     Q   Okay.  Did you do a similar history form
14 for Jennifer?
15     A   No.
16     Q   Is there a reason why you did not?
17     A   Because the evaluation of Jennifer was not
18 a formal evaluation that was scheduled.  It was based
19 on observations of our conversation.
20     Q   Okay.  And as you sit here today do you
21 believe that you have evaluated Jennifer's situation
22 sufficiently to be able to form opinions as to whether
23 she suffers from posttraumatic stress disorder?
24     A   I do.
25     Q   And is it your opinion she does suffer

38

1   from posttraumatic stress disorder?
2       A   It is.
3       Q   All right.  So you're looking for
4   developmental issues, including possible prior
5   episodes of psychological problems?
6       A   Yes.
7       Q   Would that include anxiety?
8       A   Not necessarily.  History of anxiety can
9   make someone more prone to developing a posttraumatic
10  stress disorder later on in life, but it doesn't mean
11  that they would not have it or that it should be ruled
12  out.
13      Q   Okay.  Prior episodes of depression,
14  that's something that you would inquire into?
15      A   Yes.
16      Q   And why would you inquire into that?
17      A   Prior episodes of depression can change
18  the clinical picture somewhat of someone who is having
19  a posttraumatic stress disorder episode.
20      Q   How is that?
21      A   So somebody who is depressed or has
22  experienced depression is likely to have continued
23  episodes of depression in their future.  And if
24  something terrible happens to you can -- what's the
25  word I'm looking for -- it can contribute to the

39

1   possibility of another depressive episode.  So teasing
2   out depression versus posttraumatic stress would then
3   be important.
4       Q   Okay.  And did you do that in regards to
5   ███████ as well as to Jennifer?
6       A   Yes.
7       Q   And did you find any prior history of
8   depression on either ███████ or Jennifer?
9       A   Hold on.  Jennifer had reported to me in
10  regards to her that she experienced some level of mood
11  disturbance, though not characterized as depression,
12  when she had three children under the age of three.
13  Was prescribed some antidepressant medications but
14  never took them or filled the prescription.
15      Q   Okay.
16      A   With regards to ███████, no.
17      Q   Okay.  Did Jennifer report any other
18  family history of depression in immediate family
19  members?
20      A   Not to my knowledge.
21      Q   Okay.  Would a family history of
22  psychiatric or psychological problems, including prior
23  history of depression, of immediate family members be
24  something you would want to know?
25      A   For this -- for the purposes of this I

40

1   don't think it was relevant.
2       Q   Okay.  And why not?
3       A   Because we know that Jennifer has a
4   predisposition towards some level of depression.  A
5   family history of depression would only show us that
6   she has a predisposition, which we already know.
7       Q   Okay.  Did Jennifer appear to you to be an
8   accurate historian?
9       A   Yes.
10      Q   Did you note any differences in any of the
11  records that you reviewed and the history that was
12  related to you by Jennifer?
13      A   No.
14      Q   Did it appear to you that Jennifer had any
15  particular insight into her own history of mental
16  health issues as it might be able to relate to her
17  ability to accurately describe what her daughter was
18  going through?
19      A   It seemed as if she had insight, yes.  And
20  in checking this, I did get information regarding
21  Jennifer's family history.
22      Q   Okay.  What did she report to you?
23      A   In terms of ███████ and the history report,
24  she had reported that none of her -- the question on
25  here is, "Have any of your blood relatives experienced

41

1   problems similar to those your child is experiencing?"
2   And it also looks at emotional and psychiatric
3   problems.  And her response was, "Not that we know of"
4   for both herself and for Corona.
5       Q   Okay.  No immediate family members with
6   psychological problems?
7       A   No.  And there's also a space for her to
8   put in for the other siblings whether or not they are
9   experiencing any medical, social, emotional, or
10  academic problems, and there was nothing listed there.
11      Q   Okay.  Now you indicated that other than
12  Jennifer and ███████ and a brief conversation with
13  Corona you did not speak with or rely upon anything
14  that was said to you by any third parties with respect
15  to your diagnosis of either Jennifer or ███████,
16  correct?
17      A   Correct.
18      Q   Okay.  In your report you make reference that
19  Jennifer spoke to you about what a teacher of ███████
20  had reported.  Did you attempt to make contact with
21  any of ███████ teachers to verify what Jennifer was
22  reporting to you?
23      A   Let's see -- no, we don't have any teacher
24  reports.
25      Q   Okay.  Are those sometimes reports that

42

1  you get from school teachers to see what they're
2  observing of the child in their classroom?
3      A   Yes.
4      Q   Do you know why that wasn't done in this
5  case?
6      A   It's not routine for me to reach out to
7  teachers, particularly if there are no identified
8  school difficulties.
9      Q   Okay.  And in this particular case, based
10 upon what Jennifer told you, ███ was doing very well
11 in school, correct?
12     A   Yes.
13     Q   And in fact she was enrolled in the ALPS
14 program in the Jordan School District?
15     A   Correct.
16     Q   Did you have some understanding as to what
17 the ALPS program was?
18     A   Yes.
19     Q   What is your -- what was your
20 understanding at the time you did this evaluation of
21 what ALPS was?
22     A   ALPS is the extended learning program for
23 students would have been tested as gifted or advanced
24 academically.
25     Q   Okay.  And in order to be enrolled in the

43

1  ALPS program there has to be testing done, correct?
2      A   Correct.
3      Q   And evaluation as to the student's
4  behavior and other factors that...
5      A   I don't know that behavior is taken into
6  consideration for that.  My child has tested for the
7  ALPS program in the Jordan School District so I'm
8  familiar as a parent.
9      Q   Does it require any input from prior
10 teachers?
11     A   Not to my knowledge.
12     Q   Okay.
13     A   I know it requires -- I'm trying to
14 remember what the application looks like.
15     Q   Okay.
16     A   They asked for parents' perspective in the
17 application.  I don't know and I'm not aware if they
18 ask the teachers anything.
19     Q   Okay.  Whether there's an endorsement by
20 prior teachers?
21     A   Yeah, I have no idea.
22     Q   Okay.  And there's standardized tests that
23 are administered and you have to do well enough on
24 those tests to be accepted into the program, correct?
25     A   Yes.

44

1      Q   Do you know what the two standardized
2  tests are that are administered?
3      A   The CogAT and the Iowa.
4      Q   Okay.  Do you know what ███ test
5  results were?
6      A   On those I don't know that -- I know that
7  she did well enough to get into the program, which
8  means that she has to be above a certain level on all
9  of them.
10     Q   Okay.  Now as you sit here today you've
11 prepared a very complete report.  I think it's, what,
12 17 pages -- is it 17?  17 pages.
13     A   I always got in trouble in grad school for
14 being too verbose.
15     Q   All right.  As you sit here today do you
16 remember any specific conversations with ███ that
17 are not reflected in your report?
18     A   No.
19     Q   Okay.  How about with regards to specific
20 recollection of any conversations with Jennifer that
21 are not reflected in your report?
22     A   No.  All conversations are in the report.
23     Q   All right.
24     A   With the exception of the My Little Pony
25 conversation, which we talked about.

45

1      Q   All right.  And that was memorable enough
2  that you remembered that separately?
3      A   Of course.
4      Q   Okay.  Now in reviewing your report did
5  you inquire directly of ███ as to what problems she
6  had experienced since the incident at Lifetime?
7      A   I talked to her about symptoms that she
8  had experienced, yes.
9      Q   Okay.  And maybe if you just direct us to
10 that section of your report where you have ███
11 self-reported symptoms to you.
12     A   Yes.  That would have been in the clinical
13 interview section.  I --
14     Q   So which page are we looking at?
15     A   13.
16     Q   13, okay.
17     A   Yes.  And I clarified at the beginning of
18 that that I did not speak to her directly about the
19 things that happened to her at Lifetime as I had
20 witnessed her telling all of the story to the IME and
21 I thought that that would exacerbate symptoms that she
22 was having, and I also read her deposition.
23     Q   Okay.
24     A   So for this I was asking about things
25 like -- that I would expect to see if there was

46

1  anxiety or mood disturbance or posttraumatic stress or
2  any number of conditions, including nightmares,
3  anxieties, worries, sadness, fears, anger, as well as
4  nightmares -- I think I said that already.
5      Q    You did.  All right.  Let me ask you this,
6  when I look at page 13 under the heading clinical
7  interview, this is the section there where you've set
8  out your interview of █████ where she's responding to
9  you asking her about what problems or symptoms that
10  she's experienced, correct?
11     A    Yes.
12     Q    And so the first paragraph on page 13 is
13  kind of the setup explaining that, again, you didn't
14  spend any time going into what happened at Lifetime
15  because that had been covered sufficiently by Dr. Ryan
16  in her evaluation, but you did get the self-report
17  that is in the next paragraph.  It's a lengthy
18  paragraph.
19     A    Yes.
20     Q    Neuropsychologists don't like new
21  paragraphs.
22     A    No, we don't.
23     Q    Okay.
24     A    We also dictate our reports so it's just
25  what we say.

47

1      Q    A steam of consciousness.
2      A    Yes.
3      Q    All right.  In your report and in that
4  section, pages 13 and 14, where I see something in
5  quotes, was that your attempt to best reflect exactly
6  what █████ wording was in response?
7      A    Yes.
8      Q    All right.  And, again, other than what
9  you see in your report, you don't remember anything
10  about what her response was to any particular question
11  that you may have had other than what's seen in your
12  report?
13     A    I do have notes that I took.
14     Q    Okay.
15     A    Which are here.
16     Q    And this is a series of, looks like, four
17  pages on one side that these are the notes you would
18  have taken contemporaneous to questioning her.  You
19  would have filled out sometimes what her exact wording
20  was, other times you would have summarized it, is that
21  fair to say?
22     A    Yes.
23     Q    As I look at this -- and I'm happy to let
24  Mr. Hinkins look -- it looks like it's a fairly
25  comprehensive review of the same materials you put in

48

1  pages 13 and 14, correct?
2      A    Yes.
3      Q    Okay.  In looking at these notes today
4  would they refresh any recollection as to, say,
5  verbatim statements made by █████ that are not
6  reflected in your report or in the notes?
7      A    No.
8      Q    Okay.
9      A    I put, I would say, 98 percent of those
10  notes into the report.
11     Q    Right.  Okay.  Now I want to ask you with
12  regards to some of the statements that Mrs. Ngatuvai
13  may have made to you during your evaluation of her
14  daughter as well as of herself.  The -- and those --
15  the statement of clinical interview of Jennifer, where
16  is that found in your report?
17     A    Page 4.
18     Q    All right.  And it runs from page 4 looks
19  like through page 6?
20     A    Yes.
21     Q    And, again, if there are quotation marks,
22  that would be your best effort to record exactly what
23  Mrs. Ngatuvai was saying and otherwise it would be at
24  least your best effort to summarize what she was
25  telling you?

49

1      A    Yes, and I have notes on that as well.
2      Q    Okay.  And those are all produced as part
3  of the flash drive, correct?
4      A    Correct.
5      Q    And this is one, two, three, four, five
6  pages, single-sided handwritten notes, correct?
7      A    Correct.
8      Q    And you were pretty diligent and I think
9  you said about 98 percent of your notes made it into
10  your report with regard to █████?
11     A    Yes.
12     Q    Do you have an estimate as to what
13  percentage of your notes of Jennifer's conversation
14  made it into your report?
15     A    That would be about the same.
16     Q    Okay.  Other than the review of the
17  records that were given to you did you do anything in
18  an attempt to independently verify anything that
19  Jennifer told to you during your clinical interview of
20  her?
21     A    Other than looking at the records?
22     Q    Yes.
23     A    No.
24     Q    Now I want to just ask you, there's a
25  mention of kind of an emotional meltdown that Jennifer

50

1  reported to you of ▮▮▮▮ following the first day of
2  evaluation by Dr. Ryan.  Do you recall her comments in
3  that regard?
4      A    Yes.
5      Q    Did anyone contact you after that first
6  day to say, "▮▮▮▮ had a meltdown, Dr. Wilkerson,
7  what should we do?"
8      A    No.
9      Q    When did you first learn that there had
10  been this supposed meltdown?
11      A    When Jennifer told me.
12      Q    Okay.  And that was in February of 2019?
13      A    Yes.
14      Q    Okay.
15      A    At that time my role was not as a treating
16  provider so I wouldn't have expected contact.
17      Q    Okay.  Did you tell Jennifer that you
18  could not be consulted if she had questions?
19      A    I didn't tell her that I could be
20  consulted or could not be.
21      Q    Okay.
22      A    At that time my role was simply to observe
23  the IME.
24      Q    Okay.  You thought your job was done at
25  that point?

51

1      A    Yes.
2      Q    Okay.  Now she also reported to you that
3  on New Year's that she had observed Mr. Hinkins and
4  that she had had some kind of a -- the little girl had
5  had a reaction to see Mr. Hinkins on New Year's.  Do
6  you recall what she told you about that?
7      A    Well, she did say that ▮▮▮▮ likes Jake
8  very much.  However, anything where she is expected
9  to -- whenever there is movement on the case ▮▮▮▮
10  symptoms appear to flare up.
11      Q    Okay.  Did you ask ▮▮▮▮ about seeing
12  Mr. Hinkins on New Year's Day?
13      A    No.
14      Q    Okay.  Now we don't have a lot of time
15  left but I want to ask you some questions with regards
16  to the testing that was done.  You've indicated that
17  Jennifer filled out the Conners Comprehensive Behavior
18  Questionnaire?
19      A    Yes.
20      Q    And that, again, is a measurement in this
21  case of the mother's perception of what her daughter
22  was experiencing?
23      A    Correct.
24      Q    And the Rating Scale of Impairment, that,
25  again, is a self-report that Jennifer filled out with

52

1  regard to her perception of her daughter?
2      A    Correct.
3      Q    Now I note that on the Rating Scale of
4  Impairment you found considerable impairment in her
5  ability to do household tasks.
6      A    Uh-huh.
7      Q    Do you recall that?
8      A    That was what was generated by the test
9  itself, that was not necessarily a finding I made.
10      Q    All right.
11      A    So considerable impairment, yes, in the
12  domestic sphere.
13      Q    Did you inquire whether there was anyone
14  else in that household that suffered from considerable
15  impairment in performing household tasks?
16      A    No, but I am certain that in every
17  household everybody has, to some extent, problems with
18  their household tasks.
19      Q    Okay.  And how a parent may perceive a
20  child's ability to, say, keep their room up will
21  depend upon how judgmental the parent is, correct?
22      A    That is correct.  That is true for every
23  parent report that we get, and so all of that is taken
24  with a grain of salt, the parent's observation is not
25  perfect.

53

1      Q    Okay.  It can be very subjective?
2      A    Very much.
3      Q    And variable according to the parent?
4      A    Yes.  However, there are controls built in
5  to determine whether or not a parent is being -- is
6  over reporting or under reporting, as well as
7  consistency of the reporting for validity checks.
8  That's how we determine whether or not she was over
9  reporting.
10      Q    Now with respect to the impairment and
11  ability to do household tasks, is there a specific
12  validity test that is done to determine the validity
13  of that particular measurement?
14      A    For this one -- for this one I do not
15  believe so.  However, the -- if a parent is over
16  reporting, they tend to over report on multiple
17  different measures, and the Conners Behavior Rating
18  Scale does have that included.
19      Q    Okay.  And on that one what were the test
20  results on the Conners Comprehensive Behavior Test --
21  or self-report, excuse me?
22      A    In terms of validity?  Or all of it?
23      Q    All of it.
24      A    In terms of validity, her responses did
25  not indicate either an overly positive response style,

54

1  an overly negative response style, or an inconsistent
2  response style, so it was valid.
3      Q     Okay.
4      A     And then she reported elevated scores,
5  meaning many more concerns than are typically reported
6  for a child of ███ age, in regards to emotional
7  distress, upsetting thoughts, worrying, social
8  problems, defiant and aggressive behaviors, separation
9  fears, perfectionistic and compulsive behaviors, and
10 then a variety of symptom scales for DSM diagnoses.
11     **Q     Now is the Conners Comprehensive Behavior**
12 **Report, is that a recognized diagnostic tool for the**
13 **determination of whether someone has posttraumatic**
14 **stress disorder?**
15     A     It is something that contributes to, yes.
16     **Q     Okay.**
17     A     Based on a constellation of symptoms that
18 are consistent with a diagnosis.
19     **Q     Okay.**
20     A     It is not specifically trauma oriented
21 however.
22     **Q     Okay.  So you use it as one of a variety**
23 **of tools in trying to evaluate what's going on?**
24     A     Yes.
25     **Q     All right.  The -- with regards to the**

55

1  **testing, was there any other testing that was done of**
2  **Jennifer?**
3      A     No.  Oh, yes.  Beck Anxiety Inventory and
4  Beck Depression Inventory.  Yeah, she filled out self
5  reports.
6      **Q     All right.  And you've reported those**
7  **results in your report?**
8      A     Yes.
9      **Q     Thank you.  Let's talk about the testing**
10 **that was done on ███.  You did the Reynolds Child**
11 **Depression Scale?**
12     A     Yes.
13     **Q     And found that she was at the 1st**
14 **percentile?**
15     A     She not only did not report typical levels
16 of depressive symptoms, she reported completely zero
17 levels of depressive symptoms.
18     **Q     And what did you conclude from that?**
19     A     That she -- typically when I see scores
20 like that, in my clinical experience it means that the
21 child is either statistically significantly happier
22 than all other children or, which is most likely, is
23 that they are somewhat defensive in dealing with or
24 admitting psychological problems.
25     **Q     Okay.**

56

1      A     In my clinical experience that is far more
2  likely.
3      **Q     Okay.  When you met with ███ and spent**
4  **an hour or so talking about My Pony -- My Little Pony**
5  **I guess?**
6      A     Yeah.
7      **Q     Did you form any impressions as to her**
8  **personality, whether she was depressed or happy?**
9      A     I did not.  She seemed to be a fairly
10 typical little girl who was very tired after a long
11 day.
12     **Q     Okay.  Well, I think Corona showed up late**
13 **as I recall?**
14     A     He did.
15     **Q     Okay.  What time did you spend that hour**
16 **or so with ███?**
17     A     At the very end of the day.
18     **Q     At the end.  Okay.  And then you did the**
19 **Multidimensional Anxiety Scale, the MASC 2?**
20     A     Yes.
21     **Q     And as I understand it that's a test**
22 **that's designed for children ages 8 through 19, is**
23 **that correct?**
24     A     Correct.
25     **Q     And how is that test administered?**

57

1      A     It is self-report.
2      **Q     Okay.  So the -- do you read the questions**
3  **to the child or does the child read the questions?**
4      A     It depends on the reading level of the
5  child.  Given that ███'s reading level was advanced,
6  she easily read each of the questions and understood
7  them.  I did check for understanding in the first
8  practice question and she grasped the concept easily.
9      **Q     The test itself is written at a third**
10 **grade level, correct?**
11     A     Correct.
12     **Q     Okay.  And the overall test results there**
13 **showed borderline on anxiety probability score?**
14     A     Yes.
15     **Q     And the score was 52?**
16     A     For -- the overall total score was 52.
17     **Q     Okay.  And the mean of that test is 50**
18 **with a standard deviation of ten, correct?**
19     A     That is correct.
20     **Q     Now the -- is there a similar result in**
21 **the inconsistency index?**
22     A     Yeah.  She -- it did not come up as
23 inconsistent.
24     **Q     Okay.  And eight out of the ten**
25 **measurements that were taken on the MASC 2 were within**

58

1    the norm, correct?
2        A    Correct.
3        Q    So she had two that were elevated and the
4    balance were within normal limits?
5        A    She had two that were slightly elevated
6    and one that was elevated, so there were three
7    elevations.
8        Q    Okay.  Now the questions in which the
9    elevated results were found, are you able to cull
10   those out and know which questions they were and how
11   she answered them?
12       A    I can go back, but I also have a list of
13   what it was that she had said --
14       Q    Okay.
15       A    -- on here.
16       Q    All right.  For instance, one of the areas
17   in your report that she was elevated to some degree
18   about animals and bugs.
19       A    It was bad weather, the dark, animals or
20   bugs.  So the question included all of them.
21       Q    Okay.
22       A    And they would report if they were afraid
23   of one or more of those things.
24       Q    Okay.  Very good.  Based upon her test
25   results did you at that point in time feel that any

59

1    intervention strategy was necessary to assist the
2    little girl?
3        A    In that moment?
4        Q    Yes.
5        A    No, I did not feel that would be my role.
6        Q    Okay.  And did you recommend it to anyone?
7        A    I recommended that she continue to see her
8    counselor.
9        Q    Okay.  And was she seeing a counselor at
10   that point in time?
11       A    If she wasn't, she was intending to, but I
12   can't recall.
13       Q    Okay.  Do you think it would have been
14   helpful for her to be seeing a counselor at that point
15   in time?
16       A    I always think it's helpful for children
17   to be seeing counselors.
18       Q    All right.  Now are you aware of any
19   therapy that ▇▇▇ received after seeing Pamela
20   Mitchell?
21       A    Man.  And I did review all of these
22   records this morning.  I have a name in my head but I
23   can't remember -- oh, no, Tammy Ishimatsu saw
24   Jennifer.  I don't know why I was thinking that she
25   saw ▇▇▇.  So, no, I don't believe so.

60

1        Q    Are you familiar with either Ms. Mitchell
2    or Ms. Ishimatsu?
3        A    I'm familiar with both of them by name
4    only.
5        Q    Okay.  Let me ask you, is there -- are you
6    aware of any support in the literature with regards to
7    the MASC 2 being used as a diagnostic tool for
8    posttraumatic stress disorder?
9        A    Much like the Conners it's used in
10   conjunction with a variety of different techniques.
11       Q    Okay.  You also had a Human Figure Drawing
12   that you had her perform?
13       A    Yes.
14       Q    And that -- you indicated that she was
15   thinking about being happy.
16       A    That was her report.
17       Q    Okay.  And how is that test administered?
18       A    I give her a piece of paper and a pencil
19   and ask her to draw a picture of a person.
20       Q    Okay.  Is it a picture of herself or is
21   this -- it could be anyone?
22       A    She gets to choose.
23       Q    Okay.  And did you interpret the drawing
24   that she made that day?
25       A    I did.  That is a brief projective measure

61

1    used to determine how it is that she sees herself or
2    sees other people in a very basic way.
3        Q    Okay.  And how did you interpret it?
4        A    Well, she reported that she was thinking
5    about being happy that "I just did something right or
6    gave something up for someone.  I did something
7    important or I won something."  I observed that she --
8    most children will say that they're happy in the
9    drawings that they do, but she had to justify it
10   multiple different ways that she had done something to
11   deserve being happy.
12       Q    Okay.  All right.  And then you did the
13   Kinetic Family Drawing?
14       A    Yes.
15       Q    How was that test administered?
16       A    Very similarly.  I gave her two
17   directions.  I tell her that she has to draw a picture
18   of her family and that she -- everyone in the drawing
19   has to be doing something, and then leave the rest up
20   to her.
21       Q    Okay.  And is there anything in the
22   literature supporting the use of that drawing test by
23   itself to be diagnostic for posttraumatic stress
24   disorder?
25       A    By itself?

62

1    Q    By itself.
2    A    In conjunction with other measures.
3    Q    Okay.  Similar, a constellation?
4    A    Yes.
5    Q    Okay.  And then the Plenk Storytelling
6    Test?
7    A    Yes.
8    Q    As I understand it you show a series of
9    nine photographs.
10   A    Yes.
11   Q    Some black and white, some color, that
12   depict in eight of the nine photographs one or more
13   children doing various things, correct?
14   A    Correct.
15   Q    And then the ninth or the -- I guess it's
16   really the eighth photograph shows what might be
17   described as a storm, is that right?
18   A    Roughly.  Very vague interpretation of a
19   storm but, yes.
20   Q    All right.  And you indicated in your
21   report on page 12 that she discussed themes.
22   A    Yes.
23   Q    And these are places where I didn't see a
24   lot of quotation marks but you use the word themes.
25   A    Yes.

63

1    Q    What do you mean by that?
2    A    If during our discussion of each of the
3    drawings she -- or each of the photographs she brought
4    up a particular thing over and over again throughout
5    several of the pictures, I would consider that a
6    theme.
7    Q    Okay.  Is there a reason why in that
8    section with regard to the Plenk test you did not put
9    anything in quotation marks?
10   A    No particular reason, no.
11   Q    Okay.  Now in your report you mentioned
12   the themes that she discussed with regards to six of
13   the nine photographs.
14   A    Yes.
15   Q    Do you have in your notes what the theme
16   was of her discussion of picture number 4?
17   A    Okay.  Let me get to the -- what page are
18   we on in the report so I make sure I'm speaking
19   specifically?
20   Q    Let's see, looks like page 12.
21   A    Okay.  And where do I say what the theme
22   was?
23   Q    Well, that's what I'm asking.  I didn't
24   see a discussion of the theme in card -- you called
25   them cards or photographs?

64

1    A    Yes.
2    Q    Photograph card 4.
3    A    So you wanted -- because I didn't mention
4    it in the --
5    Q    I'm just wondering, do you have in your
6    notes what the theme was?
7    A    Yes.  It was "A boy standing up in front
8    of the class.  He was standing up and talking to a
9    friend.  Talking about culture or what he's learned or
10   his New Year's resolution.  Afterwards another child
11   will go up and teach."
12   Q    Okay.  And that was the theme of what she
13   told you?
14   A    That was the narrative that she provided
15   based on the card.
16   Q    Okay.  And card or picture number 7, what
17   was the theme or narrative that she gave you there?
18   A    The narrative for number 7 was that "they
19   were playing and tickling each other."  She's
20   thinking, "Wow, this is such a fun time.  They're all
21   thinking the same thing.  And afterwards they're going
22   to go inside and play or it's dinnertime or they're
23   bored of playing."
24   Q    Okay.  And what was the theme in regards
25   to picture number 8 which is the dark clouds in the

65

1    sky?
2    A    Dark clouds.  She said that "they were
3    people or they're trees.  There's a field trip to
4    learn things about the desert or they're scientists
5    trying to see what life was like and they're thinking,
6    Wow, this is old, dude.  And they find some ground to
7    camp and the next day they find out even more."
8    Q    Okay.  Now with regards to the literature
9    with regards to the Plenk Picture Test is there
10   anything that is -- this literature accepted as being
11   diagnostic of posttraumatic stress disorder?
12   A    There is considerable amount of research
13   completed on the Plenk Storytelling Test regarding its
14   use in children with trauma.  I am unaware of what
15   that research says for the specifics of diagnosis of
16   trauma, but I do know that it was developed to be used
17   with populations of young children with trauma.
18   Q    Now with respect to the accuracy of
19   information being provided to you by a child, in this
20   case ███████ was now eight years of age, correct?
21   A    Correct.
22   Q    And so it had been some four and a half
23   years approximately since the incident at Lifetime?
24   A    Yes.
25   Q    Okay.  Developmentally I take it that

66

1  especially verbally she's very well -- she's quite
2  advanced, correct?
3      A    Correct.
4      Q    Did you inquire as to whether anyone had
5  talked to her about why she was coming to see you?
6      A    No.  I don't believe so.
7      Q    With regards to interviewing children,
8  would you agree that there are times that there is a
9  concern that a child may try to answer questions in
10 order to attempt to please you as the interviewer?
11     A    I think that could happen.  However,
12 I did not ask ▓▓▓ about the events at Lifetime.
13     Q    Okay.  And that -- would you agree with me
14 that the memory or the ability of a child to report
15 symptoms may be impacted by what others have told them
16 that they have perceived in that child?
17     A    It could.
18     Q    Okay.
19     A    But --
20     Q    For instance -- and I don't mean to cut
21 you off if you haven't finished.
22     A    In regards to ▓▓▓ I had no -- I had no
23 question about her ability to report her current
24 symptoms based on her level of insight and
25 intelligence.

