IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JENNIFER NGATUVAI,<br><br>                    Plaintiff,<br><br>v.<br><br>LIFETIME FITNESS,<br><br>                    Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO EXCLUDE EXPERT TESTIMONY AND MOTION TO STRIKE EXPERT DECLARATIONS**<br><br>Case No. 2:16-cv-39-JNP-DBP<br><br>District Judge Jill N. Parrish |

This matter is before the court on four motions in limine to exclude the testimony of Plaintiff Jennifer Ngativai's expert witnesses, [Dockets 138–41], and a motion to strike the declarations of Ms. Ngatuvai's expert witnesses, [Docket 166], filed by Defendant Lifetime Fitness ("Lifetime").

Lifetime's Motion in Limine to Exclude the Testimony of Dr. Tristyn Wilkerson, [Docket 138], is DENIED. Lifetime's Motion in Limine to Exclude the Testimony of Dr. Ann Burgess, [Docket 139], is GRANTED IN PART and DENIED IN PART. Lifetime's Motion in Limine to Exclude the Testimony of Ms. Sheryl Wainwright-Dobson, [Docket 140], is GRANTED IN PART and DENIED IN PART. Lifetime's Motion in Limine to Exclude the Testimony of Dr. Polly Westcott, [Docket 141], is GRANTED IN PART and DENIED IN PART. Lifetime's Motion to Strike the Declarations of Drs. Tristyn Wilkerson, Ann Burgess, and Polly Westcott, [Docket 166], is GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

Plaintiff Jennifer Ngatuvai and her daughter, K.N., reside in Utah. Lifetime is a fitness center located in South Jordan, Utah. At the time that this dispute arose, Lifetime offered childcare services for fitness center members' children while members made use of the fitness center. Ms. Ngatuvai was a member of Lifetime.

In August of 2014, Ms. Ngatuvai brought K.N., who was three years old at the time, to the childcare center. While K.N. was in the care of Lifetime, she was allegedly brought into the boys' bathroom and sexually assaulted by one or two other children who were also in Lifetime's care. Ms. Ngatuvai contends that, upon her return to the childcare center, the Lifetime employees were unable to locate K.N. Ms. Ngatuvai alleges that she searched for K.N. and eventually found her alone in the boys' bathroom with her shorts and underwear on the floor at her feet and her shirt twisted up around her neck.

In December of 2015, Ms. Ngatuvai brought suit against Lifetime in Utah state court on behalf of herself and her daughter, alleging negligence, negligent supervision, and negligent infliction of emotional distress. The following month, Lifetime removed the case to federal court. Lifetime now moves this court to exclude the testimony of four of Ms. Ngatuvai's expert witnesses under Federal Rules of Evidence ("Rules") 104, 403, and 702. In response to Lifetime's motion, Ms. Ngatuvai filed declarations of three experts whose testimony Lifetime seeks to exclude. Lifetime now also moves to strike the declarations of Ms. Ngatuvai's expert witnesses.

**MOTION TO STRIKE THE DECLARATIONS OF MS. NGATUVAI'S EXPERTS**

The court first addresses Lifetime's most recent motion, its Motion to Strike the Declarations of Drs. Tristyn Wilkerson, Ann Burgess, and Polly Westcott. [Docket 166]. As the court has noted, Lifetime filed motions in limine to exclude the testimony of Drs. Wilkerson, Burgess, and Westcott. In responding to these motions, Ms. Ngatuvai attached declarations of the

2

three experts. For example, in response to Lifetime's motion to exclude the testimony of Dr. Wilkerson, Ms. Ngatuvai filed Dr. Wilkerson's declaration. Broadly, Lifetime contends that these declarations are inadmissible as improper supplemental expert reports.

To the extent that these declarations do in fact constitute supplementation, Lifetime's motion is granted. However, the court finds that the declarations primarily consist of argument regarding the admissibility of the experts' testimony, and that they are therefore not in fact supplemental reports.

## I.      Legal Standard

Federal Rule of Civil Procedure ("FRCP") 26(a)(2)(B)(i) requires that parties to a suit disclose their experts' reports and that each such report contain "a complete statement of all opinions the witness will express and the basis and reasons for them." FED. R. CIV. P. 26(a)(2)(B)(i). Further, FRCP 26(e) requires that a party "supplement or correct its disclosure . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." FED. R. CIV. P. 26(e)(1)(A).

The Tenth Circuit has noted that the ongoing obligation to supplement or correct experts' reports under FRCP 26(e) does not give parties a free pass to supplement reports with information that could have been added earlier. *See Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 663 (10th Cir. 2018). Thus, in order to supplement an expert report under FRCP 26(e), the party seeking to supplement the report must demonstrate that the supplemental report will serve a purpose outlined in FRCP 26.

If an untimely disclosure does not fall within the scope of FRCP 26(e), FRCP 37(c) provides that a district court can allow evidence violating FRCP 26(a) only "if the violation is justified or harmless." *Rodgers*, 759 F. App'x at 657 (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 952 (10th Cir. 2002)).

## II.     Analysis of the Experts' Declarations

The court first identifies the portions of the declarations that improperly disclose new theories, evidence, or conclusions and holds that these supplementations are improper. Second, the court addresses the remaining portions of the declarations and finds that the declarations predominantly do not consist of new theories, evidence, or conclusions and that they are therefore not improper supplemental reports.

### A.     Inadmissible Portions of the Declarations

To the extent that the declarations of Drs. Westcott, Burgess, and Wilkerson contain new theories, evidence, or conclusions, they constitute supplemental expert reports and are untimely. Ms. Ngatuvai does not dispute that the deadline for filing expert reports has passed. Further, she does not argue that these alleged supplemental reports, if they are correctly classified as such, are justified or harmless. *See* FED. R. CIV. P. 37(c). Thus, to the extent that these declarations constitute supplements to the reports of Drs. Westcott, Burgess, and Wilkerson, they are inadmissible.

Having reviewed the declarations, however, the court has only identified the disclosure of new theories, evidence, or conclusions in one instance in Dr. Wilkerson's declaration. In her declaration, Dr. Wilkerson adopts the conclusions articulated in Ms. Wainwright-Dobson's expert report. This delayed adoption of Ms. Wainwright-Dobson's report is improper. In her initial expert report, Dr. Wilkerson made no mention of Ms. Wainwright-Dobson's conclusions. In adopting Ms. Wainwright-Dobson's conclusions, Dr. Wilkerson therefore seeks to supplement her original report. Because Ms. Wainwright-Dobson's findings were available to Dr. Wilkerson prior to the

close of discovery, this supplementation does not fall within the scope of FRCP 26(e)(1)(A) and are therefore untimely. Further, because Ms. Ngatuvai makes no argument to suggest that these delayed disclosures are either justified or harmless, the court grants the motion to strike Dr. Wilkerson's belated adoption of Ms. Wainwright-Dobson's report.[1]

> B.   Portions of the Declarations That Do Not Constitute Supplementation

While one portion of Dr. Wilkerson's declaration constitutes improper supplementation, the remaining portions of her declaration, as well as the other two experts' declarations, do not. The declarations do not, as Lifetime suggests, introduce new evidence or theories in this case. To the contrary, the declarations respond to Lifetime's arguments that the experts are either unqualified to testify on certain issues or that the methodologies they employed are unreliable. They make these arguments based upon the methodologies and qualifications that they disclosed in their original reports. Such explanations are entirely appropriate in response to a motion in limine to exclude an expert witness.

Ms. Ngatuvai's experts' declarations primarily function as appropriate argument in response to Lifetime's motions in limine. To illustrate, the court addresses specifically Dr. Westcott's declaration in which she defends the methodologies she employed in diagnosing Ms. Ngatuvai with PTSD. In Dr. Westcott's initial expert report, she described the process by which she diagnosed Ms. Ngatuvai with PTSD. She listed the documents that she reviewed and the family members of Ms. Ngatuvai that she interviewed. Dr. Westcott further explained that she examined Ms. Ngatuvai through an "extensive clinical interview" and that she administered three tests, the

---

[1] Lifetime also asserts that Dr. Wilkerson's declaration is improper because she explains the language with which she made her recommendations and the level of certainty that she intended that language to convey. This is merely a response to Lifetime's argument that Dr. Wilkerson's language was not certain enough. It does not constitute a new theory, evidence, or conclusion.

Millon Clinical Multiaxial Inventory-IV ("MCMI-IV"), the Civilian Mississippi Scale ("CMS") and the PCL-5, a checklist used to diagnose PTSD based upon the symptoms identified in the Fifth Edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"). Dr. Westcott's report then discusses how these materials and her examination of Ms. Ngatuvai led her to diagnose Ms. Ngatuvai with both chronic PTSD and chronic Major Depressive Disorder.

In its motion in limine, Lifetime suggests that Dr. Westcott's methodology is unreliable, pointing to alternative methods of diagnoses she could have used and arguing that the tools Dr. Westcott relied upon were improper. To combat these allegations, Dr. Westcott explains in her declaration why the methodology outlined in her report was proper and why the methodology that Lifetime proposes is not. Further, she provides evidence from texts within the field of psychology supporting the methods upon which she relied and notes that these methods are the same as those she employs in her clinical assessments outside of the litigation context.

None of the arguments in Dr. Westcott's declaration go beyond the scope of the arguments that Ms. Ngatuvai could have made in her memorandum. To suggest that Dr. Westcott must not only outline her qualifications and methodologies in her original report but must also predict how Lifetime will challenge those qualifications and methodologies and then respond to such challenges is unreasonable. At no point in her declaration did Dr. Westcott introduce new evidence or expand on her theories. Thus, her declaration is not an untimely supplement to her expert report because it is not a supplement to her report at all.

Upon review, the court finds that this characterization of the declarations accurately describes the majority of the arguments set forth in all three of the declarations.[2] The arguments

---

[2] Similarly, Dr. Burgess and Dr. Wilkersons's declarations both address Lifetime's allegations that their methodologies in diagnosing Ms. Ngatuvai and K.N. with PTSD were unreliable. They, like Dr. Westcott, explain why they employed those methodologies. Further, Dr. Wilkerson explains

made in these declarations are predominately of the sort that Ms. Ngatuvai's counsel might have made in responding to Lifetime's motions in limine. Lifetime's motion to strike, [Docket 166], is therefore granted to the extent that Ms. Ngatuvai seeks to supplement her expert reports. As has been addressed, however, the court concludes that the declarations almost entirely consist not of supplementation, but instead of proper arguments in response to Lifetime's motions.