67

1      Q    Okay.  But insofar as memories going back
2  to when she was four or five years of age, did you do
3  anything to try to determine whether she had the
4  ability to recall those types of events?
5      A    No.  It was my understanding that there
6  was going to be a separate neuropsychological
7  evaluation completed that would be answering those
8  questions.
9      Q    Okay.  During the time that you spent with
10 ▓▓▓ did she report having any anxiety over any
11 situations that she was experiencing in her life other
12 than what might be trauma from the event at Lifetime?
13     A    Let me check.  Can you repeat the
14 question?
15          (Whereupon, the question was read back by
16 the court reporter.)
17          THE WITNESS:  She's afraid of bugs.  Some
18 of the anxieties that she appears to be experiencing
19 do not -- it's not directly related in her mind but
20 can be related to the trauma of particularly the fear
21 of being alone, for example.  For her I don't think
22 that she conceptualizes that as being connected but in
23 many different ways she reported worry about being
24 left alone, about parents going away, about Dad going
25 for travel, et cetera.  She did report some fears of

68

1  worms and heights and going fast, things that were not
2  related.  However, those could be considered typical
3  childhood fears.
4  (BY MR. TRAYNER)
5      Q    Okay.  Lockdown drills, she doesn't like
6  lockdown drills?
7      A    She says that it's boring.  That doesn't
8  seem to be a fear issue.
9      Q    Okay.  And --
10     A    She doesn't like to be quiet.
11     Q    Did she tell you why the principal had
12 left?
13     A    No.
14     Q    Did she tell you why the teacher had left?
15     A    No.
16     Q    Did she report to you that she was anxious
17 when her parents would fight?
18     A    Yes.
19     Q    She told you that she was anxious at
20 school sometimes.  What was it that caused her to be
21 anxious at school?
22     A    She said -- she said that she likes to
23 know what to expect and sometimes at school she
24 doesn't know what to expect.
25     Q    Okay.

69

1      A    She didn't report any fears regarding her
2  school performance.
3      Q    In fact, she said she was "pretty chill"
4  at school?
5      A    "Pretty chill."
6      Q    How does a neuropsychologist interpret
7  "pretty chill"?
8      A    Pretty chill?  That she has a great grasp
9  of the English language.
10     Q    Okay.  And did you have access to the
11 deposition of Pamela Mitchell?  I didn't know if I saw
12 that.
13     A    No.  I had her therapy records.
14     Q    Okay.  So insofar as how Miss Mitchell
15 interpreted her therapy records at the time that ▓▓▓
16 ceased to see her after April 2015, you don't know
17 what Ms. Mitchell's impressions were, correct?
18     A    No, I don't.
19     Q    Now as I understand it the criterion for a
20 PTSD diagnosis varied for diagnosing the condition in
21 children under the age of six versus older than the
22 age of six, is that correct?
23     A    That is.
24     Q    And so the criterion that you were using
25 were with respect to being older than the age of six

70

1  because that's the time you evaluated her?
2      A  Yes. I was looking at present symptoms.
3      Q  Okay. Now as I understand it one of the
4  criterion -- in fact, criterion 1 is that the person
5  has to be exposed to death, threatened death, actual
6  or threatened serious injury, rational or threatened
7  sexual violence in the following ways: Direct
8  exposure, witnessing the trauma, or learning that a
9  relative or close friend was exposed to a trauma, is
10  that right?
11      A  Correct.
12      Q  Now with respect to the -- I take it
13  that -- what is it with respect to criterion A that
14  took place that qualifies ▆▆▆ under criterion A?
15      A  Sexual violence.
16      Q  Okay. And what is the definition that you
17  use of sexual violence?
18      A  Nonconsensual sexual contact, as she was a
19  child and could not consent.
20      Q  Okay. The fact that she was under the age
21  of 18 just means as a result you're not able to
22  consent?
23      A  Well, age of consent is below 18 but, yes.
24  Being a three to four-year-old at the time she was
25  unable to consent to that.

71

1      Q  Okay. Was there any indication from your
2  understanding as to how this incident took place that
3  even though she may not be legally able to consent
4  that she consented to engage in that behavior?
5      A  From what I have found working extensively
6  with preschool age children who have been sexually
7  abused, it does not matter if they consented to what
8  was going on at the time or not. In fact, their
9  understanding of consent leads them to considerable
10  guilt if they feel they did consent to it, so it can
11  actually make things worse.
12      Q  Okay. With regards to developmentally
13  appropriate sexual behavior, do you have any expertise
14  in that?
15      A  Yes.
16      Q  What expertise do you have?
17      A  Working with preschool aged clients and
18  their families for many years.
19      Q  All right. And are you aware of the
20  literature in regards to what is developmentally
21  appropriate for a child in the age of 3 to 4 years of
22  age?
23      A  I am. There's quite a bit of contention
24  and argument about that.
25      Q  Okay. And are you aware of any literature

72

1  that would support that the type of behavior that was
2  exhibited -- allegedly exhibited at Lifetime that day
3  would be something other than developmentally
4  appropriate sexual behavior?
5      A  Yes.
6      Q  What literature are you aware of?
7      A  I don't have the specific article that I
8  can pull out right now. However, the difference
9  between what I would consider developmentally
10  appropriate and what happened to ▆▆▆ has to do with
11  the oral-genital contact, which I would not consider
12  to be developmentally appropriate.
13      Q  Okay. And by the oral-genital contact
14  what is your understanding as to the contact that took
15  place in this case?
16      A  That she was licked by a boy and asked,
17  although it is unclear if she actually did, do the
18  same in return.
19      Q  Okay. Where was she licked by the boy?
20      A  She had stated in several different
21  occasions that it was on her "bum." But whether that
22  was the front or the back seemed to -- she seemed to
23  be unaware.
24      Q  Would it make any difference to you
25  whether it was the front or the back bum?

73

1      A  None whatsoever.
2      Q  Okay. So you would consider the contact
3  with the buttock region would be oral-genital contact?
4      A  Yes.
5      Q  Okay. And as you sit here today you're
6  not able to cite me to any particular literature that
7  would say that that type of conduct would constitute a
8  sexual act, are you?
9      A  Not today, but there's a plethora in the
10  literature.
11      Q  All right. And the literature -- are you
12  aware of the literature that is published by the
13  Journal of Pediatrics?
14      A  I am, though I have not read every article
15  that they have ever put out.
16      Q  Okay. How about the Journal of Child
17  Abuse and Neglect, are you aware of what they consider
18  to be developmentally appropriate sexual behavior?
19      A  Not specifically their opinion.
20      Q  Okay. Now let me ask you this, Doctor, in
21  reviewing the records of ▆▆▆ pediatricians did you
22  note any of the complaints that Mrs. Ngatuvai has had
23  concerning her daughter's condition?
24      A  I only had two records.
25      Q  Okay.

74

1    A    And I don't recall.
2    Q    **She complained to you about** ▄▄▄▄▄
3    **nightmares, correct?**
4    A    Correct.
5    Q    **Now nightmares are a frequent occurrence**
6    **to all children, would you agree?**
7    A    That is correct.
8    Q    **And in fact the prevalence of nightmares**
9    **increases between the ages of 6 and 10, correct?**
10    A    For some children.
11    Q    **Well, in contrast to the prevalence of**
12    **children under the age of 6 the incident of nightmares**
13    **increases, isn't that true?**
14    A    I am unaware of the research in that area.
15    Q    **Okay.  And do you know the peak years for**
16    **nightmares occurring in children?**
17    A    Based on my clinical observation or based
18    on research?
19    Q    **Based upon research.**
20    A    No, I know from clinical observation.
21    Q    **Okay.  What is your clinical observation?**
22    A    I would say that night terror types of
23    behaviors occur between -- earlier, between the ages
24    of 1 and a half to 5, and then nightmares where
25    children are able to verbally report the things that

75

1    they have seen in nightmare increase with the
2    development of speech and more comprehensive
3    understanding of language.
4    Q    **And do you have any claimed expertise in**
5    **the study of sleep or nightmares?**
6    A    Other than in my clinical experience, no.
7    Q    **Okay.  Now I want to go lastly to the**
8    **recommendations that you've made.  And I think you've**
9    **told us that you think you've spent enough time and**
10    **evaluated enough information with respect to Jennifer**
11    **to make a diagnosis of posttraumatic stress disorder,**
12    **correct?**
13    A    That is my impression.
14    Q    **All right.  And as I understand it you've**
15    **recommended for Jennifer that she undergo EMDR**
16    **counseling or training -- I don't know what's the best**
17    **way to describe it.**
18    A    Treatment.
19    Q    **Treatment for a period of three to 12**
20    **sessions, is that correct?**
21    A    Correct.
22    Q    **And that -- your report says that she's**
23    **likely to require ongoing cognitive behavioral**
24    **therapy.**
25    A    Correct.

76

1    Q    **What benefit do you expect Mrs. Ngatuvai**
2    **to receive from either of those recommended courses of**
3    **care?**
4    A    EMDR usually helps with the physiological
5    response to trauma with the tension and restlessness,
6    the hypervigilance, but it does not teach any
7    particular coping skills or mechanisms to deal with
8    triggers or anxieties.  The cognitive behavior therapy
9    would help with that, also would help address the
10    depression symptoms.
11    Q    **And you also recommended that she receive**
12    **some psychiatric intervention?**
13    A    Correct.
14    Q    **I take it that if your assessment is**
15    **correct, that she has posttraumatic stress disorder,**
16    **that Mrs. Ngatuvai could have benefited from that care**
17    **much earlier than 2019?**
18    A    Of course.
19    Q    **And I take it that it would be your**
20    **expectation that had she received that care that the**
21    **symptoms that she would have been experiencing today**
22    **would have been decreased significantly?**
23    A    I have no way of knowing that to be the
24    case.
25    Q    **Okay.  Well, you expect the therapies to**

77

1    be beneficial, correct?
2    A    Yes.
3    Q    **And has it been your experience that in**
4    **clinical practice that the sooner somebody begins to**
5    **receive therapy, the sooner that their symptoms begin**
6    **to respond to that therapy?**
7    A    Well, of course.  You can't respond to
8    therapy you're not receiving.
9    Q    **Right.  Now with regards to -- let me ask**
10    **you this, are you aware of any other care that**
11    **Mrs. Ngatuvai received other than from Ms. Ishimatsu?**
12    A    Like I said, she saw somebody briefly for
13    stress related to being overwhelmed with parenting.
14    And she -- let's see -- she had underwent a sequence
15    of EMDR if I remember correctly.
16    Q    **Okay.  Did you ever review those records?**
17    A    No.
18    Q    **Okay.  Now with respect to** ▄▄▄▄▄**, you've**
19    **recommended a course of individual trauma focused**
20    **behavioral therapy?**
21    A    Yes.
22    Q    **And what is that?**
23    A    Trauma focused cognitive behavioral
24    therapy.  It's a manualized component-based treatment
25    where you -- the therapist works through the trauma in

78

1  a developmentally appropriate way for young children
2  and helps them to create a -- it helps them to
3  desensitize to their own triggers of the trauma,
4  understand their triggers of the trauma, tell their
5  story and move past it to some extent.
6      Q    And is that type of therapy available here
7  locally?
8      A    Yes.
9      Q    Is it provided through your clinic?
10     A    I am trained in trauma focused cognitive
11  behavioral therapy but I don't do it very regularly.
12  I do know people who do.  The Children's Center here
13  actually did a pilot study for the -- I think it was
14  the trauma -- I can't remember where it was from.  But
15  developing a toolbox in terms of pre-school-aged
16  children and TFCBT.  So there are many practitioners
17  locally.
18     Q    You've recommended EMDR therapy for ████
19  as well?
20     A    Yes.
21     Q    And what -- just generally speaking what
22  does that consist of?
23     A    It consists of meeting with somebody for a
24  short period of time, typically three to 12 sessions,
25  depending -- so it can be shorter or longer depending

79

1  on their response to it.  And they can meet with that
2  clinician outside of their regular therapy so it's not
3  like you're seeing a regular therapist.  They recount
4  of things that are stressors or problems from the past
5  and engage in a series of physical stimulation meant
6  to reorient the brain and process trauma more
7  effectively.  I am not an EMDR provider however so I
8  probably butchered that.
9      Q    Okay.  And then you recommend periodic
10  mental health therapy?
11     A    Yes.
12     Q    And are there practitioners available for
13  that type of therapy here locally?
14     A    Yes.
15     Q    And based upon your training and
16  experience would you expect that there would be some
17  improvement in ████ symptomatology related to what
18  you have diagnosed as posttraumatic stress disorder if
19  she received the type of therapy that you've outlined?
20     A    Yes.  I do think that given her symptoms
21  there will be periods of time in her life where
22  symptoms may reemerge after a period of her seemingly
23  recovered, which is very common in kids with any kind
24  of trauma.  So, for example, romantic relationships or
25  engaging in sexual relationships with others there's

80

1  periods of time in which I could expect that symptoms
2  would recur.
3      Q    Okay.  So that would be episodic in
4  nature?
5      A    Yes.
6      Q    Okay.  And then you recommended that she
7  perhaps see a pediatric psychiatrist as needed?
8      A    As needed.
9      Q    Okay.  All right, Doctor, are there any
10  other opinions that you've formulated in this case
11  that you haven't either told us about today or have
12  put in your report?
13     A    No.
14         MR. TRAYNER:  That's all the questions I
15  have for you today.  Thank you.
16         MR. HINKINS:  We'll read and sign.
17         (Deposition concluded at 11:27 a.m.)
18
19  Original transcript was filed with Mr. Trayner.
20
21      Reading copy was sent to Mr. Hinkins.
22
23
24
25

81

1              C E R T I F I C A T E
2  STATE OF UTAH        )
3  COUNTY OF _____   )
4
5      I HEREBY CERTIFY that I have read the
6  foregoing testimony and the same is a true and correct
7  transcription of said testimony with the exception of
8  the following corrections listed below giving my
9  reasons therefor.
10
11
12
13      _____
14          TRISTYN WILKERSON, Psy.D.
15
16  Subscribed and sworn to at _____,
17
18  this _____ day of _____, 2019.
19
20      _____
21             NOTARY PUBLIC
    My commission expires:
22
23  _____
24
25

K.N. vs LIFETIME FITNESS, INC.
June 24, 2019                                                          Tristyn Wilkerson, Psy.D.

82

```
1                  C E R T I F I C A T E
2    STATE OF UTAH        )
3    COUNTY OF SALT LAKE  )
4
5          THIS IS TO CERTIFY that the deposition of
6    TRISTYN WILKERSON, Psy.D. was taken before me, AMBER
7    PARK, a Certified Shorthand Reporter in and for the
8    State of Utah.
9          That the said witness was by me, before
10   examination, duly sworn to testify the truth, the
11   whole truth, and nothing but the truth in said cause.
12         That the testimony was reported by me in
13   Stenotype and thereafter transcribed by computer under
14   my supervision, and that a full, true, and correct
15   transcription is set forth in the foregoing pages.
16         I further certify that I am not of kin or
17   otherwise associated with any of the parties to said
18   cause of action, and that I am not interested in the
19   event thereof.
20         WITNESS MY HAND on June 28, 2019.
21
22
23
24
25
```

AMBER PARK
NOTARY PUBLIC-STATE OF UTAH
COMMISSION# 678644
COMM. EXP. 08-03-2018

EXHIBIT "C"

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

 3

 4   K.N., a minor, and JENNIFER NGATUVAI, )
     individually and on behalf of K.N.,   )
 5                                          )
             Plaintiffs,                    ) Case No.
 6                                          ) 2:16-cv-00039
     vs.                                    )
 7                                          ) Judge Jill N.
     LIFETIME FITNESS, INC., a foreign      ) Parrish
 8   corporation,                           )
                                            ) Magistrate Judge
 9       Defendant.                         ) Dustin B. Pead
                                            )
10   _____

11

12          VIDEO DEPOSITION OF POLLY WESTCOTT, Psy.D.

13

14          The video deposition upon oral examination of
     POLLY WESTCOTT, Psy.D., a witness produced and sworn
15   before me, Mary S. McCarty, a Notary Public in and for
     the County of Marion, State of Indiana, taken on
16   behalf of the Defendant at the offices of Alliance
     Court Reporting, 13295 Illinois Street, Suite 218,
17   Carmel, Hamilton County, Indiana, on Thursday, June
     27, 2019, scheduled to commence at the hour of
18   8:00 a.m., pursuant to Federal Rules of Civil
     Procedure, with written notice as to time and place
19   thereof.