## MOTIONS TO EXCLUDE THE TESIMONY OF MS. NGATUVAI'S EXPERTS

Lifetime moves this court to exclude the testimony of four of Ms. Ngatuvai's expert witnesses: Dr. Tristyn Wilkerson, [Docket 138], Dr. Ann Burgess, [Docket 139], Ms. Sheryl Wainwright-Dobson, [Docket 140], and Dr. Polly Westcott, [Docket 141]. These motions are brought under Federal Rules of Evidence 104, 403, and 702.

### I.    Legal Standard

Rule 702, governing the admissibility of expert testimony, provides that

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

---

in her declaration that the qualifications she disclosed in her original report qualify her to testify about her treatment recommendations. And Dr. Burgess explains why her qualifications, which she also disclosed in her original report, qualify her to testify about childcare facility standards of care and the memory development of children who have been subject to sexual assault. Neither of these experts' arguments on these issues seek to introduce new theories, evidence, or conclusions. Rather, they seek solely to defend the admissibility of the material already disclosed in their original reports. These are appropriate arguments to make at the motion in limine stage.

F<small>ED</small>. R. E<small>VID</small>. 702.

"Rule 702 imposes a gatekeeping function on district courts to ensure expert testimony is admitted only if it is relevant and reliable." *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). In performing this gatekeeping function, "the district court generally must first determine whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (quoting F<small>ED</small>. R. E<small>VID</small>. 702). "A district court has 'wide discretion' in determining whether a witness's experience is sufficient to qualify him as an expert." *Ronwin v. Bayer Corp.*, 332 F. App'x 508, 512–13 (10th Cir. 2009) (quoting *United States v. Arney*, 248 F.3d 984, 991 (10th Cir. 2001)).

Once the court has determined that the expert is qualified, the court must determine if the expert's opinion is relevant and reliable, a two-part inquiry articulated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *Nacchio*, 555 F.3d at 1241. The *Daubert* relevance prong requires the court to consider whether the testimony will "help the trier of fact," F<small>ED</small>. R. E<small>VID</small>. 702(a), and is "relate[d] to a disputed issue in the case," *Etherton*, 829 F.3d at 1217. The *Daubert* reliability prong "calls for a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Id.* (quoting *Daubert*, 509 U.S. at 592–93). The focus of the reliability inquiry is on the methodology employed, "rather than the precise conclusions reached." *Taber v. Allied Waste Sys., Inc.*, 642 F. App'x 801, 808 (10th Cir. 2016) (citing *Daubert*, 509. U.S. at 595).

"[C]ourts applying [Rule] 702, *Daubert*, and *Kumho Tire*, are charged only with determining that the expert witness 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *United States v. Baines*, 573 F.3d 979, 989 (10th Cir. 2009) (quoting *Kumho Tire*, 526 U.S. at 152). In engaging in this analysis, the Supreme Court in *Daubert* suggested that courts consider "whether the theory or technique has (1) been or can be tested, (2) been peer-reviewed, (3) a known or potential error rate, (4) standards controlling the technique's operation, and (5) been generally accepted by the scientific community." *Etherton*, 829 F.3d at 1217 (citing *Daubert*, 509 U.S. at 593–94). The Supreme Court in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), however, recognized that these factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire*, 526 U.S. at 150. District courts thus have broad discretion to consider a variety of factors in determining the reliability of expert testimony. *Etherton*, 829 F.3d at 1217.

The district court is obligated to engage in the *Daubert* analysis when addressing the admissibility of expert testimony regardless of whether the testimony at issue is "scientific" in nature, as it was in *Daubert*. *Kumho Tire*, 526 U.S. at 147. "The proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible." *Nacchio*, 555 F.3d at 1241.

## II.    Motion to Exclude the Testimony of Dr. Tristyn Wilkerson

Lifetime moves this court to exclude portions of Dr. Tristyn Wilkerson's testimony based on Dr. Wilkerson's qualifications, the relevance of her testimony, and the reliability of her testimony. [Docket 138]. In addition, Lifetime moves this court to preclude Dr. Wilkerson from stating disputed facts in a manner that suggests the truth of those facts, or "cloaking" disputed facts

as her own expert opinion. The court addresses each of Lifetime's arguments in turn and denies Lifetime's motion to exclude Dr. Wilkerson's testimony.

    A.  Admissibility of Dr. Wilkerson's Testimony About PTSD Diagnoses

Dr. Wilkerson intends to testify about her diagnoses of both K.N. and Ms. Ngatuvai with PTSD. Lifetime moves to have this portion of her testimony excluded. First, Lifetime argues that the diagnosis of Ms. Ngatuvai is inadmissible because Dr. Wilkerson employed unreliable methodology. In addition, Lifetime challenges the reliability of both K.N.'s and Ms. Ngatuvai's diagnoses, arguing that Dr. Wilkerson improperly diagnosed them with PTSD even though they do not meet the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, ("DSM-5") criteria for PTSD. The court concludes that neither of these arguments warrants excluding Dr. Wilkerson's testimony about her diagnoses of Ms. Ngatuvai and K.N.

    1)    Dr. Wilkerson's Qualifications to Testify About PTSD Diagnoses

Dr. Wilkerson is qualified to testify about her diagnoses of Ms. Ngatuvai and K.N. Dr. Wilkerson has a bachelor's degree in psychology, a master's degree in clinical psychology, and a doctorate degree in clinical psychology. She is a licensed psychologist in the state of Utah, has worked as a neuropsychological clinician for over a decade, and has treated hundreds of patients. As a practicing psychologist, the state of Utah defines Dr. Wilkerson's profession to include the practice of mental health therapy, which includes "establishing a diagnosis in accordance with established written standards generally recognized in the professions of mental health therapy" and "prescribing a plan for the prevention or treatment of a condition of mental illness or emotional disorder." UTAH CODE §§ 58-61-102(9)(a)(i); 58-61-102(8)(b), (c). Dr. Wilkerson is qualified to make PTSD diagnoses in her practice as a psychologist. The court concludes that she is qualified to testify about those diagnoses in federal court. Lifetime does not dispute Dr. Wilkerson's qualifications to testify about the PTSD diagnoses.

2)      Relevance of Testimony About Dr. Wilkerson's PTSD Diagnoses

Dr. Wilkerson's testimony about the PTSD diagnoses will assist the trier of fact in understanding the evidence in this case. Lifetime does not contest the relevance of Dr. Wilkerson's testimony about her diagnoses. To prevail in this suit, Ms. Ngatuvai must prove that she has suffered damages stemming from the alleged sexual assault. To prove these damages, Ms. Ngatuvai alleges that she and K.N. now suffer from mental and anxiety disorders. The typical layperson lacks the expertise required to diagnose someone with PTSD. Thus, Dr. Wilkerson's testimony will assist the jury in better understanding the damages alleged by Ms. Ngatuvai. Her testimony is therefore relevant.

3)      Reliability of Dr. Wilkerson's PTSD Diagnoses

Dr. Wilkerson's testimony about her diagnoses is reliable, contrary to Lifetime's contention that it is inadmissible because it is based upon unreliable methodologies. "[T]he purpose of the *Daubert* inquiry is always 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Goebel v. Denver & Rio Grande W. R. Co.*, 346 F.3d 987, 992 (10th Cir. 2003) (quoting *Kumho Tire*, 526 U.S. at 152). The court concludes that Dr. Wilkerson's testimony meets this standard with respect to both Ms. Ngatuvai's and K.N.'s diagnoses. Any challenges to Dr. Wilkerson's methodologies raised by Lifetime are challenges to the weight of her testimony, rather than its admissibility. Thus, those issues are properly addressed on cross-examination, not through exclusion of Dr. Wilkerson's testimony.

In diagnosing K.N. with PTSD, Dr. Wilkerson reviewed a wide range of records pertaining to K.N. and the alleged incident in the Lifetime bathroom.[3] She also met with Ms. Ngatuvai and Corona Ngatuvai in February of 2018 and observed the first day of Dr. Eileen Ryan's Independent Medical Exam ("IME") of K.N. She then met with both Ms. Ngativai and K.N. in February of 2019, at which time K.N. participated in a psychological examination including a comprehensive clinical interview. Over the course of that meeting, Dr. Wilkerson administered two tests to K.N.'s mother on behalf of K.N., the parent forms for the Conners Comprehensive Behavior Rating Scales and the Rating Scale of Impairment. In addition, she administered five tests to K.N. herself, the Reynolds Child Depression Scale, the Plenk Storytelling Test, Kinetic Family Drawing, Human Figure Drawing, and the Multidimensional Anxiety Scale for Children, Second Edition. Based upon this analysis, Dr. Wilkerson concluded that K.N. met the DSM-5 criteria for PTSD and diagnosed her with PTSD.

In diagnosing Ms. Ngatuvai with PTSD, Dr. Wilkerson engaged in a similar process. She reviewed a range of records,[4] spoke with Ms. Ngatuvai and Corona informally in February of 2018, met with Ms. Ngatuvai and K.N. in February of 2019, and then met with Ms. Ngatuvai again in March of 2019. She administered two tests to Ms. Ngatuvai, the Beck Anxiety Inventory – II and the Beck Depression Inventory – II. Dr. Wilkerson concluded that Ms. Ngatuvai met the DSM-5

---

[3] Dr. Wilkerson reviewed Pamela Mitchell's records from her therapy sessions with K.N., the depositions of Corona Ngatuvai, K.N., and Ms. Ngatuvai, Dr. Eileen Ryan's Independent Medical Examination of K.N., the transcript of the police interview of K.N., Tammy Ishimatsu's records from her therapy sessions with Ms. Ngatuvai, and pediatric records from Parkward Pediatrics, the Riverton Family Health Center, Dr. Allison Triplitt, and Dr. Michael Johnson of Family First Pediatrics.

[4] Dr. Wilkerson's report does not differentiate between the records that she reviewed for K.N. and the records that she reviewed for Ms. Ngatuvai. Given the overlap between Dr. Wilkerson's interactions with K.N. and Ms. Ngatuvai, the court reads this to suggest that the previously addressed records were relevant to her diagnoses of both K.N. and Ms. Ngatuvai.

criteria for both PTSD and a Major Depressive Disorder and diagnosed her with both. Lifetime contends that the methodology employed in diagnosing Ms. Ngatuvai is unreliable, arguing that Dr. Wilkerson should have conducted more extensive testing.