20

21

22

23              ALLIANCE COURT REPORTING
                    P.O. Box 78261
24            Indianapolis, IN 46278-0261
                    877.867.8600
25            www.alliancecourtreporting.com
```

Page 94

1    Q.  And you believe that it's out there to be found in a
2    medical literature search?
3    A.  Yes.  It will not say:  This is the only measure that
4    will tell you that someone has PTSD.  No.  Is it set
5    up to be a part of a PTSD battery of tests?  Yes.
6    Q.  Okay.  Let's turn now to the PCL-5 test.  Why did you
7    select that test?
8    A.  So the PCL-5 is in accordance to the Diagnostic and
9    Statistical Manual that I was referencing before that
10   will give us:  What are the criteria for PTSD?  It
11   specifically organizes the symptoms into categories
12   that reflect a correlation of the categories in that
13   Diagnostic and Statistical Manual.
14         There's a scaling system where we look at -- it
15   offers what's called a Likert scale.  So, basically,
16   from 1 to 5, how often are you experiencing these
17   symptoms?  Because that's important when you're
18   looking at exaggeration, for example.  Some people
19   will say they have experienced all of the symptoms but
20   they only are experiencing them once every four
21   months.  That doesn't qualify for a diagnosis.
22         So it gives us a little bit more information of:
23   Are they experiencing these symptoms?  How often are
24   they experiencing these symptoms?  And how much are
25   those symptoms interfering in day-to-day life?

Page 95

1         MR. TRAYNER:  Okay.  Let's now mark -- have this
2    marked as Exhibit Number 7, and this is a document
3    entitled PTSD Checklist.
4         (Deposition Exhibit No. 7 marked for
5    identification.)
6    BY MR. TRAYNER:
7    Q.  We'll hand you now what has been marked as Exhibit
8    Number 7, and is the last page of this document the
9    20-question self-report questionnaire?
10   A.  Yes.
11   Q.  So this is, again, yet another source that's available
12   on the Internet.
13   A.  Yes.
14   Q.  Okay.  Now, the -- is this the same questionnaire that
15   you administered to Ms. Ngatuvai?
16   A.  Pretty much, yes.  Same questions.  The format looks a
17   little different, but yes.
18   Q.  Okay.  Now, I note that at the beginning of this, the
19   instructions say that it was to be answered based upon
20   whether -- how much they had been troubled by a
21   problem in the last month -- in the past month.  Is
22   that the same instructions you gave Ms. Ngatuvai?
23   A.  Correct, in reference to the specific trauma.
24   Q.  Now, there are versions of the PCL-5 that assess
25   symptoms over a different or longer time frame,

Page 96

1    correct?
2    A.  Yes.
3    Q.  And did you administer any of those?
4    A.  No.
5    Q.  Okay.  And my understanding is that those meant to
6    assess symptoms over a longer or different time frame
7    have not been validated.  Do you agree with that?
8    A.  Yes.
9    Q.  Okay.
10   A.  It's also not relevant to me to fully understand if
11   I'm looking at -- the question is, what is this person
12   experiencing at this point in time?  I want to know
13   what their symptoms are in the last month versus what
14   happened 10 years ago.
15   Q.  Okay.  So your diagnosis of Ms. Ngatuvai would be
16   related solely to the period of the last month before
17   you saw her?
18   A.  Correct.
19   Q.  Okay.
20   A.  I mean, I -- in my interview, I'm asking all sorts of
21   questions to obtain a history before that, but when
22   I'm categorizing and I've decided this might be a
23   possible diagnosis, I want to know if those symptoms
24   specifically are relevant within the last month.
25   Q.  All right.  Now, the PCL-5 is not intended to be a

Page 97

1    stand-alone tool to diagnose PTSD.  Would you agree
2    with that?
3    A.  That's correct.
4    Q.  And that it is to be used to assist the clinician in
5    making a provisional diagnosis of PTSD.
6    A.  That is correct.
7         MR. TRAYNER:  Let's go ahead and mark this as
8    Exhibit Number 8, a document entitled Using the PTSD
9    Checklist.
10        (Deposition Exhibit No. 8 marked for
11   identification.)
12   BY MR. TRAYNER:
13   Q.  All right.  Doctor, are you familiar with this
14   document?
15   A.  Yes.
16   Q.  All right.  Let me -- I'm going to just draw your
17   attention to page 1.  Not the cover sheet, but page 1.
18   After the bullet points near the top, it says, quote:
19   The PCL-5 should not be used as a stand-alone
20   diagnostic tool.  When considering a diagnosis, the
21   clinician will still need to use clinical interviewing
22   skills and a recommended structured interview, e.g.,
23   Clinician-Administered PTSD scale for DSM-5, CAPS-5,
24   close paren, to determine whether the symptoms meet
25   criteria for PTSD by causing clinically significant

Page 98

1    distress or impairment and whether those symptoms are
2     not better explained by or attributed to other
3    conditions, close quote.
4        Did I read that correctly, first of all?
5  **A.  Yes.**
6  Q.  All right.  Well, I've been practicing.
7        Do you agree or disagree with the statements that
8    we just read?
9  **A.  Well, so this is based -- and the reason why this was**
10  created is for people who are doing stand-alone
11  assessments of people without an interview process.
12  So I agree with it:  If you're not interviewing them,
13  you should have some sort of structured other
14  interview process.
15      If you're saying that this is relevant in this
16  situation, I mean, the structured interview, or what's
17  called a semi-structured interview, was conducted
18  during a clinical process over several hours, which is
19  not usually the case.  When someone is given the PCL
20  and the Mississippi, for example, it used to be given
21  to -- just paper copies to people every time that they
22  came back from combat because they were trying to mark
23  them when they came back without an interview process
24  associated with it.
25  Q.  I'm going to move to strike as nonresponsive.  I'll

Page 99

1    just ask you, do you agree or disagree with that
2    statement that we just read?
3  **A.  Depends on the situation.**
4  Q.  Okay.  All right.  And you conducted a semi-structured
5    interview, correct?
6  **A.  Correct.**
7  Q.  You did not conduct a CAPS-5 structured interview?
8  **A.  Correct.**
9  Q.  Let me ask you, do you know, as you sit here today,
10  the statistical correlations between the PTSD scale on
11  the PCL-5 test and, say, the Generalized Anxiety
12  Disorder Scale 7?
13  **A.  I would -- I would guess that it's a high number but I**
14  don't know the number exactly, no.
15  Q.  Okay.  How about with regards to the correlation with
16  the Beck Depression inventory?  Are you aware of any
17  statistical correlation?
18  **A.  Again, I would say it's high.  This is the same**
19  conversation we just had where there are correlating
20  symptoms, in fact overlapping symptoms, between
21  anxiety, depression and PTSD.
22  Q.  Okay.  And for that reason, because of the overlapping
23  possibilities, and the possibility that certain tests
24  overreport, there's a need to conduct a check or
25  validity test.

Page 100

1  **A.  Correct.**
2  Q.  To determine how much of what's going on is
3    trauma-based versus depression and anxiety.
4  **A.  Correct.**
5  Q.  Now, the CAPS-5 test, have you heard it described as
6    the gold standard in PTSD assessment?
7  **A.  Again, I'm going to say it depends on the type of**
8    trauma.
9  Q.  Well, let me ask you, have you -- have you ever read
10  where --
11  **A.  So there's not -- to my knowledge, there is not one**
12  research base that would say:  You should only give
13  one instrument and nothing else in evaluation for
14  PTSD, that our bodies, the American Psychological
15  Association, the Neuropsychological Association, would
16  say that you need to have several facets of your
17  evaluation to be able to diagnose someone in a
18  forensic setting.  That includes self-report
19  inventories, objective personality testing, record
20  review, interview, collateral information from outside
21  sources.  All of those together provide a
22  comprehensive picture to answer a question, not one
23  specific measure.
24      MR. TRAYNER:  Okay.  Let's go ahead and mark this
25  as Exhibit 9.  And I wrote on the bottom of it and so

Page 101

1    if our reporter will cover my handwriting with the
2    sticker, I'd appreciate it.
3        (Deposition Exhibit No. 9 marked for
4    identification.)
5        MR. TRAYNER:  A sticker covers many sins.
6  BY MR. TRAYNER:
7  Q.  Let me hand you Exhibit 9.
8        And, Jake and Rich, this is the
9    Clinician-Administered PTSD Scale for DSM-5 CAPS-5
10  document.
11      Let me ask you first of all, are you familiar
12  with this particular document that has been printed
13  out?
14  **A.  Yes.  I referenced it earlier in our conversation to**
15  say it's a basis of what I do in my interview.
16  Q.  Okay.  And in the description of the CAPS-5, it says,
17  quote:  The CAPS is the gold standard in PTSD
18  assessment.
19  **A.  This was assigned for a clinical population.  So**
20  that's why it's a 30-minute structured interview for
21  clinical populations, yes.
22  Q.  And I think you've told us why you may have some
23  disagreement as to whether it's the gold standard in
24  PTSD assessment in this case, correct?
25  **A.  Correct.**

Page 102

1    MR. TRAYNER:  Doctor, I think that's all the
2    questions I have for you today.
3        THE WITNESS:  Thank you very much.
4        MR. TRAYNER:  Thank you.
5        MR. HUMPHERYS:  I have no further questions.  I
6    don't have any questions.
7        We will read and sign.
8        MR. TRAYNER:  Okay.
9        MR. HUMPHERYS:  And if you'll -- I would like
10   electronic copies, and other than --
11       MR. TRAYNER:  Should we go --
12       MR. HUMPHERYS:  I don't get the original so
13   electronic copies would be all I would want.  This is
14   Mr. Humpherys.
15       MR. TRAYNER:  Why don't we go off the record now,
16   Rich, if that's all right?
17       THE VIDEOGRAPHER:  Very well.  We'll go off the
18   record now.  The time is 10:30.
19       MR. HINKINS:  Okay.
20       THE REPORTER:  Mr. Trayner, you need a
21   transcript, correct?
22       MR. TRAYNER:  Yes.  Yes.
23       THE REPORTER:  Electronic?
24       MR. TRAYNER:  Electronic, please.  A mini would
25   be great.

Page 103

1    THE REPORTER:  And that was Mr. Humpherys that
2    needed a copy as well, right?
3        (The deposition concluded at 10:30 a.m.)
4        AND FURTHER THE DEPONENT SAITH NOT.
5
6
7        _____
          POLLY WESTCOTT, Psy.D.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 104

1    STATE OF INDIANA        )
                             )  SS:
2    COUNTY OF MARION        )
3        I, Mary S. McCarty, a Notary Public in and for
4    the County of Marion, State of Indiana at large, do
5    hereby certify that POLLY WESTCOTT, Psy.D., the
6    deponent herein, was by me first duly sworn to tell
7    the truth, the whole truth, and nothing but the truth
8    in the aforementioned matter;
9        That the foregoing deposition was taken on behalf
10   of the Defendant at the office of Alliance Court
11   Reporting, 13295 Illinois Street, Suite 218, Carmel,
12   Hamilton County, Indiana, on Thursday, the 27th day of
13   June, 2019, scheduled to commence at the hour of
14   8:00 a.m., pursuant to the Federal Rules of Civil
15   Procedure;
16       That said deposition was taken down
17   stenographically and transcribed under my direction,
18   and that the typewritten transcript is a true record
19   of the testimony given by the said deponent; and
20   thereafter presented to said deponent for his/her
21   signature;
22       That the parties were represented by their
23   counsel as aforementioned.
24       I do further certify that I am a disinterested
25   person in this cause of action; that I am not a

Page 105

1    relative or attorney of either party, or otherwise
2    interested in the event of this action, and am not in
3    the employ of the attorneys for any party.
4        IN WITNESS WHEREOF, I have hereunto set my hand
5    and affixed my notarial seal this 10th day of July,
6    2019.
7
8        _____
9              N O T A R Y  P U B L I C
10   My Commission Expires:
     June 8, 2025
11
     County of residence:
12   Marion
13
14
15
16
17
18
19
20
21
22
23
24
25

27 (Pages 102 to 105)

EXHIBIT "D"

INDEPENDENT PSYCHOLOGICAL EVALUATION
3/9/2019

Patient:            Jennifer Ngatuvai
Date of Exam:       2/27/2019
Age:                46

### *Referral:*

An Independent Psychological Examination was completed on Jennifer Ngatuvai at the request of her attorney, Rich Humpherys. The purpose of the evaluation was to render an opinion regarding Mrs. Ngatuvai's current psychological functioning following a traumatic experience on August 14, 2014. As a part of the present evaluation, Mrs. Ngatuvai underwent an extensive clinical interview, including completion of three questionnaires (Millon Clinical Multiaxial Inventory-IV, The Civilian Mississippi Scale, and PCL-5). Mrs. Ngatuvai's sister and sister-in-law were interviewed via telephone separately.

Records were reviewed included documents from:
1. United States District Court - District of Utah
2. Meaningful Life Counseling
3. Utah Office for Victims of Crime
4. Pam Mitchell, LCSW
5. Riverton Hospital
6. Pulse Oximetry
7. Heart Center
8. Columbia's St. Mark's Hospital
9. Alta Internal Medicine
10. IHC Hearing and Balance Center
11. Wasatch Imaging
12. Sorensen Cardiovascular Group
13. Rocky Mountain Neurological Associates
14. Cottonwood Hospital
15. Methodist Hospital
16. The Ohio State University Wexner Medical Center
17. University of Utah Health Care
18. Ms. Ngatuvai's journal entries
19. Plaintiffs' statement of material facts
20. Written depositions of Pam Mitchell, LCSW, Tammy Ishimatsu, LCSW, Corona Ngatuvai, and Jennifer Ngatuvai.

Additionally, the video of interview of the Independent Medical Examination of Mrs. Ngatuvai's daughter conducted by Dr. Ryan was reviewed.

### *Waiver of Confidentiality:*

At the initiation of the current evaluation, Mrs. Ngatuvai was advised of her HIPAA rights in the performance of a psychological evaluation. She was informed that she had the right to decline the current evaluation, which had been requested by her attorney, Rich Humpherys, as a part of an independent psychological examination. She was advised that should she decline the current evaluation, Rich Humpherys would be informed of her request. She was informed that a report would be provided to her attorney. Mrs. Ngatuvai indicated that she understood her waiver of confidentiality, and made no objection to proceed with the evaluation.

**I have been asked to address the question of what injuries, if any, has Jennifer Ngatuvai suffered as a result of her involvement following the sexual assault of her three-year old daughter at the LifeTime Fitness Facility which occurred on August 18, 2014. If there are such injuries, I am to: (a) describe what they are, (b) any applicable diagnosis(es), (c) the basis for the diagnosis(es), (d) how the injuries affect her life, (e) the needed likely treatment, (f) the likely healing or recovery from these injuries, and (g) whether the nature of the injuries permanent.**

**In addressing the above issues, I am basing my opinions upon many things, including: (a) all of the records listed above, (b) my personal interviews, (c) my education, training and experience in this area, (d) the current peer review literature considered authoritative in my area of practice and specialty, and finally, (e) to base my opinions only on a reasonable degree of probability in my profession and in my area of specialty. Accordingly, my opinions stated below meet these bases.**

**To properly address the questions, it is necessary that I outline the relevant historical facts relating to Mrs. Ngatuvai, upon which my opinions are based.**

*History of events according to Mrs. Ngatuvai:*
*On August 18, 2014, Mrs. Ngatuvai took her then 3-year daughter to her gym's in-house daycare where she had been a member since 2006. After attending a water aerobics class, she returned to the daycare to pick up her daughter. Upon arrival, she could not find her. After a thorough search, she turned and looked over a locked half-door into the bathroom where she found her daughter standing with her shorts and underwear down around her ankles and her t-shirt around her neck. She inquired to a nearby worker who mentioned bits of a story (i.e. two boys around the age of 12 were in the bathroom with her at one point) but no certain explanation of what occurred. The employee allegedly said that they found her like that but did not know how it occurred. She went to the manager's office and reported the incident in hopes to find out more about what happened. She was acutely fixated on the fact that she knew her daughter would not have been able to enter through the door alone as it was locked. Upon denial of lack of knowledge about the incident on behalf of the employees and manager, she left with her daughter. She took her daughter to get groceries where she began to describe that boys "licked her." A few hours later, when she laid her daughter down for a nap, she had quiet time to process and think about what had occurred and she became intensely panicked and upset as she pieced together what her daughter said, flashes of memories of her daughter standing almost naked, and lack of protocol supervision at the daycare. She telephoned Child Protective Services and the police. Following which, Mrs. Ngatuvai took her daughter to a series of interviews at the Children's Justice Center. She recounts that the first included her witness of her daughter having a physical examination and swabbing of her private areas during which she became paralyzed with anxiety. When exiting the evaluation, she fell to the floor and could not breathe. The next few days were challenging to remember as she was overwhelmed with emotion and distress. Later, Mrs. Ngatuvai discovered that her daughter had been taken into the bathroom by two older boys in the daycare. With her bottoms pulled down, one laid underneath her while she was standing and they "licked her bum." A request was made for her to do the same but she did not. When finished, they splashed water from the toilet on her. She vacillated from periods of uncontrolled crying, to anger, to paralyzing anxiety (i.e. rapid heart rate, shortness of breath, muscle tension). Watching her daughter evoked a new sense of protection and upset as she contrasted the innocence of her appearance to the known violations of her innocence that had occurred.*

*Reportedly the police investigated the incident for a month. The gym was reportedly non-cooperative in turning over security videos for quite some time. During that month, anger and irritability increased and a sense of disillusionment for an establishment that she had trusted for so long. Ultimately, the surveillance cameras did not cover the area in question and there was never an identification of the boys. The case was closed. Motivated by protecting other children, Mrs. Ngatuvai set up an appointment with the manager at the gym to discuss what happened and what measures they had taken to prevent further harm. She was*

*distraught to discover that the gym had not changed the cameras, increased staff, or changed policies and in general were not reassuring of her concerns.*

*In months following the traumatic incident, Mrs. Ngatuvai experienced new onset of intense guilt, panic, and anger. She was generally irritable, tearful, and consumed with anger and sadness about what had occurred to her daughter; her role in bringing her to the gym that day; and the lack of responsiveness by the gym to protect children going forward. She was consumed by a feeling of helplessness. She found little motivation to attend to routine housework, hygiene, or social engagements. She spent much of her day in bed apart from taxiing her kids to their activities. She had experienced flashes of images of her daughter naked at the gym as well as imagining the acts of what occurred to her. Especially when around her children, she became hypervigilant and acutely aware of potential harm that could occur to them thus she engaged in "hovering" behavior characterized by increasing supervision. The only relief she found was when she was told that her son may have a brain tumor which allowed her to focus on something she felt she could control (i.e. taking him to a specialist and following up on recommendations) for a three-week period. That said, when it was discovered he did not have a tumor, she was immediately consumed with reliving thoughts related to her daughter's trauma. Since the trauma, she regularly questions her children's well-being when they are apart. For the first few years after the incident, she could not part with specifically the daughter in question or leave her unattended. In fact, when she began preschool, she waited in the parking lot of the preschool during the day or made sure her husband was there if she was involved in another activity. She has attended and continues to attend any outside of school function including field trips. When attending a public birthday party, Mrs. Ngatuvai will attend and watch from a distance. Her daughter is resistant to use public or unfamiliar restrooms and therefore there is anticipation stress present when they are engaged in outings. In general, she sees her daughter as more emotional and less tolerant of frustration and stress which, when she witnesses her emotionality, reminds her of what happened and triggers a physiologic response. She finds herself constantly questioning if her behavior is because of the trauma and how her personality would have unfolded should the trauma not have occurred.*

*As aspects of litigation continue, Mrs. Ngatuvai living of the trauma and the aftermath are more prominent. Specifically, about a year ago, her daughter underwent an independent medical examination that left her crying all night. Similarly, Mrs. Ngatuvai participated in her daughter's therapy for several months which helped her to understand how the trauma affected both her and her daughter but also force re-experiencing of the trauma and how it continues to affect her ability to function. It was recommended that she undergo her own individual therapy which was short-lived because she felt the therapist focused on other issues apart from her own traumatic reaction to the incident. She tried to connect with her as she strongly desired to feel better, however, after a few months, she realized it was not a good match. Later, she attended therapy focused on traumatic reaction (i.e. EMDR) which helped to temper her emotionality. Specifically, she found following treatment she was less tearful and more in control of her irritability and anger, however, she continued to experience circling thoughts about the trauma.*

Following the aforementioned trauma, Mrs. Ngatuvai continues to experience a clear and distinct change in emotional functioning and subsequent ability to cope and manage her life. She reports her mood as "exhausted" with a strong desire to be in bed during the day. She feels down and blue and helpless much of the time. She experiences strong feelings of guilt for her part in taking her daughter to the gym that day. Sleep is characterized by difficulty getting to sleep and staying asleep. She denies suicidal ideation or worthlessness. She is readily irritable and admits to yelling and screaming at minor things wherein before she was known to be very tolerant and even-keeled. She feels anxious and worried specifically about her youngest daughter's well-being even when it is at a known structured setting of school. In fact, since the trauma she regularly uses Tylenol PM or Melatonin as well as turning on the television for distraction in order to get to sleep. She has gained 80-pounds since the incident. Although she continues to battle intrusive thoughts, depression, helplessness, and guilt surrounding the trauma, she has learned ways to cope. She presently schedules activities and various volunteer work daily in order to keep herself out of the house and

distracted. She finds that giving back to her community and helping others helps to make her feel productive. That said, in moments of "quiet" and when isolated, she immediately returns to a mindset of pain, hurt, and reliving the trauma. She also experiences moments when busy that she is reminded of aspects of what happened at the gym and experiences an immediate physiological reaction (i.e. increased heart rate, chills, stomach upset, muscle tension, rapid breathing). Previously someone who did not outwardly express emotions or react emotionally, she now readily cries and feels momentarily paralyzed when something bad happens to others (e.g. housefires, natural disasters). She avoids driving anywhere near the gym as well as conscious engagement in thinking about the trauma. Mostly outside of her home, she now feels jumpy and readily startled and at times has a strong foreboding feeling.

Since the trauma, Mrs. Ngatuvai has discontinued several activities she used to enjoy. Previously very active and focused on health and exercise, she no longer attends a gym. She made an attempt to switch gyms briefly but could not disassociate the trauma experience and also lacked motivation to workout. Overall, she has little to no energy. Previously exemplary at maintaining a clean house and cooking meals, she engages in the bare minimum and relies on her husband and children to complete tasks (which did not happen before). Previously gregarious and social, she now limits social engagements and, when involved in activities, she prefers to be on the periphery of engagement. Just this year she discontinued management of a Christmas party that she was well-known to manage previously. Previously engaged and attuned to her marriage, she now feels more emotionally numb and distant and at times irritated by her husband. Sexual intimacy has dramatically decreased, and she experiences no libido. Responsible for the families' financial payments, she now occasionally misses or forgets to pay bills. Her hygiene has declined, and she no longer showers regularly or attends to hair and makeup as she did before. Similarly, she misses children's activities which did not occur before as she was well-adept at organization and planning. She has discontinued home crafts which used to be an active passion.

### Relevant record review:

According to the United States District Court – District of Utah records from August 18, 2014, Mrs. Ngatuvai checked her 3-year old daughter into the daycare at Lifetime Fitness in South Jordan, Utah, to be cared for as she exercised. When she was finished with her workout, she went to the daycare to pick up her daughter. She could not find her, and no one seemed to know where she was. She eventually found her daughter in the boys' bathroom crying, with her skirt and underpants on the floor and her shirt twisted sideways around her neck. She proceeded to dress her daughter and spoke briefly with a young attendant who said she had witnessed her daughter in the bathroom with a boy. The attendant had taken stickers off both children in order to call their parents and notify her supervisor. Ms. Ngatuvai spoke with the supervisor regarding what had happened. That is when her daughter told her the boys had "licked her bum." The supervisor denied the attendant had seen any boys in the bathroom. Ms. Ngatuvai also notified the club manager who said he would investigate but never contacted her. Ms. Ngatuvai then filed a police report and contacted Child Protective Services. She was taken to the Children's Justice Center to be interviewed and also to collect DNA samples from her genital and anal area. Records document Ms. Ngatuvai's experience of mental and emotional turmoil this has caused for both her daughter and herself. It is noted that she stated she suffers from anxiety and depression and uses Melatonin and Tylenol PM to sleep.

Ms. Ngatuvai engaged in individual therapy with Tammy Ishimatsu, LCSW from March 2015 through May 2015. Records document symptoms including not sleeping well, lack of motivation, crying, fatigue and irritability. She is noted to be worrisome and can do "nothing" for long periods of time. Active avoidance of thinking about the incident with her daughter is noted. Ms. Ngatuvai is documented to state that the incident "rules her whole life" and feels like nothing she does is enough. She reports feeling like everyone thinks she should be "done" coping with it. There are several notes about "trauma" focused therapy and intervention. In her deposition, Ms. Ishimatsu opined that she was engaged in secondary trauma treatment that, in this case, was related to her daughter's abuse. Of note, Tammy Ishimatsu, LCSW by degree which

means she holds a master's level degree in social work which does not have specific specialized training in clinical diagnostics.

According to the Utah Office for Victims of Crime records from March 19, 2015, it is documented that Ms. Ngatuvai feels sad, hopeless and overwhelmed. She has been depressed, irritable and will cry. She has lost motivation...and has gained weight. On the Global Assessment of Functioning Scale, she scored at 68 (highest level past year - estimated) and 59 (on admission).

In her testimony documented on January 6, 2017, Mrs. Ngatuvai documents her own emotional distress as detailed below:

- She stated she feels as though she has been "socked in the stomach" and that she cannot breathe. She reported not being able to trust anyone or anything around her. She stated she feels like she is missing something, every time her daughter is not with her. She stated she feels like anything that does not work out for her daughter, in life, is because she let this happen to her.
- She described nightmares in which she is unable to get to her daughter who is on an island surrounded by snakes and alligators.

In the testimony of Tammy Ishimatsu, LCSW (Mrs. Ngatuvai's therapist) from March 20, 2017, symptoms of Mrs. Ngatuvai's emotional distress are noted:

- She had a lot of depressive symptoms and would get "lost in her head."
- Prominent and pervasive worries was present as well as finding herself getting lost in her ipad or TV, not realizing large amounts of time had gone by.
- She avoided thinking about the trauma as she could.
- She had been irritable with her family and that she had increased arguing.
- It is noted that Ms. Ngatuvai did not complete treatment.

Mrs. Ngatuvai's personal journal entries were reviewed which document the course of emotional distress:

- An 8/19/14 entry documents feeling like "the wind has been knocked out" of her and like she cannot breathe. She has become tearful and nauseous thinking about the incident.
- An 9/13/14 entry documents feeling "empty" and everything and everyone around her is "bugging" her.
- An 9/24/14 entry documents feeling helpless and that her heart hurts for her daughter.
- A 10/4/14 entry documents, "My head is so messed up. I don't know how to process anything. I am angry, grumpy and so sad. I am so sad I want someone to know what to say to I am not so sad but I don't even know what it would be."
- A 3/5/15 entry documents feeling alone and wanting to cry and scream all at the same time. She states she is still having "bad days".
- A 3/9/15 entry documents that after her first therapy appointment for herself, she was left her feeling exhausted, frustrated and lost.
- A 12/31/15 entry documents she writes that she felt broken and she wanted her family around but wants everyone to go away at the same time. She wrote she can lay around and do nothing all day.

On August 8, 2017, Mrs. Ngatuvai underwent an independent neuropsychological examination by Dr. Duff at the request of defense counsel. It is my opinion that his examination appears inaccurate and incomplete. The following issues should be considered as questionable when placing value on this examination:

1. Patients with trauma reactions and/or PTSD often do not demonstrate that cognitive impairments on objective testing because there is not a brain-based change. That said, it does not implicate that

they do not have more challenges with attention, concentration, and focus but the etiology is due to the weighting of psychological factors and often times most prominent when involve in day-to-day life or stimuli that evokes a more prominent stress reaction.

2. Dr. Duff alludes to "psychiatric symptoms appear to be exaggerated on some scales" albeit her performance on the MMPI-2 RF is documented as "relatively valid." "Overreporting" is documented on an inventory designed specifically for post concussive symptoms (RPCQ) which is specifically for use with post concussive/TBI patients **not PTSD or psychologically traumatized patients without concussion or TBI**. Of known, the inventories widely accepted to evaluate PTSD were either not administered (The Civilian Mississippi Scale) or an older version of the test was administered (i.e. PCL-C vs. the PCL-5) suggesting possible lack of expertise or current knowledge base of the literature.

3. Dr. Duff states that the MMPI-2-RF did not capture "fears," anxiety, or social avoidance he opined are typically seen in PTSD patients, however, fears, anxiety, and social avoidance are not a categorized as part of the criteria for PTSD. Specifically, the MMPI-2-RF is not geared towards assessing secondary trauma.

4. Dr. Duff did not contact collateral sources in order to best surmise any changes in functioning following the traumatic incident.

5. Dr. Duff's evaluation appears to have surmised that Mrs. Ngatuvai is not telling the truth regarding past treatment for mental health issues by referring to the fact that she was provided a list of therapists as well as antidepressant medication by her PCP when in college and trying to decide if she should stay in school. It was not considered that there no formalized diagnosis of depression in the medical records, no documentation of depression criteria in the records, no documentation of follow-up on counseling, and only a brief trial of the medication was used during a stressful period in her life (i.e. not indicative of prior chronic psychiatric difficulties as it is insinuated). Similarly, Dr. Duff appears to conclude that Mrs. Ngatuvai's prior experience with weight gain and fatigue (mentioned episodically in PCP records from 1992, 1997, 2000, 2006, 2009, 2012) are indicators of psychological disturbance without consideration she experienced external stressors including whether or not to continue with college, several medical issues, and a lengthy process and treatment for fertility issues as well as birthing/raising five children.