The use of the DSM criteria to diagnose PTSD is widely accepted both within the field of psychology and by courts engaging in the *Daubert* gatekeeping role. *See Braxton v. DKMZ Trucking, Inc.*, 2015 WL 630297, at *3 (E.D. Mo. Feb. 13, 2015) ("These two factors, the use of established diagnostic criteria [such as the DSM criteria] in a manner not specific to the litigation context, are sufficient to establish the reliability of [the expert's] testimony."); *Jones v. Halliburton Co.*, 2011 WL 1841148, *3 (S.D. Tex. May 13, 2011) ("Courts have refused to exclude the expert opinion of mental health professionals whose diagnoses of PTSD and other mental disorders are based upon the criteria outlined in the DSM–IV (and prior editions)."). Lifetime concedes that the use of this criteria is proper.

The process by which Dr. Wilkerson concluded that Ms. Ngatuvai met the DSM-5 criteria was also sufficiently reliable. Dr. Wilkerson reviewed documents, interviewed Ms. Ngatuvai on multiple occasions, and administered multiple self-report tests over the course of the interviews with Ms. Ngatuvai. She testified in her deposition and reiterated in her declaration that this is the same methodology she uses when clinically diagnosing and treating patients with PTSD outside of the scope of litigation. Finally, Dr. Wilkerson represents that the use of various tests, interview techniques, and methods she employed are recognized as appropriate in the field of mental health.

Lifetime's argument boils down to a contention that Dr. Wilkerson did not do enough in diagnosing Ms. Ngatuvai because there were better methodologies she could have employed. But the court's role is not to insist that experts make use of the absolute best methodologies, or even that the expert's conclusion is indisputably correct. *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222

13

(10th Cir. 2003) ("The plaintiff need not prove that the expert is undisputably correct or that the expert's theory is generally accepted in the scientific community." (citation omitted)). Rather, courts are obligated to ensure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Goebel*, 346 F.3d at 992 (quoting *Kumho Tire*, 526 U.S. at 152). Dr. Wilkerson's testimony meets this standard. Lifetime's arguments go to the weight of her testimony, not to its admissibility.[5]

4)      Lack of Evidence of Sexual Violence

In addition, Lifetime contends that Dr. Wilkerson cannot have properly diagnosed Ms. Ngatuvai and K.N. with PTSD because they do not meet the DSM-5 criteria for PTSD. In particular, Lifetime notes that the DSM-5 criteria to diagnose an individual with PTSD require that the individual be exposed, directly or indirectly, to "death, threatened death, actual or threatened serious injury, or actual or threatened sexual violence." Lifetime contends that no such event occurred in this case and that the PTSD diagnoses are thus unreliable. The court concludes that this argument is one for cross-examination and that it does not warrant excluding Dr. Wilkerson's testimony.

Dr. Wilkerson, in employing the previously discussed reliable methodologies, concluded that Ms. Ngatuvai and K.N. met the DSM-5 criteria for PTSD. In her deposition, Dr. Wilkerson explains that the alleged incident in the Lifetime bathroom constituted "nonconsensual sexual contact" and that it therefore fell within the definition of "sexual violence." Further, in her declaration, she notes that the World Health Organization ("WHO") defines child sexual abuse as

---

[5] Lifetime does not challenge the methodology that Dr. Wilkerson employed in diagnosing K.N. with PTSD. The court notes, however, that the process by which Dr. Wilkerson diagnosed K.N. resembles the process she employed in diagnosing Ms. Ngatuvai. Thus, her methodology in diagnosing K.N. was also reliable and any challenge to that methodology can be raised on cross-examination.

"the involvement of a child in sexual activity that he or she does not fully comprehend, is unable to give informed consent to, or for which the child is not developmentally prepared and cannot give consent, or that violates the laws or social taboos of society . . . ." Thus, in Dr. Wilkerson's professional opinion the alleged incident in the Lifetime childcare facility bathroom can be qualified as sexual violence for the purposes of a PTSD diagnosis.

Lifetime, on the other hand, argues that the alleged event in the Lifetime childcare center bathroom does not meet the standard for "sexual violence" required to trigger PTSD under the DSM-5. Further, Lifetime claims that Dr. Wilkerson improperly applied the WHO's definition of child sexual abuse, as the WHO's definition further requires that the perpetrator of the assault be "another child who by age or development is in a relationship of responsibility, trust or power, the activity being intended to gratify or satisfy the needs of the other person."

This dispute falls within "the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts." *Kumho Tire*, 526 U.S. at 153. Psychologists reasonably differ in their application of the DSM criteria when diagnosing PTSD. Dr. Wilkerson, in applying reliable methodology, concluded that the event alleged in this case fulfills the "sexual violence" requirement. Lifetime believes that this conclusion was incorrect and is free to cross-examine Dr. Wilkerson on this exact issue. The court declines to exclude Dr. Wilkerson's testimony solely because Lifetime believes Dr. Wilkerson reached an improper conclusion. *See Taber*, 642 F. App'x at 808 ("[The reliability inquiry] requires the district court to focus on the methodology employed by the expert rather than the precise conclusions reached.") (citing *Daubert*, 509. U.S. at 595). It will be the role of the jury to decide whether Dr. Wilkerson's conclusion is correct.

B.      Admissibility of Dr. Wilkerson's Treatment Recommendations

Dr. Wilkerson's report addresses the treatment that she recommends for Ms. Ngatuvai and K.N. Dr. Wilkerson is qualified to testify about her treatment recommendations. Further, her testimony about her treatment recommendations is relevant and reliable. Thus, this testimony is admissible.

Dr. Wilkerson recommends that K.N. participate in a course of individual trauma-focused behavioral therapy, Eye Movement Desensitization and Reprocessing, and ongoing weekly mental health therapy and support. In addition, Dr. Wilkerson notes that pharmacological intervention may be advisable and recommends consultation with a pediatric psychiatrist. She further states that ongoing psychiatric treatment and follow up visits are likely to be needed. Her report concludes that, with these treatments, K.N.'s prognosis is good, "although she is likely to experience resurfacing of some symptoms of post-traumatic stress at unpredictable times throughout her life."

Dr. Wilkerson makes similar recommendations for Ms. Ngatuvai. Her report provides that Ms. Ngatuvai would benefit from a course of cognitive behavioral therapy, Eye Movement Desensitization and Reprocessing, and ongoing therapy for the foreseeable future. In addition, Dr. Wilkerson notes that Ms. Ngatuvai may benefit from a consultation with a psychiatrist and that ongoing treatment is likely to be needed. She also states that pharmacological intervention through anti-depressant medication, particularly Selective Serotonin Reuptake Inhibitors, may be useful.

Lifetime contends that portions of Dr. Wilkerson's testimony about her treatment recommendations are inadmissible for three reasons. First, Lifetime argues that Dr. Wilkerson lacks the expertise required to recommend that K.N. and Ms. Ngatuvai receive psychiatric and pharmacological treatment. Second, it argues that Dr. Wilkerson's recommendations are unreliable because they lack any basis in her report. Finally, Lifetime argues that Dr. Wilkerson's

recommendations are unreliable because she does not state them to a "reasonable medical probability." The court concludes that none of these arguments warrant the exclusion of Dr. Wilkerson's testimony as inadmissible under Federal Rule of Evidence 702.

> 1)   Dr. Wilkerson's Qualifications to Testify About Treatment Recommendations

Lifetime first argues that Dr. Wilkerson lacks the necessary qualifications to testify about her treatment recommendations. It contends that Dr. Wilkerson cannot properly recommend that Ms. Ngatuvai and K.N. receive psychiatric or pharmacological treatment because Dr. Wilkerson is a psychologist, not a physician or psychiatrist. The court concludes that Dr. Wilkerson, a psychologist who regularly works with psychiatrists to facilitate her patients' pharmacological treatment, is qualified to testify about the treatment she recommends.

As the court has already noted, Dr. Wilkerson has a bachelor's degree in psychology, a master's degree in clinical psychology, and a doctorate degree in clinical psychology. She is a licensed psychologist in the state of Utah, has worked as a neuropsychological clinician for over a decade, and has treated hundreds of patients. Further, the practice of psychology is defined under Utah law to include "the practice of mental health therapy . . . for the purpose of preventing, treating, or eliminating mental or emotional illness or dysfunction." UTAH CODE § 58-61-102(9)(a)(i). Further, the practice of mental health therapy is defined to include "establishing a diagnosis" and "prescribing a plan for the prevention or treatment of a condition of mental illness or emotional disorder." *Id.* § 58-61-102(8)(b), (c). Though psychologists are not authorized under Utah law to prescribe medication, Dr. Wilkerson regularly works in tandem with psychiatrists to obtain and monitor pharmacological treatment for her patients and represents that this is common for practicing psychologists.

Based upon Dr. Wilkerson's education, training, and experience as a neuropsychologist, the court concludes that Dr. Wilkerson is qualified to testify about her recommendations that Ms.

Ngatuvai and K.N. be treated through medication, ongoing work with psychiatrists, and ongoing work with psychologists.

### 2) Relevance of Testimony About Treatment Recommendations

Dr. Wilkerson's testimony is relevant, as it will assist the trier of fact in understanding the evidence in this case. The typical layperson is unlikely to have knowledge of how to treat disorders such as PTSD or Major Depressive Disorder. Thus, Dr. Wilkerson's testimony will be helpful to the jury in better understanding the treatment necessary to remedy or mitigate the alleged damages in this case. Her testimony is therefore relevant.

### 3) Reliability of Dr. Wilkerson's Treatment Recommendations

Dr. Wilkerson's testimony about her treatment recommendations is reliable. Lifetime, to the contrary, argues that her testimony should be excluded because it is unreliable. First, Lifetime contends that her recommendations lack any basis. Second, it asserts that Dr. Wilkerson's recommendations are insufficiently certain and are therefore inadmissible. The court finds no merit in either argument.

#### a) Lack of Basis for Dr. Wilkerson's Treatment Recommendations

Dr. Wilkerson diagnosed Ms. Ngatuvai with PTSD and Major Depressive Disorder. In addition, she diagnosed K.N. with PTSD. Based upon those diagnoses, she concluded that the aforementioned treatment was warranted.

"An expert witness's testimony can rely solely on experience." *Nacchio*, 555 F.3d at 1258. In such a case, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id.* (quoting FED. R. EVID. 702 Advisory Committee's Note (2000)).