6. Dr. Duff places a high weight on documentation from therapist Tammy Ishimatsu, LCSW who, as mentioned above, does not hold necessary training or experience to diagnose clinical disorders or trauma or secondary trauma victims. That said, in her deposition and notes she documents treatment for secondary trauma. Per Mrs. Ngatuvai's own sense, the counseling was not progressing and she was not engaged so she discontinued treatment. She did, however, seek appropriate treatment several years later when she engaged in EMDR: A therapy known to be effective for trauma-related disorders.

7. According to his CV, Dr. Duff's present focus and specializations are on Dementia and Dementia-related research. In fact, his present position is in the University of Utah's Center for Alzheimer's Care. There is no mention of a specialty in Posttraumatic Stress Disorder and/or trauma-related disorders.

*Additional Relevant Background*

Mrs. Ngatuvai was born on January 1, 1973 in Salt Lake City, Utah. She was raised by her biological parents (both of whom are still living) in a household of 8 children. Childhood was notable for a relatively impoverished household wherein all the children worked jobs to contribute financially. In general, her family was not known for expression of emotions and early independence was cultivated. She denies any difficulties with anxiety, depression, or significant behavioral disturbance growing up. She denies any incidence of trauma. In school, she earned average grades and spent much of her time outside of school working instead of participating in extracurriculars. Socializing mainly occurred within the context of her siblings. After high school she attended Brigham Young University for 2 ½ years. She was not invested in

coursework and her grades were poor. After attending a mission trip for 1 ½ years in Italy, she returned and did not continue her college degree. A year later she married her husband whom she met while in college. The couple have been married for 22 years and have five children (ages 8, 10, 12, 14, and 16). Employment over her adult life includes positions in fast food and secretarial work. She has not worked in recent years and instead has volunteered in various organizations.

Medical history is significant for occipital migraines, vestibular dysfunction, hyperlipidemia, chronic thyroiditis, cholecystectomy, infertility issues, and motor vehicle accident in January 2014 wherein she sustained hip and neck injuries. She presently takes Melatonin and Tylenol PM.

Psychiatric history is significant for mild depressive ideation post-childbirth (2006), however, her overall functioning was not impeded and she did not engage in treatment. Medical records document a period of difficulty sleeping, emotional lability, and poor concentration in college (Primary care note dated 12/23/92 and again at a follow up on 1/20/23). Brief trial of Elavil is noted with absent symptoms of depression noted at a follow up on 2/10/93.

*Collateral interview:*

*Mrs. Ngatuvai's sister was interviewed via telephone for collateral information. Although the sisters do not live in the same city, they talk on the phone for on average an hour daily. Her sister describes a clear and distinct personality change following the trauma as well as a change in Mrs. Ngatuvai's functioning. She describes her sister prior to the trauma as active, involved, energetic, boisterous, health-focused, organized, and engaged. She did not overtly show emotion and keep her feelings to herself. She easily managed her household as well as the schedules of activities for herself and her 5 children.*

*Following the trauma, Mrs. Ngatuvai first noticed her sister withdrawing. She did not initiate contact and was defensive and less open about even day-to-day activities. She became "obsessive" over controlling her children and what they were doing when they were not in direct contact with her. New onset of tearfulness, overt irritability, and screaming was noted in situations where minor events happened. Overall, she became intolerant of even minor stress. Several times when together, she witnessed emotional "explosions" that were entirely inconsistent with her known personality and resulted in disturbing all those in close proximity. She became unable to manage household tasks and ultimately her house became a "disaster". She lacked energy and experienced a significant weight gain. Despite soliciting her involvement, even on family vacations, she was resistant to involvement in socializing which was a stark contrast to how she typically functioned. Her sister witnessed regular fighting between Mrs. Ngatuvai and her husband which was also a difference from their characteristically harmonious relationship. Although in the last year or so, she has been less irritable, she remains less social, joyful, and even keeled. Her sister believes that she has thrown herself into overprogramming (through volunteer work) in effort to distract from the hurt and pain she is experiencing. When they are together in person, she notes a change from being previously loud and funny wherein now she is now loud and angry.*

*Mrs. Ngatuvai's sister-in-law was interviewed via telephone for collateral information. She lives locally, has years of experience teaching piano to Mrs. Ngatuvai's children, and used to see and talk to Mrs. Ngatuvai daily prior to the trauma. She describes Mrs. Ngatuvai as fun-loving, positive  active, unflappable, and happy prior to the trauma. The two actively coordinated time off with their children and initiated plans for family outings. Out of their very large family, Mrs. Ngatuvai was known to be the person who attended every family function without exception and enthusiastically socialized and hosted friends and family. Her sister-in-law immediately noticed a change in August 2014 without being informed of the situation. She recounted that Mrs. Ngatuvai pulled back, did not initiate contact, became*

*irritable, and was overtly depressed, isolated, and withdrawn. Most days she would get up to take her kids to school and then crawl back into bed. She stopped attending to household chores, did not maintain her yard, and rarely left the house unless it was for child-related activities. Eventually, her sister-in-law became one of two family members who were told about the incident which gave her an understanding of what was going on. Despite encouragement to engage in life, Mrs. Ngatuvai was limited in her motivation to change. Since that time, she has involved herself in volunteer work but much of her energy is now focused on controlling her children's activities and their behavior in often overt and harsh ways. She has been much less interactive and emotionally connected, continues to be socially isolated, and demonstrates ongoing anger and irritability. She has missed family events and even when present she is not fully engaged. Because of her shame and guilt over the situation, she has not revealed what occurred to all family members which has also caused her role and the family to be splintered. The two family's routine game night and family dinners have not continued after the trauma.*

### Behavioral Observations:

Mrs. Ngatuvai was casually dressed. Her hair and clothing were mildly disheveled but fairly well-kempt. She was pleasant and cooperative with the examination. Speech was fluent and articulate. Thought processes were tangential at times but with direction she was able to return to her response. Affect was generally flat with tearfulness surrounding recollection of finding her daughter after the trauma as well as ongoing perceived guilt regarding her role in the event. Comprehension was intact. Behavior and content of speech were consistent throughout the examination. Presentation was felt to be a reliable and accurate representation of function.

### Personality Testing:

*Mrs. Ngatuvai completed three self-report questionnaires: MCMI-IV, PCL-5, and the Civilian Mississippi Scale.*

Mrs. Ngatuvai completed an objective personality test (MCMI-IV). The pattern of scores suggests an overall introversive and edgy way of relating interpersonally. Rarely does she exhibit social initiative and typically maintains a restrictive affect. Although she experiences significant fatigue, diminished energy, and a general weakness in expressiveness and spontaneity, she can also be sulky and irritable. She is likely to have drifted into a peripheral role in social and family relationships, but she retains a strong need to depend on others. In part this reflects her low self-esteem, her deficiencies around autonomous behavior, and a possible inability to function in a socially competent manner. She is inclined to self-belittling and seems to have accepted the image of a weak and ineffectual person.

Symptoms of a major depressive disorder are noted in her profile responses. Frequent instances of irritability usually turned toward others have instead, turned to marked self-condemnation and feelings of desolation. Vacillations between idle discontentment, and anxious, brutal self-abhorrence are very likely present. Both of these may be mixed with thoughts of suicide and anxious sense of hopelessness, as well as outbursts of bitter discontentment and irrational demands. Hopeless feelings break through to awareness as a result of her current circumstances. When she cannot contain the undercurrent of depressive feelings, brief anger outbursts are likely. Overall, an emotionally impassiveness, emotionally unexcitable, and an apathetic quality is seen in her lack of affectionate or erotic needs.

Typically, conflicted and irritable, her characteristic personality style appears to be complicated by symptoms of anxiety. Headaches, insomnia, and fatigue may be present as well as behavioral symptoms such as distractibility, apprehensiveness, and fearful presentments. These symptoms are likely to be products of unresolved inner conflicts that rise to the surface upsetting the usual ease with which she discharges her anger and resentment.

On two self-report measures designed to assess Posttraumatic Stress Disorder symptomatology (The Civilian Mississippi Scale; PCL-5), her scores fell in the moderate range suggesting that she is confronted with PTSD symptoms on a fairly regular basis that interfere with daily functioning. Specifically, she experiences 4 of 5 criteria for intrusive symptoms (Category B) at a "moderate" to "quite a bit" level; 2 of 2 criteria for avoidance symptoms (Category C) at a "moderate" to "quite a bit" level; 4 of 7 criteria for negative alterations in mood/cognition symptoms (Category D) at a "moderate" to "quite a bit" level; and 4 of 6 criteria for alterations in arousal and reactivity (Category E) at a "moderate" to "quite a bit" level.

*Diagnosis:*

1.    **Posttraumatic Stress Disorder, chronic**
2.    **Major Depressive Disorder, chronic**

*Summary:*

Mrs. Ngatuvai is a 46-year old Caucasian female who experienced a traumatic incident in August 2014 when she left her 3-year daughter in the care of a trusted childcare at her gym. Upon return, she found her 3-year old daughter standing in the boys' bathroom with her shorts around her ankles and her shirt around her neck in a location she had no access to given her age and abilities. She shortly thereafter discovered that there were boys in the restroom with her and, according to her daughter, they forced her clothing off and "licked her bum." Subsequently, Mrs. Ngatuvai witnessed to her daughter's medical exam where they examined for sexual abuse and swabbed for DNA. These events are enough to substantiate the definition of a trauma according to the *Diagnostic and Statistical Manual for Mental Disorders-V* by witnessing the aftermath of sexual exploitation as well as learning that the traumatic event occurred to a close family member. Individual interview, collateral interviews, and objective personality testing document that Mrs. Ngatuvai meets criteria for **Posttraumatic Stress Disorder (PTSD) and Major Depressive Disorder** in accordance with diagnostic criteria from the *Diagnostic and Statistical Manual for Mental Disorders-V*. To a high degree of psychological certainty, these disorders were not present previously and were in fact caused by the trauma in August 2014. Although Mrs. Ngatuvai experienced a prior history of depressive ideation around the time she was struggling in college as well as after the birth of one of her five children, she did not previously meet criteria for a Major Depressive Episode as it did not impede her functioning in a significant way and was in fact relatively short-lived and related to environmental stress and hormonal changes.   In individuals that experience a trauma, there is less likely a significant and longlasting impact if the trauma is rapidly and formally recognized/owned by the perpetrator, consequences are instituted for the perpetrator, and the victim is able to navigate their emotional reaction and process the situation with, at first, limited contact or confrontation of triggers (e.g. people/thoughts/events that represent the trauma). Mrs. Ngatuvai was initially not quickly heard or reassured by LifeTime that the sexual assault occurred, the perpetrators were never identified, and there were no formal manner that procedures changed at LifeTime to prevent further harm to children.  To a high degree of psychological certainty, as these factors contributed to heightening of psychological symptoms and thus she developed a reactive Major Depressive Disorder. Additionally, the combination of reexperiencing the sexual assault trauma by triggers acutely (e.g. being around her daughter, multiple interrogations by authorities for herself and her daughter, sexual examination of her daughter) and the longer term inherent nature of the daily experience of triggers for that trauma (e.g. living and caring for her assaulted daughter and associated situations where she must leave her in unattended environments such as school) her clinical depression has become more pronounced and chronic.

At this time, Mrs. Ngatuvai successfully meets criteria for **PTSD** as characterized by ongoing intrusive thoughts and memories, dissociative reactions, marked physiologic response to memories and/or other trauma related incidents, persistent avoidance, persistent negative beliefs or expectations, marked diminished interest in activities, feelings of detachment, limited positive emotional experience, and marked alteration of arousal and reactivity. Prominent depressed mood, diminished interest in activities, significant weight gain, inappropriate guilt, fatigue, and psychomotor agitation are criteria present that qualify for her for **Major Depressive Disorder.**

Although, Mrs. Ngatuvai's overall severity of symptoms has improved since the initial year post-trauma, she continues to demonstrate a significant change in functioning that has affected day-to-day activities in various ways including her ability to manage her household and hygiene, reduced motivation, and significantly interfere with ability to sustain healthy family and friend relationships. Previously someone who was gregarious, happy, active, and socially involved, she now has a limited range of affect, low

frustration tolerance and irritability with her family, and narrows her focus on the protection of her own children at the expense of friendships and extended family relationships. Entirely consistent with parents who have children who are sexually abused, and even more prominent who parents who are involved in the trauma itself (i.e. placing a child care in the situation, present for the immediate aftermath) there is very prominent feelings of helplessness, anger, and personal feelings of devaluation, shame, and blame that interfere with her ability to engage with others. As with many chronic cases of PTSD, her tendency towards ruminating over self-blame has contributed to the duration of her symptoms. Overall, she has become more isolated, as with many trauma survivors, because her sense of community and belonging was destroyed when trust was so dramatically violated in the act of the trauma.

Prognosis is guarded for Mrs. Ngatuvai. As in cases where there is no direct charge or identification of perpetrators occurs and no known steps has occurred to prevent further offenses of children within the facility (known to her), her healing processes is limited. That said, treatment of EMDR specifically, has helped to dampen her anger and push to resume volunteer work which she uses as a distraction, at times, at a level to her detriment. Further, the fact that the exposure to the trauma has produced both PTSD and Major Depressive Disorder makes it much more likely for her to recover in full as one syndrome feeds into the other. As in this case, as depressive symptoms improve briefly, she becomes even more alert to memories, thought, and guilt stemming from the trauma which then facilitates a return to her depressive state. At this point, she is functioning at bare minimum level compared to her functioning prior to the trauma exposure. She also plays a different and more harsh and sterile role in her family and she has limited capacity for emotional engagement with others. Patients who suffer from such pronounced symptoms of PTSD over one-year post-trauma, despite intervention, are more likely to have chronic symptoms ongoing. Further, it is known that mothers specifically of children exposed to sexual trauma have more of a pronounced and chronic recovery.

It is worthy of consideration that Mrs. Ngatuvai is at risk for further emotional, psychosocial, and medical impairments given the nature and duration of PTSD combined with a Major Depressive disorder. Research has shown that these individuals are at greater risk for other psychological disorders including depression and anxiety disorders as well as various medical disorders including heart disease, high blood pressure, high cholesterol, diabetes, chronic headaches, irritable bowel syndrome, and GERD. Further, individuals with chronic PTSD are at greater risk for relationship difficulties, maintenance of employment, divorce, and suicide.

I understand that discovery is ongoing in this matter. Additional information produced in connection with this litigation, including deposition testimony, expert reports or testimony, or new or additional information that otherwise becomes available, may have an effect on the opinions expressed here. Hence, I reserve the right to amend, supplement or modify this report and the opinions expressed here as necessary in light of the above or any other future developments in this litigation. In addition, I reserve the right to submit additional declarations or reports in rebuttal to expert reports that may be submitted.


Polly Westcott, Psy.D., HSPP
Neuropsychologist & Psychologist

ADDENDUM:

Diagnostic Criteria according to the Diagnostic and Statistical Manual – Fifth Edition

*Posttraumatic Stress Disorder*
   A.  Exposure to actual or threatened death, serious injury, or sexual violence in one (or more) of the
        following ways:
        1.  Directly experiencing the traumatic event(s).
        2.  Witnessing, in person, the event(s).
        3.  Learning that the traumatic event(s) occurred to a close family member or close friend, in
             cases of actual or threatened death of a family member of a friend, the event(s) must have
             been violent or accidental.
        4.  Experiencing repeated or extreme exposure to aversive details of the traumatic event(s).
   B.  Present of one (or more) of the following intrusion symptoms associated with the traumatic
        event(s), beginning after the traumatic event(s) occurred:
        1.  Recurrent, involuntary, and intrusive distressing memories of the traumatic event(s).
        2.  Recurrent distressing dreams in which the content and/or effect of the dream are related
             to the traumatic event(s).
        3.  Disassociate reactions(e.g., flashbacks) in which the individual feels or acts as if the
             traumatic event(s) were recurring.
        4.  Intense or prolonged psychological distress at exposure to internal or external cues that
             symbolize or resemble an aspect of the traumatic event(s).
        5.  Marked physiological reactions to internal or external cues that symbolize or resemble an
             aspect of the traumatic event(s).
   C.  Persistent avoidance of stimuli associated with the traumatic event(s), beginning after the traumatic
        event(s) occurred, as evidenced by one or both of the following:
        1.  Avoidance of or effort to avoid distressing memories, thoughts, or feelings about or
             closely associated with the traumatic event(s).
        2.  Avoidance of or efforts to avoid eternal reminders (people, places, conversations,
             activities, objects, situations) that arouse distressing memories, thoughts, or feelings about
             or closely associated with the traumatic event(s).
   D.  Negative alterations in cognitions and mood associated with the traumatic event(s), beginning or
        worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:
        1.  Inability to remember an important aspect of the traumatic event(s) (typically due to
             dissociative amnesia and not to other factors such as head injury, alcohol, or drugs).
        2.  Persistent and exaggerated startle negative beliefs or expectations about oneself, others,
             or the world (e.g. "I am bad," "No one can be trusted," "The world is completely
             dangerous," "My whole nervous system is permanently ruined").
        3.  Persistent, distorted cognitions about the cause or consequences of the traumatic event(s)
             that lead the individual to blame himself/herself or others.
        4.  Persistent negative emotional state (e.g., fear, horror, anger, guilt, or shame).
        5.  Markedly diminished interest or participation in significant activities.
        6.  Feelings of detachment or estrangement from others.
        7.  Persistent inability to experience positive emotions (e.g., inability to experience
             happiness, satisfaction, or loving feelings).
   E.  Marked alternations in arousal and reactivity associated with the traumatic event(s), beginning or
        worsening after the traumatic event(s) occurred, as evidenced by two (or more) of the following:
        1.  Irritable behavior and angry outbursts (with little or no provocation) typically expressed
             as verbal or physical aggression toward people or objects.
        2.  Reckless or self-destructive behavior.

      3.      Hypervigilance.
      4.      Exaggerated startle response.
      5.      Problems with concentration.
      6.      Sleep disturbance (e.g. difficulty falling or restless sleep).
F.  Duration of the disturbance (Criteria B, C, D, and E) is more than 1 month.
G.  The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.
H.  The disturbance is not attributable to the physiological effects of a substance (e.g., medication, alcohol), or another medical condition.

### *Major Depressive Disorder*

A.  Five (or) more of the following symptoms have been present during the same 2-week period and represent a change from previous functioning; at least on of the symptoms is either (1) depressed mood or (2) loss of interest or pleasure.
    5.  Depressed mood most of the day, nearly every day, as indicated by either subjective report (e.g., feels sad, empty, hopeless) or observation made by others (e.g. appears tearful)
    6.  Markedly diminished interest or pleasure in all, or almost all, activities most of the day, nearly every day (as indicated by either subjective account or observation).
    7.  Significant weight loss when not dieting or weight gain (e.g. a change of more than 5% body weight in a month), or decrease or increase in appetite nearly every day.
    8.  Insomnia or hypersomnia nearly every day.
    9.  Psychomotor agitation or retardation nearly every day (observable by others not merely subjective feelings of restlessness or being slowed down).
   10.  Fatigue or loss of energy nearly every day.
   11.  Feelings of worthlessness or excessive or inappropriate guilt (which may be delusional) nearly every day (not merely self-reproach or guilt about being sick).
   12.  Diminished ability to think or concentrate, or indecisiveness, early every day (either by subjective account or observed by others).
   13.  Recurrent thoughts of death (not just fear of dying), recurrent suicidal ideation without a specific plan, or a suicide attempt or a specific plan for committing suicide.
B.  The symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.
C.  The episode is not attributable to the physiological effects of a substance or to another medical condition.
D.  The occurrence of the major depressive episode is not better explained by schizoaffective disorder, schizophrenia, schizophreniform spectrum and other psychotic disorders.
E.  There has never been a manic episode or a hypomanic episode.

EXHIBIT "E"



UNIVERSITY OF UTAH
HEALTH CARE | Center for Alzheimer's Care,
Imaging and Research (CACIR)

**Kevin Duff, PhD, ABPP**
Board Certified in Clinical
Neuropsychology
Professor,
Neuropsychologist
Direct (801) 585-9983
Fax (801) 581-2483
kevin.duff@hsc.utah.edu

**INDEPENDENT NEUROPSYCHOLOGICAL EVALUATION**

**Examinee: Jennifer Ngatuvai**
**Date of Examination:  8/8/17**
**Date of Report:  8/28/17**
**Date of Birth: 1/1/73**
**Basis of Evaluation: Review of amended complaint, depositions of the examinee and Tammy Ishimatsu, police reports, medical records, interview, and test results**
**Examiner: Kevin Duff, PhD, ABPP**

**IDENTIFYING INFORMATION**: Mrs. Jennifer Ngatuvai is a 44-year old, right-handed, married, white female with 13 years of education. She was referred for an independent neuropsychological evaluation by Stephen Trayner to assess cognitive and psychological functioning as it pertains to Ngatuvai vs. Lifetime Fitness Inc.

**BACKGROUND INFORMATION**: During a clinical interview, the examinee reported poor memory, decreased attention, and difficulties with problem solving and decision making, which have been worsening over the past couple years. Psychiatrically, she noted multiple symptoms that have been worsening over the past few years, including being "not happy," longstanding sleep disturbances, "tired all the time," gained 80 pounds, irritability, and less patience. She reported experiencing passive suicidal ideations following the incident, although had no such thoughts at this time. She denied homicidal ideations, hallucinations, or delusions. She denied any regular physical pain, and she denied any significant stressors. Regarding day-to-day functioning, she acknowledged regular volunteer work (e.g., multiple schools, international rescue council, cub scouts), driving, managing medications, shopping, handling finances, and completing all basic activities of daily living (e.g., bathing, grooming, dressing, toileting), all without difficulty. She did report difficulties completing household chores, including cooking, which have been developing over time.

Medical history is remarkable for hyperlipidemia, chronic thyroiditis, and hypothyroidism (according to a recent office visit with Dr. Philip Roberts on 5/1/17). She reported having a couple motor vehicle accidents over the years. In the most serious of these, she was transported by ambulance to the emergency room, where she was treated and released. She denied other neurological conditions. Prior to the current incident in 2014, she reported a possible episode of post-partum depression, which was not treated. She denied any other prior psychiatric difficulties. Since the incident, she stated that she has seen two counselors: 1) 2015 or 2016, several sessions that she did not know if it was helpful, and 2) spring of 2017, 3 – 4 sessions, mutual decision to stop treatment. She denied use of tobacco, alcohol, or illegal drugs. She reported that she takes birth control pills, Tylenol PM, and melatonin.

She noted that she was born and raised in Utah. She described her childhood as "chaotic" but normal. She denied any experiences of trauma, abuse, or neglect. She indicated that she graduated high school, and completed less than 2 years of college. She denied any earlier academic difficulties (e.g., special education classes, repeating grades). She had done secretarial work in the past, but has not worked for

**The University of Utah
Center for Alzheimer's Care,
Imaging and Research (CACIR)**
650 Komas Drive #106-A
Salt Lake City UT 84108
**www.utahmemory.org**

pay since 2004. She has been married for 20 years. She lives with her husband and their 5 children (ages 6 – 15). She denied any legal/criminal history.

In describing the incident on 8/18/14, she noted that she was picking up her daughter at the daycare facility at the gym. She found her daughter in the bathroom with her shorts and underwear off and her shirt up around her neck. Staff mentioned finding at least one boy in the bathroom with her daughter. She talked to multiple staff members, including the manager of the daycare facility and the gym. However, she felt that the staff were "dismissive" of her concerns. She left the gym feeling confused about what had happened. As she processed it more, she decided to seek services for her daughter. She reported that her daughter seems to be coping with this incident better than she is. Mrs. Ngatuvai continues to feel that nothing was ever resolved (e.g., from the daycare facility, from the gym, from the police).

**REVIEW OF RECORDS:**

As noted above, the amended complaint, depositions of the examinee and Tammy Ishimatsu, police reports, and medical records were reviewed. Of the 1,000+ pages of records reviewed, the following seem most relevant (in chronological order):

Alta View Internal Medicine Associates office visit note on 12/23/92 indicated "depression" in the examinee and recommended counseling and anti-depressant medication. Note from phone call on 1/22/93 indicated that examinee was provided with names of therapists in Provo area. Note from visit on 2/10/93 indicated that the examinee had light-headedness and was still taking anti-depressant medication. Note from visit on 3/4/93 indicated episodes of light-headedness and headaches in the examinee. Note from visit on 2/7/94 indicated that the examinee was experiencing headache and pain behind eye. Neurology visit was recommended. Additional anti-depressant medication (Prozac or Zoloft) was also recommended, but this was delayed until after neurology visit. Note from visit on 1/21/97 indicated examinee had fatigue, weight gain, and heart palpitations due to anxiety.

Cottonwood Hospital emergency room note by Dr. Anctil on 3/2/97 indicated examinee was involved in a low speed motor vehicle accident with no loss of consciousness. Treated for neck and back strain and released that same day.

Office visit note on 5/1/00 indicated fatigue in examinee despite sleeping 9 hours per night. Weight at 262 pounds.

Methodist Health System gastrointestinal consultation note by Dr. Jones on 8/13/02 indicated the examinee had acute epigastric pain.

Office visit note on 7/31/03 indicated examinee reporting shooting pain in head. Note from visit on 8/23/04 indicated examinee reporting "high chest pain." Note from visit on 11/22/04 indicated examinee reporting vertigo.

Diagnostic imaging report from Dr. Oneil on 11/30/04 indicated a normal MRI of the brain following dizziness and vertigo in the examinee.

The University of Utah
Center for Alzheimer's Care,
Imaging and Research (CACIR)
650 Komas Drive #106-A
Salt Lake City UT 84108
www.utahmemory.org

Vestibular evaluation report from Dr. Layton on 12/8/04 indicated a "very significant vestibular response" in the right ear of the examinee, but it was unclear if this was new or pre-existing.

Physical therapy letter by Mr. Kennedy on 7/25/05 indicated that examinee was seen for physical therapy for dizziness and imbalance.

Office visit note on 4/26/06 indicated examinee experiencing post-partum depression. Anti-depressant medication prescribed.

Office visit on 11/24/08 indicated dizzy spells in examinee.

Imaging report by Dr. Nemeth on 12/10/08 indicated incidental findings on an MRI of the brain that did not explain the examinee's symptoms.

Office visit note on 1/7/09 indicated examinee vertigo and blurred vision.

Transthoracic echocardiogram report by Dr. Sorensen on 1/15/09 indicated a normal study in the examinee.

Neurological consultation note from Dr. Black on 1/23/09 indicated that the examinee was having recurrent migraine headaches since 1995. At that visit, she was being evaluated for other somatic symptoms (blurred vision, lightheadedness, trouble maintaining balance, insomnia, fatigue).

Granger Medical Center note on 9/17/09 indicated unusual somatic symptoms ("rash all over body").

Alta Internal Medicine note from Dr. Roberts on 9/5/12 indicated fatigue and insomnia.

Alta Internal Medicine note from Dr. Roberts on 2/22/13 indicated hip and leg pain.

The Smart Clinic note on 1/28/14 indicated "constant" neck and back pain following a motor vehicle accident on 1/15/14.

South Jordan Police Department Case Narrative, 8/18/14. On the date of the incident, the reporting officer (W. Henderson) did not indicate that Mrs. Ngatuvai was in any apparent distress.

The Smart Clinic note from Dr. Bertram on 8/27/14 indicated pain has resolved.

South Jordan Police Department Supplemental Report, 10/2/14. The reporting officer (A. Thompson) did not indicate that Mrs. Ngatuvai was in any apparent distress.

Alta Internal Medicine note from Dr. Roberts on 11/18/14 indicated headache and vertigo.

Riverton Hospital note on 11/25/14 indicated a second largely unremarkable MRI of the brain.

**The University of Utah
Center for Alzheimer's Care,
Imaging and Research (CACIR)**