Dr. Wilkerson is a licensed psychologist, has worked as a neuropsychological clinician for over a decade, and has treated hundreds of patients. In her report and deposition, Dr. Wilkerson

18

repeatedly notes that she anticipates that both K.N. and Ms. Ngatuvai will experience ongoing symptoms. Her recommendations are plainly treatments that she, based upon her training and extensive experience in recommending treatment to individuals with PTSD, believes will aid K.N. and Ms. Ngatuvai in treating and managing the disorders with which she has diagnosed them. Dr. Wilkerson's recommendations are based on her training, her experience, and the diagnoses addressed in her expert report. Her treatment recommendations are reliable.

b)  Lack of Certainty in Dr. Wilkerson's Treatment Recommendations

Lifetime further contends that Dr. Wilkerson's treatment recommendations are unreliable because they are not stated with enough certainty. Lifetime's position relies on the application of Utah state law. The court is unable to identify any basis for this argument under Federal Rule of Evidence 702.

First, Lifetime argues that Dr. Wilkerson's testimony is inadmissible because, under Utah state law, Ms. Ngatuvai must prove her damages by a "more likely than not" standard. This argument appears to conflate the admissibility standard for expert witness testimony in federal court and Ms. Ngatuvai's burden of proof under Utah state law.

"The admission of expert testimony in a federal trial is governed by Federal Rule of Evidence 702, which provides that, '[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.'" *Gust v. Jones*, 162 F.3d 587, 594 (10th Cir. 1998) (quoting FED. R. EVID. 702). The court has already addressed Dr. Wilkerson's qualifications, as well as the relevance and reliability of her testimony. While Dr. Wilkerson's testimony may not alone meet Ms. Ngatuvai's burden of proof, it is still relevant as it will help the jury better understand the

damages alleged. Thus, regardless of whether Dr. Wilkerson's testimony meets Ms. Ngatuvai's burden of proof, it still fulfills the requirements of Rule 702.

In the alternative, Lifetime appears to argue that Dr. Wilkerson's testimony is inadmissible because it does not meet Utah's standards for expert testimony. Federal Rule of Evidence 702 determines the admissibility of expert testimony in federal court. The admissibility of an expert witness under state law does not.[6] As the court has addressed, Dr. Wilkerson is qualified, and her testimony is relevant and reliable. This testimony fulfills the requirements of Federal Rule of Evidence 702, the standard governing the admission of expert testimony in federal court. The fact that her testimony does not, according to Lifetime, meet the standard for admission of expert testimony in Utah state court is irrelevant to this court's Rule 702 analysis.

Lifetime's argument that Dr. Wilkerson's testimony must be excluded under Rule 702 because it does not meet Ms. Ngatuvai's burden of proof under state law is unavailing. Similarly, its argument that the testimony must be excluded under Rule 702 because it does not meet Utah's standard for the admission of expert testimony is meritless. Dr. Wilkerson's testimony is sufficiently reliable under Rule 702.

C.      Disputed Factual Allegations Presented as Expert Testimony

Finally, Lifetime argues that Dr. Wilkerson should be precluded from "cloaking statements of alleged and disputed facts as her own expert opinion." For example, Lifetime argues that Dr. Wilkerson cannot testify that "[K.N.] has demonstrated a pattern of increase in symptom severity

---

[6] The court has identified some caselaw to suggest that there may be a link between the competency of an expert witness under Federal Rule of Evidence 601 ("Rule 601") and state law standards for the admissibility of expert testimony. *See LeMaire By & Through LeMaire v. United States*, 826 F.2d 949, 954 (10th Cir. 1987). Because Lifetime expressly brings its motion under Federal Rules of Evidence 104, 403, and 702, rather than Rule 601, however, the court will not now read a new, complex choice of law argument into Lifetime's briefing and deny Ms. Ngatuvai the opportunity to respond to said hypothetical argument.

whenever she is expected to meet with her attorney or be interviewed regarding the sexual abuse she endured" because Dr. Wilkerson has no personal knowledge of this alleged fact.

The court agrees that Dr. Wilkerson, an expert witness without personal knowledge of the disputed facts to which Lifetime refers, should not be permitted to testify to the truth of said facts because such testimony would constitute hearsay. While Dr. Wilkerson may not testify about hearsay statements, the court cannot at this stage categorically bar Dr. Wilkerson from testifying about the disputed facts at issue. Federal Rule of Evidence 703 ("Rule 703") provides that an expert may base her opinion on facts that she has been made aware of, even if those facts would not be admissible, so long as an expert in the field would reasonably rely on those kinds of facts. FED. R. EVID. 703. Rule 703 also provides that otherwise inadmissible facts upon which an expert relies may be disclosed to the jury if the "probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." *Id.*

At this stage of the litigation, it is impossible for the court to know whether Rule 703 permits Dr. Wilkerson to testify about these disputed facts. Standing alone, Dr. Wilkerson's statements regarding the alleged sexual assault of K.N. and K.N.'s alleged reaction to the assault appear to be hearsay. But they are also the sorts of facts upon which a psychologist would reasonably rely in forming an opinion. Rule 703 provides that these otherwise inadmissible facts may be disclosed to the jury if their probative value substantially outweighs their prejudicial effect. However, because the court is unfamiliar with the context in which these statements may be brought into Dr. Wilkerson's testimony, the court cannot determine the probative value of the statements. How Dr. Wilkerson may testify about the alleged facts underlying her opinions is therefore more properly addressed at a later time.

### III.   Motion to Exclude the Testimony of Dr. Ann Burgess

Lifetime moves this court to exclude portions of Dr. Ann Burgess's testimony based on Dr. Burgess's qualifications, the relevance of her testimony, and the reliability of her testimony. [Docket 139]. First, Lifetime moves this court to exclude Dr. Burgess's testimony about her conclusions regarding the alleged sexual assault of K.N. Second, Lifetime seeks to exclude Dr. Burgess's testimony about the alleged adverse effects of Dr. Eileen Ryan's examination of K.N. Third, Lifetime contends that Dr. Burgess is unqualified to testify about K.N.'s memory development and about the management of a commercial childcare facility. Finally, Lifetime moves this court to exclude testimony about the fact that a character on the television series *Mindhunter* was based on Dr. Burgess. Lifetime's motion is granted in part and denied in part.

#### A.  Admissibility of Dr. Burgess's Testimony About the Alleged Assault

Lifetime first moves this court to exclude Dr. Burgess's conclusion that the alleged incident constitutes sexual assault. Lifetime argues that the methodology employed by Dr. Burgess in reaching this conclusion was unreliable. In engaging in its gatekeeping role, the court concludes that Dr. Burgess is qualified to testify and that she has employed reliable methodology, but notes that Dr. Burgess's testimony may not be relevant.

##### 1)  Dr. Burgess's Qualifications to Testify About the Alleged Assault

Dr. Burgess is qualified to testify about her conclusions regarding the alleged sexual assault and its impact on K.N. Dr. Burgess is a clinical specialist in psychiatric nursing. She has a master's degree in nursing and a doctorate degree in nursing science. She has been a private practitioner for approximately forty years and has evaluated, treated, and interviewed hundreds of sexual assault victims, about half of whom have been children or adolescents. She is currently a full-time professor of psychiatric nursing at Boston College, where she instructs on the prevention, identification, and treatment of child trauma. Dr. Burgess therefore has the qualifications necessary

to testify about whether the medical evidence in this case in consistent with sexual assault, what constitutes sexual assault among children, and the impact of child sexual assault on the victim.

2)   Relevance of Dr. Burgess's Testimony About the Alleged Assault

The relevance of Dr. Burgess's testimony about whether K.N. was sexually assaulted cannot be determined by the court at this time. If Dr. Burgess seeks solely to testify about K.N.'s credibility, her testimony is irrelevant. "In general, expert testimony which does nothing but vouch for the credibility of another witness encroaches upon the jury's vital and exclusive function to make credibility determinations, and therefore does not 'assist the trier of fact' as required by Rule 702." *United States v. Charley*, 189 F.3d 1251, 1267 (10th Cir. 1999). Thus, Dr. Burgess may not simply express her opinion that the events alleged did in fact occur. Her conclusion that Ms. Ngatuvai and K.N. are telling the truth and that K.N. was in fact assaulted will not be helpful to the trier of fact.

On the other hand, if Dr. Burgess employs her extensive knowledge about child sexual abuse victims and testifies that the evidence in this case is consistent with the sexual assault allegations, her testimony may be relevant. Expert testimony may be admissible when the expert's testimony consists of "general and conditional opinions" about whether the medical evidence is consistent with the allegations of sexual assault. *Charley*, 189 F.3d at 1264–65. Similarly, Dr. Burgess's testimony about what constitutes sexual assault among children and her conclusions regarding whether the alleged facts in this case align with that definition are relevant. Lay members of the jury are unlikely to have the expertise required to understand what constitutes sexual assault among minors or what sorts of behaviors are common among sexual assault victims. This testimony will thus help the jury understand evidence relating to the alleged sexual assault.

The relevance of Dr. Burgess's testimony is thus contingent on the manner in which she testifies about the alleged sexual assault. Testimony that simply bolsters K.N.'s and Ms.

Ngatuvai's credibility is not relevant. Testimony about the medical evidence, child sexual assault, and how a victim of child sexual assault may behave may be relevant.

### 3) Reliability of Dr. Burgess's Testimony About the Alleged Incidents

Dr. Burgess's testimony about the alleged sexual assault is reliable, contrary to Lifetime's contention that her methodology was unreliable. In fulfilling its gatekeeping role, the court is tasked with ensuring that "an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Dr. Burgess's methodology meets this standard.

In reaching her conclusions, Dr. Burgess reviewed a range of documents, including the police report from the incident, Pamela Mitchell's counseling records with K.N., the video deposition of K.N., the recording of Dr. Eileen Ryan's examination of K.N, Dr. Ryan's Rule 35 report, pediatric records from Dr. Tew,[7] and Ms. Ngatuvai's witness statement. She also conducted multiple interviews with Ms. Ngatuvai and relied on her "combined clinical and research experience with over a hundred child abuse victims and specifically in daycare settings." Having reviewed all of the relevant information, Dr. Burgess concluded that the alleged incident in the Lifetime childcare center's bathroom constituted sexual assault of K.N. During her deposition, Dr. Burgess asserted that the process she employed in reaching this conclusion is similar to that which she employs in non-litigation settings, though she noted that her clinical evaluations tend to be more focused on treatment than do her forensic evaluations.

---

[7] In her report, Dr. Burgess did not note that she had reviewed Dr. Tew's pediatric records. However, she disclosed these records at her deposition and stated that the failure to list the pediatric records in her original report was an unintentional omission.

Lifetime argues that Dr. Burgess's methodology is unreliable because she should have reviewed K.N.'s police interview, the depositions of Lifetime childcare facility staff, and the police officers' depositions. In addition, Lifetime argues that Dr. Burgess should have reviewed the depositions of K.N.'s therapists and pediatricians after the incident. Lifetime's argument goes to the weight, rather than the admissibility, of Dr. Burgess's testimony.