650 Komas Drive #106-A
Salt Lake City UT 84108

**www.utahmemory.org**

Vestibular and balance test report by on 12/11/14 indicated an abnormal Dix-Hallpike test in the examinee, but with the remainder being normal.

Office visit note from Dr. Watkins on 1/13/15 indicated "chronic daily headaches" for the past three years, pain and chronic symptoms since motor vehicle accident in 1/14, and "mild chronic depression."

Therapy visit note from Tammy Ishimatsu on 3/9/15 indicated that examinee was referred for secondary trauma.

The Smart Clinic note from Dr. Bertram on 4/15/15 indicated pain "seems to be associated with psychological stressors."

Therapy visit note from Tammy Ishimatsu on 5/5/15 is the seventh and last therapy session that the examinee attends, which is well-below the recommended treatment course by this provider.

The Smart Clinic note from Dr. Bertram on 6/15/15 indicated feet hypersensitivity and swelling of the feet and hands.

Office visit note from Dr. Roberts on 5/1/17 indicated that the examinee did not present with anxiety, depression, focus problems, memory changes, or weight changes. On symptom checklist, the examinee answered all relevant questions except those on Psychology/Stress (e.g., life going well; do you feel anxious, depressed, or sad; feeling down, depressed, or hopeless?).

Deposition of Tammy Ishimatsu indicated: a strong family history of depression in the examinee (p. 29), pre-existing trauma and chronic pain in the examinee (p. 32), quite functional on 5/5/15 visit ("Has been busy with family responsibilities, PTA, et cetera, so less time stuck thinking about trauma"; p. 49), examinee did not complete recommended treatment course (p. 51), and examinee did not meet full criteria for PTSD at initial or later visits (pp. 54 - 55).

**MENTAL STATUS EXAMINATION AND BEHAVIORAL OBSERVATIONS:**

The examinee arrived on time for the appointment. She presented as a well-groomed and casually dressed woman, who appeared her stated age. She was pleasant and cooperative throughout the evaluation. She readily adapted to the testing situation and established good rapport with the examiner. She was alert and oriented to person, time, place, and situation (e.g., MoCA orientation = 6/6 correct). Psychomotor activity was unremarkable, as was gait. Affect was appropriate in range and expression. Attention and concentration were grossly intact. Auditory comprehension appeared intact. Rate, fluency, and prosody of speech were grossly intact. Word finding difficulties were not observed. Thought content and processes appeared unremarkable during the interview. However, she tended to be more tangential during the testing session (e.g., talking about her children), and she needed redirection to stay on task. She also made a number of negative comments about her abilities (e.g., "I can't do that," "I'm not good at that"), and she needed reassurances at times. Memory for recent and remote events was unremarkable. The patient's insight into cognitive abilities appeared diminished, as she tended to underestimate her abilities on objective testing. She put forth adequate effort (see

**The University of Utah
Center for Alzheimer's Care,
Imaging and Research (CACIR)**

650 Komas Drive #106-A
Salt Lake City UT 84108

**www.utahmemory.org**

below), and it is believed that the results are representative of current abilities. Wherever possible, results have been compared to norms based on age and education.

**PROCEDURES ADMINISTERED**:

Beck Anxiety Inventory (BAI); Beck Depression Inventory – II (BDI); Boston Naming Test (BNT); Brief Visuospatial Memory Test – Revised (BVMT-R); Clinician-Administered PTSD Scale for DSM-5 (CAPS-5); Hopkins Verbal Learning Test – Revised (HVLT-R); Interview; Minnesota Multiphasic Personality Inventory – 2 Restructured Format (MMPI-2-RF); Modified Somatic Perceptions Questionnaire (MSPQ); Montreal Cognitive Assessment (MoCA: orientation items only); Neuropsychological Assessment Battery (NAB: Judgment subtests); Post-concussive Checklist – Civilian version (PCL-C); Rivermead Post-Concussive Symptom Questionnaire (RPCSQ); Test of Memory Malingering (TOMM); Test of Premorbid Functioning (ToPF); Trail Making Test (TMT: Parts A and B); Wechsler Adult Intelligence Scale – IV (WAIS-IV: selected subtests).

**TEST RESULTS**:

*In the test results below, percentiles are primarily reported. Higher percentiles indicate better cognitive performances, where lower percentiles indicate poorer performances. An average or typical percentile score is the 50th percentile, although scores between the 26th – 74th percentiles are also normal. Scores falling between the 6th – 25th percentiles are viewed as borderline to low average. Scores falling at the 5th percentile or lower are typically viewed as impaired. A score at the 75th percentile means that only 25% of peers are doing better on this test, whereas a score at the 5th percentile means that 95% of peers are doing better.*

Effort: Behaviorally, Mrs. Ngatuvai appeared engaged in the cognitive tests and she seemed to be putting forth adequate effort. On a formal measure of cognitive effort, her performance was adequate (TOMM Trial 2 = 50/50 correct, Trial 2 = 50/50 correct). On an embedded measure, her performance was also adequate (WAIS-IV Digit Span RDS = 9). Her self-reported somatic symptoms on a scale (MSPQ) were below levels reported by patients in pain clinics (higher than 37% of these individuals) and those suspected of malingering (higher than only 1% of these individuals). Her report on a scale of personality and psychopathology (MMPI-2-RF) suggested relatively valid reporting of symptoms (e.g., F-r T-score = 51, Fs T-score = 66, RBS T-score = 71, FBS-r T-score = 64). Conversely, on a scale of post-concussive symptoms (RPCQ), she endorsed more symptoms than 70% of patients who suffered an acute severe traumatic brain injury (e.g., prolonged loss of consciousness, clear findings on brain imaging). She also over-reported her cognitive complaints compared to objective findings (e.g., MMPI-2-RF COG T-score = 69, but intact cognitive profile).

Overall, the examinee's performance on cognitive measures appears valid. However, her responses of psychiatric symptoms appear to be exaggerated on some scales.

In evaluating the examinee's effort on cognitive and psychiatric testing, it should be noted that: 1) stand-alone and embedded effort measures were chosen a priori, 2) choices of effort measures were made based on theoretical reasons and empirical

**The University of Utah
Center for Alzheimer's Care,
Imaging and Research (CACIR)**

650 Komas Drive #106-A
Salt Lake City UT 84108

**www.utahmemory.org**

**Kevin Duff, PhD**

Correspondence
Page 6 of 11

evidence to support their ability detect insufficient effort, 3) cutoff scores for these effort measures were determined a priori, and 5) effort measures and cutoff scores are consistently used with similar examinees (e.g., demographically similar, other clinical and independent neuropsychological evaluations).

<u>Intellectual/Overall Functioning</u>: Based on current reading abilities, premorbid intellect was estimated to be in the average range (ToPF percentile = 45). Current intellect was also average (WAIS-IV General Ability Index percentile = 58), with slightly better verbal than non-verbal abilities (WAIS-IV Verbal Comprehension Index percentile = 69, Perceptual Reasoning Index percentile = 42).

<u>Attention/Processing Speed</u>: Simple attention was average (WAIS-IV Digit Span percentile = 31). Processing speed was average to high average (WAIS-IV Coding percentile = 38; TMT-A percentile = 58; WAIS-IV Symbol Search percentile = 82). Working memory was well above average (WAIS-IV Arithmetic percentile = 92).

<u>Visuospatial/Construction</u>: Constructional abilities were average (WAIS-IV Block Design percentile = 31).

<u>Memory</u>: Performance on a list-learning task was average (HVLT-R Total Recall percentile = 27). Across three learning trials, she recalled 5, 9, and 12 out of 12 words. After a 20-25 minute delay, she was able to recall 11 of 12 words, which is average compared to her peers (HVLT-R Delayed Recall percentile = 66). Across three learning trials, the examinee's immediate recall of a series of visually presented designs was average (BVMT-R Total Recall percentile = 34). Delayed recall of the designs was also average (BVMT-R Delayed Recall percentile = 42).

<u>Executive Functioning</u>: Verbal reasoning was average (WAIS-IV Similarities percentile = 42). Non-verbal reasoning was also average (WAIS-IV Matrix Reasoning percentile = 54). Judgment for everyday problems was high average (NAB Judgment percentile = 82). Set shifting was well above average (TMT-B percentile = 95, 0 errors).

<u>Psychological Functioning</u>: On the clinical scales of the MMPI-2-RF, a well-validated measure of personality and psychopathology, her responses suggested very few psychiatric concerns. She did show mild elevations on scales associated with depression (e.g., RCd T = 67, RC2 T = 69), anger (ANP T = 77), and social aloofness (DSF T-score = 68). On this scale, she also reported mild fatigue (MLS T-score = 75) and cognitive complaints (COG T-score = 69). No other clinical elevations were observed on the MMPI-2-RF. Specifically, she did not endorse heightened levels of anxiety (AXY T-score = 59), feelings of persecution (RC6 T-score = 43), dysfunctional negative emotions (RC7 T-score 48), stress or worry (STW T-score = 43), inefficacy (NFC T-score = 58), fears that limit her actions (BRF T-score = 43), specific fears (MSF T-score = 42), or social avoidance (SAV T-score = 47), all of which are symptoms associated with PTSD. Self-report on another scale of anxiety symptoms were in the minimal range (BAI = 6).

Conversely, on a series of more face valid psychiatric scales, she did endorse symptoms consistent with severe depression and varying levels of PTSD. For example, her responses on self-report measure of depressive symptoms were in the severely depressed range (BDI-II = 29). On a self-report checklist for symptoms of

**The University of Utah
Center for Alzheimer's Care,
Imaging and Research (CACIR)**

650 Komas Drive #106-A
Salt Lake City UT 84108

**www.utahmemory.org**

Kevin Duff, PhD

PTSD, her responses were just above the cutoff to provisionally suggest this condition (PCL-C = 45, cutoff = 44). On a structured interview for PTSD (CAPS-5), she endorsed multiple symptoms associated with PTSD, including intrusive symptoms (e.g., unwanted memories of the event, unpleasant dreams of the event), avoidance of stimuli associated with event (e.g., avoiding driving by the gym where the event occurred), negative thoughts or feelings about the event (e.g., significant guilt at failing to protect her daughter), and hypervigilance symptoms (e.g., over-protectiveness of daughter, unique restrictions that apply to her daughter). She also noted that these symptoms have been present since the incident and they cause her significant distress.

**REFERRAL QUESTIONS:**

1. What is Ms. Ngatuvai's current diagnosis and objective findings?

There is conflicting evidence about the presence of any psychiatric diagnosis at this time.

Evidence in support of a current diagnosis of PTSD includes:
   a. Her responses on a structured interview for PTSD (CAPS-5), in which she endorsed intrusive symptoms, avoidance of stimuli associated with event, negative thoughts or feelings about the event, and hypervigilance symptoms. She also noted that these symptoms have been present since the incident and they cause her significant distress.
   b. Her responses on a self-report checklist for symptoms of PTSD were just also above the cutoff to provisionally suggest this condition.

Evidence that does not support a current diagnosis of PTSD includes:
   a. Tammy Ishimatsu's deposition from her therapy notes that the examinee did not meet full criteria for PTSD at initial or later visits. If the examinee did not meet full criteria for PTSD at that time (i.e., closer to the incident), then it seems unlikely that she would meet full criteria at the present time.
   b. On the MMPI-2-RF, the examinee did not endorse items that are typically associated with PTSD, such as heightened levels of anxiety, feelings of persecution, dysfunctional negative emotions, stress or worry, inefficacy, fears that limit her actions, specific fears, or social avoidance. She also denied most symptoms of anxiety symptoms on another self-report scale. PTSD is an anxiety-based disorder, and the absence of anxiety symptoms seems to contraindicate a diagnosis of this condition.
   c. A recent meta-analysis (Scott et al., 2015) revealed significant neurocognitive effects associated with PTSD, with the largest adverse effects on tests of verbal learning and memory, speed of information processing, and attention/working memory. Across the current neuropsychological evaluation, the examinee's cognitive test scores ranged from average to well above average. She showed no neurocognitive deficits, which would be unusual for patients with PTSD.
   d. Although her responding on the MMPI-2-RF was largely valid, there is concern that she is over-endorsing symptoms on other scales. For example, on a scale of post-concussive symptoms, she endorsed more symptoms than 70% of patients who suffered a severe traumatic brain injury (e.g., prolonged loss of consciousness, clear findings on brain

The University of Utah
Center for Alzheimer's Care,
Imaging and Research (CACIR)

650 Komas Drive #106-A
Salt Lake City UT 84108

www.utahmemory.org

imaging), even 12 months after their injury. She also over-reported her cognitive complaints compared to objective findings.

e. Behaviorally, she presented as a pleasant, cooperative, and engaging individual. Until asked about symptoms of PTSD, her affect did not suggest anxiety, fear, or apprehension.

f. Although functional impairment is not required for a diagnosis of PTSD, difficulties with daily functioning would be supportive of this condition. The examinee acknowledged regular volunteer work (e.g., multiple schools, international rescue council, cub scouts), driving, managing medications, shopping, handling finances, and completing all basic activities of daily living (e.g., bathing, grooming, dressing, toileting), all without difficulty.

g. During the interview, she denied any other prior psychiatric difficulties, with the exception of a possible episode of post-partum depression, which was not treated. However, medical records indicate psychiatric treatment (counseling and anti-depressant medication) dating back to 1992.

h. In describing the incident on 8/18/14, the examinee stated that she had not witnessed the incident. Although DSM-5 diagnostic criteria for PTSD allow for one to learn of a traumatic event occurring to a close family member without actually witnessing it, there is very little research on this new addition to the diagnostic criteria. Prior versions of the DSM required a witnessing of the traumatic event.

i. Police reports did not conclusively determine that there was any sexual assault of the examinee's daughter. If there was no sexual assault, then there is no traumatic event to support a diagnosis of PTSD.

j. Many of the examinee's current psychiatric complaints (low mood, sleep disturbances, fatigue, weight gain) appear to pre-date the incident in 8/14. For example, office notes indicate depression (12/23/92), fatigue and weight gain (1/21/97), fatigue and weight gain (5/1/00), post-partum depression (4/26/06), fatigue (1/23/09), and fatigue and insomnia (9/5/12).

k. Despite multiple visits with medical professionals following the incident on 8/18/14, none mention PTSD or other distress in the examinee until the first therapy note from Tammy Ishimatsu on 3/9/15. If the examine was as distressed/impaired as she claims, then I would expect other healthcare professionals to note these symptoms.

l. The examinee's most recent medical visit (office visit note from Dr. Roberts on 5/1/17) indicated that the examinee did not present with anxiety, depression, focus problems, memory changes, or weight changes. This note seems to contradict the information that the examinee relayed during the current evaluation.

Evidence in support of a current diagnosis of depression includes:

a. Her responses on the BDI-II indicate depressive symptoms that fall into the severe range.

b. Her responses on the MMPI-2-RF suggested mildly elevated scales associated with depression, anger, social aloofness, fatigue, and cognitive complaints. These are all symptoms typically associated with depression.

c. The examinee has a prior history of depression treatment (counseling and anti-depressant medication) dating back to 1992 in her medical records. Depression tends to be a recurrent psychiatric condition, so her prior

The University of Utah
Center for Alzheimer's Care,
Imaging and Research (CACIR)

650 Komas Drive #106-A
Salt Lake City UT 84108

www.utahmemory.org

history suggests that she may again experience this condition in the future.
d. Intake assessment with Tammy Ishimatsu, LCSW, on 3/9/15 indicated a diagnosis of depression, single episode, moderate severity.

Evidence that does not support a current diagnosis of depression includes:
a. Neurocognitive effects are typically associated with depression. Across the current neuropsychological evaluation, the examinee's cognitive test scores ranged from average to well above average. She showed no neurocognitive deficits, which would be unusual for patients with notable depression.
b. As noted earlier, there is concern that she is over-endorsing symptoms on some psychiatric/cognitive/somatic scales. The BDI-II, on which she reported severe levels of depressive symptoms, does not contain validity scales. Therefore, it is unclear if she was over-reporting depressive symptoms on this scale.
c. Behaviorally, she presented as a pleasant, cooperative, and engaging individual. Her affect did not suggest depression.
d. Although functional impairment is not required for a diagnosis of depression in the DSM-5, difficulties with daily functioning would be supportive of this condition. The examinee acknowledged regular volunteer work, driving, managing medications, shopping, handling finances, and completing all basic activities of daily living, all without difficulty.
e. The examinee's most recent medical visit (office visit note from Dr. Roberts on 5/1/17) indicated that the examinee did not present with anxiety, depression, focus problems, memory changes, or weight changes. This note seems to contradict the information that the examinee relayed during the current evaluation.

2. Does Ms. Ngatuvai's current objective findings substantiate the need for additional care and treatment at this juncture?

Since the preponderance of evidence did not support a diagnosis of PTSD at this time, then the need for additional care and treatment of PTSD is not supported at this time.

The evidence of ongoing depression in the examinee was more equivocal. However, if depression is currently present, then it is not clear if any depressive symptoms are directly related to the incident with her daughter on 8/18/14. To be conservative, some additional treatment of depressive symptoms may be considered for this individual.

3. What treatment plan, if any, is recommended at this time?

Despite the examinee's responses on self-report questionnaires, her current depressive symptoms are more likely to be in the mild range, as they appear to minimally affect her ability to carry out daily activities. As such, some combination of anti-depressant medication and individual counseling seems appropriate to reduce

The University of Utah
Center for Alzheimer's Care,
Imaging and Research (CACIR)

650 Komas Drive #106-A
Salt Lake City UT 84108

www.utahmemory.org

her depressive symptoms. The examinee's past psychiatric treatment has focused on trauma and her PTSD symptoms, whereas any future treatment should focus on her depressive symptoms, especially her guilt about not protecting her daughter. It is also recommended that the examinee find a provider with the experience, knowledge, and skills to address her symptoms. Ms. Ngatuvai reported that she was unsure if her treatment with Tammy Ishimatsu was helpful, as she did not think that this therapist had the experience she sought. She also reported that a more recent attempt at therapy in the spring of 2017 ended after 3 – 4 sessions, with unclear results. A doctoral level, licensed psychologist with training and experience with cognitive behavioral therapy for depression would be a more appropriate provider for the examinee.

4. Has all treatment since the date of the alleged incident been reasonable and customary and medically necessary?

As noted above, the examinee reported two attempts at psychiatric treatment since the alleged incident in 2014: 1) several outpatient sessions with Tammy Ishimatsu, LCSW, focused on trauma-related therapy, which were largely unsuccessful and prematurely discontinued, and 2) 3 – 4 outpatient sessions with a provider of unknown credentials that also focused on trauma issues, and was again discontinued without clear results. Medical records do not indicate any other psychiatric treatments since 2014. The examinee denied taking any psychiatric medications at this time.

Since the preponderance of evidence did not support a diagnosis of PTSD at this time, these two attempts at trauma-related therapy do not seem appropriate. It does not appear that there have been any attempts to manage her depressive symptoms, which admittedly appear mild at this time. Although mild depressive symptoms do not necessarily require intervention, Ms. Ngatuvai's history of recurrent depressive symptoms since at least 1992 does indicate that some form of treatment is indicated.

5. In your opinion, will Ms. Ngatuvai suffer any permanent partial disability as a result of this alleged incident?

In my opinion, Ms. Ngatuvai has not suffered any permanent partial disability as a result of this alleged incident.

6. At what time can it be expected that Ms. Ngatuvai should reach MMI (maximal medical improvement)? If, in your opinion, Ms. Ngatuvai has reached MMI prior to this appointment, what date might it have been? Was treatment past the date of MMI palliative in nature?

With recurrent depression, maximal medical improvement is difficult to establish, as the individual is always at risk for another depressive episode. However, if one considers her daily functioning as an indicator of maximal medical improvement, then she has already reached that point. The examinee acknowledged regular volunteer work, driving, managing medications, shopping, handling finances, and completing all basic activities of daily living, all without difficulty. There was no report that these

**The University of Utah
Center for Alzheimer's Care,
Imaging and Research (CACIR)**

650 Komas Drive #106-A
Salt Lake City UT 84108

**www.utahmemory.org**

daily activities were impaired at any point following the alleged incident in 2014. As such, it is reasonable to conclude that she never fell below her maximal medical level of functioning.

As noted above, her two attempts at psychiatric treatment since 2014 were not viewed to be beneficial for her.

7. Could Ms. Ngatuvai's PTSD symptoms she is alleging be from this alleged incident?

Since the preponderance of evidence did not support a diagnosis of PTSD at this time, then her reported symptoms could not be from this alleged incident.

8. Could Ms. Ngatuvai's alleged symptoms of depression be from this alleged incident?

As noted above, Ms. Ngatuvai seems to suffer from recurrent depression, dating back at least to 1992. Her medical records contain multiple symptoms of depression, before and after the alleged incident in 2014. It is reasonable to conclude that she would have experienced symptoms of depression even if the alleged incident had not occurred. It is also possible that stress associated with the alleged incident could have triggered another depressive episode in the examinee.

Thank you for allowing us the opportunity to see the claimant for this independent neuropsychological evaluation. Should you have any questions concerning the current test results or this report, please feel free to contact my office.

Kevin Duff, PhD, ABPP
Board Certified in Clinical Neuropsychology
CACIR Neuropsychologist
Professor, Department of Neurology
University of Utah School of Medicine

**The University of Utah
Center for Alzheimer's Care,
Imaging and Research (CACIR)**

650 Komas Drive #106-A
Salt Lake City UT 84108

www.utahmemory.org

EXHIBIT "F"

## CRAIG J. BRYAN, PsyD, ABPP

11140 S. Farnsworth Ln  |  Sandy, Utah 84070

May 14, 2019

Stephen J. Trayner
Strong & Hanni
102 South 200 East, Suite 800
Salt Lake City, UT 84111

RE: Ngatuvai v. Lifetime Fitness

Dear Mr. Trayner:

I am submitting this report at your request to provide information about the diagnosis of posttraumatic stress disorder (PTSD) and its treatment, as relevant to the matter of Ngatuvai v. Lifetime Fitness. I have not been able to meet with Mrs. Ngatuvai or K.N. directly to conduct a psychological evaluation, but I have reviewed the following case-related materials provided by your office:

1. Report of independent neuropsychological evaluation conducted by Dr. Kevin Duff, PhD, ABPP, conducted on 8/8/2017;
2. Handwritten notes and raw data from Dr. Duff's independent neuropsychological evaluation;
3. Report of independent psychological evaluation conducted by Dr. Polly Westcott, PsyD, conducted on 2/27/2019;
4. Raw data from Dr. Westcott's independent psychological evaluation;
5. Report of opinion provided by Dr. Erin Bigler, PhD, dated 4/1/2019;
6. Report of forensic evaluation conducted by Dr. Ann Burgess, DNSc, APRN, BC, dated 2/23/2019;
7. Report of opinion provided by Dr. Tristyn Wilkerson, PsyD, dated 3/25/2019;
8. Report of opinion provided by Dr. Elizabeth Johnson, PhD, dated 4/4/2019;
9. Report of DNA analysis conducted by Jake Hinkins, dated 12/14/2017;
10. Report of life care plans conducted by Sheryl Dobson-Wainwright, RN, dated 3/25/2019;
11. Report of economic damages conducted by Daniel Rondeau, dated 4/5/2019;
12. Report of opinion provided by Dr. Eileen Ryan, DO, dated 4/5/2018;
13. Report of forensic DNA analysis conducted by Thomas Wahl, dated 4/2/2019; and
14. Report of opinion provided by Dr. Janet Warren, DSW, dated 2019.

*Unless otherwise noted, all of the opinions detailed below are based on a reasonable degree of psychological probability.*

## 1. Opinion regarding Mrs. Ngatuvai's diagnosis of posttraumatic stress disorder (PTSD)

I have not met with Mrs. Ngatuvai to conduct an independent psychological evaluation directly, but I have carefully reviewed the report, raw data, and handwritten notes of Dr. Kevin Duff, PhD, ABPP, who conducted an independent psychological evaluation of Mrs. Ngatuvai on August 8, 2017, approximately three years after the potentially traumatic event

1

at the Lifetime Fitness gym. I have also carefully reviewed the report and raw data of Dr.
Polly Westcott, PsyD, who conducted an independent psychological evaluation of Mrs.
Ngatuvai on February 27, 2019, approximately four and one half years after the potentially
traumatic event and 18 months after Dr. Duff's evaluation.

When assessing and diagnosing PTSD, it is critical to take into consideration the condition's
overlap with other mental health conditions and human stress reactions. Depression, in
particular, shares many symptoms with PTSD and can often be mistaken for PTSD when its
onset follows a significant life stressor. Because of these overlapping symptoms, diagnostic
evaluations should include methods designed to confirm the presence of symptoms and
features that support the diagnosis of PTSD as well as methods designed to disconfirm the
diagnosis and/or to provide a better explanation of the reported symptoms, problems, and
impairment.

Overall, Mrs. Ngatuvai's responses and performance on the various tests administered during
both evaluations suggest that she was experiencing a high level of emotional and
psychological distress. Validity indicators further suggest there is little evidence that she was
intentionally or deliberately exaggerating her symptoms or problems. Mrs. Ngatuvai's pattern
of responses suggest the following:

- The symptoms and problems of PTSD that Mrs. Ngatuvai rated the most severe are
  not unique to PTSD and can be inflated by general stress and depression (e.g.,
  concentration problems, sleep impairment, loss of interest, irritability).

- Mrs. Ngatuvai endorsed a high level of symptoms and problems that are more
  specific to depression than PTSD.

- Mrs. Ngatuvai endorsed few symptoms and problems that are more specific to PTSD
  than depression.

Based on Mrs. Ngatuvai's responses, my opinion is that a diagnosis of PTSD is possible but
not probable. A more likely diagnosis is major depressive disorder. Adjustment disorder is
another possibility, but her reported levels of depressive symptomatology would suggest that
major depressive disorder is more likely than adjustment disorder.

## 2.  Opinion regarding K.N.'s diagnosis of PTSD

I do not have sufficient experience or expertise with the diagnosis and clinical care of
children to render an opinion about K.N.'s diagnosis.

I do, however, have sufficient experience and expertise to note that sexual abuse and
molestation during early childhood is a known risk factor for developing PTSD and other
mental health conditions. This risk is increased when the sexual contact involves physical
injury, penetration, and intense fear, and when the sexual contact occurs multiple times (e.g.,
Boroughs et al., 2015; Johnson, Pike, & Chard, 2001; Koverola, Proulx, Battle, & Hanna,

BRYAN 000002

1996). Based on my review of the materials listed above, the alleged incident does not appear to be characterized by physical injury, penetration, intense fear, or recurrence.

### 3. Opinion regarding the most beneficial treatment for plaintiffs' condition

Several decades of research support the effectiveness of trauma-focused therapies for individuals diagnosed with PTSD (Lee et al., 2016; Watts et al.,2013). Three forms of psychotherapy are recommended by multiple scientific bodies as first-line treatments (Berg et al., 2007; Department of Veterans Affairs & Department of Defense, 2017): cognitive processing therapy (CPT), prolonged exposure (PE), and eye movement desensitization processing (EMDR). Up to 90% of individuals with PTSD who complete one of these therapies report significant reductions in PTSD symptom severity and over 50% fully recover from the condition. Antidepressant medications have also garnered scientific support for the treatment of PTSD, although the magnitude of benefit is generally smaller than the benefit obtained from trauma-focused therapies (Lee et al., 2016; Watts et al.,2013). The combination of antidepressant medication with trauma-focused therapy does not necessarily yield better outcomes than trauma-focused therapy alone (Hetrick, Purcell, Garner, & Parslow, 2010; Rauch et al., 2019).

Trauma-focused therapies typically involve 10-12 one-hour outpatient therapy sessions, typically scheduled once per week. In the event of insufficient treatment response, research suggests that adding additional sessions of trauma-focused therapy (i.e., increasing the "dose"), can improve recovery rates for slow responders. When trauma-focused therapies are delivered with high fidelity by an appropriately-trained clinician, up to 90% of individuals with PTSD experience significant clinical improvement. Individuals who experience clinical improvement after these therapies tend to maintain their gains for many years (Resick, Williams, Suvak, & Monson, 2012).

In the life care plan developed by Ms. Wainwright for Mrs. Ngatuvai and K.N. include the following recommended treatments:

- Up to 12 sessions of cognitive behavioral therapy (CBT);
- Up to 12 sessions of eye movement desensitization reprocessing (EMDR);
- Lifelong supportive counseling; and
- Lifelong antidepressant medication treatment.

The life care plan for K.N. also includes the following recommended treatment:

- Lifelong benzodiazepine medication treatment (specifically, alprazolam).

My opinion is that this life care plan includes redundant and excessive mental health services. In addition, alprazolam is not recommended due to the lack of strong evidence for its efficacy and its known adverse effect profile and associated risks among individuals with PTSD (Cole, & Kando, 1993; Department of Veterans Affairs & Department of Defense, 2017; Guina, Rossetter, DeRhodes, Nahhas, & Welton, 2015; Van Minnen, Arntz, & Keijsers, 2002).

BRYAN 000003

- First, CBT and EMDR are both empirically-supported for the treatment of PTSD and are fairly comparable to each other with respect to effectiveness. Only one of these treatments is recommended. Of the two, I would recommend trauma-focused CBT over EMDR due to scientific evidence suggesting trauma-focused CBT (e.g., cognitive processing therapy, prolonged exposure therapy) yields somewhat better outcomes than EMDR (Watts et al., 2013).

- Second, general supportive counseling is not recommended for PTSD because it is much less effective than trauma-focused CBT. Furthermore, general supportive counseling can interfere with the typical recovery process observed in trauma-focused CBT. Finally, because relapse or recurrence of PTSD is low following effective trauma-focused CBT, general supportive counseling is unlikely to be required for either Mrs. Ngatuvai or K.N.

- Antidepressant medication is less effective for PTSD than trauma-focused CBT, and does not yield incremental clinical benefit over trauma-focused CBT alone. If the plaintiffs receive trauma-focused CBT, antidepressant treatment and psychiatric medication management are unlikely to be required.

- Benzodiazepine medication is contraindicated for PTSD because this drug class interferes with trauma-focused CBT and the recovery process. This part of K.N.'s life care plan could therefore be harmful and contribute to long-term morbidity.