In her deposition, Dr. Burgess, an expert in psychiatric nursing and treatment of sexual assault victims, addressed her decision not to request any of this documentation. She noted that she did not feel as though she needed to review K.N.'s police interview or the depositions of the Lifetime staff or police officers because she had the police report, which Dr. Burgess felt sufficiently summarized these interviews and depositions. Further, Dr. Burgess stated that, because she had K.N.'s therapists' and pediatricians' records, she did not feel as though it would be beneficial to review their depositions as well.

Though Lifetime challenges Dr. Burgess's decision, it fails to identify any specific information that Dr. Burgess failed to consider as a result of her decision. The court has no reason to believe that Dr. Burgess failed to consider relevant information in reaching her conclusions.

Lifetime's challenge to Dr. Burgess's methodology goes to the weight of her testimony, rather than to its admissibility. While Lifetime is free to cross-examine Dr. Burgess about her decision to review the relevant reports, rather than the interviews and depositions themselves, that decision does not warrant exclusion of her expert testimony.

B.     Admissibility of Dr. Burgess's Testimony About Dr. Ryan's IME

Lifetime also moves this court to exclude Dr. Burgess's testimony about the alleged adverse effect that Dr. Eileen Ryan's IME had on K.N. First, to the extent that Ms. Ngatuvai seeks to recover damages for the allegedly improper means by which Dr. Ryan conducted the examination of K.N., this testimony is either irrelevant or barred by the judicial proceedings

privilege. Second, to the extent that Dr. Burgess's statements about the IME are intended solely as the basis of her expert opinion that K.N. has suffered from PTSD, the court cannot at this stage determine their admissibility. Lifetime's motion is granted in part and denied in part.

First, if Ms. Ngatuvai presents this testimony in order to suggest that K.N. recover damages stemming from the IME, the testimony is not admissible. This dispute centers on the alleged negligence of Lifetime while it supervised K.N. at a childcare center, not on Dr. Ryan's alleged conduct. Dr. Burgess's testimony about Dr. Ryan's conduct during the IME therefore will not assist the trier of fact to understand the evidence or determine any fact at issue in the dispute. It is irrelevant.[8]

Second, the admissibility of Dr. Burgess's testimony about the impact that the IME has had on K.N. cannot be determined at this stage. As the court has noted, an expert witness may base her opinion on facts that she has been made aware of even if those facts would not be admissible, so long as an expert in the field would reasonably rely on those kinds of facts. FED. R. EVID. 703. Whether those inadmissible facts may be disclosed to the jury is dependent on whether the facts' "probative value in helping the jury evaluate the [expert's] opinion substantially outweighs their prejudicial effect." *Id.*

---

[8] To the extent that Ms. Ngatuvai seeks to hold Lifetime liable for the alleged harm caused by this litigation, her claim would likely be barred by the Utah judicial proceedings privilege. The privilege is "intended to promote the integrity of the adjudicatory proceeding and its truth finding processes." *Moss v. Parr Waddoups Brown Gee & Loveless*, 285 P.3d 1157, 1165 (Utah 2012) (quoting *Pratt v. Nelson*, 164 P.3d 366, 376 (Utah 2007)). It applies to the conduct, as well as the statements, of judicial participants. *Id.* at 1166. The applicability of the privilege to a claim brought against Lifetime based on Dr. Ryan's conduct in the course of an IME is not entirely clear. Because the court has concluded that testimony about Dr. Ryan's conduct is not relevant to Ms. Ngatuvai's negligence claims against Lifetime, however, the court merely flags this as a possible issue with any independent claim for damages based on the IME.

Dr. Burgess has no personal knowledge of K.N.'s reaction to the IME. She has learned of K.N.'s reaction through Ms. Ngatuvai. This is likely inadmissible hearsay. However, a psychiatric nurse examining an alleged victim of child assault would reasonably rely on a parent's description of the child's behavior in developing an opinion about the child's welfare. Thus, under Rule 703, Dr. Burgess is free to base her opinion on Ms. Ngatuvai's representations regarding the impact of the examination on K.N.

While Dr. Burgess may rely on these inadmissible statements in developing her opinions, the court cannot at this stage of the litigation determine whether the statements' probative value substantially outweighs their prejudicial effect. Thus, the court cannot determine whether the statements may be disclosed to the jury. The dispute over how Dr. Burgess may testify about the alleged facts underlying her opinions is therefore more properly addressed at a later time.

C.   Admissibility of Dr. Burgess's Testimony About Memory Development

In her report, Dr. Burgess addresses the development of K.N.'s memory of the alleged sexual assault. Lifetime argues that Dr. Burgess's testimony should be excluded because she is unqualified to testify about children's memory development. The court concludes that Dr. Burgess's testimony is admissible.

1)   Dr. Burgess's Qualifications to Testify About Memory Development

Dr. Burgess is qualified to testify about the development of K.N.'s memory of the alleged assault. In support of its motion to exclude this testimony, Lifetime relies entirely on a portion of Dr. Burgess's deposition, taken out of context, in which Dr. Burgess states that she does not hold herself out as an expert on children's memory development. Despite this statement, Dr. Burgess is qualified to testify for two reasons.

First, the statement upon which Lifetime relies is taken out of context. In her deposition, Dr. Burgess went on to say that she does not hold herself out as an expert on children's memory

development, other than with respect to what she has published. Thus, while Dr. Burgess does not consider herself an expert on the development of childhood memory broadly, she has not categorically denied any expertise in the area.

Second, having reviewed the publications that Dr. Burgess has identified in her curriculum vitae, which was attached to her initial report, the court concludes that Dr. Burgess is qualified to testify about a child's memory development with respect to trauma and sexual abuse. Dr. Burgess's report, as well as her declaration, demonstrate that Dr. Burgess has published on this exact topic.[9]

The development of a child's memories of an alleged traumatic experience and sexual assault is well within the scope of Dr. Burgess's expertise. One out-of-context statement pulled from Dr. Burgess's deposition does not eliminate Dr. Burgess's qualification to testify about this issue.

2)      Relevance and Reliability of Testimony About Memory Development

Lifetime does not dispute the relevance or reliability of Dr. Burgess's testimony about childhood memory development. The court concludes that her testimony is both relevant and reliable. Dr. Burgess's testimony will assist the trier of fact in understanding how a victim of sexual assault might remember the incident. This is a topic with which a lay person is unlikely to be familiar. Further, Dr. Burgess's testimony is based upon her extensive experience and research in

---

[9] Dr. Burgess in her declaration identifies five of her publications relevant to children's memory development. All of the publications that she references are also listed on her curriculum vitae, which was disclosed with her original report. The publications that Dr. Burgess identifies are: CHILD TRAUMA: ISSUES AND RESEARCH (A.W. Burgess ed., 1992); A.W. Burgess, & C. Grant, *Children Exploited Through Sex Rings*, Arlington, VA: National Center for Missing & Exploited Children 1–40 (1988); A.W. Burgess & C.R. Hartman, *Information Processing of Trauma,* Child Abuse and Neglect 17(1) 47–57 (1993); A.W. Burgess, C.R. Hartman & P.T. Clements, Jr., *Biology of Memory and Childhood Trauma*, 33 J. PSYCHOSOC. NURSING & MENTAL HEALTH SERVS. 1 (1995); A.W. Burgess, C.R. Hartman & T. Baker, *Memory Presentations of Childhood Sexual Abuse*, 33 J. PSYCHOSOC. NURSING & MENTAL HEALTH SERVS. (1995).

this exact area, as well as the previously discussed documents and interviews she reviewed. Though, as the court has addressed, Dr. Burgess is not entitled to testify about whether Ms. Ngatuvai or K.N. are telling the truth, her testimony about the development of a child's memory of a traumatic event is relevant and reliable.

D.      Admissibility of Testimony About Commercial Childcare Center Management

Dr. Burgess's report includes statements about Lifetime's allegedly negligent conduct in its management of the childcare center and its failure to supervise K.N. Dr. Burgess may not testify on this issue because the standard of care owed in the course of supervising children at a childcare center will not help the trier of fact.

As this court has addressed in its order denying Lifetime's motion for summary judgment, the standard of care owed in the course of supervising a child and managing a childcare center is within the scope of the average layperson's common knowledge and experiences. Thus, Dr. Burgess's testimony about this standard of care would not be helpful to the jury and is not relevant. It is therefore inadmissible under Rule 702.

E.      Admissibility of Testimony About *Mindhunter* Character

Lifetime asks that this court exclude under Federal Rule of Evidence 403 testimony about the fact that a character on the television show *Mindhunter* was based upon Dr. Burgess. Ms. Ngatuvai concedes this argument. The court therefore grants this request. Dr. Burgess shall not be permitted to testify about the fact that she has inspired a character on the television series *Mindhunter*.

## IV.   Motion to Exclude the Testimony of Ms. Wainwright-Dobson

Lifetime moves this court to exclude Ms. Wainwright-Dobson's testimony under Rules 104, 403, and 702. [Docket 140]. Ms. Wainwright-Dobson's report consists of life care plans for Ms. Ngatuvai and K.N. These life care plans provide estimates of the treatment costs that Ms.

Ngatuvai and K.N. will incur over the course of their lives. To determine what treatment Ms. Ngatuvai and K.N. will require, Ms. Wainwright-Dobson relied upon Dr. Wilkerson's report.

Lifetime first seeks to have Ms. Wainwright-Dobson's report and testimony excluded, arguing that Ms. Wainwright-Dobson is unqualified to testify about treatment recommendations for Ms. Ngatuvai and K.N. Second, Lifetime argues that Dr. Wilkerson's belated "approval" of the report should be stuck as untimely. Third, Lifetime contends that the life care plans do not have a reliable basis in Dr. Wilkerson's report. Finally, Lifetime requests that this court preclude Ms. Wainwright-Dobson from cloaking disputed facts as her own expert opinion. The court grants in part and denies in part Lifetime's motion.

A.  Ms. Wainwright-Dobson's Qualifications to Testify

Ms. Wainwright-Dobson is qualified to testify about the life care plans that she has prepared for Ms. Ngatuvai and K.N. Rule 702 requires that an expert be qualified "by knowledge, skill, experience, training, or education." FED. R. EVID. 702. Ms. Wainwright-Dobson is a nurse and nurse case manager and she is a Certified Life Care Planner. In addition, Ms. Wainwright-Dobson testified in her deposition that she has worked with approximately one hundred individuals who were sexually abused as children in her work as an insurance company case manager.