## 4. Opinion regarding the potential cause of Mrs. Ngatuvai's symptoms

According to DSM-5 criteria, the diagnosis of PTSD requires that a person be exposed to death, threatened death, actual or threatened serious injury, or actual or threatened sexual violence in one of the following ways: direct exposure, witnessing the event, learning that a relative or close friend was exposed to the event, or indirect exposure to the details of the event. Over 80% of individuals who experience such an event do not subsequently develop PTSD. As such, exposure to an event that meets one or more of these criteria is not sufficient for the diagnosis. Experiencing the onset of emotional and psychological symptoms after exposure to a potentially traumatic event also is not sufficient for the diagnosis. It is possible that the experienced symptoms are attributable to a different cause or a different condition. Because of this, an important component of diagnosing PTSD is considering and ruling out alternative explanations.

Based on my review of the materials listed above, it is possible that Mrs. Ngatuvai's symptoms are directly related to the events that occurred at Lifetime Fitness. As summarized above, however, her reported symptoms and testing results suggest that Mrs. Ngatuvai's symptoms may be better explained by depression. Major depressive episodes often have an onset soon after a stressful life event and can be maintained over time by enduring or persistent life stress. It is also possible that Mrs. Ngatuvai's symptoms and problems are more directly related to her frustration with the perceived inadequate response by Lifetime Fitness staff and law enforcement personnel.

BRYAN 000004

Upon review of all of the materials listed above, my opinion is that Dr. Duff's independent psychological evaluation provides a thorough and comprehensive differential diagnosis that uses empirically-supported methods and procedures that are recommended for use in forensic and clinical settings (Young, 2017). Dr. Duff also had the opportunity to meet with Mrs. Ngatuvai in-person and to review considerable more materials and records than I was able to review.

5. **Opinion regarding the independent psychological evaluations and conclusions of Dr. Duff and Dr. Westcott**

Both of the evaluations conducted by Dr. Duff and Dr. Westcott included multiple methods for assessing symptoms and problems associated with PTSD and other mental health conditions. All of the methods used were reliable and valid. Mrs. Ngavutai's scores on some tests were more severe during Dr. Westcott's evaluation, which occurred approximately 18 months after Dr. Duff's. The overall magnitude of this change was not large enough to be clinically meaningful, however. Furthermore, Mrs. Ngavutai's scores on various validity scales and measures do not support the conclusion that she is exaggerating her concerns and problems to a noticeable degree. Overall, Mrs. Ngavutai's responses and performance across both evaluations were therefore largely consistent with each other. Despite this consistency, Dr. Duff and Dr. Westcott arrived at different conclusions and diagnoses.

Dr. Duff and Dr. Westcott both used two different self-report scales designed to assess PTSD symptom severity in their evaluations: both used the PTSD Checklist for DSM-5 (PCL-5), Dr. Duff used the PTSD Checklist for Civilians (PCL-C), and Dr. Westcott used the Civilian Mississippi Scale (CMS). Each of these scales are reliable and valid measures of PTSD symptom severity that can be used to estimate the probability of someone meeting diagnostic criteria for PTSD. These scales are limited by face validity and vulnerability to response bias, however. In particular, item response can be inflated by nontrauma-related stress and mental health conditions like depression. Because of this, self-report method should be augmented by assessment methods that are less face valid.

Dr. Duff used the following methods to augment self-report PTSD scales:

- The MMPI-2-RF assesses personality traits and a broad range of psychopathology. The MMPI-2-RF includes items that are frequently endorsed by individuals with PTSD, but these items are embedded amongst several hundred items, thereby rendering them less obvious. The MMPI-2-RF is one of the most well-researched measures of personality and psychopathology, especially in forensic settings.

- The Clinician Administered PTSD Scale for DSM-5 (CAPS-5) is a clinician-administered interview that is similar to the PCL-5, although clinicians determine item ratings using standardized scoring criteria, therefore reducing response bias stemming from self-report methodology can be reduced. The CAPS-5 is widely considered the "gold standard" method for diagnosing PTSD.

5

BRYAN 000005

- Multiple tests to assess symptoms and problems that are commonly associated with PTSD (e.g., concentration, processing speed) as well as symptoms and problems that are not necessarily associated with PTSD (e.g., postconcussive syndrome). These tests do not directly assess PTSD but would be expected to vary in meaningful ways based on the presence or absence of PTSD.

Dr. Westcott used the following methods to augment self-report PTSD scales:

- The MCMI-IV assesses personality traits and a broad range of psychopathology, similar to the MMPI-2-RF, but has a much smaller research base (Young, 2017). As a result, conclusions based on the MCMI-IV are less likely to be supported by scientific research.

- Interviews with family members and other collateral sources of information. This method can provide external perspectives about Mrs. Ngatuvai's symptoms and problems, but it is vulnerable to response bias because family members and friends may be motivated to provide information that would be favorable to Mrs. Ngatuvai's case.

In my opinion, the methods and procedures used by Dr. Duff were more comprehensive and better suited to obtain an accurate diagnosis of PTSD than the methods and procedures used by Dr. Westcott. Of note, Dr. Duff used the CAPS-5 and MMPI-2-RF, both of which are very useful for minimizing the impact of biased responding and differentiating between PTSD and other mental health conditions with overlapping symptoms.

Based on the available evidence, I agree with the following conclusions of Dr. Duff:

- Dr. Duff concluded there is conflicting evidence supporting a diagnosis of PTSD. I agree with this conclusion.

- Dr. Duff concluded there is strong and consistent evidence supporting a diagnosis of major depressive disorder. I agree with this conclusion.

- Dr. Duff concluded that cognitive behavioral therapy by a licensed psychologist is recommended. I agree with this conclusion.

- Dr. Duff concluded that, with appropriate treatment, Mrs. Ngatuvai is unlikely to suffer permanent partial disability as a result of the alleged incident. I agree with this conclusion.

- Dr. Duff concluded that Mrs. Ngatuvai's depression symptoms may have been activated by the alleged incident, but it is also possible that they would have occurred without the alleged incident. I agree with this conclusion.

Based on the available evidence, I agree with the following conclusions of Dr. Westcott:

BRYAN 000006

- Dr. Westcott concluded there is sufficient evidence to support a diagnosis of major depressive disorder. I agree with this conclusion.

- Dr. Westcott concluded that, to a high degree of psychological certainty, that Mrs. Ngatuvai's perceptions and appraisals of Lifetime's response to the alleged incident contributed to a reactive major depressive disorder. I agree with this conclusion.

- Dr. Westcott concluded that rumination and self-blame have sustained Mrs. Ngatuvai's symptoms. I agree with this conclusion but note that these are also common features of major depressive disorder.

- Dr. Westcott concluded that, without treatment, PTSD is associated with increased risk for a range of health conditions. I agree with this conclusion.

Based on the available evidence, I <u>disagree</u> with the following conclusions of Dr. Westcott:

- Dr. Westcott concluded there is sufficient evidence to support a diagnosis of PTSD. I disagree with this conclusion because the available evidence suggests this diagnosis is improbable and that Mrs. Ngatuvai's symptoms are better explained by major depressive disorder.

- Dr. Westcott concluded that prognosis is guarded because the perpetrator is unknown, no charges have been pressed against the perpetrator, and because patients who suffer with PTSD for over a year are less likely to recover. I disagree with this conclusion because trauma-focused cognitive-behavioral therapies have been used successfully for individuals in this situation. Furthermore, research shows that length of time since the traumatic experience does not reduce the efficacy of trauma-focused therapies.

**6. Opinion regarding the appropriate and recommended treatment protocols for the plaintiffs, assuming the plaintiffs' experts are correct about the diagnosis of PTSD.**

If a diagnosis of PTSD is accurate for both Mrs. Ngatuvai and K.N., it is recommended that both receive trauma-focused cognitive behavioral therapy. Recommended options include cognitive processing therapy (CPT) or prolonged exposure (PE), both of which are highly effective for adults with PTSD. Results of multiple clinical trials indicate these treatments significantly reduce symptoms of PTSD, depression, and many other associated problems such as anger, substance abuse, and suicidal ideation (Bryan et al., 2016; Resick, Nishith, & Griffin, 2003; Smith et al., 2007; Watts et al., 2013). Eye movement desensitization reprocessing (EMDR) is a viable alternative, as it has also garnered considerable empirical support although some evidence suggests it is slightly less effective than trauma-focused CBT (Watts et al., 2013). All of these treatments are typically 10-12 sessions in duration, but can be extended to 18-24 sessions for slow responders. If scheduled once per week, delivered by an appropriately trained clinician, and completed in entirety, Mrs. Ngatuvai and K.N. should expect to experience significant symptom reduction in less than three months.

BRYAN 000007

Mrs. Ngatuvai's reported benefit after attending a handful of EMDR sessions in the past. This suggests that, if Mrs. Ngatuvai had completed a full course of trauma-focused therapy, she would have likely experienced greater benefit. This further suggests she would likely benefit from trauma-focused therapy in the future. Finally, just as obtaining trauma-focused therapy in the future will likely help, it is worth noting that had Mrs. Ngatuvai completed the entire treatment protocol, it is likely that she would have benefitted and experienced significant symptom reduction.

In his report relevant to this case, Dr. Bigler provides an overview of the neural regions and structures implicated in PTSD, but his opinion focuses to a large extent on research based on individuals with chronic and/or untreated PTSD. Dr. Bigler does note in his opinion that trauma-focused therapies are effective for reducing PTSD symptoms, but does not detail the neural bases for recovery from PTSD that have been observed among patients who receive psychological treatment for the condition.

Many of the brain structures identified by Dr. Bigler are interconnected with each other and other brain structures and regions. Two networks of interconnected brain regions, in particular, have been implicated in PTSD: the salience network and the central executive network. The salience network involves interconnections among multiple brain regions and is involved in detecting and integrating sensory, emotional, and cognitive information. By contrast, the central executive network involves interconnections among other brain regions and is involved in information processing, problem solving, and decision-making. Among individuals with PTSD, salience network connections are generally *increased* whereas central executive network connections are generally *decreased* as compared to individuals without PTSD (Abdallah, Averill, & Akiki, 2019; Akiki, Averill, & Abdallah, 2017).

Different patterns of change in these two networks have been identified in individuals who recover from PTSD. Among individuals who receive trauma-focused therapies, central executive network interconnections are strengthened (Abdallah et al., 2019; Brooks & Stein, 2015; Shou, Yang, & Satterthwaite, 2017), a pattern that suggests neurological adaptation. By contrast, among individuals who receive nontrauma-focused therapies, salience network interconnections are decreased (Abdallah et al., 2019), a pattern that suggests neurological normalization. This suggests two different pathways to recovery from PTSD in which neural alterations associated with PTSD are "undone" or "reversed."

In conclusion, I recognize that discovery is still ongoing in this case. If additional information is produced in connection with this case (e.g., depositions, additional expert reports), the opinions summarized above could change. Please let me know if you have any questions about these recommendations.

Regards,

Craig J. Bryan, PsyD, ABPP
Board Certified Licensed Clinical Psychologist

BRYAN 000008

# EXHIBIT "G"

Monica Applewhite, Ph.D.
Forensic Social Worker
Expert Consultant

608 Patterson Avenue
Austin, Texas USA 78703

Tel:  01.817.247.9315
Email:  monicaapplewhite@yahoo.com

**Expert Report regarding Plaintiffs v. Life Time Fitness, Inc**

*United States District Court*
*District of Utah, Central Division*
*Case No. 2:16-cv-00039*

1. This report addresses the events of August 18, 2014 involving ▮▮▮ and Jennifer Ngatuvai in the Life Time Fitness Child Center, normal and problem sexual behavior in children, the standard of care for supervision of young children, methods for prevention of child to child abuse in organizations, and my opinions regarding the specifics of the case that is captioned above.

## Qualifications

2. My name is Monica Applewhite and I have a Ph.D. in social work and I am an expert in the field of social work and sexual abuse, including but not limited to the historical evolution of policies and laws in the United States to protect children from sexual abuse, the education, screening, monitoring, development of risk management policies for protection from abuse and exploitation, organizational responses to allegations of sexual abuse and exploitation, the behaviors and tactics of sexual offenders and the standards of care for protection of vulnerable populations from the early 1930's to today.  I have spent the past 25 years conducting research in the area of sexual abuse and sexual misconduct in organizations in order to assist organizations in developing best practices for prevention and response.  I have worked with more than 300 organizations that serve children, youth, and vulnerable adults to investigate allegations of misconduct, assess the risk of programs and implement programs to prevent and respond properly to incidents and allegations of abuse.  I am currently the director of Confianza LLC, which is a consulting firm specializing in standards of care and the dynamics of abuse in environments where children, youths, and vulnerable adults are served.  My curriculum vitae, with a comprehensive listing of client relationships, depositions and testimony, and compensation is attached as Appendix A to this document.

## Duty to the Court

3. I understand that my overriding duty is to assist the court on matters that are within my expertise.  I also understand that this duty overrides any obligation to those instructing me.

4. I confirm that I understand my duty to the court, that I have complied with this duty, and will continue to comply with it.

## Case materials reviewed

- Deposition transcript of Jessica Bosch
- Deposition transcript of Sarah (Johnson) Carroll
- Deposition transcript of Kendra Crossley
- Deposition transcript of Steve Cutler
- Deposition transcript of Kim Devlin
- Deposition transcript of Calle Ellingson
- Deposition transcript of Anna Erdmann
- Deposition transcript of Savannah Ferran
- Deposition transcript of Alexis Hudson Sanderson
- Deposition transcript of Stacie LeFranc
- Deposition transcript of Jessica Longtine
- Deposition transcript of Joshua Reding
- Deposition transcript of Shaun Reeve
- Deposition transcript of Haylie Savoy
- Deposition transcript of Brooke Williams
- Deposition transcript of Corona Ngatuvai
- Deposition transcript of Jennifer Ngatuvai
- Deposition transcript of Tammy Ishimatsu
- Deposition transcript of Dr. Michael Johnson
- Deposition transcript of Linda Lewis
- Deposition transcript of Pamela Mitchell
- Deposition transcript of Dr. Philip Roberts
- Deposition transcript of Dr. Jimmy Ryan
- Deposition transcript of Dr. Joseph Watkins
- Deposition transcript of Officer Ryan Coons
- Deposition transcript of Officer Wayne Henderson
- Deposition transcript of Detective Andrew Thompson
- Deposition transcript of Sandra Gault
- Deposition transcript of Justin Masin
- Deposition transcript of Kambree Anderson
- Deposition transcript of Michael Headrick
- Deposition transcript of Rachael Parry

- All deposition exhibits
- Initial Disclosures (DEF 000001 – 261)
- Responses to Discovery Requests (DEF 2 000001 – 170)
- 1st Supplemental Response (DEF 1 – 000001 – 855)
- 2nd Supplemental Response (DEF 3 – 000001)
- 3rd Supplemental Response
- 4th Supplemental Response (DEF 4 – 000001 – 10)
- 5th Supplemental Response (DEF 5 – 000001 – 23)
- 6th Supplemental Response (DEF 6 – 000001 – 32)
- 7th Supplemental Response (DEF 7 – 000891 – 001073)
- 8th Supplemental Response (DEF 8 – 000001 – 96)
- 9th Supplemental Response (DEF 9 – 000097 – 178)
- 10th Supplemental Response (DEF 10 – 000001 – 410)
- 11th Supplemental Response (DEF 11 – 000001 – 5)
- 12th Supplemental Response (DEF 12 – 000001 – 8 and DEF 12 – 000009 - 113)
- 13th Supplemental Response (DEF 13 – 000001 – 8)
- 14th Supplemental Response (DEF 14 – 000001 – 80)
- 15th Supplemental Response (DEF 15 – 000001 – 54)
- 16th Supplemental Response
- 17th Supplemental Response (DEF 17 – 000001 – 81)
- February 8-9 Rule 35 Examination Proceedings
  - Introduction
  - Jennifer Ngatuvai Parts 1-3
  - Corona Ngatuvai
  - ██████ Ngatuvai Parts 1-3
- March 6, 2018 Deposition of ██████ Ngatuvai with Exhibits
- Quality Forensic DNA Testing Preliminary Report
- Quality Forensic DNA Testing Second Analytical Report
- April 5, 2018 Rule 35 Report by Dr. Eileen Ryan
- August 8, 2018 Neuropsychological Evaluation of Jennifer Ngatuvai by Dr. Kevin Duff
- Expert Report by Dr. Janet Warren
- Case review and Expert Report of Thomas Wahl, Forensic DNA Consultant
- Independent Psychological Evaluation of Jennifer Ngatuvai by Dr. Polly Westcost
- Expert Report by Dr. Erin David Bigler
- Expert Report by Dr. Ann Wolbert Burgess
- Expert Report regarding Jennifer and ██████ Ngatuvai by Dr. Tristyn Teel Wilkerson
- Expert Report by Dr. Elizabeth Johnson
- Expert Reports by Gary C. Harmor, Chief Forensic Serologist

## Standards of Care

5.  The term "standard of care" is utilized in this report to represent the reasonable expectations of society and the law from an organization with respect to the particular form of abuse and during the specific timeframe under consideration.  The standard of care allows the actions of an organization to be evaluated based upon reasonable standards of skill, learning, and judgment used by similar organizations as of the time of the alleged breach of the standard.

6.  The basis for establishing standards of care is as follows:

    - LAW.  Federal and state laws that address sexual abuse and sexual assault, sexual offenders, reporting laws, and access to criminal records.

    - GUIDELINES.  Federal and state regulations, guidelines, and governmental resources for organizations that serve children, youths and vulnerable adults.

    - PROFESSIONAL KNOWLEDGE.  State of professional knowledge regarding best practices for provision of services.

    - PUBLIC KNOWLEDGE.  State of public knowledge and general awareness regarding the specific form of abuse.

    - ORGANIZATIONAL PRACTICES.  Common practices and standards established and maintained by similar organizations and programs.

    - OTHER AVAILABLE RESOURCES.  Resources available to assist organizations in the prevention and response, such as books, sample policies, professional associations, trade magazines, and conferences.

## Background and Relevant Facts of the Case

7.  Despite a great deal of effort to reconstruct and analyze what happened with ████ on August 18, 2014, the events of this day are still unclear.

8.  There are some facts are known through video documentation.  These facts are as follows:

    a)  ████ was first seen in the Child Center on video at 9:09am

    b)  ████ was seen alone in the gym area beginning at 10:29am.  She squatted several times in the gym.

    c)  ████ left the gym area at 10:32am and was found by Calle Ellingson at approximately 10:48am, leaving approximately 16 minutes for the events to have unfolded.

    d)  From 10:32am to 10:48am, staff were in the hallway outside of the restroom five (5) times and adults were in the hallway a total of 21 times.

    e)  At 10:47am Calle Ellingson is seen walking toward the bathrooms at the same time with Jennifer Ngatuvai, but they were not together.

    f)    At 10:48:38am Calle interacted with Savannah Ferran, who was working in the toddler area. They spoke across the short wall, with Calle remaining outside the restrooms.

    g)    At 10:48:51am Savannah interacted with Stacie LeFranc, who was a floater and supervisor. Stacie LeFranc was in the toddler area at the time.

    h)    At 10:49:00am Savanah interacted again with Calle Ellingson.

    i)    At 10:49:30: Calle interacted with Savannah.

    j)    At 10:51:12 Jennifer and ███ Ngatuvai walked up the hallway to the front desk.

9.    Based on statements made to the police and witness testimony, the following information can also be reasonably accepted about the interactions viewed on video:

    a)    At 10:47am Calle Ellingson went to look in the boys restroom because she had been told a naked girl was in there. Calle Ellingson then saw from the door of the restroom that ███ Ngatuvai was in the restroom with her clothes off.  Calle Ellingson reported that ███ was alone at this point.

    b)    At 10:48:38am Calle asked Savannah Ferran what she should do about the little girl in the boys restroom.

    c)    At 10:48:51am Savannah asked Stacie LeFranc what she should do.  She was told to get the girl into the girls restroom and call the mother to help her get dressed.

    d)    At 10:48:38am Calle interacted with Savannah Ferran, who was working in the toddler area. They spoke across the short wall, with Calle remaining outside the restrooms.

    e)    At 10:49:00am Savanah Ferran told Calle Ellingson to remove the girl to the girls restroom and call the mother.

    f)    At 10:49:30: Calle Ellingson told Savannah Ferran that the mother was already there to help.

10.    According to Stacie LeFranc's statement to the police, she misunderstood or was told incorrectly that there was also a boy in the restroom with the girl.  She stated that she gave this incorrect information to Jennifer Ngatuvai, but that she corrected herself immediately and informed Ms. Ngatuvai that there was not a boy in the restroom, that ███ was alone when she was found.

11.    According to Jennifer Ngatuvai, she found her daughter alone in the boys restroom with her shirt tangled around her neck.  Calle Ellingson was also outside the restroom when Jennifer Ngatuvai found her daughter.

12.    Jennifer Ngatuvai reported to the police that she believes Life Time employees were covering up what had occurred.  She stated that Child Center staff told her they found ███ and a boy in the restroom and that they had taken both children's stickers.

13.    According to Jennifer Ngatuvai, she became extremely upset upon finding her daughter in the boys' restroom in a state of undress.  Jennifer Ngatuvai reported to police that ███ was unable to dress or undress herself.

14. Jennifer Ngatuvai reported that ▮ told her she had been in the restroom with a boy, and later, two boys.  Jennifer Ngatuvai also reported that ▮ said that she had taken off her skort and underwear and that a boy or two boys had taken off her shirt, had taken off their own cloths, and that a boy had "licked her bum," while in the bathroom.

15. No other witnesses reported hearing ▮ speak or hearing her speaking to her mother.   One witness, Steve Cutler, reported that he heard Jennifer Ngatuvai asking her daughter questions and telling ▮ what happened.  He reported that ▮ did not speak and did not answer questions in his presence.

16. Police records shown that Mrs. Ngatuvai was cautioned by police officers not to talk with her daughter about the situation or ask questions until she could be interviewed by a forensic interviewer.  This caution is consistent with a known feature of memory in children ▮'s age at the time:  that they are highly suggestable to information provided by others (Ceci & Bruck, 1995).

17. ▮ participated in a forensic interview three (3) days after the events, on August 21, 2014. Jennifer Ngatuvai reported to police that she had talked to ▮ about the incident "on a few different occasions."

18. When ▮ began the forensic interview, the interviewer began with the standard test to ensure that the child knows the difference between the truth and a lie. ▮'s answers did not reflect her ability to distinguish between truth or lie as she affirmed that she was a 14 year-old boy and that she knew the name of the interviewer's dog.  The interviewer continued the interview process despite not meeting this basic criteria (Lieb, Berliner & Toty, 1997; Lyon, Carrick, & Quas, 2010; Mart, E. G. (2010).).

19. ▮ answered most questions and provided both realistic "My grandpa gave me a fishing box" and fanciful "I saw a ghost in my room and I was scared by it" stories to the interviewer which were also consistent with her age and development.

20. In describing the incident at the Child Center, ▮ provided many pieces of information that included the following:

    a) I put my clothes on and my neck was tangled up

    b) the boys took off my shirt and I took off and my underwear and pants and my shoes and then we were both naked in the bathroom

    c) the two boys played with me in the bathroom

    d) then I licked the boy and he was trying to sit on me

    e) I was licking him one time and he said "lick two times"

    f) the other boy says lay down and I said "gross"

    g) the other girl was laughing and I was laughing at the boys

    h) when my mom saw me naked the boys were in the bathroom

    i) my mom saw me in the bathroom when I was borned (sic)

j)  the teacher girl said "get your clothes on"

k)  he licked me on the bottom of me

l)  I was laying down and I said "eeww your stinky bum."

m) the boy licked my bum and he was flushing the toilet and I got a little tiny water on me…it was cold

n)  I was three and I was in the boy's bathroom and it was my dad's bathroom.

21. In the forensic interview, ████ also said that her mother found her and said, "why is this girl naked in the boys' bathroom?" and that the gym girl said "get out of here."

22. In the forensic interview, ████ stated twice, "My mom told me in the car that there were two boys in the bathroom."  She also said "and I told her what's their names? And she said I don't know."

23. On August 18 between 9:00am and 11:00am, records show there were 10 team members (staff) working in the Child Center, plus Sarah Johnson who was the active supervisor at the time of the events.  Team members were assigned to cover zones.  Calle Ellingson was assigned outside, Savannah Ferran was assigned to the main toddler room, and Stacie LeFranc was assigned as a floater and supervisor.

24. The table below shows the number of children in the Life Time Fitness Child Center from 9:00am to 11:00am on August 18, 2014.


## Table 1.  Child Center Occupancy Records

| | |
|---|---|
| 9:00am | 32 children |
| 9:15am | 52 children |
| 9:30am | 65 children |
| 9:45am | 89 children |
| 10:00am | 119 children |
| 10:15am | 158 children |
| 10:30am | 161 children |
| 10:45am | 145 children |
| 11:00am | 127 children |
| 11:00am | 89 children |


25. Police concluded that there was probable cause to believe ████ had been sexually abused but that there was not sufficient information to identify a suspect or suspects and the case was inactivated.

Police did not find that the Child Center was involved in any wrongdoing, including non-supervision, failure to protect, or failure to disclose the identity of perpetrator (Utah Administrative Code, R512-80. Definitions of Abuse).

## Normal Sexual Development in Children

26. Normal childhood development includes behaviors that fall in the category of "sexual exploration."

27. Normal sexual exploration is behavior that occurs spontaneously, intermittently and behavior itself does not cause emotional distress.  When it involves other children, normal sexual play is mutual, playful, non-coercive, and involves children of similar age and size (Friedrich, et al, 1998; Friedrich, et al, 2001; Horner, G, 2004).

28. In order to determine whether behavior is "normal" or "abnormal" it is also important to consider whether the behavior is rare or common for the child's developmental stage (Kenny, Dinehart, & Wurtele, 2013)

29. High-frequency behaviors for children under 5 years old include showing genitals to others, looking at others' private body parts, being curious about other people's body parts (especially genitals and breasts), wanting to be naked, looking at other people while they are dressing or toileting, cuddling with familiar people, and touching their own genitals both in private and in public (American Academy of Pediatrics, 2005; Lamb & Coakley, 1993).

30. Normal behavior, such as taking off one's clothing or touching ones' own genitals, that are inappropriate in school or child care settings should be redirected by adults in an emotionally neutral manner (neither affirming nor punishing).  If the child is easily redirected, the behavior is still considered "normal." (Davies, Glaser, & Kossoff, 2000; Hagan, Shaw,& Duncan, 2008; Hornor, 2004).

## Child to Child Sexual Abuse

31. In order to be considered "sexual abuse" rather than "normal sexual exploration," the child to child contact would involve either an older, larger child (4 years apart) with a younger child; and/or force, intimidation, threats, or other forms of physical or emotional coercion (ATSA Task Force Report, 2008).  This contrasts with behaviors that involve mutual interaction among similarly aged children.

32. Determining whether behavior among similarly aged children is "harmful" behavior also involves consideration of whether there is emotional distress and/or physical pain or injury to a child.

33.  Although the State of Utah did not have specific statutes to address child to child contact in 2014, Utah currently defines sexual abuse as follows (Utah Administrative Code. 78A-6-105):
    (a) an act or attempted act of sexual intercourse, sodomy, incest, or molestation by an adult directed towards a child; or
    (b) an act or attempted act of sexual intercourse, sodomy, incest, or molestation committed by a child towards another child if:
        a.   there is an indication of force or coercion;

      b.  the children are related, as described in Subsection (26), including siblings by marriage while the marriage exists or by adoption;

      c.  there have been repeated incidents of sexual contact between the two children, unless the children are 14 years of age or older; or

      d.  there is a disparity in chronological age of four or more years between the two children.

34. Problem sexual behaviors in children under age 6 are extremely rare, while normal exploration is common in this age category.  The younger the child, the more rare it is for the child to exhibit problem sexual behavior (Friedrich, 1991).  Unlike problem sexual behavior in older children and adolescents, problem sexual behavior in children under 6, is more common among girls than boys (ATSA Task Force Report, 2008).

35. In children under 12 years old, even when the word "sexual" is used to describe problem behavior, the intention or motivation for the behavior may not be related to sexual gratification or sexual stimulation (Silovsky & Bonner, 2003).

36. Among minors who sexually offend against other children, adolescents aged 12 to 14 are the most common offenders (ATSA Task Force Report, 2008).

## Standards for Preventing Child to Child Sexual Abuse in Organizations

37. The vast majority of established standards of care for sexual abuse prevention and response in organizations are designed to address child sexual abuse that is perpetrated by adults who use grooming and relationship-development to seduce children into having sexual contact (Centers for Disease Control, 2007; US Department of Health and Human Services, 2008)

38. There are standards of care in organizations to address child to child sexual abuse, but those standards are less clearly defined and less established than the standards for preventing sexual abuse perpetrated by adults (Hammond, 2003).

39. Because child-perpetrated sexual abuse is more often opportunistic and unplanned, the key components to preventing this form of abuse are less focused on identifying a potential perpetrator and more focused on identifying a potential incident and preventing it before it develops (Leclerc & Felson, 2016).

40. In practical terms, the reasonable steps to preventing child to child incidents of abuse in organizations during the 2014 included the following:

    a)  The design of the facility minimizes "secret" places that are difficult to observe and or monitor,

    b)  The organization has created rules about locker rooms and restrooms,

    c)  The organization limits the access of older adolescent children to younger children,

    d)  The organization identifies children who have behavioral warning signs, these behaviors have been addressed to prevent incidents of abuse,

e) The organization has developed a written monitoring plan that assures no part of the facility is unmonitored,

f) The organization uses "zones" to facilitate supervision,

g) The organization teaches active supervision to all staff,

h) The organization assigns staff to monitor designated areas so that no area is left unmonitored by staff or other adults,

i) The organization ensures an adequate staff to area ratio and staff to child ratio for staff to maintain frequent observation of children in the assigned area,

j) The organization trains staff to constantly move through the assigned area and to use scanning to identify safety and potential abuse issues.