Lifetime argues that Ms. Wainwright-Dobson is not qualified to testify because she is not a physician and thus cannot recommend treatment. But Ms. Wainwright-Dobson is entitled to rely on the diagnoses and recommendations made in another expert's report in preparing her life care plans. *North v. Ford Motor Co.*, 505 F. Supp. 2d 1113, 1119 (D. Utah 2007). While she may lack the training or expertise required to diagnose Ms. Ngatuvai and K.N. or to prescribe specific treatments, Ms. Wainwright-Dobson is trained to prepare life care plans based upon other experts' recommendations. Ms. Wainwright-Dobson is thus qualified to prepare and testify about Ms.

Ngatuvai's and K.N.'s life care plans to the extent that she has prepared the plans in reliance on Dr. Wilkerson's report.[10]

B.      Relevance of Ms. Wainwright-Dobson's Testimony

Ms. Wainwright-Dobson's testimony is relevant. To prevail in this suit, Ms. Ngatuvai must prove that she has suffered damages stemming from the alleged sexual assault. As has been addressed, Ms. Ngatuvai alleges that she suffers from PTSD and Major Depressive Disorder and that K.N. suffers from PTSD. The typical layperson lacks the expertise required to estimate the cost of treating these disorders. Thus, Ms. Wainwright-Dobson's life care plans will assist the jury in better understanding the costs associated with the damages alleged by Ms. Ngatuvai in this case. Her testimony is therefore relevant.

C.      Reliability of Ms. Wainwright-Dobson's Testimony

Lifetime argues next that most of Ms. Wainwright-Dobson's testimony is unreliable. Lifetime moves to have her testimony excluded because her report allegedly lacks any basis in Dr. Wilkerson's report. Lifetime argues first that Dr. Wilkerson's belated approval of Ms. Wainwright-Dobson's life care plans was improper. Lifetime further argues that Ms. Wainwright-Dobson's life care plans, which rely on Dr. Wilkerson's original report, include estimated costs for treatments that Dr. Wilkerson's report does not contemplate. Thus, Lifetime argues that her life care plans are baseless and unreliable.

The court concludes that Dr. Wilkerson's belated "approval" of Ms. Wainwright-Dobson's report was untimely. The court further concludes that, with the exception of the portions of the life care plans to which Lifetime does not object, Ms. Wainwright-Dobson's report improperly

---

[10] Lifetime notes that Ms. Wainwright-Dobson's report, if admissible, is only admissible to the extent that Dr. Wilkerson's report is admissible. The court has already examined Dr. Wilkerson's report and concluded that it is not, at this point in the litigation, subject to exclusion.

expands beyond the scope of the treatment recommendations provided for in Dr. Wilkerson's original report.

        1)  Dr. Wilkerson's Delayed Approval of Ms. Wainwright-Dobson's Report

After the deadline for expert reports had passed, Ms. Wainwright-Dobson submitted to Lifetime an updated report. The only difference between her original report and the updated report was, according to Lifetime, one line noting that Dr. Wilkerson had reviewed the life care plans and approved them. As the court has already addressed at length, Ms. Ngatuvai has provided no justification for these belated disclosures. The court will therefore consider Ms. Wainwright-Dobson's report in its original form, without the belated "approval" of Dr. Wilkerson. The court's analysis thus centers on the original report submitted by Ms. Wainwright-Dobson and its reliance on Dr. Wilkerson's expert report.

        2)      Life Care Plan Prepared for K.N.

The majority of Ms. Wainwright-Dobson's life care plan for K.N. is unreliable as it expands the scope of what Dr. Wilkerson recommends. In preparing the report, Ms. Wainwright-Dobson met with K.N. for about fifteen minutes, interviewed Ms. Ngatuvai for approximately one hour, reviewed articles on PTSD and treatment of child sexual abuse victims, reviewed Pamela Mitchell's therapy records with K.N. dated between September 11, 2014 and April 23, 2015 reviewed the depositions of Corona Ngatuvai and Ms. Ngatuvai, reviewed the reports of Dr. Burgess and Dr. Wilkerson, and researched the cost of future medications and treatments. In preparing K.N.'s life care plan, Ms. Wainwright-Dobson argues that she relied on the treatment recommendations contained in Dr. Wilkerson's report.

Lifetime argues that Ms. Wainwright-Dobson's report should be excluded because Ms. Wainwright-Dobson did not rely on Dr. Wilkerson's recommendations in estimating K.N.'s treatment costs. It argues that Ms. Wainwright-Dobson's life care plan for K.N. includes treatments

that do not have a sufficient basis in Dr. Wilkerson's report. The court addresses Ms. Wainwright-Dobson's conclusions in turn.

### a)   Estimated Costs of Specific Therapies

Ms. Wainwright-Dobson's estimates of the costs associated with Individual Trauma Focused Behavioral Therapy ("TF-CBT") and Eye Movement Desensitization and Reprocessing Therapy ("EMDR") are indisputably proper. Lifetime does not contest the appropriateness of these conclusions, as they are specifically recommended in Dr. Wilkerson's report. The inclusion of these treatments is thus appropriate.

### b)   Estimated Cost of Weekly Visits with a Psychologist

Ms. Wainwright-Dobson's estimation of the costs associated with weekly visits with a psychologist for the rest of K.N.'s life lacks basis in Dr. Wilkerson's report. Dr. Wilkerson's report notes that K.N. "would benefit from ongoing weekly mental health therapy and support to address any residual anxiety symptoms." Dr. Wilkerson's report also notes that K.N. is likely to experience resurfacing of some of the symptoms of PTSD throughout her life and states that the therapies she recommends "will reduce the likelihood of chronic impairment and will assist in [K.N.'s] development of coping skills to address symptoms as they arise."

Ms. Wainwright-Dobson's life care plan assumes that these recommendations require weekly therapy for the entirety of K.N.'s lifetime. This recommendation goes beyond the scope of Dr. Wilkerson's report, which makes no mention of an entire lifetime of weekly treatment. This recommendation therefore lacks a proper basis in Dr. Wilkerson's report and is inadmissible.

### c)   Estimated Cost of Twice-Yearly Visits with Psychiatrist

Ms. Wainwright-Dobson's estimation of the costs associated with a lifetime of twice-yearly visits with a psychiatrist also lacks a basis in Dr. Wilkerson's report. Dr. Wilkerson's report

recommends consultation with a pediatric psychiatrist and notes that ongoing treatment and follow up visits are likely to be needed. Additionally, Dr. Wilkerson's report notes that K.N. will likely experience resurfacing of symptoms.

Dr. Wilkerson's report does not, however, make mention of an entire lifetime of twice-yearly visits with a psychiatrist. Like Ms. Wainwright-Dobson's estimate of the cost of a lifetime of weekly psychological therapy, her estimate of the cost of a lifetime of twice-yearly visits with a psychiatrist expands the scope of what Dr. Wilkerson's report expressly contemplates. Her estimate is therefore unreliable and inadmissible.

### d)   Estimated of Cost of Medication

Finally, Ms. Wainwright-Dobson's estimates of the costs associated with specific medications lack basis in Dr. Wilkerson's report. Dr. Wilkerson's report recommends consultation with a pediatric psychiatrist, notes that pharmacological intervention may be advisable, and advises that ongoing treatment will be likely in this area.

Dr. Wilkerson's report makes no mention of specific medication for K.N. Instead, it broadly references pharmacological intervention. Ms. Wainwright-Dobson's estimates of the costs associated with specific medications required her to speculate as to what pharmacological intervention might be prescribed for K.N. Thus, her cost estimates with respect to sertraline, paroxetine ER, or fluoxetine to treat PTSD and depression for Alprazolam (Xanax) lack foundation and are therefore inadmissible.

### 3)   Life Care Plan Prepared for Ms. Ngatuvai

The majority of Ms. Wainwright-Dobson's life care plan for Ms. Ngatuvai similarly lacks foundation. In preparing her report, Ms. Wainwright-Dobson interviewed Ms. Ngatuvai for approximately one hour, reviewed an article on the treatment of parents of child victims, reviewed the records of Ms. Ngatuvai's primary care doctor, reviewed the depositions of Corona Ngatuvai,

Ms. Ngatuvai, Tammy Ishimatsu, and Pamela Mitchell,   reviewed the independent neuropsychological evaluation of Ms. Ngatuvai conducted by Dr. Kevin Duff, reviewed the reports of Dr. Burgess and Dr. Wilkerson, and researched the cost of future medications and treatments. In preparing Ms. Ngatuvai's life care plan, Ms. Wainwright-Dobson asserts that she relied on the treatment recommendations contained in Dr. Wilkerson's report.

Lifetime argues that Ms. Wainwright-Dobson's report should be excluded because the treatments discussed in Ms. Wainwright-Dobson's report lack basis in Dr. Wilkerson's report. Having reviewed both Dr. Wilkerson's report and Ms. Wainwright-Dobson's life care plan for Ms. Ngatuvai, the court concludes that, with the exception of one conclusion to which Lifetime does not object, the life care plan lacks sufficient basis in Dr. Wilkerson's report. Her life care plan for Ms. Ngatuvai, for the most part, lacks foundation and is therefore inadmissible.

a)  Estimated Cost of Specific Therapies

Ms. Wainwright-Dobson's estimates of the costs associated with Cognitive Behavioral Therapy ("CBT") and EMDR are indisputably proper. Lifetime does not contest the appropriateness of these estimates, as they are specifically addressed in Dr. Wilkerson's report. The inclusion of these treatments in Ms. Wainwright-Dobson's report is thus appropriate.

b)  Estimated Cost of Visits with Psychologist

Ms. Wainwright-Dobson's estimate of the costs associated with an average of two and a half visits to a psychologist per month for the duration of Ms. Ngatuvai's life lacks a factual basis. While Dr. Wilkerson's report notes that "[Ms. Ngatuvai] is likely to require ongoing therapy for the foreseeable future," it makes no mention of such regular therapy sessions for Ms. Ngatuvai's entire lifetime. The report merely recommends "ongoing" therapy for the "foreseeable future."