(See Additional Materials Relied Upon, specifically *Centers for Disease Control*; *National Health and Safety Standards: Guidelines for Early Care and education Programs*; *National Center on Early Childhood Health and Wellness; The Administration for Children and Families' Training and Technical Assistance*)

41. There are no well-established protocols for prevention of sexual abuse by another child under the age of 6 because reports of incidents of this nature are so rare.


## Life Time Fitness Child Center

42. The Life Time Fitness Child Center is a service for Life Time members who are parents to drop off children between the ages of 3 and 11 years old for monitored play-time up to two hours.

43. The Child Center is an Exempt entity with respect to Utah State licensing due to the characteristics of the facility.  These characteristics include the short duration that children are permitted to stay in the Center (less than two hours) and the requirement that parents stay in the building.  Exempt entities are not permitted to diaper or change the children, nor are they allowed to provide food. Parents are required to be available to their children within 5 minutes if they are needed (Utah Administrative Code, Child Care Licensing R430-8).

44. While their children are in the Life Time Child Center, the parent must stay on the premises at all times.  They leave their phone number and where in the Life Time Fitness Center they will be. Parents are required to respond immediately if contacted by staff of the Child Center

45. Access to the Center is controlled through a front desk check in and check out.  There is no other entrance or exit from the Center unless there is an emergency.  Parents or guardians are required to provide a government issued form of identification and the same parent or guardian that checks the child in is required to check the child out.  Parents are permitted to enter the Center with their child and stay for up to ten minutes.  Parents are also permitted to enter the Center to find their child when they are ready to check out.

46. Identifying information for each child is printed out as a sticker and the sticker is placed on the child's back.  Children are further identified with Colored Dots on the sticker that signify children who are restricted to the toddler room, restricted from the Maze, or are potty training.  Children with severe allergies wear wristbands with the allergy written on it.

47. Life Time Fitness Policies state that Child Center team members are not to change diapers or assist children in the bathroom.  In the case of a child who needs a diaper change or bathroom assistance, the parent is called using the Pager system.  The team member is instructed to say, "Attention Life Time members and guests.  Would (parent name) please return to the Child Center, (parent name) please return to the Child Center.  Thank you."  Parents are instructed in these policies and sign statements that they agree to adhere to the policies of the Child Center.

48. Parents are also paged if a crying child cannot be comforted for 10 minutes, if there are disciplinary problems, or if there are health issues with the child.

49. The extent to which Life Time Fitness addressed the standards of care for supervision and prevention of child to child abuse is described in the following table:

## Table 2.  Standards of Care and How the Standard was Addressed

| Standard | How the standard was addressed by the Life Time Fitness Child Center with respect to the hallway and restroom area |
|---|---|
| Design of facility minimizes "secret" places | The hallway, water fountain and restroom area is a high-traffic area, as it is the route to all areas of the Child Center except the computer and infant rooms.  The facility is designed with low-walls to allow "line of sight" monitoring of the area from multiple vantage points in the facility.  See Figures 1-4<br><br>The boys restroom is in the middle of the Center, in a high-traffic walkway, with a half-door on the Restroom itself.  The stall doors do not go to the ground, allowing an observer to see from the doorway how many children are in a stall. |
| The organization has rules about locker rooms and restrooms | Only two children are allowed in the restroom at a time and only one to a stall.  Staff are not permitted to be in the restroom if a child is in there.  Staff are not permitted to assist children with their clothes unless it is just a button and then another staff member is to watch. |
| Limits the access of older, adolescent children | The Child Center accepts infants through 11-year-olds.  Infants and toddlers are separated from the 3 to 11-year-olds.  Children 12 years old and above are not permitted in the Child Center. |

| | |
|---|---|
| Children who have behavioral warning signs are identified; behaviors have been addressed | The Child Center maintains a low tolerance for behavioral problems, using Behavior Warnings and Reports, suspension, and termination of privileges based on the frequency and severity of the behavior.<br><br>No concerns about a child with sexual or other behavioral problems have been identified in this case. |
| Monitoring plan assures no part of the facility is unmonitored | Play space zones may not be opened unless there is a staff member assigned to the zone.  The front desk and hallway are in the "Red Zone" which is monitored by the front desk, toddler area staff and the floater.  At times, the restrooms my also be monitored by a hallway team member. |
| Uses "zones" to facilitate supervision | The Child Center is divided into play spaces or "zones." |
| Teaches active supervision to all staff | Active supervision is taught to all Life Time Team members.  They are taught to plan, scan, and prevent in their mandatory training.  Team members are taught to constantly observe interactions and behaviors among children. |
| Staff assigned to monitor designated areas so that no area is unmonitored | The hallway and bathroom zone is formally monitored by video camera and also monitored by staff moving from zone to zone, toddler area staff, and parents bringing and retrieving their children.  During slow times in the facility, when there is less traffic in the area, the hallway may also have a staff member assigned to the area.<br><br>Child Center also utilizes a "floater" to roam the facility and check bathrooms for horseplay, too many children or other supervision issues. |
| Adequate staff to area ratio and staff to child ratio for staff to maintain frequent observation of children | The internal policy of the Life Time Fitness Child Centers maintains an average 12:1 roaming ratio of children to staff. Staff are instructed, "It is important to remember that we have a 1:12 average roaming ratio.  There are times that we will be above a 1:12 ratio; however, there are more times that we are under a 1:12 ratio."<br><br>Staff members are instructed to continually scan and count the number of children in their zone so that they can notify a Child Center Supervisor if Team Members need to move around the zones.<br><br>Actions that are taken during periods of high usage of the Child Center are to move around the zones, bring in the Department Head to assist, call Kids Activity team members, the General Manager, or other Department Heads for a short period of time until the usage decreases. |

| | |
|---|---|
| Staff trained to constantly move through the assigned area and to use scanning to identify safety and potential abuse issues. | Life Time Fitness training for staff is heavily geared toward monitoring and supervision of the children.  In order to teach staff members to actively supervise and monitor the children, as well as interrupt potential problems, Team Members are taught to utilize the 4 Ps (Plan/Scan, Prevent, Prioritize, and Play).<br><br>• **Plan/Scan** means to scan every area of your zone to identify and prevent hazards to children or conflicts among them from arising.<br><br>• **Prevent** means that the key to keeping children safe to prevent incidents before they before they begin and understand what is and is not age appropriate behavior and play.<br><br>• **Prioritize** means to immediately deal with hazards or child conflicts and prioritize dangerous situations for children.<br><br>• **Play** means to actively engage the children in your zone while constantly scanning, planning, and preventing incidents from occurring. |

**Figure 1.  View of Restrooms from Front Desk**



**Figure 2. View of Restrooms from Maze Area**



**Figure 3. View of Restrooms from Main Area near Front Desk**



**Figure 4. View of Restrooms from Main Area near Maze**



## Opinions Regarding the Events of August 18, 2014

50. It is not possible to state precisely what happened with ███ Ngatuvai on the morning of August 18, 2014. It is also unknown what ███ would have reported in her August 21 forensic interview had she not been confronted with the anger and distress of her mother immediately upon being discovered without her clothes on in the restroom at the Child Center. The effects of adult influence and suggestion in these circumstances is well-understood and well-documented in the empirical literature (Bernet, 1997; Campbell, 1998; Ceci & Bruck, 1993; 1995; Lyon, Malloy, Quas, & Talwar, 2008).)

51. It is possible, however, to evaluate the system that was in place at the Child Center at the time and to determine whether the protective measures that were in place were reasonable, responsible, and met standards of care for supervision and prevention of child to child sexual offending in fitness facility's Child Center.

52. The Life Time Child Center restroom area was reasonably supervised and the boys restroom was not a "private" or secret place. This opinion is based on the following:

   a) The Child Center was designed to allow both formal and informal monitoring of the hallway restroom area. During the timeframe under consideration – from approximately 10:32am to 10:48am, team members and parents walked by the restroom about every 30 seconds, with the longest duration in between adults passing by being 68 seconds.

   b) The Child Center's written, active monitoring plan includes line-of-sight monitoring and scanning from front desk, main toddler room, and the hallway.

   c) The restrooms themselves were designed with half-doors on the entrances that allow line-of-sight supervision.

   d) All team members were trained in supervision and taught how to scan and anticipate problems among children.

   e) All team members were trained regarding the bathroom rules and how to monitor bathrooms.

   f) Video cameras were used to monitor the hallway outside the bathroom.

   g) Facility rules required no more than 2 children were allowed in the bathroom at any given time and all staff were familiar with this rule and their responsibility to enforce it.

   h) Video footage of the facility on the date in question, including the gymnasium, outdoor area, hallway, and toddler areas show a calm, well-managed environment that was reasonably supervised.

53. On the morning of August 18, the Child Center had 11 staff members supervising children during the time of the events, with a maximum number of 161 children and a maximum ratio of 14:1. While this ratio briefly exceeded the average program ratio of 12:1, it did not exceed the reasonable number of children that can be well-supervised in an appropriately designed play-space, with

children involved in ordinary play activities.  The standard of care requires that there are *adequate staff to supervise the identified area*.

In this particular case, the restrooms and hallway are the area in question.  Because of this configuration, the hallway and restroom area is more supervised when there are more children moving through, more parents walking by, and more staff circulating through the hallway and monitoring the restrooms which are in plain view from the hallway, the toddler room, and front desk.  The overall number of children actually increases the amount of traffic through the hallway and past the restrooms and increases the informal monitoring of the restrooms.  This observation can be verified through a review of available video footage showing the increase of hallway traffic during the times of that higher numbers of children are in the facility.

In my opinion, the events of August 18 occurred in spite of the reasonable care taken by the Life Time Child Center team members and in spite of monitoring and supervision that met prevailing standards of care (See Table 2).

54. Reviewing ███'s forensic interview, her mother's descriptions of the events of August 18, 2014, and the subsequent forensic and psychological evaluations, it is clear that ███'s descriptions of events varied both among and within these sources.  However, at no time in any of her descriptions, did ███ describe threats, force, intimidation, or any behavior that was physically or emotionally coercive.  She also did not report experiencing fear, anxiety, or emotional distress associated with the various interactions she described.  Because neither force nor emotional distress were elements in her description, ███ was describing an interaction that, if it did occur, would fall in the category of "sexual exploration" because it does not meet the criteria for child to child abuse in either the professional literature or the current Utah Administrative Code.

55. Life Time employees responded appropriately upon finding ███ undressed in the boys restroom.  Calle Ellingson responded calmly and did not scold ███ or shame her for being in the restroom without her clothes.  "Gently setting limits on such activities when they are done in the presence of nonfamily members or in public, without harsh reaction to or shaming of the child, helps the child grasp socially acceptable behavior" (Hagan, Shaw, & Duncan, 2008).  Seeing a lone child in a restroom undressed does not indicate that abuse has occurred and a more dramatic reaction from the Life Time team members would not have been appropriate because it may have alarmed or frightened the child unnecessarily.

56. The question of whether there ever was a boy in the restroom with ███ on the morning of August 18, 2014 remains unresolved.  This opinion is based on the following:

   a) Jennifer Ngatuvai was stated there must have been a boy in the restroom was because ███ could not have taken off her own clothing.  However, according Jennifer Ngatuvai's testimony ███ could pull down her pants and underwear to go to the bathroom because she was toilet trained.  ███'s medical records stated that she could dress herself.  There is no corroborating evidence that another child removed her clothing.

b) Jennifer Ngatuvai reported that Child Center staff told her they found ▇ and a boy in the restroom and that they had taken both children's stickers. This version of events would require a team member to have entered the restroom, removed the stickers from the children's clothing and then leave naked children in the restroom. This scenario is simply not plausible.

c) Calle Ellingson remained in the hallway after finding ▇ and Jennifer Ngatuvai was also moving through the hallway by the time Calle Ellingson saw ▇ It is unclear when any interaction between staff and a boy could have happened between 10:47am and 10:49am, or how a boy could have left the restroom during this timeframe without being noticed by staff members or Jennifer Ngatuvai.

d) Neither Jennifer Ngatuvai nor Calle Ellingson or any other team member observed ▇ with a boy or any other child in the restroom or outside of the restroom.

e) Video clips of ▇ prior to being in the restroom show her alone a few minutes before she was found in the restroom.

f) ▇ stated her mother told her there were two boys. ▇ was not able to describe the boy or boys and also stated that the boy or boys were still in the restroom when her mother found her.


**Conclusions**

57. In my opinion, the Life Time Fitness Child Center took reasonable steps and met prevailing standards of care for a) policies, procedures, and staff training for monitoring and supervision of children in and around the Child Center restrooms, and b) the prevention of child sexual abuse (including child to child abuse) in the Child Center restrooms.

58. If additional information is forthcoming, I shall review it and incorporate any new information as soon as possible.


Respectfully submitted,

Monica Applewhite, Ph.D.
May 17, 2019

## Additional Materials Relied Upon

Administration for Children and Families' Training and Technical Assistance.  **Active Supervision Toolkit**. 2011

American Academy of Pediatrics (2005).  **Sexual Behaviors in Children**. Elk Grove, IL: American Academy of Pediatrics.

American Academy of Pediatrics (2016).  **Educational Brochure.  Sexual Behaviors in Young Children:  What's Normal, What's Not?.**

Association for the Treatment of Sexual Abusers (ATSA) **Report on the ATSA Task Force on Children with Sexual Behavior Problems**.  *Child Maltreatment, 13*(2) May 2008.

Bernet, W. (1997). **Case study: Allegations of abuse created in a single interview**. *Journal of the American Academy of Child & Adolescent Psychiatry*, *36*(7), 966-970.

Bussey, K. (1992).  **Lying and Truthfulness:  Children's definitions, standards, and evaluation reactions**.  *Child Development*, *63*, 129 – 137.

Campbell, T. W. (1998). **Smoke and mirrors: The devastating effect of false sexual abuse claims**. New York: Insight Books.

Ceci, S.J. & Bruck, M. (1993). **Suggestibility of the Child Witness: A Historical Review and Synthesis**. *Psychological Bulletin*, *113*(3), 403-439.

Ceci, S. J., & Bruck, M. (1995). *Jeopardy in the courtroom: A scientific analysis of children's testimony.* Washington, DC, US: American Psychological Association.

Ceci, S. J., & Bruck, M. (1995). **Age difference in the reliability of reports.** In *Jeopardy in the courtroom: A scientific analysis of children's testimony* (pp. 233-251). Washington, DC: American Psychological Association.

Ceci, S. J., & Bruck, M. (1995). **The effects of repeated questioning.** In *Jeopardy in the courtroom: A scientific analysis of children's testimony* (pp. 107-125). Washington, DC: American Psychological Association.

Centers for Disease Control. (2007). **Preventing Child Sexual Abuse Within Youth-Serving Organizations:  Getting Started on Policies and Procedures**.  U.S. Department of Health and Human Services.

Cordisco Steele, L., & National Children's Advocacy Center (2015). **Do Forensic Interview Protocols Work for Preschoolers?** Huntsville, AL: National Children's Advocacy Center.

Davies, S.L., Glaser, D., Kossoff, R. (2000). **Children's sexual play and behavior in preschool settings:  Staff's perceptions, reports and responses**.  *Child Abuse and Neglect*, *24*, 1329-1343.

Faller, K. C. (2007). **Coaching children about sexual abuse: A pilot study of professionals' perceptions**. *Child Abuse & Neglect*, *31*(9), 947-959.

Faller, K.C. (2017). **The Witch-Hunt Narrative: Introduction and Overview**. *Journal of Interpersonal Violence*, *32*(6), 784-804.

Friedrich, W.N., Fisher, J., Broughton, D., Houston, M., & Shafran, C.R. (1998). **Normative sexual behavior in children: a contemporary sample**.  *Pediatrics*, *101*(4), E9.

Friedrich, W.N., Grambsch, P., Broughton, D., Kulper, J., & Beilke, R.L. (1991). **Normative sexual behavior in children**. *Pediatrics*, *88* (3), 456-464.

Goodman, G.S., Jones, O., & McLeod, C. (2017). **Is there a Consensus about Children's Memory and Suggestibility**? *Journal of Interpersonal Violence*, *32*(6), 926-933.

Griffin, A. (May 2019).  Director of Architecture for Life Time Fitness.  Personal communication.

Hagan, J.F., Shaw, J.S., & Duncan, P. (Eds.). (2008). Theme 8: **Promoting healthy sexual development and sexuality**.  In *Bright futures: Guidelines for health supervision of infants, children, and adolescents* (3rd ed.) (pp. 169 – 176). Elk Grove Village, IL. American Academy of Pediatrics.

Hammond, W.R. (2003).  **Public health and child maltreatment prevention:  The role of the centers for disease control and prevention**.  *Child Maltreatment*, *8*, 81-83.

Hornor, G. (2004). **Sexual behavior in children: normal or not?** *Journal of Pediatric Health Care*, *18* (2), 57-64.

Howe, M.L. & Knott, L.M. (2015). **The Fallibility of Memory in Judicial Processes: Lessons from the past and their modern consequences**. *Memory*, *23*(5) 633-656.

Kenny, M.C., Dinehart, L.H., & Wurtele, S.K. (2013). **Recognizing and Responding to Young Children's Sexual Behavior**. *Young Exceptional Children*. Online First: November 12, 2013.

Klemfuss, J. & Ceci S. (2012). **Legal and psychological perspectives on Children's Competence to Testify in Court**. *Developmental Review*, *32*(3), 268-288.

Kuehnle, K. & Connell, M. (Eds). (2009). *The evaluation of child sexual abuse allegations: A comprehensive guide to assessment and testimony*. Hoboken, NJ: John Wiley and Sons.

Lamb, S. & Coakley, M. (1993). **"Normal" Childhood Sexual Play and Games: Differentiating Play from Abuse**. *Child Abuse & Neglect*, *17*, pp. 515-526.

Leach, C., Powell, M. B., Sharman, S.J., & Anglim, J (2017). **The Relationship between Children's Age and Disclosure of Sexual Abuse During Forensic Interviews**. Child Maltreatment. Vol 22(10) 79-88.

Leclerc, B & Felson, M. (2016). **Routine Activities Preceding Adolescent Sexual Abuse of Younger Children**. *Sexual Abuse: A Journal of Research and Treatment*. *28*(2) 116 – 131.

Lieb, R., Berliner, L., & Toty, P. (1997). **Protocols and training standards: investigating allegations of child sexual abuse**. Olympia, WA: Washington State Institute for Public Policy.

Lipian, M. S., Mills, M. J., & Brantman, A. (2004). **Assessing the verity of children's allegations of abuse: A psychiatric overview**. *International Journal of Law & Psychiatry*, *27*(3), 249-263.

Lyon, T.D., Carrick, N., & Quas, J.A. (2010). **Young Children's Competency to Take the Oath: Effects of Task, Maltreatment, and Age**. *Law and Human Behavior*, *34*(2), 141 – 149.

Lyon, T. D., Malloy, L. C., Quas, J. A., & Talwar, V. A. (2008). **Coaching, truth induction, and young maltreated children's false allegations and false denials.** *Child Development*, *79*(4), 914-929.

Mart, E. G. (2010). **Common errors in the assessment of allegations of child sexual abuse**. Journal of Psychiatry and Law, *38*(3), 325-343.

National Center on Early Childhood Health and Wellness. **Active Supervision**. (2011)

National Child Traumatic Stress Network. (2009). **Sexual Development and Behavior in Children**. National Center on Sexual Behavior of Youth.

National Resource Center for Health and Safety in Child Care and Early Education**.  Supervision and Discipline**.  *Caring for Our Children:  National Health and Safety Standards: Guidelines for Early Care and Education Programs*.

Ney, T. (Ed.). (1995). *True and false allegations of child sexual abuse: Assessment and case management.* Philadelphia, PA, US: Brunner/Mazel.

Newlin, C. V. (2015). **Child Forensic Interviewing: Best Practices**.  *Office of Juvenile Justice and Delinquency Prevention*.  Juvenile Justice Bulletin.

Schreier, H. A. (1996). **Repeated false allegations of sexual abuse presenting to sheriffs: When is it munchausen by proxy?** *Child Abuse & Neglect*, *20*(10), 985-991.

Silvosky, J. F. & Niec, L. (2002). **Characteristics of Young Children with Sexual Behavior Problems:  A Pilot Study**.  *Child Maltreatment*, *7*(3), 187-197.

Untied States Department of Health and Human Services. (2008).  **The Role of Professional Child Care Providers in Preventing and Responding to Child Abuse and Neglect**.  Administration for Children and Families.  Office of Child Abuse and Neglect.

Utah Administrative Code. Title R430. Health, Family Health and Preparedness, Child Care Licensing. §R430-8.  **Exemptions from Child Care Licensing.**

Utah Administrative Code. Rule 512-80.  **Definitions of Abuse.**

Utah Administrative Code. 78A-6-105.  **Definitions.**

EXHIBIT "H"



**THE OHIO STATE UNIVERSITY**
**Wexner Medical Center**

**Department of Psychiatry**
**and Behavioral Health**
1670 Upham Drive  Suite 130
Columbus, Ohio 43210
Phone: 614-685-5602
Fax:  614-293-4200

May 15, 2019

Mr. Stephen J. Trayner
Strong & Hanni
South 200 East, Suite 800
Salt Lake City, UT 84111
(801) 532-7080
(801) 323-2090 (fax)
strayner@strongandhanni.com

> *Re: K.N., a minor and Jennifer Ngatuvai, individually and on behalf of*
> *K.N. v.  Life Time Fitness Inc.*
> *Case No. 150909040*

Dear Mr. Trayner,

As per your request, I have reviewed plaintiffs' expert reports pertaining to the above-referenced case.   In my report dated April 4, 2018, I indicated that it was my opinion to a reasonable degree of medical certainty that ████ Ngatuvai did not suffer any immediate or long-term psychological damage as a result of whatever occurred in the boys' bathroom at the Life Time Fitness child center. My opinion has not changed after reviewing the following:

1. Plaintiffs' Disclosures and Designation of Expert Witnesses dated April 5, 2019
2. Curriculum Vitae and report of  Polly Westcott, Psy.D., HSPP, dated March 9, 2019
3. Curriculum Vitae and Tristyn Teel Wilkerson, Psy.D., dated March 25, 2019
4. Curriculum Vitae and report of Erin David Bigler, Ph.D., dated April 1, 2019
5. Curriculum Vitae and report of Ann Wolbert Burgess, DNSc, APRN, BC, dated February 23, 2019
6. Curriculum Vitae and letter from Elizabeth A. Johnson, Ph.D., dated April 4, 2019
7. Curriculum Vitae and reports  of  Gary C. Harmor, dated December 14 and 18, 2017
8. Curriculum Vitae and Life Care Plan by Sheryl Dobson Wainwright, RN, BSN, MBA, CCM, LNCC, CLCP, MSCC, dated March 25, 2019
9. Curriculum Vitae and report of Daniel T. Rondeau, dated April 5, 2019

I will restrict my commentary on specific reports to those that address ████ Ngatuvai. All of my opinions stated are to a reasonable degree of medical certainty.

**Review of Reports**

*<u>Ann Wolbert Burgess, DNSc, APRN, BC</u>*

Dr. Burgess interviewed Jennifer Ngatuvai by telephone for unspecified periods of time in May of 2017 and February of 2019 at the request of plaintiffs' counsel. There is no indication that she evaluated ████ Her report indicates that she had limited access to and/or reviewed far less information than I had in forming her opinions. For example, there is no reference to having reviewed the deposition transcripts of Life Time Fitness staff or ████ 's teacher, pediatricians, police officers, therapists, etc.; the hallway video; the video of the police interview of ████ the sexual assault examination report; etc. This lack of information may be a factor in the development of her opinions, and I will highlight major concerns or problems with respect to her conclusions.

Dr. Burgess did not have adequate information on which to base her opinions. Unlike a clinical evaluation, which is based primarily on information obtained from a patient, a forensic evaluation requires a level of objectivity that would have required a review of information from a variety of sources. Dr. Burgess did not even evaluate ████ and there is a wealth of evidence that Dr. Burgess either was not given access to or did not request that is odds with information provided by Mrs. Ngatuvai.

Dr. Burgess, perhaps because of a lack of information available to her, consistently assumes facts not in evidence. This is not appropriate for a forensic independent medical evaluation, especially not in a case such as this with conflicting information. For example, Dr. Burgess assumes the accuracy of the position presented by plaintiffs' counsel and Mrs. Ngatuvai that:

1.  ████ was lured into a bathroom by two predatory boys for the purpose of sexual exploitation (no evidence of this)
2.  ████ was coerced into taking her clothes off (no evidence of this).
3.  ████ was found in the bathroom with another little boy (in depositions, staff clarified that this was a misinterpretation—a little boy told staff that a girl was in the boys' bathroom; no boy was observed in the bathroom with ████
4.  There were two boys in the bathroom (in dispute)
5.  Staff took the stickers of the children in the bathroom (Life Time Fitness staff testified that no one is aware of this having occurred.[1] )
6.  ████ 's clothing was removed by one or two boys (████ has consistently indicated that she removed at least part of her own clothing.)

Dr. Burgess offers no additional information that would indicate that what may have happened in the bathroom was traumatizing to ████ The Lamb and Coakley (1993) article that Dr. Burgess references does not provide illumination with respect to Dr. Burgess's opinion that this was not

---

[1] Calle Ellingson was the staff member who was told by a little boy that ████ was naked in the boys' bathroom and found her. She testified in her deposition that she did not see any boy in the bathroom with ████ and did not take ████ s sticker. Stacie LeFranc testified that she told Savannah Ferran to tell Calle to stay with ████ but could not recall whether she told Savannah to tell Calle to take ████ s sticker. As anyone who has ever had a sticker placed on their clothes knows, stickers often fall off even without active play.

normal sex play.[2]  Indeed, ███ s varied descriptions of what may have occurred do not indicate that force or coercion was used, there was no aggression, and the boy(s) were not significantly older than her. However, Dr. Burgess assumes that there were two boys, although this is not clear, and that they "performed sexual acts" on ███

The information provided in the American Academy of Pediatrics web page entitled "Sexual Behaviors in Young Children: What's Normal, What's Not" would place the bathroom incident in the category of "Normal, Common Behaviors."[3]  Dr. Burgess cites literature related to sexual trauma and abuse that is not relevant to this case. The Pynoos and Nadar 1989 study she references refers to the trauma experienced in 1984 when a sniper shot repeated rounds of ammunition from a second story window at children on an elementary school playground. Scores of children were pinned under gunfire, one child and a passerby were killed, and 13 other children and one playground attendant were injured. Children ran screaming across the playground trying to get out of the line of fire, some dropped to the ground motionless, some hid behind trees or trash cans.  Teachers threw themselves on top of students in an attempt to shield them.  In some classrooms, teachers put children in the closet or directed them to hide under their desks. The siege was not ended until the S.W.A.T. team stormed the sniper's apartment and discovered that he had killed himself. The children did not have access to their parents or siblings who were also students during the attack.

The Terr study cited by Dr. Burgess involved the Chowchilla school-bus kidnapping of 1976 in which 26 children (ages 5 to 14) disappeared for 27 hours, and eventually escaped from their captors. After their return, the children disclosed that their school bus had been stopped by a van blocking the road, three masked men had taken over the bus at gunpoint, and they had been transferred to two blackened, boarded-over vans in which they were driven about for 11 hours. They were then transferred into a "hole" (actually a buried truck-trailer), and the kidnappers covered the truck-trailer with earth. The children were buried in the hole for 16 hours until two the oldest and strongest boys (ages 10 and 14 years) dug them out. By then the kidnappers had left the vicinity.  The specifics of these cases are presented to clarify the there is simply no comparing what may have occurred in the bathroom of the child center at Life Time Fitness to a sniper attack or being kidnapped and buried underground.  I am unsure as to the purpose of Dr.

---

[2] The conclusions of this paper were based on a survey of 300 undergraduates at a women's college, only 128 of whom returned the survey. Of those who returned the survey, 85% recalled a "childhood sexual game experience," of which 44% described cross-gender play.  Of those who recalled engaging in sex play, 30% reported that they had been "persuaded, manipulated, or coerced," and there was a "trend that suggested that being coerced was related to participating in cross-gender play." The authors developed a "typology" of "normal" childhood sexual play and games.  (The incident with ███ did not neatly fit into any category, but likely was closest to "Exposure.")  The authors state, "A separate classification was established for those stories that could not be considered 'normal sexual play,' but were judged as abusive according to the generally accepted criteria of child sexual abuse (use of extreme force or threat, *or* a 5-year or greater age difference between the two participants.)" The limitations of this study should be noted (retrospective analysis by survey, only 128/300 subject participation, and the authors' explanation/hypothesis for the fact that most women recalled the sex play as "normal" as related to the stereotypic gender roles of women having less control over their bodies).

[3] Kellogg ND. Clinical report—the evaluation of sexual behaviors in children. *Pediatrics*, 124(3): 992-998. September 2009.  https://www.healthychildren.org/English/ages-stages/preschool/Pages/Sexual-Behaviors-Young-Children.aspx

RYAN 000062

Burgess's mention of Terr's definition of Type I and Type II trauma. Terr defines Type I trauma as a single, one-time event such as rape, major accident, natural disaster, or witnessing the death of a loved one, and Type II trauma as involving multiple, prolonged, or chronic events, such as those involving repeated child abuse or captivity (Terr, 1991). Clearly, ▮▮▮ has not experienced either Type I or Type II trauma. The Pynoos, Steinberg, and Aronson book chapter referenced by Dr. Burgess discussed memory organization of traumatic experiences (e.g., a "life threatening automobile accident" in which the child's mother died, and being "viciously attacked by a dog while playing alone"). Whatever ▮▮▮ experienced in the child center bathroom was not traumatic.[4]

Dr. Burgess did not provide a specific reference for her mention of Fivush regarding childhood memory and so I cannot comment on the context for Fivush's discussion of recall in young children. However, it is well known that although preschoolers can provide accurate accounts, they are disproportionately vulnerable to a variety of suggestive influences that may distort their memory.[5]