Ms. Wainwright-Dobson's estimate of the cost of between one and four visits with a psychologist for the duration of Ms. Ngatuvai's life therefore expands the scope of Dr. Wilkerson's report. Because this estimate lacks a sufficient basis, it is unreliable.

c)  Estimated Cost of Twice-Yearly Visits with Psychiatrist

Ms. Wainwright-Dobson's estimate of the costs associated with a lifetime of twice-yearly visits with a psychiatrist is similarly unreliable. Dr. Wilkerson's report recommends consultation with a psychiatrist and notes that ongoing treatment and follow up visits are likely to be needed. As is the case with respect to the ongoing visits with a psychologist, Dr. Wilkerson's report does not suggest that Ms. Ngatuvai will need to visit with a psychiatrist twice a year for the remainder of her life. This estimate lacks a sufficient factual basis in Dr. Wilkerson's report and is therefore inadmissible.

d)  Estimated Cost of Medication

Ms. Wainwright's estimate of the cost of pharmacological treatment similarly lacks a foundation. Dr. Wilkerson's report states that "[p]harmacologic intervention through medication may be useful in reduction of symptoms of depression. Common antidepressant medications include Selective Seratonin [sic] Reuptake Inhibitors such as Prozac or Zoloft." Ms. Wainwright-Dobson estimates the annual costs associated with a prescription for Sertraline, Paroxetine ER, or Fluoxetine to treat PTSD and depression. In making that estimate, however, Ms. Wainwright-Dobson assumes that this prescription will be necessary for the entirety of Ms. Ngatuvai's life.

While Sertraline, Paroxetine ER, and Fluoxetine are all Selective Serotonin Reuptake Inhibitors, the length of the recommended treatment is not specified in Dr. Wilkerson's report. Ms. Wainwright-Dobson's estimate of the costs associated with a lifetime prescription of any of these medications therefore lacks a factual basis.

D.     Opportunity for Ms. Wainwright-Dobson and Dr. Wilkerson to Supplement Their Reports Regarding the Life Care Plans

Having reviewed Ms. Wainwright-Dobson's life care plans, the court has concluded that they lack sufficient basis in Dr. Wilkerson's report. Dr. Wilkerson has, however, belatedly disclosed that she approves of Ms. Wainwright-Dobson's life care plans. The court hereby orders that Ms. Wainwright-Dobson and Dr. Wilkerson have thirty days to supplement their reports, explaining the discrepancies between Ms. Wainwright-Dobson's life care plans and Dr. Wilkerson's report.

Federal Rule of Civil Procedure 37(c)(1) provides that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). No substantial justification has been provided for this belated disclosure. The court concludes, however, that this belated disclosure will be harmless to Lifetime.

In the Tenth Circuit, courts must consider the *Woodworker's* factors to determine whether a belated disclosure is harmless to the non-disclosing party. *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999). This inquiry requires the court to determine "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Id.*

First, the court acknowledges that these delayed disclosures, without mitigating measures, could prejudice Lifetime. Lifetime notes, for example, that it has not had the opportunity to depose Dr. Wilkerson about Ms. Wainwright-Dobson's life care plans. This factor thus does not favor admission of the belatedly disclosed opinions.

The second factor, however, cuts in favor of their admission, as any possible prejudice to Lifetime can be cured. The belated disclosure did not come on the eve of trial. To the contrary, no trial date has been set and, due to the disruption to court operations caused by the novel coronavirus, it is unlikely that the court would be able to set a trial date for a number of months, if not longer. Thus, the court can cure any possible prejudice by allowing Lifetime to depose both Dr. Wilkerson and Ms. Wainwright-Dobson about their supplemental disclosures. In addition, the court grants Lifetime leave to rebut Dr. Wilkerson's and Ms. Wainwright-Dobson's delayed disclosures, if it so chooses.

Third, this belated testimony will not disrupt the trial. As the court has noted, no trial date has been set and, due to the coronavirus pandemic, it is unlikely that a trial date will be set for a number of months. Fourth, there is no indication that these supplemental disclosures were made in bad faith. The court therefore concludes that allowing these supplemental disclosures will be harmless to Lifetime

FRCP 37 provides that the court may, on motion and after giving an opportunity to be heard, order payment of the reasonable expenses, including attorney's fees, caused by delayed disclosures. FED. R. CIV. P. 37(c)(1)(A). The court has ordered that Lifetime may again depose Dr. Wilkerson and Ms. Wainwright-Dobson and may also obtain supplemental expert reports to rebut the belated disclosures.

To ensure that Lifetime does not bear the cost associated with these depositions and supplemental reports, the court orders that Ms. Ngatuvai must pay the reasonable attorney's fees and costs incurred by Lifetime in connection therewith. At the close of the additional discovery allowed in this order, Lifetime shall file a motion for reasonable costs and attorney's fees for the court's consideration and Ms. Ngatuvai shall have the opportunity to respond.

E.      Factual Allegations Presented as Expert Testimony

Finally, Lifetime argues that Ms. Wainwright-Dobson should be precluded from testifying about disputed facts in a manner that suggests the truth of those facts, or from "cloaking" disputed facts as her own expert opinion.[11] This court has addressed this issue repeatedly in this motion and concludes that this request is premature.

Federal Rule of Evidence 703 recognizes that an expert may base her opinion on facts that she has been made aware of even if those facts would not be admissible, so long as an expert in the field would reasonably rely on those kinds of facts. FED. R. EVID. 703. Rule 703 also provides that otherwise inadmissible facts or data on which an expert relies may be disclosed to the jury if the inadmissible facts' "probative value in helping the jury evaluate the [expert's] opinion substantially outweighs their prejudicial effect." *Id.*

While the statements upon which Ms. Wainwright-Dobson relies are hearsay, as Ms. Wainwright-Dobson has no personal knowledge about the truth of the observations at issue, her reliance on those statements is reasonable.

Whether the statements upon which Ms. Wainwright-Dobson relies can be disclosed to the jury, however, is contingent on the probative value and prejudicial effect of the statements. At this stage of the litigation, without any familiarity with the context in which Ms. Wainwright-Dobson might seek to testify about the alleged facts at issue, the court cannot determine whether her statements will be admissible. This dispute is better left for a later time.

---

[11] Lifetime provides a non-exhaustive list of the types of statements that it moves this court to exclude. For example, it points to Ms. Wainwright-Dobson's statement that "symptoms [of PTSD started] immediately after the incident, and they have continued to this date."

V.        **Motion to Exclude the Testimony of Dr. Polly Westcott**

Lifetime moves this court to exclude the testimony of Dr. Polly Westcott under Rules 104, 403, and 702. [Docket 141]. First, Lifetime argues that Dr. Westcott's diagnosis of Ms. Ngatuvai with PTSD must be excluded because the methodology Dr. Westcott employed is unreliable. Additionally, Lifetime moves this court to exclude Dr. Westcott from testifying about Ms. Tammy Ishimatsu's qualifications as a counselor, the impact that this litigation has had on Ms. Ngatuvai, and the impact that Lifetime's immediate response to the alleged sexual assault had on Ms. Ngatuvai. The court grants Lifetime's motion in part and denies it in part.

A.  Admissibility of Dr. Westcott's PTSD Diagnosis

Dr. Westcott intends to testify about her diagnosis of Ms. Ngatuvai with PTSD. Dr. Westcott is qualified to testify about the diagnosis and her testimony is relevant and reliable. Thus, Dr. Westcott's testimony about Ms. Ngatuvai's PTSD diagnosis is admissible.

1)  Dr. Westcott's Qualifications to Testify About PTSD Diagnosis

Dr. Westcott is qualified to testify about her diagnosis of Ms. Ngatuvai. Dr. Westcott has a bachelor's degree in psychology, a master's degree in counseling psychology, a second master's degree in clinical psychology, and a doctorate degree in psychology. In addition, she completed a two-year post-doctoral fellowship in neuropsychology. In her active clinical practice as a psychologist, Dr. Westcott regularly diagnoses and treats patients with PTSD and trauma-related issues. In her deposition, Dr. Westcott represented that approximately thirty-five to forty percent of her work involves treatment of PTSD and approximately twenty percent involves treatment or evaluation of victims of either some type of sexual crime or alleged sexual abuse. Dr. Westcott has the training and experience necessary to make a PTSD diagnosis and similarly is qualified to testify on such a diagnosis.

2)  Relevance of Dr. Westcott's Testimony About PTSD Diagnosis

Dr. Westcott's testimony about Ms. Ngatuvai's PTSD diagnosis is relevant to this dispute. In order to prevail, Ms. Ngatuvai must prove damages stemming from Lifetime's alleged negligence. To prove damages, Ms. Ngatuvai argues that she has developed PTSD due to the alleged sexual assault of her daughter. The jury is unlikely to have the expertise necessary to determine whether Ms. Ngatuvai suffers from PTSD without the help of an expert. Dr. Westcott's expert testimony will therefore assist the trier of fact in determining whether Ms. Ngatuvai has suffered damages. Lifetime does not dispute the relevance of Dr. Westcott's testimony.

3)  Reliability of Testimony About PTSD Diagnosis

Dr. Westcott's testimony about Ms. Ngatuvai's PTSD diagnosis is reliable. In diagnosing Ms. Ngatuvai with PTSD, Dr. Westcott reviewed, among other documents, Ms. Ngatuvai's personal journal entries, records from Ms. Ngatuvai's counseling sessions at the Utah Office for Victim of Crimes, and the written depositions of Pamela Mitchell, Tammy Ishimatsu, Corona Ngatuvai, and Ms. Ngatuvai. She also examined Ms. Ngatuvai through an "extensive clinical interview," during which Dr. Westcott administered three tests, the Millon Clinical Multiaxial Inventory-IV ("MCMI-IV"), the Civilian Mississippi Scale, and the PCL-5, a checklist used to diagnose PTSD based upon the DSM-5 criteria. Dr. Westcott also interviewed Ms. Ngatuvai's sister and sister-in-law via telephone. Based upon this analysis, Dr. Westcott concluded that Ms. Ngatuvai met the DSM-5 criteria for PTSD and diagnosed her with PTSD. Lifetime challenges this methodology, arguing that the tests employed by Dr. Westcott are unreliable.

As this court has noted, the use of the DSM criteria to diagnose PTSD is widely accepted both within the field of psychology and by courts engaging in the *Daubert* gatekeeping role. *See Braxton,* 2015 WL 630297, at *3 ("These two factors, the use of established diagnostic criteria [such as the DSM criteria] in a manner not specific to the litigation context, are sufficient to

41

establish the reliability of [the expert's] testimony."); *Jones*, 2011 WL 1841148, *3 ("Courts have refused to exclude the expert opinion of mental health professionals whose diagnoses of PTSD and other mental disorders are based upon the criteria outlined in the DSM–IV (and prior editions).")." Dr. Westcott's use of the DSM-5 criteria was therefore appropriate.