Despite the fact that Dr. Burgess notes that Mrs. Ngatuvai was yelling, complaining, and "expressing her anger" in front of ▮▮▮ she does not consider the effect that an angry mother who is yelling at grown-ups about finding her daughter in the bathroom naked likely would have had on ▮▮▮ particularly with respect to engendering a sense of shame and fear of having done something wrong. Dr. Burgess does not address the fact that a mother's anger for finding ▮▮▮ naked in the boys' bathroom likely would have been interpreted by the 3-year-old ▮▮▮ as anger at her. Nor does Dr. Burgess mention the fact that Mrs. Ngatuvai does not appear to have been attentive to ▮▮▮ s thoughts, feelings, and behavior in the aftermath of the incident. For example, as I noted in my April 4, 2018 report, Mrs. Ngatuvai acknowledged that ▮▮▮ was with her the entire time she was "yelling" at and confronting the Life Time Fitness staff and stated, "it would surprise me if she wasn't aware that I was upset . . . I was yelling at people." She acknowledged not listening to what ▮▮▮ was saying when she confronted staff, stating, ". . . I don't know exactly her words, because, again, she was talking at the same time I was yelling." Mrs. Ngatuvai also discussed the incident on the phone after leaving Life Time Fitness in front of ▮▮▮

Dr. Burgess assumes that merely because Mrs. Ngatuvai was told by the police not to discuss the Life Time Fitness incident with ▮▮▮ on the day of the incident, she did not. Dr. Burgess avoids evidence to the contrary, including information from ▮▮▮ herself that the incident was not only discussed with her mother around the time of the incident, but continues to be regularly discussed. There are numerous references in the records reviewed that the incident was repeatedly discussed (reading a book entitled My Body Belongs to Me, commenting on the child center when driving by it, etc.). This is not a criticism of Mrs. Ngatuvai for doing so, as it would be difficult for a parent to refrain from trying to obtain information, but one cannot have it both ways. If ▮▮▮ is as intuitive and intelligent as her parents perceive her to be (and which I concur with based on my evaluation of ▮▮▮ then it highly likely that ▮▮▮ also wanted to be

---

[4] Pynoos RS, Steinberg AM, Aronson L. Traumatic Experiences: The early organization of memory in school-age children and adolescents. *In Trauma and Memory: Clinical and Legal Controversies*, Oxford University Press, New York, 1997, pp: 272-289.

[5] Bruck M, Ceci SJ (1999). The suggestibility of children's memories. *Annual Review of Psychology*, 50:419-439.

reassured by her m███████that what happened was not her fault and that her mother was not angry or disappointed with her. Before I even began my interview of ████ she was well aware of the reason for the evaluation. There is no indication that my evaluation "resurrected her memories and feelings." Mrs. Ngatuvai never indicat██ ███ she did not tell ████s pediatrician at the time about the incident for fear of breaching any agreement about not discussing the incident, as Dr. Burgess appears to indicate in her report. Rather, Mrs. Ngatuvai indicated during the evaluation on February 9, 2018 that she did not reveal what happened at Life Time Fitness because she "did not love" the physician that ████ was seeing at tha███████, and didn't "notice anything medically" that she related to the incident.

Dr. Burgess opines that ████ would not hav██████led the genital examination as she had been to "well-child check-ups and a doctor's office before and was aware that the body is viewed by a doctor so it would not be expected that she remembers thi██████separate visit 4 years later." Well child visits do not routinely include genital examinations such as the one that ████ had, and the examinations in a pediatrician's office do not focus on the genitalia.

Dr. Burgess states in her report, "This debate deals with memory structure especially in a 3-year-old child right after a sexualized event vs this same child at age 7 and her retrospective memory." Dr. Burgess misinterprets the signi██████ of ████s difficulty with recall. She is quite correct in that one would not expect a 7-year-old to accurately recall events from 4 years ago. However, this evaluation is not primarily concerned with the absolute accuracy of ████s current recollection. According to her report, Dr. Burgess did not view the video of the police interview of ████[6] Had she done so, she would have observed the numerous inconsistencies that I delineated in my report of April 4, 2018, including difficulty understanding the concept of "truth," not answering questions she did not understand, inaccurate statements regarding a cat and having seen a ghost, etc. These inconsistencies were noted in the immediate aftermath of the incident, not years later as Dr. Burgess indicates. At no time, either ████diately in the aftermath of being found in the bathroom, during the sexual abuse genital examination, during the interview with Officer Coons, during t██████ sessions, or 4 years later did ████ ever indicate that she was frightened by the boys, threatened, coerced, or harmed in any way. ████consistency is a critical feature of this case.

████

It is clear from the records reviewed, including records that Dr. Burgess did not review, as well ██████ evaluation of ████ which Dr. Burgess did not perform, that ████ was not traumatized by what may have happened in the bathroom. The totality of the information provided, including a face-to-face evaluation of ████ and a face-to-face interview with Mrs. Ngatuvai indicate that the distressing aspect of what may have occurred in the bathroom was the belief (reinforced by her mother) that she was at fault for being "naked in the boys' bathroom." The long-term nature of ████ion has perpetuated a focus on the incident. Dr. Burgess's comparison of whatever brief activity with a little boy or boys occurred in the bathroom with a sniper attack or traumatic kidnapping is not appropriate.

In her report, Dr. Burgess does not indicate that she read the depositions of the Life Time Fitness staff. Had she done so, she would have discovered that there was a miscommunication regarding

---

[6] At ████s deposition she was shown a photo of the police officer who interviewed her and did███ recognize him.

*Ngatuvai v. Lifetime Fitness*
*May 15, 2019*
*Page 6 of 13*

staff finding ▮▮▮ in the bathroom with a little boy, and that in the chain of communication the fact that a little boy told a staff member that there was a girl in the boys' bathroom was mistranslated into there being a little boy in the bathroom with ▮▮▮ Given what is known, a plausible explanation of what happened is that ▮▮▮ mistakenly wandered into the boys' bathroom, took off some of her clothes to go to the bathroom,[7][8] and over the course of that time one or two other boys came in to use the bathroom and initiated the "game" that ▮▮▮ described. This is not to indicate that this scenario actually happened, but based on the information presented to me, it is as likely or more likely than the scenario presented by Dr. Burgess. Regardless, even accepting the scenario presented by Dr. Burgess (two boys engaging in play with ▮▮▮ who was at least partially naked), there is no indication that she found this frightening or hurtful. Dr. Burgess repeatedly indicates that ▮▮▮ was sexually assaulted and her opinions are based on this assumption. The use of the term "sexualized" is also questionable. Given the young age of the boy(s) and the behavior described, actual "sexual" intent (to achieve sexual arousal) is highly questionable, especially given the fact that ▮▮▮ makes no mention of their penises.

It is not clear what Dr. Burgess means by her statement, "Daycare staff should be in complete control of children under their care." However, it is unrealistic to expect that each child in a gym play area would have a 1:1 staff member observing them at all times, and Mrs. Ngatuvai would have been well aware that this not the case from the numerous other times that ▮▮▮ was in the Life Time Fitness play area.

Dr. Burgess concludes that the "daycare abuse has had a serious and prolonged impact on ▮▮▮ Ngatuvai." Dr. Burgess cites the multitude of long-term physical and mental health problems that can result from childhood physical or sexual abuse; however, there is no indication that ▮▮▮ was abused or perceived herself to have been abused, and there is no indication of immediate or long-term trauma. Hence, in my opinion to a reasonable degree of medical certainty, there are no current physical or emotional consequences from the Life Time Fitness incident, and there will be not be any physical or emotional consequences secondary to it in the future. Any future social or emotional difficulties that ▮▮▮ may experience will not a result of what happened in the Life Time Fitness daycare bathroom.

Dr. Burgess noted the fact that ▮▮▮ was seen in play therapy (specifically initiated by her mother in response to the incident at Life Time Fitness) and indicates that her verbalizations in play therapy were spontaneous indications of having been traumatized. In my opinion to a reasonable degree of medical certainty, ▮▮▮'s verbalizations reflect the fact that she was aware of her mother's distressed response to the incident and that the importance of the incident was highlighted and kept alive by the continued focus on it. Even the verbalizations noted in Dr. Burgess's report indicate that ▮▮▮ was discussing the incident with her mother, and there is the

---

[7] As I noted in my April 2018 report, Mrs. Ngatuvai has reported that ▮▮▮ was unable to take her own clothes off. However, Dr. Ryan's record indicates that ▮▮▮ was able to put her clothes on as early as February 2013 (age 2.0) and able to dress and button up with supervision in August 2014. Dressing and undressing are developmental milestones that most children attain by the age of 3 (https://www.cdc.gov/ncbddd/actearly/milestones/milestones-3yr.html).
[8] Undressing is easier and typically attained by age 2. Scharf RJ, Scharf GH, Stroustrup A (2016). *Developmental milestones. Pediatrics in Review*, 37(1): 25-37.

role of fantasy (which is part of play therapy) keeping the incident highlighted—for example drawing pictures of the boys whom she could not identify or describe at the time of the incident.

Dr. Burgess indicates in her report that ▮▮s belief that the incident at Life Time occurred because she did not look up at the signs for the boys' and girls' bathrooms is synonymous with or indicative of the fact that she "struggles with the memory of the incident, and internalizes her distress. The memory is still traumatic with fear of it happening again." A thorough reading of my report, including ▮▮s discussion of her thoughts and feelings surrounding the incident, clarifies that any distress ▮▮ currently experiences (and this appears to be only in the context required evaluation in ongoing litigation) has to do not with what actually happened in the bathroom, but with its aftermath. As noted in my report, ▮▮'s temperament and personality is such that she tends to respond to other negative experiences in a similar way (getting the wrong answer in school, spilling her milk, etc.).

Dr. Burgess draws conclusions that are far afield of the objective nature of a forensic evaluation. For example, Dr. Burgess's reflections on the meaning of traumatic urination and showering and how she believes they relate to ▮▮s "trauma" is not based on any empirically validated science that would apply to this case and is in my opinion a fantastical reach. In my opinion continued focusing on what Dr. Burgess terms "an opportunity for a therapist to help ▮▮ process the recurring image of the bathroom event" would be highly counter-therapeutic. Firstly, there is no "recurring image." There is no indication that ▮▮ experiences recurrent imaging of the incident. As I describe in ▮▮s own words in my report, as her cognitive processes have matured, she has attempted to "fill in the blanks" with respect to what happened at Life Time Fitness, and there is no way to know what really occurred and what did not since much of her narrative is conflicting. A therapist's focus on "helping" ▮▮ "reconstruct" what happened would likely be based on inaccuracies and could crystalize an identity of victimhood and powerlessness, which does not currently exit.

Dr. Burgess also takes certain inconsistencies in ▮▮s statements during my evaluation to piece together an inaccurate assessment of ▮▮'s current state, opining that "The incident is often on her mind; it is unresolved. … The incident has affected her mood state and she blames herself."

Dr. Burgess's acceptance at face value the accuracy of Mrs. Ngatuvai's statements regarding ▮▮s behavior and their significance speaks to a lack of objectivity which is problematic in a forensic evaluation. It is notable that Dr. Burgess does not mention the deposition testimony of ▮▮s kindergarten teacher (as it appears she did not have it for review), but only mentions that Mrs. Ngatuvai told her that ▮▮s second grade teacher has noted that since December 2018 ▮▮ has been "withdrawn, preoccupied, not concentrating on her work, avoiding her classmates, and not socializing as she had."[9] Dr. Burgess ostensibly includes this information that a change in ▮▮s behavior 4 ½ years after the incident at Life Time Fitness and 10 months after my evaluation to buttress her opinion that ▮▮ has experienced long-term effects (that she had not been experiencing during the several years prior to December of 2018). I disagree with her opinion. Not only did ▮▮ not exhibit any symptoms of depression or posttraumatic stress after

---

[9] I was denied an opportunity to interview ▮▮s teachers by plaintiffs' counsel, and as of the time of this report have not received permission to do so.

*Ngatuvai v. Lifetime Fitness*
*May 15, 2019*
*Page 8 of 13*

the incident, the nature of what may have happened in the bathroom would not even qualify as a traumatic stressor. It is illogical to believe that she has suddenly become symptomatic as a "delayed" response.

Dr. Burgess's opinion that ██████ has a "guarded prognosis" is not supported by the facts in this case, nor by ██████ s sustained healthy functioning after the incident at Life Time Fitness. ██████ is not in need of treatment addressing sexual trauma or the aftermath of sexual trauma as she was not traumatized sexually or otherwise.

Several of Dr. Burgess's opinions are not presented to a reasonable degree of medical or professional certainty. In my opinion, she appears to be creating a narrative to fit with a version of events (a traumatic event with lasting effects) for which there is no evidence. For example:

1. "…the significance and dynamics of the shower where the child is required to take clothes off and could be a cue reminder of the bathroom event where ██████ protested doing what the boys wanted. This behavior offers an opportunity for a therapist to help ██████ process the recurring image on the bathroom event."
2. "██████ may be dissociating or 'lost in thought' during the urinary release that is under autonomic nervous system control, as was the bathroom event."

Dr. Burgess opines that ██████ s "reaction to the incident" (specifically blaming herself) is not related to her mother's reactions and behavior, "but rather ██████ s reaction to the incident and the resurfacing of the incident through the depositions and interviews." There is no indication that ██████ s emotional, cognitive, or behavioral functioning has suffered related to the incident at Life Time Fitness. As I described in my April 2018 report, the behaviors that ██████ s parents relate are well within the norm of childhood behavior (urinary accidents, angry outbursts when she does not get her way, minor manipulation of parents and siblings, etc.) and do not reflect pathological behaviors in response to trauma. Indeed, every child's behaviors could be viewed as trauma-related if this were the yardstick. I did not opine that ██████ s blaming herself for the incident was wholly related to her mother's reaction; however, her mother's reaction after finding ██████ in the bathroom clearly indicated to ██████ that something bad had occurred. Her mother's questioning and subsequent admonitions about "getting naked" reinforced this. However, ██████ s personality style is also a major factor. She has been described as highly intelligent, sensitive, and focused on doing everything right and not making mistakes. ██████ was very well aware of why she was being evaluated by me before the evaluation commenced. Fortunately the entire evaluation was recorded, and there is no indication at any time during my interviews that ██████ was distressed or disturbed by my evaluation. She was able and willing to do an excellent job for a 7-year-old of explaining her recollections and memories (including admitting contradictions) of the incident and its aftermath, as well as her current thoughts and feelings.

A similar claim was made regarding ██████ s deposition. My review of the video of that deposition does not indicate that potentially traumatizing interview techniques were utilized or that ██████ was distressed.

There is no indication that ██████ ruminates about the Life Time Fitness incident, but in my opinion ██████ believes that the "this" in her statement, "it's because if I looked up at the sign,

RYAN 000067

none of this would ever happen," includes the continued focus on this incident of 4 years ago, including interviews and detailed questioning about it.  The evaluation was merely the vehicle by which █████ made us aware of what she recalls, thinks, and feels.

Dr. Burgess indicates that Mrs. Ngatuvai told her that █████ "sobbed all night" after meeting with me and has been distressed since that time.  A review of the taped interview as well as my report clarifies that █████ was quite bright and interactive and actually welcomed the chance to talk.  On day 2, she denied that she was upset about our discussion the day before.  She did reveal that her mother questioned her about what we talked about, and that she told her mother that she blamed herself.  It should be noted her mother stated that she thought that █████ blamed herself for the incident even before my evaluation commenced, and this is described in my report. Although it is not entirely clear what Dr. Burgess means regarding, "Dr. Ryan's belief of Mrs. Ngatuvai's motive fails to have supporting evidence;" it may be related to my statement in the April 2018 report that █████s sense that something "bad" happened in the bathroom "has been nurtured by her mother in a well-meaning attempt to hold Life Time Fitness accountable for what she perceives to be their negligence with respect to supervision… ."  Although there are other potential explanations for Ms. Ngatuvai's responses to the Life Time Fitness incident, I chose the most benign one.

Dr. Burgess erroneously seems to indicate that I advocate "forgetting" trauma.  This would be inaccurate.  Recommending that an individual try to "forget" his or her trauma is not clinically appropriate.  The issue in this case is that in my opinion, █████ has not been traumatized, sexually or otherwise by what occurred in the bathroom of the Life Time Fitness child care center, and continued focus on the incident (for example by engaging in individual therapy as recommended by Dr. Burgess "to deal with the episodes of anger and physiological signs of trauma") would be counter-therapeutic and put █████ at risk for developing an identity as "victim."

Several of Dr. Burgess's recommendations, even given her opinion that █████ was sexually traumatized and "trauma-specific symptoms identified are directly attributable to the daycare abuse" are problematic.  For example, her opinion that Life Time Fitness should have investigated all of the "male" children at the child center to see if they had been abused or witnessed oral sex is both inappropriate and impossible. It is unclear what family relationships need to be "re-set," and that is not clarified in her report.  █████ has not received any individual counselling in several years, and there is no indication that it is required now or will be in the future.  I am not sure what a personal trainer and martial arts training is supposed to accomplish. My evaluation of █████ and the history provided indicates that she feels strong and capable of defending herself.

### *Tristyn Teel Wilkerson, Psy.D.*

Dr. Wilkerson is a licensed psychologist who evaluated Jennifer and █████ Ngatuvai at the request of plaintiffs' counsel. She also observed the first day of my evaluation of █████ Ngatuvai on February 8, 2018.  Dr. Wilkerson's report indicates that she met with Jennifer Ngatuvai on February 22, 2018, and then with █████ and Jennifer on March 7, 2019, and that █████ participated in a "brief clinical interview." Dr. Wilkerson did not interview █████ regarding the

event that occurred at Life Time Fitness, which in my opinion was appropriate given the fact that she had viewed my interview of ████ on February 8, 2018. Her report does not indicate whether she watched the video recording of my interview of ████ on February 9, 2018.

Although this was an independent medical evaluation to render an opinion regarding ████ Ngatuvai, Dr. Wilkerson was afforded the opportunity to interview Mrs. Ngatuvai about her own social history, background, past psychiatric symptoms and treatment, and current functioning. I was not allowed during the IME to ask any questions of Mrs. Ngatuvai that did not specifically relate to ████.

Dr. Wilkerson notes that Mrs. Ngatuvai reported that an antidepressant was either recommended and/or prescribed after the birth of her third child; however, she did never took the medication. Studies indicate that it is far more likely for primary care physicians and obstetricians/gynecologists to under-diagnose rather than over-diagnose mood disorders such as major depression, including mood disorders that occur in postpartum period.[10] The assumption appears to be that because Mrs. Ngatuvai disagreed with the recommendation of her physician (and believes she was "overwhelmed" rather than depressed), she does not have a history of clinically significant mood problems preceding the Life Time incident.[11] As previously noted, I was not allowed to question Mrs. Ngatuvai regarding her mental health history, but there are reasons why this issue is significant:

1. Ms. Ngatuvai likely has a history of major depression preceding the incident at Life Time Fitness.[12] Major depressive disorder is usually highly recurrent, with at least 50 percent of those who recover from a first episode of depression having one or more additional episodes in their lifetime, and approximately 80 percent of those with a history of two episodes having another recurrence. Extant research indicates that recurrent major depression reflects an underlying vulnerability that is largely genetic in nature.

2. It is noted in Dr. Wilkerson's report that Mrs. Ngatuvai has reported that she been so profoundly depressed that she is unable to get out of bed.[13] However, Dr. Kevin Duff's independent medical evaluation indicates that these symptoms are not noted in the medical records he reviewed. Ms. Ngatuvai's response to what happened at Life Time Fitness is highly atypical, even if the worst possible scenario occurred (two boys engaged ████ in activity that involved licking her as they went under her legs, which she perceived as "gross," and refused to reciprocate). ████ made statements to both Dr.

---

[10] Flanagan T, Avalos LA (2016). Perinatal obstetric office depression screening and treatment: Implementation in a Health Care System. *Obstetrics & Gynecology*, 127(5): 911-915.

[11] Dr. Polly Westcott's evaluation of Jennifer Ngatuvai does not mention Mrs. Ngatuvai being prescribed Prozac, but does mention another episode of difficulty sleeping, decreased concentration, and emotional lability—all symptoms of clinical depression—in 1993, and that she was prescribed the antidepressant Elavil (amitriptyline).

[12] Dr. Kevin Duff's independent medical evaluation notes "depression" diagnosed with the recommendation for treatment in 1992-1993 and in 2006 in Mrs. Ngatuvai's medical records that he reviewed. Complaints consistent with chronic depression are noted in the medical records reviewed by Dr. Duff, including numerous somatic complaints, insomnia, fatigue, and chronic pain, which are often present in depressive disorders.

[13] Dr. Westcott's report states that Mrs. Ngatuvai "no longer showers" or attends to hygiene regularly and does not pay bills regularly. Surely, ████ is aware that something is wrong with her mother, hence her comments about wishing her mother was happy or happier.

Wilkerson (and to me) that indicate a level of concern regarding her mother's well-being that is atypical for a 7-year-old. For example one of her "wishes" in the interview with Dr. Wilkerson was for "mom to have the best life she could have." With me, ███ stated that she thought her mother would be happier if she could return to work out at Life Time Fitness.

3. Maternal major depression and anxiety can have significant effects on children.[14] [15] ███'s sensitivity to her mother's mood and behavior would be expected to manifest as some degree of worry/anxiety, especially given her temperament. Fortunately, in school ███ describes herself as "pretty chill," which is consistent with the deposition testimony of her kindergarten teacher.

Dr. Wilkerson bases her diagnosis of posttraumatic stress disorder in ███ on the fact that ███ "exhibited symptoms of post-traumatic stress following the incident as was documented and diagnosed." Dr. Wilkerson refers to the clinical evaluation performed by Ms. Pam Mitchell, which was based primarily on information presented by Mrs. Ngatuvai about the incident at Life Time Fitness, and regarding concerns that had not been noted by any other sources, including ███'s pediatrician. The behaviors that Mrs. Ngatuvai presented and perceived as related to the Life Time Fitness incident (anger, wetting her pants, increased anxiety, and talk about being scared) are not only observed in normal and non-traumatized preschoolers, they would not be unexpected in the aftermath of an increased focus on the incident (a genital exam, reading a book on inappropriate touching, her mother's discussions with her about when it is "okay" to be "naked," etc.) and her mother's obvious anger and distress in the aftermath. Also, as previously noted, the content of the play therapy, as reported by Ms. Mitchell, does not indicate that ███ was fearful or anxious or had trouble separating from her mother. Even during play that touched on the incident there were no incidents of urinary incontinence or evidence of significant anxiety. It was primarily information from Mrs. Ngatuvai that provided the basis for the diagnosis. As noted above, a clinical evaluation is different from a forensic evaluation. It was clinically appropriate for Ms. Mitchell to accept at face value the information provided by Mrs. Ngatuvai about ███'s behavior without further investigation. It is not appropriate in a forensic evaluation.

A review of all the information provided to me does not indicate that whatever happened in the Life Time Fitness child center bathroom qualifies as sexual "violence." After one to two sessions, the therapy sessions were only every 2 to 3 weeks and then monthly or less frequently until termination of treatment in April 2015. The therapy appears to have been focused on ███ feelings of responsibility for what happened. It is well accepted that genuinely traumatized individuals may feel responsible for what happened to them; however, ███ was not traumatized. The most emotionally distressing aspect of the incident was the aftermath (her mother's reaction, the recognition that she should not have "gotten naked" in the boys' bathroom and feeling disappointed in herself for not looking up at the sign, and the continued focus as a result of litigation).

---

[14] Van der Waerden J, Galera, C, et al. (2015) Maternal depression trajectories and children's behavior at age 5 years. *The Journal of Pediatrics*, 166(6): 1440-1148.
[15] Matijasevich A, Murray J, et al. (2015) Trajectories of maternal depression and offspring psychopathology at 6 years: 2004 Pelotas cohort study. *Journal of Affective Disorders*, 17: 424-431.

RYAN 000070

In my opinion, ███ is not experiencing hypervigilance, avoidance, or negative mood. Dr. Wilkerson states in her report, "It is common for trauma victims to have periods of improvement in symptom severity followed by an increase in symptom severity when they are exposed to reminders of the event. ███ has demonstrated a pattern of increase in symptom severity whenever she is expected to meet with her attorney or be interviewed regarding the sexual abuse she endured." These litigation-related activities do not qualify as re-exposure.[16] Examples of anxiety related to re-exposure would be:

1. Anxiety when driving by Life Time Fitness (███ however, wishes she could return because she had fun; she did not describe any anxiety or physical symptoms that are related to anxiety.)
2. Avoidance of playing with boys (███ however, actively seeks out boys and often feels like she has more in common with them than girls.)
3. Refusal to be placed in any other child center (███ however, has gone to at least one other gym child center since the Life Time Fitness incident without experiencing difficulties.)

Dr. Wilkerson recommends trauma-focused cognitive-behavioral therapy, which would necessitate a focus on a trauma that did not occur, which is not appropriate, and would likely be harmful. There is no evidence that ███ "struggles with traumatic memories" or is "hypervigilant." There was no evidence of this during 2 days of evaluation which focused on the incident at Life Time Fitness. Eye Movement Desensitization and Reprocessing (EMDR) therapy is not indicated. Psychiatric medication is not indicated.

███

***Erin D. Bigler, Ph.D.***

Dr. Bigler focused on the biology of PTSD and its underlying neuroanatomical basis. According to his report, he reviewed my report, but did not interview ███ or Jennifer Ngatuvai and did not review the video of my evaluations. He also appears to have not had access to the depositions of Life Time Fitness staff, ███s pediatricians, or her teachers. The critical issues and point of disagreements in this case appears to be whether whatever behavior ███ engaged in while in the bathroom at Life Time Fitness was of a traumatizing nature (in my opinion it was not), and whether ███ was traumatized by the incident (in my opinion she was not). Dr. Bigler provides a scholarly summary of the potential effects of trauma on the brain. However, in my opinion ███ would not be expected to have experienced any of these effects, as she was not traumatized. It should also be noted that not all individuals respond in the same way even to traumatizing events. The majority of individuals will experience at least one traumatic event in their lifetimes, but the lifetime prevalence of PTSD is less than 10 percent. The majority of individuals who experience a potentially traumatic event do not develop PTSD. In my opinion, ███ Ngatuvai did not experience a traumatic event in the bathroom, was not traumatized, and has not developed PTSD.

---

[16] Re-exposure would be exposing ███ to Life Time Fitness or to cues that remind her of the incident at Life Time Fitness. Individuals with PTSD typically avoid reminders of the trauma, and re-exposure therapy is sometimes used to decrease the autonomic (fight-or-flight) symptoms (panic, nausea, shortness of breath, rapid heart rate, light-headedness, etc.) associated with the trauma and exposure to reminders. ███ has not symptoms of PTSD such as avoidance or re-experiencing, as she was not traumatized.

## *Life Care Plan of Sheryl Dobson-Wainwright and Expert Report of Daniel T. Rondeau*

In her report, Ms. Dobson-Wainwright makes numerous assumptions that are not supported by evidence. For example, she claims that ████s therapist "refused to keep seeing her after she found out there were legal proceedings surrounding the abuse," and that this "add[ed] to the trauma." It is clear from the records reviewed that ████ was discharged by Ms. Mitchell on April 23, 2015 because she did not require treatment, and this was before she was made aware of any legal proceedings.

Ms. Dobson-Wainwright's report indicates that she interviewed Jennifer Ngatuvai in their home for an unspecified period of time, but the information gleaned specifically from those interviews is unclear. She does not indicate that she viewed the video of my interviews of ████ and her parents on February 8, 2019 and February 9, 2018. Ms. Dobson-Wainwright's report does not indicate that she reviewed the depositions of ████s teacher or physicians, ████s medical or educational records, or the deposition of Life Time Fitness staff. She appears to have based her opinion on information obtained from Mrs. Ngatuvai. (████ reportedly "did not want to stay to talk about the abuse or how she is feeling.") Ms. Dobson-Wainwright states that her "report is based on the recommendations of Dr. Wilkerson." As I have noted above, in my opinion there is no need for ████ to see a psychiatrist or to be prescribed medication for a mental illness and there will be no future need secondary to what happened at Life Time Fitness. She does not now, nor will she in the future, require individual therapies, such as EMDR or TF-CBT related to the incident.

## CONCLUSION

It remains my opinion to a reasonable degree of medical certainty that ████ Ngatuvai did not suffer any immediate or long-term psychological damage as a result of whatever occurred in the boys' bathroom in the child center of Life Time Fitness and does not require treatment, a personal trainer, or gym membership.

I hope that the information and conclusions contained in this report are clear. Please feel free to call me at 614-685-5602 with any questions or concerns.

Sincerely,

Eileen P. Ryan, DO
Interim Chair and Professor of Psychiatry and
Behavioral Health
Vice-Chair of Clinical Services
The Ohio State University Wexner Medical Center

RYAN 000072