Similarly, Dr. Westcott utilized a reliable methodology in concluding that the DSM-5 criteria were met. Lifetime contends that Dr. Westcott should have used tests other than the MCMI-IV, Civilian Mississippi Scale, and PCL-5 tool in diagnosing Ms. Ngatuvai. Lifetime argues that the MCMI-IV tool is imperfect because it allows patients to lie about symptoms, creating a "malingering" issue. Lifetime further notes that the PCL-5 checklist is intended as a provisionary diagnostic tool, and that Dr. Westcott should instead have used the CAPS-5 structured interview, which Lifetime argues is the "gold standard" in PTSD diagnoses. Finally, Lifetime argues that the Civilian Mississippi Scale should not be relied upon because Dr. Westcott acknowledges that it is not the single most reliable test.

Dr. Westcott defends her methodology, representing that her diagnosis of Ms. Ngatuvai based upon an examination of Ms. Ngatuvai in a clinical setting, review of Ms. Ngatuvai's medical records, the results of the aforementioned tests, and the DSM-5 criteria is proper within her field of practice. She further notes that the methods she used were the same ones she employs outside of the litigation context, in clinical assessments and referrals to aid practitioners in diagnosis and treatment.[12] In addition, in response to Lifetime's motion, Dr. Westcott presents the court with

---

[12] In her deposition, Dr. Westcott does identify some differences in her clinical practice versus her litigation practice. But those differences do not suggest that her methodology in a litigation setting is less robust than in a clinical setting. For example, she notes that her forensic interview process is lengthier than her clinical interview process, that it sometimes includes more testing, and that the report process tends to be lengthier and more detailed.

extensive literature supporting her contention that the tests upon which she relied in diagnosing Ms. Ngatuvai are reliable.

Dr. Westcott's methodology is reliable. Lifetime's argument essentially rests on its claim that Dr. Westcott did not use "the best" methodology in reaching her conclusion. It argues that there are problems with the tests she employed and that her methodology thus cannot be relied upon. The court is unconvinced.

The court's role is not to insist that an expert makes use of the absolute best methodologies, or even that the expert's conclusion is indisputably correct. *Dodge*, 328 F.3d at 1222 ("The plaintiff need not prove that the expert is undisputably correct or that the expert's theory is generally accepted in the scientific community." (citation omitted)). Rather, the court must ensure that the expert, "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Goebel*, 346 F.3d at 992 (quoting *Kumho Tire*, 526 U.S. at 152). Dr. Westcott's methodology meets this standard.

Lifetime's argument regarding Dr. Westcott's method of diagnosing Ms. Ngatuvai goes to the weight of her testimony, not to its admissibility. If Lifetime believes that Dr. Westcott should have employed different tests in making her diagnosis, Lifetime is free to question Dr. Westcott about her methodology on cross-examination.

4)      Lack of Evidence of Sexual Violence

Lifetime also argues that Dr. Westcott cannot have properly diagnosed Ms. Ngatuvai with PTSD because Ms. Ngatuvai does not meet the DSM-5 criteria for PTSD. In particular, Lifetime notes that the DSM-5 for PTSD requires the individual be exposed, directly or indirectly, to "death, threatened death, actual or threatened serious injury, or actual or threatened sexual violence." Lifetime contends that no such event occurred in this case and that the PTSD diagnosis is thus

unreliable. The court has already addressed this issue with respect to Dr. Wilkerson and reiterates its position here. This argument is one for cross-examination and it does not warrant excluding Dr. Westcott's testimony.

Dr. Westcott, in employing the previously discussed, reliable methodology, concluded that Ms. Ngatuvai met the DSM-5 criteria for PTSD. Thus, in her medical opinion, the alleged sexual assault was evidently sufficient to trigger PTSD. Lifetime challenges this conclusion, arguing that the event does not constitute sexual assault or violence.

This dispute falls within "the range where experts might reasonably differ, and where the jury must decide among the conflicting views of different experts." *Kumho Tire*, 526 U.S. at 153. Psychologists reasonably differ in their application of the DSM criteria when diagnosing PTSD. Dr. Westcott concluded that the event alleged in this case fulfills the "sexual violence" criteria. If Lifetime believes that this conclusion is incorrect, it is free to cross-examine Dr. Westcott on this exact issue. The court declines to exclude Dr. Westcott's testimony solely because Lifetime believes that she reached an improper conclusion. *See Taber*, 642 F. App'x at 808 ("[The reliability inquiry] requires the district court to focus on the methodology employed by the expert rather than the precise conclusions reached.") (citing *Daubert*, 509. U.S. at 595). It will be the role of the jury to decide whether Dr. Westcott's conclusion is correct.

B.      Admissibility of Dr. Westcott's Testimony About Ms. Ishimatsu

Lifetime next moves this court to exclude Dr. Westcott's testimony about Tammy Ishimatsu's qualifications. Ms. Ngatuvai represents that this testimony is only intended as rebuttal testimony in the event that Lifetime seeks to impeach Dr. Westcott's testimony with evidence that Ms. Ishimatsu did not diagnose Ms. Ngatuvai with PTSD. The court makes no determination about the appropriateness of this testimony on rebuttal. However, at this juncture, the court holds that

this testimony is inadmissible so long as Lifetime has not used Ms. Ishimatsu's expert testimony to challenge Dr. Westcott's expert testimony.

Dr. Westcott notes in her report that Ms. Ishimatsu is certified "by degree which means she holds a master's level degree in social work which does not have specific specialized training in clinical diagnostics," and that Ms. Ishimatsu "does not hold necessary training or experience to diagnose clinical disorders or trauma or secondary trauma victims." In her deposition, Dr. Westcott also states that individuals trained as social workers, such as Ms. Ishimatsu, "are not trained in their degree program with specifics of clinical diagnostics, and when they provide a diagnosis, it has to be under the supervision of someone who has a doctorate."

First, Dr. Westcott's testimony about Ms. Ishimatsu's qualifications to testify in federal court is outside of the scope of her expertise. Ms. Ngatuvai argues that Dr. Westcott has more experience than Ms. Ishimatsu, that Ms. Ishimatsu will admit at trial that she lacks experience, and that Ms. Ishimatsu is not qualified to testify about a diagnosis of PTSD. None of these arguments suggest that Dr. Westcott is an expert on the admissibility of expert witness testimony in federal court.

Second, to the extent that Dr. Westcott intends only to comment on Ms. Ishimatu's professional qualifications, her testimony is irrelevant. Simply stating that Ms. Ishimatsu has certain qualifications and noting that those qualifications are arguably inferior to hers will not help the trier of fact understand the evidence or determine a fact in issue. The jury need not hear from an expert in order to understand Ms. Ishimatsu's qualifications. If Ms. Ngatuvai seeks to call Ms. Ishimatsu's qualifications into question, she is free to do so on cross-examination.

Dr. Westcott is either unqualified to testify about Ms. Ishimatsu's qualifications or, until Lifetime "opens the door" on this issue, her testimony is irrelevant. Thus, Dr. Westcott's testimony as to Ms. Ishimatsu's qualifications is inadmissible under Rule 702.[13]

C.    Admissibility of Dr. Westcott's Testimony About the Impact of Lifetime's Conduct on Ms. Ngatuvai

Finally, Lifetime argues that Dr. Westcott should be precluded from testifying about the impact that this litigation has had on Ms. Ngatuvai, as well as the impact that Lifetime's response to the alleged sexual assault had on Ms. Ngatuvai. The court reiterates its earlier position regarding Rule 703 and expert testimony. This dispute is impossible to resolve without further context. It is therefore premature.

Dr. Westcott does not have personal knowledge of the impact that this dispute has had on Ms. Ngatuvai. She also does not have personal knowledge of the impact that Lifetime's conduct immediately after the alleged sexual assault had on Ms. Ngatuvai. Dr. Westcott's testimony about Ms. Ngatuvai's reactions is hearsay because Dr. Westcott would be testifying only about what Ms. Ngatuvai has told her.

While these statements may be hearsay, Dr. Westcott's status as an expert witness makes it impossible for the court to categorically exclude these statements from Dr. Westcott's testimony at this stage of the litigation. Pursuant to Rule 703, Dr. Westcott is entitled to base her opinions on facts that she has been made aware of, even if those facts would not be admissible, so long as an expert in the field would reasonably rely on those kinds of facts. FED. R. EVID. 703. Further, Rule 703 provides that otherwise inadmissible facts or data upon which an expert relies may be

---

[13] As the court has noted, it makes no determination regarding the appropriateness of this testimony in the event that Lifetime uses Ms. Ishimatsu's conclusions to challenge Dr. Westcott's opinions.

disclosed to the jury if the facts' "probative value in helping the jury evaluate the [expert's] opinion substantially outweighs their prejudicial effect." *Id.*

Ms. Ngatuvai's statements about her mental and emotional well-being fall within the category of facts upon which a psychologist would reasonably rely. Thus, it is appropriate for Dr. Westcott to base her opinions on those statements. The appropriateness of disclosing these alleged facts to the jury, however, is a separate matter that the court is unable to decide at this juncture. At such an early stage of the litigation, and without any familiarity with the context in which these statements might be raised, the court cannot determine whether the probative value of these statements substantially outweighs their prejudicial effect. A discussion of how Dr. Westcott may testify about the alleged facts underlying her opinions is therefore more properly addressed at a later time.

## CONCLUSION AND ORDER

For the foregoing reasons, the court hereby ORDERS that:

1. Lifetime's Motion in Limine to Exclude the Testimony of Dr. Tristyn Wilkerson, [Docket 138], is DENIED.

2. Lifetime's Motion in Limine to Exclude the Testimony of Dr. Ann Burgess, [Docket 139], is GRANTED IN PART and DENIED IN PART.

3. Lifetime's Motion in Limine to Exclude the Testimony of Ms. Sheryl Wainwright-Dobson, [Docket 140], is GRANTED IN PART and DENIED IN PART.

4. Lifetime's Motion in Limine to Exclude the Testimony of Dr. Polly Westcott, [Docket 141], is GRANTED IN PART and DENIED IN PART.

5. Lifetime's Motion to Strike the Declarations of Drs. Tristyn Wilkerson, Ann Burgess, and Polly Westcott, [Docket 166], is GRANTED IN PART and DENIED IN PART.

6. Plaintiff, at her option, shall have thirty (30) days to supplement the expert reports of Ms. Wainwright-Dobson and/or Dr. Wilkerson. Lifetime shall have the opportunity to depose both Ms. Wainwright-Dobson and Dr. Wilkerson about any supplemental disclosures and may also, at its option, submit rebuttal expert reports. Plaintiff shall bear all reasonable costs and attorney's fees incurred in connection therewith. The parties shall meet and confer in order to agree upon a schedule.

Signed September 10, 2020

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge